UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHAUNTE OTT,

　　　　　Plaintiff,

　　v.　　　　　　　　　　　　　　　　　　　Case No. 09-C-0870

CITY OF MILWAUKEE, ARTHUR L. JONES,
NANETTE H. HEGERTY, CARL BUSCHMANN,
JAMES DEVALKENAERE, ROBERT SIMON,
ERIC MOORE, RICKY BUREMS,
PERCY MOORE, MICHAEL DUBIS,
and OTHER AS-OF-YET
UNKNOWN EMPLOYEES OF THE CITY OF
MILWAUKEE,

　　　　　Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S CIVIL
## LOCAL RULE CIVIL L.R. 56(b)(2)(B)(ii)
## STATEMENT OF ADDITIONAL FINDINGS OF FACT

The defendants, by their attorneys, Grant F. Langley, City Attorney, by Assistant City

Attorney Jan A. Smokowicz, submit the following responses to Plaintiff's Civil Local Rule Civil

L.R. 56(b)(2)(B)(ii) Statement of Additional Findings of Fact:

### Jessica Payne Homicide

1.　　On the morning of August 30, 1995, the dead body of Jessica Payne was found on a mattress behind a vacant home located at 3116 North 7th Street in Milwaukee. Declaration of Heather Lewis Donnell In Support of Plaintiff's Civil L.R. 56(b)(2)(B)(ii) Statement of Additional Facts ("Donnell Declaration"), Exhibit 1 (Nov. 14, 1995, Preliminary Hearing Transcript) at 4:25-5:15.

Response:　　Object as a duplication of Defendants' Proposed Finding of Fact

("PFOF") No. 1. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

2. The medical examiner's report and autopsy clearly indicate that Ms. Payne was sexually assaulted because her body was found partially nude, bruising on various regions of her body, her bra was torn in the center exposing her breast, her t-shirt was pulled up to near her breast level, her pants were pulled down to her knee level, and the high concentration of seminal material found in the vaginal area. Donnell Declaration, Exhibit 2 (Declaration of Dennis Waller ("Waller Declaration")) at pg. 28. *See also id.* at Exhibit 3 (Deposition of Arthur Jones ("Jones Dep.")) at 48:12-49:2; 50:20-51:17 (signs of homicide where there has also been a sexual assault include female victim found disrobed or partially disrobed, the location where the body is found and the presence of semen.)

Response: Object as a legal conclusion rather than a statement of fact; further object as irrelevant as neither Chaunte Ott nor any other individual was ever charged with the sexual assault of Ms. Payne.

3. As a result, the medical examiner ordered a complete sexual assault examination of the specimens. The vaginal swabs obtained from Ms. Payne contained semen. Donnell Declaration, Donnell Declaration, Exhibit 2 (Waller Declaration) at pg. 28; Exhibit 4 (Affidavit of Deanna D. Lankford ("Lankford Affidavit") at ¶15.

Response: Object as irrelevant to the extent that the reasons for obtaining the sample do not bear upon any issue to be decided in the pending motion; object to the remainder of the proposed finding as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 68. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

4. Mr. Ott had nothing to do with the homicide of Ms. Payne. Donnell Declaration, Exhibit 5 (Deposition of Chaunte Ott ("Ott Dep.")) at 28:2-3; 89:9-20; 132:4-133:3; *Id.* at Exhibit 4 (Lankford Affidavit) at ¶17 ("Chaunte Ott is clearly excluded from the biological evidence in the case of Jessica Payne."); *Id.* at Exhibit 6 (Deposition of John Pray ("Pray Dep.")) at 56:24-56:27.

Response: Object as irrelevant as Ott's claimed actual innocence is irrelevant to the determination of the due process claims that are the subject of the pending motion; further object as an opinion rather than a factual statement.

5. The DNA evidence "confirm[s] that [Walter] Ellis is the true perpetrator" of Payne's homicide and confirms "that Chaunte Ott did not commit this offense." Donnell Declaration, Exhibit 4 (Lankford Affidavit) at ¶17.

Response: Object as irrelevant as Ott's claimed actual innocence is irrelevant to the determination of the due process claims that are the subject of the pending motion; further object as a conclusory or legal opinion rather than a factual statement.

6. On the night of August 27, 2995, Mr. Ott worked at the White Manor Liquor Store and then his manager dropped him off at Kelly Parker's home, where he was staying at that time so that he could babysit her children the following morning. Donnell Declaration, Exhibit 5 (Ott Dep.) at 174:23-175:20.

Response: Object as irrelevant as Ott's claimed actual innocence is irrelevant to the determination of the due process claims that are the subject of the pending motion.

**The Initial Police Investigation Of The Payne Homicide**

7. The police arrested and interviewed Latonia Cooper as a possible witness in the Payne homicide. Donnell Declaration, Exhibit 11 (Deposition of James DeValkenaee on June 22, 2010 ("DeValkenaere II Dep.")) at 88:4-22; *Id*. at Exhibit 8 (DeValkenaere Dep. Ex. 17 – October 10, 1995 Supplementary Police Report by Det. DeValkenaere): *Id.* at Exhibit 9 (August 31, 2995 Supplementary Police Report by Detectives Schuler & Young).

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 108-118. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

8. During one of her interviews with the detectives, they showed Ms. Cooper a photograph of the man she now knows to be Walter Ellis and although she did not know him by name, Cooper identified the man in the photograph (Ellis) as having something to do with Payne's murder. Donnell Declaration, Exhibit 10 (Deposition of Latonia Cooper ("Cooper Dep.")) at 8:2-19.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 109-113. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

9. Ms. Cooper told the detectives that she saw Ms. Payne around Walter Ellis just before she left Payne with Sandra Giles at Mr. Brooks' home. Cooper told the detectives that

she believed Sandra Giles and Walter Ellis had something to do with Payne's Murder. Donnell Declaration, Exhibit 10 (Cooper Dep.) at 14:11-21; 24:8-17.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 111, 113. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

10. Ms. Cooper also told the detectives that Ellis liked to be around women who smoked crack cocaine and that he liked to be around them because they were too high to defend themselves. Donnell Declaration, Exhibit 10 (Cooper Dep.) at 9:8-10:7.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 110. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

11. Ms. Cooper knew Sandra Giles as a "madam" or a woman who tried to prostitute girls, and she was trying to prostitute Payne and Morrison to pay for their stay at Brooks' home. Donnell Declaration, Exhibit 10 (Cooper Dep.) at 11:1-17; 56-57; *See also* Defendants Statement of Fact No. 23.

Response: Object as a duplication of the pertinent facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 23. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

12. If Detective DeValkenaere took notes during his interview of Ms. Cooper on October 10, 1995, he would have taken notes in a steno pad and then destroyed his notes, Donnell Declaration, Exhibit 11 (Deposition of James DeValkenaere on April 12, 2012 ("DeValkenaere II Dep.")) at 89:9-90:2.

Response: Object as irrelevant as there is no evidence that the notes contain any entries relevant to plaintiff's due process claims.

13. The information Ms. Cooper provided to the Detectives, including Detective DeValkenaere, concerning Walter Ellis' possible involvement in the Payne murder was not reflected in any police reports in the Milwaukee Police Department's homicide file. Donnell Declaration, Exhibit 2 (Waller Declaration at p. 30, ¶4(d).

4

Response: Object as unsubstantiated by admissible evidence; there is no evidence that Ms. Cooper made any statements about Ellis in DeValkenaere's presence. See Defendants' Proposed Finding of Fact ("PFOF") No. 108, 109, and 118.

14. According to the Milwaukee Police Department's official written policy, the detectives who interviewed Ms. Cooper should have recorded the information she provided in their Memo Books and retained them, even if the notes were taken on a steno pad, detective's interview notes were to be retained. Donnell Declaration, Exhibit 2 (Waller Declaration) at p. 20, ¶2(g); *Id.* at Exhibit 12 (Rule 30(b)(6) Deposition of Diana Rowe ("Rowe Dep.")) at 38:18-39:23; 43:7-43:19; 53:14-21.

Response: Object as irrelevant as there is no evidence that the notes contain any entries relevant to plaintiff's due process claims.

**The Payne Investigation Goes Cold**

15. After collecting the physical evidence and interviewing the initial witnesses, the Payne homicide went cold until it was assigned to Detectives DeValkenaere and Buschmann as a cold case for which they were considered the primary detectives with the primary responsibility investigating the case. Donnell Declaration, Exhibit 7 (DeValkenaere Dep. I) at 40:6-9; *Id.* at Exhibit 13 (Deposition of Carl Buschmann on June 30, 2010 ("Buschmann I Dep.") at 34:22-35:12 (assigned Payne as a cold case); *Id.* at 40:6-9 (DeValkenaere and Buschmann "primary" detectives on Payne homicide); *Id.* at 42:1-5 (once assigned Payne as a cold case, they had "primary responsibility for investigating the Payne homicide).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that either defendant detective obtained any exculpatory information withheld from Ott; further object as a duplication of those pertinent facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 102-103. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional facts.*") (emphasis supplied)**.**

16. As lead detectives assigned to the Payne homicide investigation, it was incumbent on Detectives DeValkenaere and Buschmann to stay abreast of all fact developments in the investigation, meetings, and reports. Donnell Declaration, Exhibit XX (Waller Declaration) at 32.

5

Response: Object as unsubstantiated by admissible evidence as there is no evidence that in the Milwaukee Police Department there are "lead detectives" in any homicide investigation, and no evidence of the responsibilities of any such fictitious individuals.

17. The only lead Detectives DeValkenaere and Buschmann had at the time they were assigned the case was Richard "Cortez" Gwin because Ientha Waller, a jailhouse informant, told Detective DeValkenaere that someone named "Cortez" had supposedly told her "he had a white bitch for sale." Donnell Declaration, Exhibit 13 (Buschmann I Dep.) at 45:22-46:2; *Id*. at Exhibit 2 (Waller Declaration) at p. 25; *Id.* at Exhibit 14 (October 4, 2995 Supplementary Police Report by Detective DeValkenaere.)

Response: Object as irrelevant to the due process claim as these circumstances do not establish that either defendant detective obtained any exculpatory information withheld from Ott.

18. According to Defendants' reports, Waller also told Detective DeValkenaere that Sandra Giles had supposedly bragged about holding the white girl that was killed for four days and when she tried to leave she killed her. Donnell Declaration, Exhibit 2 (Waller Declaration) at p. 29; *Id.* at Exhibit 14 (October 4, 1995 Supplementary Police Report by Detective DeValkenaere).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that the defendant detective obtained any exculpatory information withheld from Ott.

**Detectives Buschmann and DeValkenaere Coerce Gwin**

19. On October 24, 2995, Detectives Buschmann and DeValkenaere arrested Mr. Gwin for the homicide of Payne and held him in custody. Mr. Gwin was a 17 years old at the time of his arrest. Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 139:8-140:25, 147:5-9; 159:20-25; *Id*. at Exhibit 13 (Buschmann I Dep.) at 47:5-9; 61:12-62:18; 67:7-10.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that either defendant detective obtained any exculpatory information withheld from Ott.

20. That same day, Detectives Buschmann and DeValkenaere interviewed Richard Gwin, while he was in custody during which Mr. Gwin did not implicate Sam Hadaway or

6

Chaunte Ott in the murder of Jessica Payne. Donnell Declaration, Exhibit 13 (Buschmann I Dep.) at 61:12-66:7.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that either defendant detective obtained any exculpatory information withheld from Ott; further object as a duplication of certain relevant facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 102. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

21. The next day, Detectives DeValkenaere and Buschmann released Gwin from custody and then interviewed Gwin about his knowledge of the Payne homicide a second time. This time, according to Detectives DeValkenaere and Buschmann, Gwin allegedly implicated Chaunte Ott and Sam Hadaway in Payne's murder. Exhibit 13 (Buschmann I Dep.) at 82:22-83:4; *Id*. at Exhibit 7 (DeValkenaere I Dep.) at 75:5-83:6.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 102. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

22. Before his death, Gwin told his sister, Theresa Gwin, that he lied to the police and at Ott's criminal trial. Donnell Declaration, Group Exhibit 15 (Affidavit of John Pray ("Pray Affidavit on April 15, 2009") at ¶5.

Response: Object as inadmissible hearsay.

### Hadaway Was An Easy Target For Defendants
### To Coerce Into Providing false Testimony Against Mr. Ott.

23. Sam Hadaway has cerebral palsy, which has rendered his left side weak and without sensation. Hadaway also has a learning disability that makes it difficult for him to read or write. Donnell Declaration, Exhibit 16 (Deposition of Samuel Hadaway ("Hadaway Dep.")) at 7:8-7:25 ("My whole left side shut down. I was born like that…no grip. No Feeling. I can't do nothing with it."); 6:14-7:2.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that either defendant detective obtained any exculpatory information withheld from Ott; further object as a duplication of certain relevant facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 39. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.")

(emphasis supplied).

24.     Hadaway also suffers from a seizure disorder for which he takes medication to prevent him from seizing.  The police did not give Hadaway his anti-seizure medicine while he was in custody.  Donnell Declaration, Exhibit 16 (Hadaway Dep.) at39:4-9; 12:5-12:16.

Response:     Object as unsubstantiated by admissible evidence; see Defendants' Proposed Finding of Fact ("PFOF") No. 91.

25.     Hadaway was arrested and brought him [sic] in for questioning after Richard Gwin was released.  Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 179:18-22.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 103.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

26.     Hadaway denied that Ott or he had any involvement in the Payne homicide during his first three interrogations by the police, including:  the interrogations conducted on October 24, 2995 by Detectives Burems and Valuch; the interrogation conducted on October 25, 1995, by Detective Eric Moore; and the interrogation on October 26, 2995 conducted by Detectives P. Moore and Dubis.  *See* Defendants' Statement of Facts Nos. 95, 97 & 99.

Response:     Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 95, 97, 99.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

27.     Hadaway was then interviewed on October 27, 1995 by Defendant Detectives DeValkenaere and Buschmann who coerced and manipulated Hadaway into falsely implicating Mr. Ott in the murder of Jessica Payne, in part by threatening to charge him with Payne's homicide if he did not implicate Mr. Ott in Payne's murder.  Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 130:4-11.

Response:     Object as a legal conclusion rather than a statement of fact; further object as a duplication of certain relevant facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 84, 85, 86, 87, and 103.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied).

8

28. Defendant Detectives DeValkenaere and Buschmann coerced and manipulated Hadaway into providing false statements against Mr. Ott by telling him that he would get a plea agreement and he would only have to serve up to 5 years' imprisonment, but if he failed to implicate Ott in Payne's murder they would charge him instead and Hadaway would be imprisoned for 80 years. Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 17:9-13 ("They told me if I don't testify – testify against [Ott], they'll switch it over to me, I'll do the 80 years." *See also Id*. at 17:17-25; 36:14-21; 130:7-11.

Response: Object as a legal conclusion rather than a statement of fact; further object

as a duplication of certain relevant facts set forth in Defendants' Proposed Finding of Fact

("PFOF") No. 86. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

29. Detectives DeValkenaere and Buschmann fed Hadaway facts about the Payne homicide like that she was found on a mattress and that her neck was lacerated. Hadaway did not know these facts if not fed to him by these Defendants. Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 20:15-25; ID. at Exhibit 17 (Buschmann's Resp. to Plaintiff's First Set of Requests to Admit No. 41 (Buschmann admitted to provided information about the homicide, including Gwin's statement to Hadaway during his interrogation of Hadaway). Although Hadaway was afraid of lying, he believed he "had no choice. It was I do he life bit or the five years. Okay, I take the five." Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 36:17-19.

Response: Object as a legal conclusion rather than a statement of fact; further object

as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 85. *See* Civil L. R.

56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

30. Detectives DeValkenaere and Buschmann also intimidated and threatened Hadaway by prohibiting him from speaking to his family during their several days of interrogating him while he was in custody beginning on October 27, 1995. Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 26:19-27:7.

Response: Object as irrelevant to the due process claim as these circumstances do

not establish that either defendant detective obtained any exculpatory information withheld

from Ott.

31. The information that Hadaway provided to Detectives Buschmann and DeValkenaere on October 27, 1995, implicating himself and Chaunte Ott in the murder of Payne was all false. Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 77:25-78:5.

Response: Object as a legal conclusion rather than a statement of fact.

9

32.     Detectives DeValkenaere and Buschmann destroyed the notes they took during their interrogations of Hadaway, and no record was ever made of the first hour and half of their interrogation.  Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 42:24-43:14; 44:12-44:14; *Id.* at Exhibit 13 (Buschmann I Dep.) at 50:9-51:5; 51:9-14; 102:11-13 (no record for the first hour and a half of Buschmann's and DeValkenaere's interrogation of Hadaway); *Id.* at Exhibit 19 (Buschmann II Dep.) at 30:24-31:14; 31:15-25; 33:9-11; *Id.* at Exhibit 20 (Defendants Responses to Plaintiff's Third Set of Interrogatories) at Nos. 16-17.

Response:     Object as irrelevant as there is no evidence that the notes contain any

entries relevant to plaintiff's due process claims.

33.     On November 1, 1995, Detective Simons conducted a polygraph on Hadaway during which Hadaway related the false story provided by the Detectives DeValkenaere and Buschmann that Mr. Ott and he were supposedly involved in Payne's homicide.  Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 111:20-23.

Response:     Object as a legal conclusion rather than a statement of fact; further object

as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 107.  *See* Civil L. R.

56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

34.     After he Polygraph concluded Detectives Simons and Buschmann interrogated Hadaway again, during which Hadaway was coerced and manipulated into lying about Mr. Ott's and his involvement again.  Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 79:16-80:19; *Id.* at Exhibit 18 (Deposition of Robert Simons "Simons Dep.") at 149:1-10.

Response:     Object as a legal conclusion rather than a statement of fact; further object

as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 107.  *See* Civil L. R.

56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

35.     No evidence of the coercion of Hadaway or leniency promised him was included in any of Defendants Buschmann's, DeValkenaere's or Simons' official police reports documenting their interrogations of Hadaway.  Nor was any evidence reported that Detectives Buschmann, DeValkenaere and Simons fed Hadaway facts about the Payne homicide; instead, those reports all indicated that Hadaway was the source of the details concerning the murder. Donnell Declaration, Exhibit 2 (Declaration of Dennis Waller ("Waller Declaration") at 8, 33.

Response:     Object as a legal conclusion rather than a statement of fact; further object

as irrelevant as these circumstances support only a claim of fabricated evidence and not

exculpatory evidence withheld from the criminal defendant.

10

36.     The only evidence linking Mr. Ott to Payne's homicide was the statements by Hadaway and Gwin.  Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 127:22-25; *Id.* at Exhibit 13 (Buschmann I Dep.) at 89:21-25.

Response:     Object as a legal conclusion rather than a statement of fact.

37.     Despite having no physical evidence linking Mr. Ott to Payne's homicide and although there were leads to follow up on in the investigation, Detectives Buschmann and DeValkenaere concluded their investigation, closed the case, and sought charges against Mr. Ott. Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 127:15-25; 129:23-131:21; *Id.* at Exhibit 13 (Buschmann I Dep.) at 89:21-25; Exhibit 2 (Waller Declaration) at pp. 21, 24-26 & 31-32.

Response:     Object as an opinion rather than a factual statement; further object as a

legal conclusion rather than a statement of fact.

### At The Time Of Payne's Homicide, The Milwaukee Police Department Was Investigating The Link Between Multiple Unsolved Female Homicides; Defendants Ignored Evidence That Payne Fit The Same Pattern, And Manufactured Evidence Of Ott's Guilt Instead.

38     Around the time of Payne's homicide, the Milwaukee Police department was investigating a possible link among several unsolved female homicides due to the similarities among the homicides, including the demographic of the victims, the locations the bodies were found and the manner in which they were killed.  Donnell Declaration, Exhibit (DeValkenaere I Dep.) at 87:9-12; 124:24-125:7 (there were similarities among female homicides of drug addicted women who were strangled and dumped in vacant areas for a single perpetrator to be responsible); *Id.* at Exhibit 13 (Buschmann I Dep.) at 23:4-12; *Id.* at Exhibit 21 (Deposition of Eric Moore on August 23, 2010 "E. Moore I. Dep.") at 50:19-51:3; *Id.* at Exhibit 22 (Deposition of Eric Moore on May 7, 2012 (E. Moore II Dep.") at 44:23-45:3; at *Id.* at Exhibit 23 (Deposition of Daniel Phillips ("Phillips Dep.") at 60:3-63:19 (recalls homicide detective briefings and handout listing multiple unsolved female homicides that could be linked shortly after the time of Payne's homicide).

Response:     Object as irrelevant to the due process claim as these circumstances do

not establish that any named defendant detective obtained any exculpatory information

withheld from Ott.

39.     Shortly after Payne's homicide, Detective Eric Moore was assigned to review 32 unsolved female homicides between 1980 and 1995 for possible connection among them and to determine if there was physical evidence to resubmit for additional DNA testing.  See Donnell Declaration, Exhibit 24 (January 99, 1996 Moore Report – Exhibit 1 from E. Moore II Dep.). Moore identified 5 cases in particular that should e prioritized for submitted for DNA testing,

11

including Payne's and two other women who were killed in the months just preceding Payne' murder (Farrior and McCormick), and whose murders were eventually linked to Ellis. *Id.* at 5-7; *see also supra* PSOAF No. 41. Detective Moore documented it his report, the "Moore Report", which he submitted to his supervisors on or about January 9, 196. Id. at Exhibit 21 (E. Moore I Dep.) at 50:19-60:20; *Id.* at Exhibit 24 (January 9, 1996 Moore Report – Exhibit 1 from E. Moore II Dep.); *Id*. at Exhibit 13 (Buschmann I Dep.) at 72:16-21 (at time E. Moore resubmitted female DNA for additional testing was same time as Payne homicide).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any named defendant detective obtained any exculpatory information withheld from Ott.

40. The Moore Report was never provided to Mr. Ott's counsel before his criminal trial. Donnell Declaration, Exhibit 25 (City of Milwaukee's Response to Plaintiff's Second Set of Requests to Admit) at Nos. 39-43.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any named defendant detective obtained any exculpatory information withheld from Ott.

41. By the time of Payne's homicide, Walter Ellis had already murdered seven women in Milwaukee by strangulation or stabbing them in the next, including:

  a. Tanya Miller died of strangulation on or about October 11, 1986. Her body was found at 2123 N. 28th Street in Milwaukee. Serial killer Walter Ellis was subsequently convicted of her murder.

  b. Irene Smith died of stab wounds and strangulation on November 28, 1992. Her body was found in the alley near 3028 N. 7th Street in Milwaukee. Serial killer Walter Ellis was subsequently convicted of her murder.

  c. Florence McCormick died of strangulation on April 24, 1995. Her body was found at 618 W. Locust Street in Milwaukee. Vaginal and Anal swabs were taken as part of the sexual assault evidence. Serial killer Walter Ellis was subsequently convicted of her mother.

  d. Sheila Farrior died of strangulation on June 27, 1995. Her body was found at 1442 W. Chambers Street in Milwaukee. She was found completely nude and appeared to have a bra bound around her neck and mouth area. Vaginal swabs were taken from Ms. Farrior's body. Serial killer Walter Ellis was subsequently convicted of her murder.

e. Jessica Payne died of a laceration to her throat on August 30, 1995. Her body was found at 3116 N. 7th Street in Milwaukee. She was found partially unclothed, her bra torn and her pants pulled down. Seminal material was recovered from a vaginal swab which produced DNA. The DNA has subsequently been linked to serial killer Walter Ellis. Even though a reasonably trained police detective would consider obvious patterns, physical evidence, and similarities, inexplicably Ellis has not been charged with the Payne murder.

After Payne's homicide, Ellis went to murder three additional women, Joyce Mims, Maryetta Griffin and Orethean Stokes. *See* Donnell Declaration, Exhibit 2 (Waller Declaration) at 28-29; *Id.* at Exhibit 26 (Ellis Criminal Complaint); *Id*. at Exhibit 4 (Lankford Affidavit) at ¶¶27-39.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any named defendant detective obtained any exculpatory information withheld from Ott; further object as a conclusory opinion rather than a factual statement with respect to the Payne homicide.

### Ott's Criminal Trial

42. The State of Wisconsin charged Ott with first degree intentional homicide. *See* Defendants' Statement of Fact No. 6.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 5. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

43. Ott's criminal trial began on February 26, 1996, and concluded with the jury convicting him of first degree murder of February 29, 1996. Donnell Declaration, Exhibit 27 (Chaunte Ott Criminal Trial Transcript) at 66; *see also* Defendants' Statement of Fact No. 6.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 6, 67. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

44. Hadaway repeated the false account provided by Detectives DeValkenaere and Buschmann at Mr. Ott's criminal trial because the Defendant Detectives told him if he did not lie they would charge him with the homicide of Jessica Payne. Richard Cortez Gwin lied at Mr. Ott's criminal trial as well. Donnell Declaration, Exhibit 16 (Hadaway Dep.) at 77:16-24; 118:18-23; 129-22-130:20; *Id.* at Group Exhibit 15 (Affidavit of John Pray on October 16, 2008) at ¶5.

Response: Object as an opinion rather than a factual statement; further object as irrelevant as these circumstances support only a claim of fabricated evidence and not exculpatory evidence withheld from the criminal defendant.

45. Ott was sentenced to life in prison. Ott's appeal of his criminal conviction was denied. Donnell Declaration, Exhibit 28 (March 2, 1996 Sentencing Transcript) at 30; Defendant's Statement of Fact No. 67.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 67. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

### The Wisconsin State DNA Database

46. The Wisconsin State DNA databank is the repository for DNA profiles of known offenders and profiles developed from evidence in unsolved cases ("evidentiary profiles"). It consists of three levels. The first level is the local level, which consists of the Milwaukee and Madison divisions; this level is also referred to as LDIS. In the first level of the Databank, all evidentiary DNA profiles are uploaded and stored. The second level is the state level, which stores all evidentiary DNA profiles as well as the convicted felon DNA profiles. Finally, the third level is the national level or CODIS which is the national databank of DNA profiles, which is managed and maintained by the FBI. Donnell Declaration, Exhibit 29 (Declaration of Daniel Haase ("Haase Declaration")) at ¶4.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

47. In 2003, the Wisconsin DNA Databank was only loading DNA profiles developed from Short Tandem Repeat ("STR") testing into the system. Prior to using STR, the State of Wisconsin had used Restriction Fragment Length Polymorphism ("RFLP") analysis to develop DNA profiles. In 2003, The State of Wisconsin was no longer utilizing RFLP testing. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶5.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

48. STR profiles can only be compared can be compared to another STR profile. RFLP profiles cannot be compared to STR profiles in the Databank. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶6.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

49. In 2003, for the Madison division of the LDIS, the evidentiary DNA profiles were compared to profiles stored on the state level on a bi-monthly basis or approximately every two weeks. For the Milwaukee division, as soon as the evidentiary profiles were loaded to the local level of the Databank, they were automatically placed in the state level of the Databank and compared with any convicted felon profiles. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶7.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

**Wisconsin Innocence Project Represents Ott And Seeks Additional DNA Testing**

50. In May 2002, John Pray, Ott's attorney from the Wisconsin Innocence Project, sent a request to Assistant District Attorney Mark Williams to have the Wisconsin State Crime Laboratory develop a Short Tandem Repeat (STR) DNA profile from the vaginal swab of Ms. Payne to compare to the known DNA samples taken in the case and search against the state CODIS database, which Williams agreed to do. Donnell Declaration, Exhibit 6 (Pray Dep.) at 34:18-23; *Id.* at Exhibit 30 (February 26, 2002 Letter from Pray to Williams).

Response: Admit.

51. As a result of Pray's request, in August 2002, forensic analyst Patty Dombroski developed a male STR DNA profile from the vaginal swab of Jessica Payne. Ms. Dombrowski used that profile to compare to the standards for Chaunte Ott, which excluded Chaunte Ott as a contributor. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶9.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

15

52. Ms. Dombrowski called the Milwaukee Police Department with the results of this test and the detective she spoke with conveyed to her that he assumed that the unknown male STR DNA profile she developed must have been one of Payne's consensual sex partners. Donnell Declaration, Exhibit 29 (Haase Declaration at ¶10.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

53. Because of a recent audit of the FBI national DNA Databank, there was a concern in the forensic community about loading DNA profiles of consensual sexual partners into the DNA databanks. As a result, Dombrowski did not upload the DNA profile obtained from the Payne vaginal swab to the Wisconsin DNA Databank. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶11.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

54. On or about October 10, 2002, Mr. Pray received the results of Mr. Dombrowski's tests from Mr. Williams indicating that the STR profile developed from the semen taken from the vaginal swab obtained from Ms. Payne (Item B1a) excluded all known DNA profiles, including Ott. Donnell Declaration, Exhibit 6 (Pray Dep.) at 31:9-15; 34:18-23; *Id.* at Exhibit 31 (Pray Dep. Ex. 3- October 10, 2002 Letter from Mark Williams to John Pray); *Id.* at Exhibit 32 (Pray Dep. Ex. 4 (September 25, 2002, State Crime Lab Report to Chief Arthur L. Jones).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

55. The September 25, 2002 State Crime Lab Report reported that the unknown male STR profile developed from the vaginal swab obtained from Ms. Payne (Item B1a) was searched against all profiles in the Casework and Convicted Offender Indices of the Wisconsin [DNA] Databank at the State level on September 24, 2002 and the search yielded no matches. Donnell Declaration, Exhibit 6 (Pray Dep.) at 40:19-24; *Id.* at Exhibit 32 (Pray Dep. Ex. 4 – September 25, 2002, State Crime Lab Report to Chief Arthur L. Jones.)

16

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

### In Early 2003, The Defendants Reopen the Mims Homicide Investigation

56.     In 2003, Detectives Buschmann and Wesolowski were regular partners and close friends.  Donnell Declaration, Exhibit 33 (Buschmann's Response to Plaintiff's Fourth Set of Interrogatories No 18) (Buschmann and Wesolowski partners from 2000 to 2004); *Id.* at Exhibit 34 (Wesolowski Dep.) at 16:22-17:9.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

57.     On or about February 2003, Detective Wesolowski was working on limited duty after heart surgery and he was assigned to review old cases to resubmit for DNA testing.  The homicide of Joyce Mims was one of the cold cases that Detective Wesolowski most likely reviewed and resubmitted to the State Crime Lab for additional DNA testing.  Donnell Declaration, Exhibit 34 (Wesolowski Dep.) at 36:4-37:2; 89:3-16.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

58.     On or about March 31, 2003, Daniel Haas [sic] from the State Crime Lab called Detective Wesolowski on the telephone and reported that the Crime Lab had developed an STR profile from evidence collected on Ms. Mims underwear found near her body, which matched the DNA profile of Fabian Reyes in the Wisconsin State Databank.  Donnell Declaration, Exhibit 34 (Wesolowski Dep.) at 38:18-39:10.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

59.     As a result of that hit, Detectives Wesolowski and Buschmann re-opened the Mims homicide and began to actively investigate it by arresting and interviewing Fabian Reyes

17

for Mims' murder. Donnell Declaration, Exhibit 34 (Wesolowski Dep.) at 39:17-40:4; 46:5-49:6; *Id.* at Exhibit 19 (Bushman II Dep.) at 15:12-17:9.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

60. Detective Wesolowski had been one of the scene detectives first on the scene of the Mims homicide and involved in preserving the physical evidence. Mims body was also found naked except for her socks with evidence that she had been sexually assaulted. Donnell Declaration, Exhibit 34 (Wesolowski Dep.) at 24:6-15; *Id.* at Exhibit 4 (Lankford Affidavit at ¶23; Exhibit 35 (June 21, 1997 Supplementary Police Report by Detective Gary Temp).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

61. Mims body was found at 2940 N. 5th Street in Milwaukee, which is approximately 3 ½ blocks away walking distance from where Payne's body was found at 3116 N. 7th Street in Milwaukee. Donnell Declaration, Exhibit 26 (Walter Ellis Criminal Complaint); *Id.* at Exhibit 36 (Google Map Directions).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

62. After Detectives Wesolowski and Buschmann interviewed Mr. Reyes and he was polygraphed, the murder charges were dropped against him and there were no additional leads on the Mims case until approximately a month later when Detective Wesolowski received another call from Daniel Haase from the State Crime Lab. Donnell Declaration, Exhibit 34 (Wesolowski Dep.) at 47:5-7; 49:7-15.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

**In May 2003, Defendants Learned That The Jessica Payne And Joyce Mims Homicides Were Linked To A Single Perpetrator**

18

63.     On April 30, 2003, the unknown STR male DNA profile obtained from the vaginal swab from Joyce Mims was loaded to the state level Databank.  Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶12.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

64.     On or about May 19, 2003, Mr. Haase learned that the evidentiary profile from the Payne vaginal swab had not been loaded to the state level of the Wisconsin DNA Databank. Haase advised that it should be loaded.  Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶13.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

65.     On or about May 19, 2003, the DNA Databank matched the two unknown male profiles obtained from the vaginal swabs taken from Payne and Mims cases, and Daniel Haase then worked to confirm that both profiles had been accurately loaded to the Databank.  Donnell Declaration, Exhibit 29 (Haase Declaration at ¶¶14-15.

Response:     Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 68.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

66.     On or about May 22, 2003, Mr. Haase prepared a Confidential Laboratory Report that reported the match between the unknown male STR DNA profiled obtained from the vaginal swab from Jessica Payne and the unknown male STR DNA profiled obtained from the vaginal swab from Joyce Mims.  Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶16.

Response:     Object as a duplication of the relevant facts set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 68.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

67.     On May 23, 2003, Mr. Haase called Detective Wesolowski on the telephone and reported to Detective Wesolowski the match the DNA Databank had made between the Payne and Mims evidentiary profiles.  Mr. Haase further conveyed to Detective Wesolowski that this meant that the same unknown male deposited semen in the vagina of Jessica Payne's body and in

Case 2:09-cv-00870-RTR     Filed 08/09/13     Page 19 of 29     Document 180

the vagina and on the right thigh of Joyce Mims. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶17; *Id.* at exhibit 34 (Wesolowski Dep.) at 49:12-15.

Response: Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 69. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

68. On their telephone call, Mr. Haase also told Detective Wesolowski that Chaunte Ott had been convicted of Payne's homicide and Detective Wesolowski told Haase that he would start the paperwork that could re-open the Payne homicide case. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶18.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

69. Detective Wesolowski also requested that Haase fax his report to him when they were complete, which Mr. Haase did. Donnell Declaration, Exhibit 29 (Haase Declaration at ¶18.

Response: Object as a duplication of the only pertinent facts already set forth in Defendants' Proposed Finding of Fact ("PFOF") No. 70. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

70. Mr. Haase memorialized his conversation with Detective Wesolowski in the case log for the Payne file (R95-3074), which is stored in the Wisconsin State Crime Laboratory's computer system referred to as the BEAST. Donnell Declaration, Exhibit 29 (Haase Declaration) at ¶20 & Haase Declaration Ex. B. (Case Log Entry from May 23, 2003).

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

**Defendants Purposefully Hide The Information of Ott's Innocence
Linking The Mims And Payne Homicides To The Same
Perpetrator From The District Attorney's Office And Mr. Ott**

71. The information contained in the May 22, 2003 DNA Crime Lab Report linking the Payne and Mims homicides "would have been considered an important investigatory lead,"

because "there is a strong presumption that the same individual committed both crimes." Donnell Declaration, Exhibit 4 (Affidavit of Deanna D. Lankford) at ¶¶18-19.

Response:    Object as an opinion rather than a factual statement; further object as a legal conclusion rather than a statement of fact; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

72.    Once Detective Wesolowski obtained the knowledge of the connection between the Mims and Payne homicides, he would have communicated this information with Detective Buschmann, his long-term partner and as the lead detective on the Payne homicide.  Donnell Declaration, Exhibit 2 (Declaration of Dennis Waller) at p. 26; *Id.* at Exhibit 34 (Wesolowski Dep.) at 68:15-70:15 (no reason for him not to tell this information to his trusted partner).

Response:    Object as unsubstantiated by admissible evidence as there is no evidence that in the Milwaukee Police Department there are "lead detectives" in any homicide investigation, and no evidence of the responsibilities of any such fictitious individuals; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

73.    The Milwaukee Police Department received a copy of the May 22, 2003 DNA Crime Lab Report linking the Mims and Payne homicides to a single perpetrator by June 18, 2003.  Donnell Declaration, Exhibit 37 (City of Milwaukee's Response to Plaintiff's Six Set of Requests to Admit Nos. 104-105 & 113).

Response:    Object as an opinion rather than a factual statement with respect to a claim of a "perpetrator;" further object to the remainder as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 70.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

74. The May 22, 2003 DNA Crime Lab Report linking the Mims and Payne homicides to a single perpetrator was sent to Arthur Jones, who was the Chief of the Milwaukee Police Department at that time. Donnell Declaration, Exhibit 38 (May 22, 2003 DNA Report).

Response: Object as unsubstantiated by admissible evidence as there is no evidence that Chief Jones ever received or saw this document; see Defendants' Proposed Finding of Fact ("PFOF") No. 79.

75. Once the Milwaukee Police Department received the May 22, 2003 DNA Report, one of Detective Buschmann's supervisors handwrote on the fact of the Report the name "Buschmann," which indicated that the report was directed to go to Detective Buschmann. Donnell Declaration, Exhibit 19 (Buschmann II Dep.) at 37:1-4; 37:18-22; 37:25-38:9 ("a lieutenant would make sure [the DNA report] was delivered to me in my mailbox or desk"); *Id*. at Exhibit 34 (Wesolowski Dep.) at 79:5-8.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

76. Detective Buschmann does not doubt that he received the May 22, 2003 DNA report linking the Payne and Mims homicides to a single perpetrator. Donnell Declaration, Exhibit 19 (Buschmann II Dep.) at 43:2-7.

Response: Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

77. Experienced homicide detectives like Detectives Wesolowski and Buschmann would consider a DNA match between two homicides as an investigatory lead because the DNA evidence creates a strong presumption that the homicides are linked to a single perpetrator. Detectives Wesolowski and Buschmann knew that the DNA link between the Mims and Payne homicides was exculpatory information or evidence of Ott's innocence because it undermined Mr. Ott's criminal conviction for the homicide of Ms. Payne to be linked to the perpetrator of another female homicide, which occurred while Ott was in custody. Donnell Declaration, Exhibit 4 (Lankford Affidavit) at ¶¶18 & 20; *Id*. at Exhibit 2 (Waller Declaration) at pp. 26 & 28-30.

Response: Object as an opinion rather than a factual statement; further object as a legal conclusion rather than a statement of fact; further object as irrelevant to the due process

22

claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

78.     Detectives Buschmann and Wesolowski did not provide the May 22, 2003 DNA Crime Lab Report or the information contained in it to the Assistant District Attorney Mark Williams.  Donnell Declaration, Exhibit 39 (Williams Declaration) at ¶6.

Response:     Object as a duplication of Defendants' Proposed Finding of Fact ("PFOF") No. 71.  *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

79.     Chief Jones admitted that he may have received DNA reports like the May 22, 2003 DNA Report in one of his morning briefings with his senior staff. Donnell Declaration, Exhibit 3 (Jones Dep.) at 41:19-25.

Response:     Object as unsubstantiated by admissible evidence as there is no evidence that Chief Jones ever received or saw this document;  see Defendants' Proposed Finding of Fact ("PFOF") No. 79.

80.     Had Assistant District Attorney Mark Williams received the information contained in the May 22, 2003 DNA Crime Lab Report, he would have turned it over to Mr. Pray.  Mr. Ott's counsel, Mr. Pray, did not receive the May 22, 2003, DNA Report until 2007. Donnell Declaration, Exhibit 39 (Williams Declaration) at ¶7; *Id.* at Exhibit 6 (Pray Dep.) at 49:6-50:1; 54:20-19.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

81.     Indeed, Mr. Pray wrote letters to Mr. Williams in 2004-2006 requesting updates or the rerunning of DNA tests on Ott's case and he never received a response indicating that a match had been found between the DNA obtained from Payne and Mims. Donnell Declaration, Exhibit 6 (Pray Dep.) at 40:12-51:25.

Response:     Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

82.     Had Mr. Pray received the information contained in the May 22, 2003 DNA Report in 2003, he would have used it as the basis for a motion for new trial for Mr. Ott. Donnell Declaration, Exhibit 6 (Pray Dep.) at 56:14-22.

Response:     Object as irrelevant to the due process claim as these circumstances do

not establish that any defendant detective obtained any exculpatory information withheld from

Ott or otherwise violated his rights to due process following his conviction.

### Milwaukee Police Department Policies And Practices Were
### The Moving Force Behind The Violations of Mr. Ott's Constitutional Rights

83.     The City of Milwaukee has a written policy, Rule 4, general order 4/080.00(16) that require all of its officers and detectives to record "the names of persons taken into custody by them and such particulars in each case as may be important in the trial thereof. . .and matters of importance relative to the discharge of their official duties" in their Memo Books, which are officially issued to detectives and officers by the Department.  Donnell Declaration, Exhibit 40 (Milwaukee police Department, Rule 4, General Order 4/080.00(16)); *Id.* at Exhibit 12 (Rowe Dep.) a 39:1-40:21; *Id.* at Exhibit 2 (Waller Declaration) at p. 18; *see also id.* at Exhibit 40 at Rule 4/060.00(7) (requiring lieutenant detectives to inspect detectives Memo Books "each week or as necessary").

Response:     Object as irrelevant as there is no evidence that any notes prepared by

any detective contain any entries relevant to plaintiff's due process claims.

84.     The Defendant Detectives did not take notes in their Department issued Memo Books as required by the formal written policy, but took notes during witness interviews, including their interviews of Cooper, Gwin and Hadaway on steno pads and then destroyed their notes.  Donnell Declaration, Exhibit 7 (DeValkenaere I Dep.) at 42:24-43:14 (kept notes in steno pad and then destroyed notes); *Id.* at Exhibit 11 (DeValkenaere II Dep.) at 89:5-15 (if took notes during interview of Cooper he did so on a steno pad and then destroyed his notes); *Id.* at Exhibit 13 (Buschmann I Dep.) at 50:9-51:5 (took notes on steno pad and then destroyed his notes); 51:9-14 (Buschmann believed it was consistent with Department policy to destroy his witness interview notes; *Id.* at Exhibit 19 (Buschmann II Dep.) at 30:24-31:14 (took notes on steno pad and then destroyed them); 31:15-25; 33:9-11.

Response:     Object as irrelevant as there is no evidence that any notes prepared by

any detective contain any entries relevant to plaintiff's due process claims.

85.     The Rule 30(b)(6) witness designated by the City to speak on its behalf, Ms. Rowe, admitted that homicide detectives were not taking notes in their Memo Books as required by the Department's written policy and were destroying their Memo Books before their retirements.  Donnell Declaration, Exhibit 12 (Rowe Dep.) at 42:11-43:19; 51:22-24 (practice

was to retain Memo Books as long as officer was employed by the Department); 52:5-9 (as a result of this litigation, she learned detectives were not retaining their Memo Books). According to Chief Jones, "[t]here was no policy. . .from my time on the Police Department that the memo book would be turned over to the District Attorney's Office." *Id*. at Exhibit 3 (Jones Dep.) at 24:4-6; *see also id.* at Exhibit 2 (Waller Declaration) at 18-20 (city Jones Dep. At 19-20; 21-22, 24).

Response: Object as irrelevant as there is no evidence that any notes prepared by any detective contain any entries relevant to plaintiff's due process claims.

86. The failure and/or refusal of the Homicide Division to require its documentation and notes be made in the manner prescribed by the Department's policies indicates that the actual practice of the Department is to accept and condone inadequate, incomplete, and improperly slanted investigations. Donnell Declaration, Exhibit 2 (Waller Declaration) at pg. 18; *see also id*. at 18-20.

Response: Object as irrelevant as there is no evidence that any notes prepared by any detective contain any entries relevant to plaintiff's due process claims; further object as an opinion rather than a factual statement.

87. The failure to take and maintain notes in the prescribed manner of the Department's policies during the course of a homicide investigation is conducive to the effective concealment of *Brady* material. Donnell Declaration, Exhibit 2 (Waller Declaration) at pg. 18; *see also id*. at 18-20..

Response: Object as a legal conclusion rather than a statement of fact; further object as irrelevant as there is no evidence that any notes prepared by any detective contain any entries relevant to plaintiff's due process claims.

88. The obvious and deliberate indifference of the Department's supervisors to enforce the mandated notetaking practices served to deny important rights to those suspected of criminal acts. Donnell Declaration, Exhibit 2 (Waller Declaration) at pg. 18.

Response: Object as a legal conclusion rather than a statement of fact; further object as irrelevant as there is no evidence that any notes prepared by any detective contain any entries relevant to plaintiff's due process claims.

89. The City of Milwaukee had no official policy directing how DNA lab results provided to the Department from the Wisconsin Crime Lab were to be handled; however, by 2003, professional law enforcement agencies were aware of the need for an established policy to

25

properly deal with the disclosure of these types of reports. Donnell Declaration, Exhibit 2 (Waller Declaration) at 23; *see also id*. at 21-24.

Response:    Object as an opinion rather than a factual statement; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

90.    The City of Milwaukee's failure to implement an official policy directing how DNA lab results were to be handled resulted in the actual practice of leaving it to the discretion of the detective who happened to be provided the information, as opposed to uniformly disclosing it. Donnell Declaration, Exhibit 2 (Waller Declaration) at 23; *Id.* at Exhibit 19 (Buschmann II Dep.) at 46:25-47:2; *Id.* at Exhibit 34 (Wesolowski Dep.) at 83:1-16 ("I don't' know if [DNA reports] get forwarded [to the prosecutor] by the crime lab or out department. [I] [c]ouldn't tell you").

Response:    Object as an opinion rather than a factual statement; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

91.    The City of Milwaukee did not train its detectives or officers on what to do with DNA evidence that contained exculpatory evidence or evidence of a criminal defendant's innocence. Donnell Declaration, Exhibit 19 (Buschmann II Dep.) at 42:2-45:4; 46:17-47:2.

Response:    Object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

92.    Due to the City's failure to implement a policy or train its detectives, Detectives Wesolowski and Buschmann did not believe they had an obligation to provide the May 22, 2003 DNA Lab Report linking the Payne and Mims homicides to a single perpetrator to the District Attorney's Office. Donnell Declaration, Exhibit 19 (Buschmann II Dep.) at 44:2-45:4; *Id*. at Exhibit 34 (Wesolowski) at 82:24-83:16.

26

Response:     Object as an opinion rather than a factual statement; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

93.     The City's lack of official policy and due to its practice leaving it up to the discretion of its detectives whether to disclose any DNA lab results to the prosecutor or defense counsel resulted in the failure of the Detectives Buschmann and Wesolowski to turn over the May 22, 2003 DNA Report linking the Mims and Payne homicides in a timely manner. Donnell Declaration, Exhibit 2 (Waller Declaration) at 23.

Response:     Object as an opinion rather than a factual statement; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

94.     Chief Jones knew or turned a blind eye to the Department's official policy leaving it to the discretion of the detective who happened to be assigned the DNA report and/or he acted with reckless disregard by failing to implement a policy on how DNA reports were to be reviewed and disclosed. Donnell Declaration, Exhibit 2 (Waller Declaration) at pp. 21-23.

Response:     Object as an opinion rather than a factual statement; further object as a legal conclusion rather than a statement of fact; further object as irrelevant to the due process claim as these circumstances do not establish that any defendant detective obtained any exculpatory information withheld from Ott or otherwise violated his rights to due process following his conviction.

### In 2009, Mr. Ott Was Finally Exonerated And Release From Prison

95.     In June 2007, Ott's counsel received the information linking the Payne homicide to the Mims and Stoke homicides and as a result, Ott was able to successfully move for a new trial. Donnell Declaration, Exhibit 6 (Pray Dep.) at 56:16-22; Defendants' Statement of Fact No. 76.

Response:     Object as a duplication of Defendants' Proposed Finding of Fact

27

("PFOF") No. 72-78. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional* facts.") (emphasis supplied)**.**

96.     On January 8, 2009, Ott was released from prison and on June 5, 2009, the state dropped all charges against him.  Donnell Declaration, Exhibit 5 (Ott Dep.) at 5:20-25; Exhibit 41 (Chaunte Ott Civil Complain, Dkt. 1 at ¶ 44).

Response:     Admit.

97.     Mr. Ott spent from October 1995 until January 2009 wrongfully imprisoned for Payne's murder.  Subsequently, the State of Wisconsin Compensation Board found Mr. Ott was innocent of Payne's homicide by "clear and convincing" evidence.  Donnell Declaration, Exhibit 5 (Ott Dep.) at 153:21-155:16; Exhibit 42 (State of Wisconsin Claims Board Opinion, April 28, 2010) at 2-3.

Response:     Object as a legal conclusion rather than a statement of fact; object as irrelevant as the board's conclusions are not persuasive, much less binding, on the determinations of this Court.

### Mr. Ott Suffered The Loss of His Liberty, Emotionally And Mentally During The More Than 13 Years of His Wrongful Incarceration

98.     Mr. Ott suffered mental and emotional damages as a result of his wrongful conviction, including but not limited to depression, anxiety, ongoing sleep problems, and difficulty returning to society.  Mr. Ott has suffered the impact of chronic trauma due to his wrongful conviction, including the stress associated with the separation from his family, missed life opportunities, loss of freedom and personal growth.  Donnell Declaration, Exhibit 43 (Declaration of Dr. Michael Spierer ("Spierer Declaration") at pp. 13-15.

Response:     Object as irrelevant to the pending motion which addresses issues of liability and not damages.

99.     As an innocent convict, Mr. Ott suffered additional harm because inmates who refuse to "accept responsibility" for their crimes are often denied privileges and participation in programs and Mr. Ott displayed the characteristics of other wrongfully convicted individuals in that he isolated himself from other inmates and staff and focused on his exoneration and restoring his freedoms.  Donnell Declaration, Exhibit 43 (Spierer Declaration) at p. 14.

Response:     Object as irrelevant to the pending motion which addresses issues of liability and not damages.

### Despite His Wrongful Conviction, Mr. Ott Has

**Worked To Rebuild His Life After His Exoneration**

100.    Since his exoneration and release, Mr. Ott has attended classes part-time at MATC studying human services and worked in landscaping, with Hatch temporary services, and eventually with Fed Ex Smart Post.  Mr. Ott is currently employed with Fed Ex Smart Post in Brookfield, Wisconsin.  Donnell Declaration, Exhibit 5 (Ott Dep.) at 14:22-25.

Response:    Object as irrelevant to the pending motion which addresses issues of

liability and not damages.

Dated at Milwaukee, Wisconsin this 9th day of August, 2013.

<div style="margin-left: 40%;">

GRANT F. LANGLEY
City Attorney


s/JAN A. SMOKOWICZ
Assistant City Attorney
Attorneys for Defendants
jsmoko@Milwaukee.gov

</div>

P.O. ADDRESS:
Suite 800
200 East Wells Street
Milwaukee, WI  53202
(414) 286-2601
Fax:  (414) 286-855

1032-2009-2803/194540