# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHAUNTE OTT,

                Plaintiff,

       v.

CITY OF MILWAUKEE; Former Milwaukee
Police Department Chiefs ARTHUR L.
JONES and NANETTE H. HEGARTY;        **Case No. 09-C-870**
and Present and Former Detectives
CARL BUSCHMANN, JAMES DEVALKENAERE,
ROBERT SIMONS,[1] ERIC MOORE, RICKY
BUREMS, PERCY MOORE, MICHAEL DUBIS,
and OTHER AS-OF-YET UNKNOWN
EMPLOYEES OF THE CITY OF MILWAUKEE,

              Defendants.

## DECISION AND ORDER

This action arises out of the 1996 wrongful conviction of Plaintiff Chaunte Ott ("Ott") for the murder of Jessica Payne ("Payne"). Ott alleges that the Defendants coerced false statements from two men implicating him in the murder, and breached their ongoing obligation to disclose information to him when they learned that the DNA profile from Payne's murder matched the DNA profile from another woman's murder in which Ott was not involved. (Compl. 7, 9.) (ECF No. 1.)

This Decision and Order addresses Ott's motion to amend or correct

---

[1] The Court has corrected the surname of Simons by adding an "s." (*See* Smokowicz Aff. ¶ 20, Attach. S (Simons Dep.).) (ECF No. 170-19.)

his complaint (ECF No. 166) to voluntarily dismiss Defendants Ricky Burems, Percy Moore ("P. Moore")[2], and Michael Dubis ("Dubis") from this action without prejudice and without costs and to add Milwaukee Police Department ("MPD") Detective Michael Wesolowski ("Wesolowski") as a defendant in this action, and the motion of Defendants City of Milwaukee ("Milwaukee"), Arthur L. Jones ("Jones"), Nanette H. Hegarty ("Hegarty), Carl Buschmann ("Buschman"), James DeValkenaere ("DeValkenaere"), Robert Simons ("Simons"), E. Moore, Burems, Dubis, and P. Moore for summary judgment dismissing this action. (ECF No. 167.) It also addresses Ott's request in his memorandum opposing the Defendants' motion for summary judgment to voluntarily dismiss his claims against Hegarty and E. Moore and his false imprisonment claim (Count II) (Pl. Corrected Mem. Opp'n Defs. Mot. Summ. J., 38.) (ECF No. 178.)

### Motion to Amend or Correct and Request for Dismissal

Ott's motion to amend or correct with respect to dismissal of Burems, Dubis, and P. Moore was filed in an effort to simplify the action in advance of summary judgment and ensure that Ott's claims proceed against only the proper defendants. The only issue is whether the

---

[2] Because two of the Defendants have the same surname, the Court refers to Eric Moore as "E. Moore" and Percy Moore as "P. Moore."

dismissal should be with or without prejudice. Having considered the parties' arguments, the Court will dismiss this action against Burems, Dubis, and P. Moore without prejudice because the dismissal request was made prior to the filing of the summary judgment motion and the Court has made no rulings on the merits of Ott's claims against these defendants.

The Defendants oppose adding Wesolowski to this action, asserting that based on their arguments with respect to Buschmann any such claim would be futile. As will be further explained, the Court agrees. Ott will not be allowed to add Wesolowski as a party. Ott's motion to amend is granted as to the dismissal of Burems, Dubis, and P. Moore and denied in all other respects.

The dismissals of Hegarty, E. Moore and the false imprisonment claim as subsequently requested by Ott will be with prejudice because the request was made in response to the summary judgment motion. And it is based on the undisputed facts that Hegarty was not in any way personally involved in this action and that E. Moore was not involved in any of the alleged unconstitutional conduct (*See* Pl. Resp. Defs. PFOF ¶¶ 82, 97) (ECF No. 174), and because the false imprisonment claim (Count II) may not be pursued as a matter of law.

## Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.,* 320 F.3d 748, 752 (7th Cir. 2003).

### *Relevant Facts[3]*

On the morning of August 30, 1995, the dead body of 16-year-old

---

[3] The relevant facts are based on the Defendants' proposed findings of fact ("PFOF") and Ott's statement of additional findings of fact (AFOF), to the extent that they are undisputed.

Jessica Payne ("Payne") was found on a mattress behind a vacant home at 3116 North 7th Street in Milwaukee, Wisconsin. Her throat had been cut, and she was found partially clothed with her bra torn and her pants pulled down. After collecting the physical evidence and interviewing the initial witnesses, the Payne homicide went cold until it was assigned to DeValkenaere and Buschmann[4] as a cold case. They were considered the primary detectives with the responsibility of investigating the case. The only lead DeValkenaere and Buschmann had at the time they were assigned the case was Richard "Cortez" Gwin ("Gwin"). Ientha Waller ("Waller"), a jailhouse informant, told DeValkenaere that someone named "Cortez" told her "he had a white bitch for sale." (Donnell Decl., Ex. 14 (MPD Oct. 4, 1995, DeValkenaere Supplementary Rpt.) at 2.) (ECF No. 173-14.) According to the Defendants' reports, Waller also told DeValkenaere that Sandra Giles ("Giles") had told her that she had held the white girl for four days, the girl wanted to get away, and that when the girl tried to leave, "we killed her." (*Id*. at 5.)

On October 24, 1995, Buschmann and DeValkenaere arrested Gwin, age 17, for the homicide of Payne, held him in custody, and interviewed

---

[4] Buschmann and DeValkenaere were employed by the MPD, became detectives in 1991, and retired at that rank.

him. Gwin did not implicate Sam Hadaway ("Hadaway") or Ott in the murder of Payne. The next day DeValkenaere and Buschmann released Gwin from custody and then re-interviewed him about his knowledge of the Payne homicide. This time, according to DeValkenaere and Buschmann, Gwin said Hadaway told him that Ott had killed Payne.

Hadaway[5] came into the MPD detective bureau voluntarily on October 24. He was interviewed by MPD detectives on October 24, 25 and 26, and he denied that he or Ott had any involvement in the Payne homicide. On October 27, Hadaway was arrested. While he was in the city jail, Hadaway indicated that he wanted to talk to detectives. Hadaway was interviewed by Buschmann and DeValkenaere on October 27 and provided an account implicating Ott in Payne's murder. DeValkenaere and Buschmann destroyed the notes they took during their interrogation of Hadaway, and no record was ever made of the first hour and half of their interrogation.

Simons, an MPD detective trained to conduct polygraph examinations, conducted a polygraph of Hadaway on November 1, 1995.

---

[5] Hadaway has cerebral palsy which has rendered his left side weak and without sensation, a learning disability that makes it difficult for him to read or write, and a seizure disorder for which he takes medication to prevent him from seizing. There is a factual dispute regarding whether Hadaway was given his medication during questioning.

Simons also obtained a statement from Hadaway, part of which was an account that he and Ott had attempted to rob Payne.

Ott was charged under Wisconsin law with first degree intentional homicide. A jury trial was held and concluded with a guilty verdict. Prosecution witnesses included Hadaway and Gwin. At trial Ott did not testify, nor did anyone he had identified as an alibi witness. Ott was sentenced to life in prison. On appeal, the Wisconsin Court of Appeals affirmed Ott's conviction.

In May 2002, John Pray ("Pray"), Ott's attorney from the Wisconsin Innocence Project, asked Mark Williams ("Williams"), the Assistant District Attorney who prosecuted Ott, to have the Wisconsin State Crime Laboratory ("Crime Lab") develop a Short Tandem Repeat DNA profile from the vaginal swab of Payne for comparison to the known DNA samples taken in the case and a search against the state CODIS (the Combined DNA Index System) database. A profile was developed in August 2002, and forensic analyst Patricia Dombrowski ("Dombrowski") compared it to the standards for Ott, excluding him as a contributor.

Dombrowski called the MPD with the test results, and the detective she spoke to said he assumed that the unknown profile she developed must have been from one of Payne's consensual sex partners. In September

2002, the Crime Lab prepared a report indicating that the unknown profile had been searched against all profiles in the Casework and Convicted Offender Indices of the Wisconsin DNA Databank at the state level, and the search had yielded no matches. In October, Williams forwarded Dombrowski's test results excluding Ott and all known DNA profiles to Pray.

In May 2003, the Crime Lab produced a DNA testing report on two homicide victims, Payne and Joyce Mims ("Mims"), indicating that the unknown profile developed from Payne matched an unknown male DNA profile developed from the vaginal swab and a bloodstain on the right thigh of Mims. Daniel J. Haase of the Crime Lab telephoned Wesolowski, the contact detective on the Mims homicide investigation, and informed him of the report's results. Buschmann and Wesolowski were partners and good friends.[6] The DNA Report was forwarded to the MPD and stamped as received on June 18, 2003. "Buschmann" is handwritten on the report. (Smokowicz Aff. Attach. P at 55 (Ex. 5 at 1).) (ECF No. 170-16.) The report was not provided to Williams. In 2003, Milwaukee had no official policy directing how DNA results provided to the MPD by the Crime Lab were to

---

[6] There is a factual dispute as to whether Buschmann saw the May 2003 DNA report. (*See* Pl. Resp. Defs. PFOF ¶ 104.) (ECF No. 174.)

be handled.

In July 2007, the Crime Lab linked the unknown profile obtained from Payne with unknown male profiles obtained from Mims and the vaginal swab and a blood swab from the right leg of another homicide victim, Ouithreaun C. Stokes. (Lankford Aff. ¶ 22.)[7] (ECF No. 173-4.) The test result was forwarded to the District Attorney's office, and that office notified Ott's attorneys about the results. On October 2, 2007, Ott filed a motion for a new trial.

In December 2007, the Milwaukee Country trial court denied Ott's motion for a new trial. In December 2008, the Wisconsin Court of Appeals reversed and ordered a new trial. Gwin died prior to the decision, but before his death he told his sister that he had lied to the police and at Ott's criminal trial.[8]

In January 2009, Ott was released from prison, and in June the state dropped all charges against him. Subsequently the State of Wisconsin Claims Board found that Ott was innocent of Payne's homicide by "clear and convincing" evidence. (Donnell Decl., Ex. 42 (Wis. Claims

---

[7] Deanna D. Lankford is a forensic DNA analyst. (Lankford Aff. ¶ 1.)

[8] The Defendants object to this statement as hearsay. The statement is double hearsay because it is the statement of Gwin's sister about what he said. However, if Gwin's sister testifies at trial the evidence may be admissible as the statement against interest of an unavailable witness. *See* Fed. R. Evid. 804(a)(4) & (b)(3).

Board Op., Apr. 28, 2010) at 2-3.) (ECF No. 173-42.)

At a March 31, 2010, deposition, Hadaway repudiated the statement he had provided to Buschmann and DeValkenaere. Hadaway said:

- A police officer[9] questioning him about Payne's death told him that they had evidence of Ott's involvement, and if they found Hadaway's fingerprints, "it's going to be on [Hadaway], too." (Smokowicz Aff., Attach. O, 4, 13-14.) (ECF No. 170-15.)

- A police officer who interviewed Hadaway during the Payne investigation told him that Payne was found near an abandoned house, that there was a mattress in the back of the house where she was found, and that Payne's neck had been cut.

- A police officer told Hadaway that he had to admit to his part so he could get a plea agreement and serve five years in prison instead of 80 years. Although Hadaway was afraid of lying, he believed he had "no choice. It was I do the life bit or the five years." (Donnell Decl., Ex. 16 (Hadaway Dep.) at 36.) (ECF No. 173-16.)

- During the interrogation, the police would not allow Hadaway to speak to his family.

- His testimony in Ott's trial was false.

In July 2010, Buschmann admitted that he told Hadaway about a statement made by Gwin regarding the Payne homicide.

Latonia Cooper ("Cooper") learned of Payne's death when the police

---

[9] Hadaway could not specifically name the officer(s) who interviewed him or provided him with information. Ott contends that based on the Defendants' discovery responses, it had to be one of the Defendant detectives or Michael Valuch, a former defendant. (*See* Pl. Resp. Defs. PFOF ¶¶ 84-87.)

came to her house on August 31, 1995, and showed her a picture of Payne. The officers then took her to the police station for further questioning. At the station an unidentified officer showed her a picture of a man, now known to be Walter Ellis ("Ellis"). Cooper told police:

- She did not know where Ellis lived but he hung around the area with women who smoked crack cocaine.[10]

- Ellis was the man she saw Payne with just before leaving Payne with Giles at the home of [Willie] Brooks ("Brooks).

- She believed Giles and Ellis had something to do with Payne's murder.[11]

- Ellis liked to be around women who smoked crack cocaine because they were too high to defend themselves, and Ellis had previously tried to choke her, but she never told anyone.

- Cooper knew Giles as a "madam" or a woman who tried to prostitute girls, and Giles was trying to prostitute Payne and another girl to pay for their stay at Brooks' home. (Pl.'s AFOF ¶ 11.) (ECF No. 172.)

Cooper told an unidentified officer that Giles had introduced Payne to a man Cooper could no longer identify but who she believed would do

---

[10] Ott states that "Cooper was shown the photograph [of] Ellis during her first interview with the police or when she was interviewed by . . . DeValkenaere or on both occasions." (Pl. Resp. Defs. PFOF ¶ 109.) He further states that "[a]t summary judgment, it is reasonable to assume on this record that Cooper provided this information to DeValkenaere because we know that Cooper provided this information during one of her interviews, however no record exists of DeValkenaere's notes from his interview with Cooper because he destroyed them." (*Id.* at ¶ 110.)

[11] Ott also makes the argument referenced in footnote ten regarding this statement of Cooper being attributable to one made to DeValkenaere. (Pl. Resp. Defs. PFOF ¶ 111.)

harm to Payne.[12]   Cooper never told police that she saw Ellis in the house with Payne.   Cooper recalls meeting with police only once; but the record reflects that Cooper met with detectives on August 31, 1995,[13] and with DeValkenaere on October 8, 1995.   Any notes taken by DeValkenaere during his interview of Cooper would have been taken in a steno pad which he later destroyed.   The information Cooper provided to MPD detectives concerning Ellis' possible involvement in the Payne murder was not reflected in any police reports in the MPD's homicide file.

Milwaukee has a written policy, Rule 4, general order 4/080.00(16), that requires detectives to record "the names of persons taken into custody by [them] and such particulars in each case as may be important in a trial thereof . . . and matters of importance relative to the discharge of their official duties" in their official memorandum books ("memo book"). (Donnell Decl., Ex. 40 (MPD, Rule 4, General Order 4/080.00(16).) (ECF No. 173-40.)   The Defendant detectives did not take notes in their memo

---

[12] Ott also makes the argument referenced in footnote ten regarding this statement of Cooper being attributable to one made to DeValkenaere.  (Pl. Resp. Defs. PFOF ¶ 115.)

[13] The police report for the August 31, 1995, interview lists the officers who participated in the interview and does not include any of the named defendants.  With the proper foundation, the report could be admitted to show who participated in the interview as a record of a regularly conducted business activity under Fed. R. Evid. 803(6), *see White v. Godinez*, 301 F.3d 796, 801 (7th Cir. 2002), or as a public record under Fed. R. Evid. 803(8).

books, instead they took notes during witness interviews — including their interviews of Cooper, Gwin and Hadaway — on steno pads and then destroyed the notes. According to the MPD's official written policy, the detectives who interviewed Cooper should have recorded the information she provided in their memo books and retained them. Even if taken on a steno pad against policy, detective's interview notes were to be retained. The Rule 30(b)(6) witness designated by Milwaukee to speak on its behalf admitted that homicide detectives were not taking notes in their memo books as required by the MPD's written policy and were destroying the memo books before their retirements.

## Analysis

The five remaining Defendants, Milwaukee, Jones, and detectives Buschmann, DeValkenaere, and Simons (collectively the "Defendant Detectives"), assert that Jones should be dismissed for lack of personal involvement, and that the Due Process Claim (Count I) is not a constitutional claim and, even if it is, the Defendant Detectives are entitled to qualified immunity. They further contend that unless Ott can show a viable due process claim, his failure to intervene and conspiracy claims (Counts III & IV), as well as his custom and policy claims against

Milwaukee that are included in Counts I, III and IV, fail.[14]

*Jones*

Jones was chief of the MPD from November 1996 until his retirement in November 2003. He did not interview any witnesses or conduct any portion of the 1995 investigation into Payne's death, nor was he involved in Ott's criminal prosecution. The sole fact against Jones, who is sued in his individual capacity, is that he may have seen and discussed the DNA report (if a detective from the criminal investigation bureau brought it with him to a morning briefing)[15].

Liability under 42 U.S.C. § 1983 depends on personal involvement. *See Munson v. Gaetz,* 673 F.3d 630, 637 (7th Cir. 2012); *Minix v. Canarecci,* 597 F.3d 824, 833 (7th Cir. 2010). "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chi.,* 856 F.2d 985, 992-93 (7th Cir. 1988).

Construing the facts and reasonable inferences most favorably to

---

[14] Ott's Complaint also includes a claim for supervisory liability under 42 U.S.C. § 1983 (Count V) and supplemental state law indemnification claim against the City (Count VI).

[15] There is a factual dispute between the parties as to whether Jones may have seen DNA reports from the Crime Lab. (*See* Pl. Resp. Defs. PFOF ¶ 79.)

Ott, a reasonable jury could find that Jones was aware of the 2003 DNA report. However, there is no evidence that could allow a jury to conclude he was aware that the report was not provided to Ott. Despite construing these facts and inferences in the light most favorable to Ott, a reasonable jury could not find that Jones was personally involved in the alleged constitutional violation. Jones is dismissed as a defendant in this action.

*Due Process Violation*

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In evaluating qualified immunity the Court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chi.,* 733 F.3d 749, 758 (7th Cir. 2013) (citing *Pearson,* 555 U.S. at 232.) The dispositive inquiry in determining if a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

This inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition" and must be "particularized" based on the facts confronting the officer. *Brosseau v. Haugen,* 543 U.S. 194, 198-99 (2004). Government officials may be protected from liability for objectively reasonable decisions, even if the decision is later determined to be wrong. *Jones,* 856 F.2d at 994.

Based on the qualified immunity defense, the Court begins with consideration of whether Ott has presented a viable due process claim. The parties have divided Ott's due process claim into three parts: one relating to the non-disclosure of the coercion of Gwin and Hadaway's statements; the second relating to non-disclosure of Cooper's identification of Ellis; and the third relating to the failure of Buschmann (and proposed defendant Wesolowski) to provide Ott with the results of the 2003 DNA test.

### Gwin and Hadaway's Statements

Ott contends that the withholding of information about how "the Defendants" coerced Gwin and Hadaway into falsely accusing him states a *Newsome* claim, referring to *Newsome v. McCabe,* 256 F.3d 747, 751-52 (7th Cir. 2001) In *Newsome* the police coached an eyewitness into identifying James Newsome, thereby forming a "vital link in the process that led to" Newsome's conviction, "yet withheld from the prosecutors

information about their coaching of the witness." *Id*. at 749. Although the court of appeals held that Newsome could not state a federal malicious prosecution claim based on the alleged misconduct, it held that he had "a due process claim in the original sense of that phrase — he did not receive a fair trial." *Id*. at 752. In particular, the defendant officers in *Newsome* were liable "under the due process clause because they concealed exculpatory evidence — the details of how they induced the witness to finger Newsome." *Newsome v. McCabe,* 319 F.3d 301, 304 (7th Cir. 2003).

The Defendants contend that this case does not present a *Newsome* claim, relying on *Gauger v. Hendle,* 349 F.3d 354, 358 (7th Cir. 2003), overruled in part on other grounds by *Wallace v. City of Chi.,* 440 F.3d 421, 427 (7th Cir. 2006); *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1028(7th Cir. 2006); and *Harris v. Kuba,* 486 F.3d 1010, 1017 (7th Cir. 2007). Ott counters that the court of appeals has repeatedly recognized a due process claim for the kind of witness manipulation in this action, citing *Petty v. City of Chi.,* 754 F.3d 416, 423-24 (7th Cir. 2014); *Dominguez v. Hendley,* 545 F.3d 585, 590 (7th Cir. 2008) (Section 1983 due process claim stated where the police withheld exculpatory details surrounding witness manipulations); *Manning v. Miller,* 355 F.3d 1028, 1033 (7th Cir. 2004) (inducing witnesses to falsely identify plaintiff formed the basis of a *Brady*

claim); *Ineco v. City of Chi.,* 286 F.3d 994, 1000 (7th Cir. 2002) ("officers withheld exculpatory information and lied to the . . . prosecutors who successfully indicted").

Despite construing the facts and the reasonable inferences from those facts in the light most favorable to Ott, consideration of Gwin's statements under *Newsome* establishes that there are not sufficient facts to overcome summary judgment on that portion of Ott's due process claim. *Newsome* is founded upon the non-disclosure of exculpatory evidence that a confession was coerced. Gwin was questioned twice by DeValkenaere and Buschmann, once when he was in custody and once when he was not. During the second interrogation, Gwin said Hadaway told him that Ott killed Payne. For the purposes of summary judgment the Court accepts as true the evidence indicating that Gwin lied and construes the unspecified lie in the light most favorable to Ott, which would mean that Gwin's second statement and trial testimony were false. However, there is no evidence that any defendant coerced, coached, or manipulated Gwin to produce the lies. In other words, there are no facts indicating there was any exculpatory evidence regarding Gwin's statement that the defendants failed to disclose. Absent evidence that DeValkenaere and Buschmann acted improperly to elicit Gwin's statement there is no *Newsome* claim.

That portion of Ott's due process claim arising out of Gwin's statements is dismissed.

With respect to Hadaway's statements, and construing the evidence and reasonable inferences from that evidence in the light most favorable to Ott, there is sufficient evidence that DeValkenaere and/or Buschmann and/or Simons could have coerced and manipulated Hadaway into testifying, and that one or more of these defendants provided facts to Hadaway. The circumstances of Hadaway's statements not disclosed to Ott are sufficient to establish a *Newsome* claim.

The cases cited by the Defendants are distinguishable. In S*ornberger,* 436 F.3d at 1028-29, the failure of police to disclose coercion did not state a *Brady* claim because the suspect was the person who had been subjected to the interrogation and she knew about the coercive confession. *Gauger,* 349 F.3d at 360, also found that there was no *Brady* claim because the defendant had been coerced and clearly knew about the coercion. In *Kuba,* 486 F.3d at 1015, the claim that three pieces of evidence had been suppressed in violation of *Brady* was rejected because the evidence was not suppressed, and it "had limited, if any, favorability."

*Newsome* held it was clearly established in 1979 and 1980 "that police could not withhold from prosecutors exculpatory information about .

. . the conduct of a lineup." 256 F.3d at 752. "The *Brady* principle was announced in 1963 and we applied it in *Jones* [856 F.2d 985] to affirm a hefty award of damages against officers who withheld exculpatory information in 1981." *Id.* at 752-53.

The Payne investigation occurred more than a decade after the events in *Jones* and *Newsome*. As such, it was clearly established in 1995 that the Defendant Detectives could not coerce and manipulate a witness with promises of leniency and then withhold the fact of that coercion and promise of leniency from the prosecutor and Ott. Resolution of Ott's claim arising out of Hadaway's statements turns on the facts (i.e., there is a factual dispute about whether the Detective Defendants coerced and manipulated Hadaway). The Defendant Detectives' claim of qualified immunity with respect to Hadaway's statement therefore must be denied. And, based on the foregoing, summary judgment with respect to Ott's *Newsome* claim based on the non-disclosure regarding any coercion and manipulation of Hadaway is denied.

*Cooper*

Part of Ott's due process claim is predicated on the non-disclosure of the information Cooper provided to MPD detectives concerning Ellis' possible involvement in the Payne murder. That information was not

reflected in any police reports in the MPD's homicide file.

To establish a *Brady* violation, a plaintiff must show three elements: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice." *United States v. O'Hara,* 301 F.3d 563, 569 (7th Cir. 2002) (citation omitted). Prejudice exists if there is "a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (citation and internal quotation omitted). A *Brady* violation further requires "materiality" of the evidence withheld, which "in the *Brady* context is the same thing as prejudice." *United States v. Wilson,* 481 F.3d 475, 480 (7th Cir. 2007).

The Defendants contend there is no evidence that any named defendant showed Cooper the photograph of Ellis and obtained but failed to report Cooper's statements. Citing *Kuba,* 486 F.3d at 1015-16, the Defendants also argue that Cooper's statements that she was in Brooks' house and had interactions with Payne were in the MPD file, and that Ott's attorney could have had an investigator question Cooper and could have learned that other men were present in the house.

The evidence establishes that DeValkenaere interviewed Cooper and

that he and Buschmann were the primary detectives in the Payne investigation. As the primary detectives DeValkenaere and Buschmann should have been aware of all the information gathered during the investigation, including exculpatory information. When the facts and reasonable inferences from those facts are construed most favorably to Ott, a reasonable jury could conclude that DeValkeneare and/or Buschmann were aware of the exculpatory information obtained from Cooper and that they failed to disclose the information. Furthermore, while the disclosure that Cooper had contact with Payne may have caused a reasonably diligent defense attorney to interview her, that does not mean the exculpatory evidence was available to Ott. *See Boss v. Pierce,* 263 F.3d 734, 741 (7th Cir. 2001).

Additionally, based on the MPD's apparent practice, contrary to its written policy, of taking interview notes other than in memo books and destroying the notes, Milwaukee may be liable under *Monell v. Dep't of Social Servs. of the City of N.Y.,* 436 U.S. 658, 690-94 (1978), if its custom or policy was a cause of the Ott's injury. *See Jones,* 856 F.2d at 995 ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed

from prosecutors and defense counsel cannot be tolerated.")

Furthermore, it would have been clear to DeValkenaere and Buschmann long before 1995 that creating and then destroying separate notes in an attempt to skirt *Brady* would be impermissible. *See id.* Therefore, summary judgment is denied as to that portion the due process claim based on the non-disclosure of exculpatory information provided by Cooper.

*2003 DNA Results*

The third part of Ott's due process claim is based on the fact that the 2003 DNA crime lab results were not disclosed until 2007. Wesolowski was verbally informed of the contents of that report, and the MPD copy of the report bears the notation "Buschmann."

In their initial brief the Defendants argue that no *Brady* violation was occasioned by the non-disclosure of the report, noting that the Supreme Court has not yet decided whether *Brady* extends beyond trial, citing *McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003), and *District Attorney's Office for the Third Judicial District v. Osborne,* 557 U.S. 52, 129 S.Ct. 2308, 2322 (2009). In his response, Ott agrees that after his 1996 conviction *Brady* no longer applied or gave rise to a right to disclosure. However, Ott contends that due process is not eliminated,

arguing that it is the post-conviction due process right that governed the Defendants' conduct and makes Buschmann and Wesolowski liable for burying the "exculpatory" 2003 report.

In the absence of a free-standing right to DNA evidence, Ott's due-process claim hinges on whether he has a liberty interest created by state law. *See Osborne,* 129 S.Ct. at 2319 (finding that an Alaskan statute allowing prisoners to use newly discovered evidence to establish innocence created a liberty interest entitled to due-process protection). Even where a state has created a post-conviction right to access evidence, a prisoner has only a limited interest in the relief. *Id.* at 2320. As explained by *Osborne*, the question was whether consideration of Osborne's claim within the framework of Alaska's procedures for postconviction relief "offend[ed] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or "transgresse[d] any recognized principle of fundamental fairness in operation." *Id.* Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

Wisconsin has a statute, enacted in 2001, providing for the post-conviction DNA testing of certain blood samples pursuant to Wis. Stat. § 974.07 (2001-02). *See State v. Moran,* 284 Wis. 2d 24, 30, 700 N.W.2d 884,

887 (Wis. 2005.) Indeed, the Wisconsin Supreme Court has recognized that "the plain language of § 974.07(6) gives a movant the right to conduct DNA testing of physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material, *if* the movant meets several statutory prerequisites." *Id.*

However, there are no facts before the Court indicating that Ott availed himself of that procedure, which is started by the convicted individual filing a motion in the state circuit court in which he was convicted[16] and serving that motion upon the district attorney's office that prosecuted the case. *See* Wis. Stat. § 974.07(2) & (3). Assuming that those requirements are met, the circuit court must then determine whether to order testing by evaluating the convicted individual's request under Wis. Stat. § 974.07(7). The court should order DNA testing when, among other findings, it determines that it is "reasonably probable that the movant would not have been prosecuted [or] convicted" or that it is "reasonably probable that the outcome of the proceedings . . . would have been more

---

[16] Wis. Stat. § 974.07(2) allows any convicted individual to move in the court in which he was convicted for an order requiring DNA testing of evidence in the underlying case, so long as three conditions are met: (1) the evidence is relevant to the conviction; (2) the evidence is in the government's possession; and (3) the evidence had not been previously subject to DNA testing (or had been subject to DNA testing of a less-advanced degree than that available at the time of the motion). *See Cox v. Milwaukee Cnty. Dist. Attorney's Office,* 13-CV-434-JPS, 2013 WL 2239945, at *1 (E.D. Wis. May 21, 2013).

favorable to the movant" had exculpatory DNA evidence been available. Wis. Stat. §§ 974.07(7)(a-b). If the results of forensic DNA testing ordered under § 974.07 support the movant's claim, the court "shall" schedule a hearing to determine the appropriate relief to be granted to the movant. After the hearing, and based on the results of the testing and any evidence or other matter presented at the hearing, the court "shall" enter any order that serves the interests of justice. Wis. Stat. § 974.07(10)(a). Furthermore, an appeal may be taken from an order entered under § 974.07 "as from a final judgment." Wis. Stat. § 974.07(13).

Instead, Ott's attorney from the Wisconsin Innocence Project sent a request to the prosecutor asking that the Crime Lab develop a DNA profile to compare to the known DNA samples taken in the case and search against the state CODIS database. Ott did not utilize the statutory procedure of Wis. Stat. § 947.07. Thus, like Osborne, Ott "has not tried to use the process provided to him by the State or attempted to vindicate the liberty interest that is now the centerpiece of his claim." *Osborne,* 129 S. Ct. at 2321. As stated in *Osborne,* "it is [the defendant's] burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. . . . These procedures are adequate on their face, and without trying them, [the defendant] can hardly complain that they do

not work in practice." *Id.* There is no freestanding constitutional right to DNA testing, the Wisconsin DNA testing statute appears to comport with due process, and Ott failed to avail himself of that statute. Therefore, that portion of Ott's due process claim against Buschmann based on non-disclosure of the DNA test results and against Milwaukee based on the absence of a policy regarding such results is dismissed.

## Conclusion

Based on the foregoing, the Defendants' motion for summary judgment is granted with respect to the dismissal of Jones and those portions of Ott's due process claim (Count I) relating Gwin's statement and the non-disclosure of the 2003 DNA test results against Buschmann and Milwaukee, and denied in all other respects. The Court will conduct a telephone status conference to set dates for any motions in limine, a final pretrial conference, and the 2015 jury trial of this action. In advance of the conference, the parties should consider whether the previously-estimated ten days for the trial, including time to pick the jury, remains accurate.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Ott's motion (ECF No. 166) is **DENIED** for leave to file his first

amended complaint and is **GRANTED** as to the voluntarily dismissal of his claims against Burems, Dubis, and P. Moore without prejudice;

Ott's false imprisonment claim (Count II), and Hegarty and E. Moore are **DISMISSED** with prejudice;

The Defendants' motion for summary judgment (ECF No. 167) is **GRANTED** in part as to the dismissal of Jones, and those portions of Ott's due process claim relating to Gwin's statement and the non-disclosure of the 2003 DNA test results against Buschmann and Milwaukee and **DENIED** in all other respects; and

The parties must participate in a telephone scheduling conference to be conducted by the Court on October 15, 2014, at 10:00 a.m. The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 19th day of September, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**