IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN,
MILWAUKEE DIVISION

CHAUNTE OTT,                           )
                                       )          Case No. 09 CV 00870-RTR
              Plaintiff                )
                                       )
              vs.                      )
                                       )
THE CITY OF MILWAUKEE, et al           )          JURY TRIAL DEMANDED
                                       )
              Defendants.              )


**PLAINTIFF'S RESPONSE TO DEFENDANTS'
NON-*DAUBERT* MOTIONS *IN LIMINE* NOS. 1-11**

Arthur Loevy
Jon Loevy
Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Introduction .................................................................................................................... 1

I.  Defendants' Motion in Limine No. 10 Seeking To Exclude Evidence That Ellis Was Linked Through DNA To Payne and Defendants' Motion in Limine No. 11 Seeking To Exclude Evidence That Ellis Was Linked Through DNA To Other Victims Should Be Denied ................................................................................. 1

II. Defendants' Motion in Limine No. 8 Seeking To Exclude The Bates Stamp Prefix "Ellis" From Documents Offered As Evidence At Trial Should Be Denied .................................. 4

III. Defendants' Motion In Limine No. 1 Seeking to Bar Evidence Of The Failure To Disclose The Exculpatory 2003 DNA Test Results Should Be Denied ........................... 5

   A. The Evidence In Dispute Shows that Buschmann Knew For Four Years That Plaintiff Was Not Guilty, But Nonetheless Proceeded To Conceal That Information ........................................................................................................ 6

   B. Even If Not The Predicate For A Stand-Alone Claim, The Evidence At Issue Remains Very Relevant, And Should Not Be Excluded Altogether ...................... 8

IV. Defendants' Motions in Limine Nos. 2 and 3 Excluding Evidence Gwin Was Coerced and Seeking to Admit Gwin's Prior Statement and Trial Testimony Should Be Denied ................................................................................................. 12

   A. Testimony Relating to Coercion Used Against Gwin is Admissible ................... 12

      1. Theresa Jones Should be Permitted To Testify About Admissions Her Brother Made That He Was Coerced into Giving False Police Statements and Trial Testimony .............................................................. 12

      2. Plaintiff's Expert, Dennis Waller, Should Not Be Barred From Opining About Whether If the Police Used Certain Tactics Described By Gwin, That Was Inconsistent with Reasonable Police Practices .......................... 15

   B. The Admissibility of Gwin's Police Statements and Trial Testimony .................. 16

      1. The Police Statements Are Admissible Provided Plaintiff Can Explain the Manner in Which they Were Secured .................................................. 17

      2. Absent the Opportunity To Elicit Gwin's Explanation Through His Sister, Gwin's Trial Testimony is Not Admissible .............................................. 17

i

V.     Defendants' Motion In *Limine* No. 4 To Exclude Evidence Of The Destruction Of
       Defendants' Handwritten Notes Should Be Denied .................................................. 19

VI.    Defendants' Motion In *Limine* No. 5 To Exclude Defendants' Complaint And Disciplinary
       Files Is Unopposed ......................................................................................... 22

VII.   Defendants' Motion In Limine No. 6 To Exclude Evidence Of Ricky Burems Complaint
       Should Be Denied ........................................................................................... 22

VIII.  Defendants' Motion In *Limine* No. 7 Response in Opposition to Motion In *Limine*
       Excluding Evidence of the State of Wisconsin Should Be Denied ......................... 25

       A.     The Claims Board Decision is Admissible .................................................. 25

       B.     The Claims Board Decision is Relevant ..................................................... 25

              1.    The Decision Is Relevant to Damages ........................................... 26

              2.    None of the Defendants' Arguments Are Meritorious .................... 27

IX.    Defendants' Motion in Limine No. 9 Seeking To Exclude Evidence Or Testimony
       Pertaining To Defendant DeValkenaere As A Defendant In Avery Is Unopposed .......... 29

Conclusion ........................................................................................................... 30

## TABLE OF AUTHORITIES

*Annunziata v. City of New York,* No. 06 Civ. 7637(SAS), 2008 WL 2229903 (S.D.N.Y. May 28, 2008) ................................................................................................................................ 19

*Avery v. City of Milwaukee,* No. 11-c-00408 (E.D. Wis. Jan. 20, 2015) .................................... *Passim*

*Cage v. City of Chicago,* 979 F. Supp. 2d 787 (N.D. Ill. 2013) ............................................. 16

*Carter v. City of Philadelphia,* No. 97-cv-4499, 2000 WL 1498974 (E.D. Pa. July 12, 2000) ........... 2

*Censke v. United States,* No. 09 C 3651, 2014 WL 3741340 (N.D. Ill. July 29, 2014) ...................... 8

*Davis v. Rennie,* 264 F.3d 86 (1st Cir. 2001) ..................................................................... 11

*Dukes v. City of New York,* 879 F. Supp. 335 (S.D.N.Y. 1995) .............................................. 19

*Duran v. Town of Cicero,* Ill., 653 F.3d 632 (7th Cir. 2011) ............................................... 24

*Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010) ...................................................................... 17

*Good v. Curtis,* 601 F.3d 393 (5th Cir. 2010) ................................................................... 14

*Hakim v. Outsourcing Sol., Inc.,* 2002 WL 31818961 (N.D. Ill. Dec. 16, 2002) ......................... 22

*Hernandez v. Cook County Sheriff's Office,* 634 F.3d 906 (7th Cir. 2011) ............................... 17

*Hoskins v. Poelstra,* 320 F.3d 761 (7th Cir. 2003) ............................................................... 9

*Ibanez v. Velasco,* No. 96 C 5990, 2002 WL 731778 (N.D. Ill., April 25, 2002) ........................... 11

*Jiminez v. City of Chicago,* 732 F.3d 710 (7th Cir. 2013) ..................................................... 15

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ............................................... 10, 11, 19, 20

*Lopez v. City of Chicago,* No. 01-cv-1823, 2005 WL 563212 (N.D. Ill. March 8, 2005) ................... 2

*Mayes v. City of Hammond,* No. 03-cv-379, 2006 WL 2054377 (N.D. Ind. July 21, 2006) ............... 2

*McTigue v. Chicago,* 60 F.3d 381 (7th Cir. 1995) ............................................................... 21

*Molnar v. Booth,* 229 F.3d 593 (7th Cir. 2000) ................................................................. 10

*Murrell v. Frank,* 332 F.3d 1102 (7th Cir. 2003) ...............................................................8

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985)........................................................................8

*Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001) ........................................................26

*Palmer v. Chicago,* 562 F. Supp. 1067 (N.D.Ill. 1983)...................................................20

*Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012) ...............................2, 4, 26, 27

*Shannon v. United States*, 512 U.S. 573 (1994).........................................................28, 29

*Tome v. United States,* 513 U.S. 150 (1995).....................................................................18

*United States v. Boyd,* 595 F.2d 120 (3d Cir. 1978) ..........................................................9

*United States v. James*, 487 F.3d 518 (7th Cir. 2007) .....................................................11

*United States v. Lynwood*, 142 F.3d 418 (7th Cir. 1998) ...........................................28, 29

*United States v. Miroff,* 606 F.2d 777 (7th Cir. 1979), *cert. denied,* 445 U.S. 928 (1980)..................5

*Whitlock v. Brueggmann,* 682 F.3d 567 (7th Cir. 2012) ............................................13, 15

*Yeksigian v. Nappi,* No. 91-1253, 1991 WL 260773 (7th Cir. Dec. 9, 1991) ......................5

*Zafiro v. United States*, 506 U.S. 534 (1993)...................................................................11

## STATUTES AND OTHER AUTHORITIES

Fed. R. Evid. 401 ................................................................................................................8

Fed. R. Evid. 403 .........................................................................................................17, 28

Fed. R. Evid. 404 .............................................................................................................10

Fed. R. Evid. 801 .............................................................................................................18

Fed. R. Evid. 804 ......................................................................................................*Passim*

Wis. Stat. §946.31 ..............................................................................................................13

Wis. Stat. §939.74 ..............................................................................................................13

iv

Now comes, Plaintiff CHAUNTE OTT, by and through is counsel, LOEVY & LOEVY and responds in opposition to Defendants' Motions *In Limine* Nos. 1-13 as follows.

## Introduction

Because some of the relevant discussion and background overlaps, it makes the most sense for Plaintiff to respond to Defendants' motions in a somewhat different order than they were presented.

**I.** **Defendants' Motion in Limine No. 10 Seeking To Exclude Evidence That Ellis Was Linked Through DNA To Payne and Defendants' Motion in Limine No. 11 Seeking To Exclude Evidence That Ellis Was Linked Through DNA To Other Victims Should Be Denied**

Defendants seek to bar DNA evidence tending to show that the murder of 16-year old Jessica Payne for which Chaunte Ott was wrongfully imprisoned for 13 years was in fact committed by someone else. DNA not only links Mr. Ellis to the Payne rape and murder, but, even more damning, it suggests that Mr. Ellis was involved in a string of very similar crimes, including several committed after Plaintiff had already been sent to prison. Any hint or suggestion that the presence of Mr. Ellis' DNA inside Ms. Payne may have an innocuous explanation (*i.e.,* possibly still consistent with Plaintiff's own guilt) is erased by the full context: Mr. Ellis, acting alone, killed a number of women on the margins of society, always leaving their bodies -- just like Ms. Payne's was -- in vacant lots or abandoned buildings in the same geographic neighborhood.

The full extent of the DNA evidence, in other words, is powerful evidence that Plaintiff and Sam Hadaway are telling the truth when they insist that they had nothing to do with Ms. Payne's murder, and that Mr. Hadaway's statement suggesting otherwise was in fact the product of Defendants' misconduct.

1

In seeking to bar this evidence, Defendants concede, as they must, that the DNA evidence "may have some relevance" because it "tends to prove that Hadaway's statement was not true, although there still exists at least the possibility that Ellis merely had sex with Payne, but did not kill her." Dckt. 189 at 18. (The later qualifying clause, of course, merely demonstrates why the totality of the DNA evidence, showing his serial crimes, is even more probative than the link to the Payne murder would be standing alone). After acknowledging relevance, Defendants half-heartedly suggest that the Ellis DNA evidence should nonetheless be barred because Plaintiff's innocence and Mr. Ellis' guilt are "not an element of a *Newsome* claim." *Id.*

Defendants' argument misses the point. While not dispositive of a *Newsome* claim, the evidence suggesting Mr. Ellis' guilt is relevant for at least two reasons.

First, the evidence is admissible on the question of damages. *Parish v. City of Elkhart,* 702 F.3d 997, 999-1003 (7th Cir. 2012) ("Because the district court's rulings improperly limited the introduction of evidence relating to Parish's innocence, and that evidence was critical to the damages issue, the award of damages cannot stand."). The basis of that ruling is self-evident. An innocent man suffers in prison to a far greater degree than someone who actually committed the crime. *See also Mayes v. City of Hammond*, No. 03-cv-379, 2006 WL 2054377 at *9 (N.D. Ind. July 21, 2006) (question of a Section 1983 wrongful conviction plaintiff's "innocence is directly relevant to his damages, which. . . are premised on [his] suffering as an innocent man wrongly deprived of his liberty. . ."); *Carter v. City of Philadelphia*, No. 97-cv-4499, 2000 WL 1498974 at *2 (E.D. Pa. July 12, 2000) ("[T]he issue of whether or not a civil [Section 1983] plaintiff committed the underlying criminal act is central to the measure of damages for a wrongful imprisonment claim."); *Lopez v. City of Chicago,* No. 01-cv-1823, 2005 WL 563212 at *8 (N.D. Ill. March 8, 2005) ("We agree with Lopez that

evidence that shows that another person confessed to the crime and that the charges against Lopez were relevant to allow an inference that he was innocent and thus suffered the anguish during detention that an innocent person would suffer when wrongfully accused of a crime.").

Second, and independently, the evidence is also relevant to the substantive claims. The principle liability issue at trial is whether the Defendants violated Plaintiff's rights by fabricating an account of his guilt and then force-feeding it Sam Hadaway during their interrogation of him. Mr. Hadaway came away from that interrogation telling a story that implicated himself and Plaintiff in the Payne murder, although Mr. Hadaway got far more favorable treatment in exchange for agreeing to accept responsibility for a minor role in the crime. Critically, Mr. Hadaway was able to testify against Plaintiff armed with knowledge that only the true perpetrator would know.

Mr. Hadaway claims that the Defendants coerced him, and that they improperly fed him corroborative details of the crime for him to repeat back at Plaintiff's trial, details that he would not have otherwise known. The Defendants deny that they did any such things. The jury will have to decide which side to believe.

Framed as such, there can be no serious dispute that Plaintiff is entitled to introduce evidence tending to establish his insistence that he (and Mr. Hadaway) did not commit the Payne murder. If there was evidence that the crime was actually committed by a serial killer, then it is follows that it is more likely (*i.e.,* the ultimate test of relevance) that Mr. Hadaway and Plaintiff are the ones telling the truth about what happened here. This is of course exactly the evidence Defendants hope to bar. The DNA evidence links Walter Ellis to a string of rape-murders, including Payne.

Defendants' fallback argument invoking Rule 403 is equally misplaced. Boiled to its essence, the most the Defendants can argue is that the jury will look at the facts very differently if told that

3

someone else is very likely for the Payne murder. But that is exactly the point, and exactly why the evidence is so relevant. There is no danger whatsoever of any unfair prejudice here, and Defendants have failed to identify anything of the sort.[1]

Were there any doubt, the Seventh Circuit decided a very similar question in *Parish v. City of Elkhart,* 702 F.3d 997 (7th Cir. 2012), coincidentally litigated by undersigned counsel. In *Parish,* the district court had excluded DNA evidence that would have tended to establish the plaintiff's innocence by showing that another man had committed the crime for which the defendant detectives had developed evidence suggesting that he was guilty. *Id.* at 999-1003. Even though plaintiff proved a constitutional violation and won the trial, the jury had awarded almost no damages, likely because they believed he had nonetheless committed the crime. *Id.* Writing for the unanimous panel, Judge Posner reversed, explaining that it was error to have excluded the full panoply of the DNA evidence (along with other evidence bearing on innocence). *Id.* That decision controls here.[2]

## II.     Defendants' Motion in Limine No. 8 Seeking To Exclude The Bates Stamp Prefix "Ellis" From Documents Offered As Evidence At Trial Should Be Denied

Fairly characterized as a "lower-stakes" motion, Defendants seek to require Plaintiff to go through and redact all references in any Bates notation to the word "Ellis." Should the Court deny the motions to bar references to Mr. Ellis, this motion is presumably moot. If, on the other hand, the Court decides otherwise, Plaintiff has no objection to the relief sought.

---

[1]   Also unpersuasive is Defendants' suggestion that a jury will be inherently unable to understand the purposes for which the evidence is being admitted. They offer no support for their counter-intuitive suggestion that the subsequent DNA "perfect hindsight" revelations will somehow confuse the jury into concluding that the Detectives "must have known" back at the time of their investigation that Plaintiff was innocent and therefore "must have knowingly obtained false statements." Dckt. 189 at 19-20.

[2]   Because the *Parish* plaintiff won liability, the Seventh Circuit had no occasion to opine on how the evidence of innocence could have borne on liability; instead, the Court limited its discussion to

4

**III.    Defendants' Motion In Limine No. 1 Seeking to Bar Evidence Of The Failure To Disclose The Exculpatory 2003 DNA Test Results Should Be Denied**

Seizing on the Court's ruling dismissing any Section 1983 claim predicated on the withholding of the 2003 DNA results, Defendants now seek to take the next step and bar all references to these circumstances altogether.  Defendants' motion over-reaches.  While Plaintiff acknowledges that he cannot hold Buschmann liable at trial for his actions in concealing the DNA hit for four years, the evidence surrounding those events is still nonetheless very relevant to the claims that are legitimately at issue, as well as punitive damages.  Put simply, evidence that is not admissible on one issue at trial can nonetheless be relevant to others.  *See, e.g.*, *Yeksigian v. Nappi,* No. 91-1253, 1991 WL 260773, at *5 (7th Cir. Dec. 9, 1991) ("We agree with Mr. Yeksigian that the central issue before the State tribunals was different than the central issue before the district court in this litigation.  Nevertheless, evidence that the suspensions were upheld was admissible.  It did not establish conclusively whether Nappi lied to the officer.  However, it was of assistance to the jury in assessing Mr. Yeksigian's submission that Nappi harbored personal animus against him and, despite the lack of authority to issue such an order, ordered him to go home."); *United States v. Miroff,* 606 F.2d 777, 781 (7th Cir. 1979), *cert. denied,* 445 U.S. 928 (1980) (evidence of guns found in defendant's bedroom was admissible as relevant; even though the guns did not demonstrate that defendant was guilty of transporting stolen goods, it was at least a "circumstance" the jury could consider).

---

plaintiff's right to introduce the DNA evidence on the question of damages.  702 F.3d at 999-1003.

5

**A. The Evidence In Dispute Shows that Buschmann Knew For Four Years That Plaintiff Was Not Guilty, But Nonetheless Proceeded To Conceal That Information**

In the early 2003, after Plaintiff had been in prison for years for a crime he did not commit, the Milwaukee Police Department began a re-investigation into cold cases, including the homicide of Joyce Mims, which was submitted to the State Crime Lab for additional DNA testing. *See* Dckt. 172 (Plaintiff's Proposed Statement of Additional Facts) at ¶57. Mims had been killed and abandoned just a few blocks from where Payne's body had been found. *Id.* at ¶61. In May of 2003, the DNA testing developed a profile of an unknown offender, which matched the unknown offender profile that had been developed in Payne's case. *Id.* at ¶66. The same offender, in other words, had raped not only Payne, but Mims as well. More to the point, that person was not Plaintiff. And most relevant of all, Mims was killed in June of 1997, more than a year after Plaintiff had already been convicted and sent to prison. The person who killed Mims and in all likelihood Payne *could not have been Plaintiff.*

On May 23, 2003, Daniel Haase from the Illinois State Crime Lab transmitted the DNA hit and link between the Payne and Mims homicides to Milwaukee Police Detective Wesolowski. *Id.* at ¶67. Mr. Haase also told Detective Wesolowski that Chaunte Ott had been convicted of Payne's homicide, and Wesolowksi told Haase that he would start the paperwork to re-open the Payne case. *Id.* at ¶68.

There is evidence in the record that once Detective Wesolowski learned about the connection between the Mims and Payne homicides, and learned that the two were linked to someone who was not Mr. Ott, he communicated this information to Defendant Buschmann, the lead detective on the Payne homicide and Wesolowski's long-time partner. *Id.* at ¶72. Indeed, after the Milwaukee Police Department received the May 22, 2003 DNA Report, one of Detective Buschmann's supervisors hand-wrote the name "Buschmann" on its face, indicating that the report was directed to go to

6

Detective Buschmann. *Id.* at ¶75 (citing Buschmann's deposition testimony that "a lieutenant would make sure [the DNA report] was delivered to me in my mailbox or desk."). In fact, Buschmann does not deny receipt. *Id.* at ¶76.

The DNA match linking the Payne homicide not only to another murder, but also to *someone else entirely,* was a highly-significant revelation. The scenario on which Plaintiff had been falsely convicted had Mr. Hadaway holding down Payne while Plaintiff violated her. There was no other alleged perpetrator in the story. The fact that young Ms. Payne (a 16-year old runaway) had someone else's DNA inside of her (and an apparent repeat offender at that) was thus a serious blow to Defendants' case. And most troubling of all, the person who by all appearances killed both Payne and Mims could not have been Plaintiff, who was already in prison by the time of the latter crime.

A jury could reasonably conclude that any legitimate detective confronted with this game-changing revelation would have taken at least some steps to explore its significance. Having succeeded in building a case that Plaintiff was guilty, a detective subsequently confronted with a DNA match to another man would have tried to make sense of the development. Conversely stated, the fact that a detective confronted with this new information did absolutely nothing for four more years -- did not notify the District Attorney, did not notify Plaintiff's counsel, and did no further re-investigation -- is highly suspicious behavior. It certainly suggests that Buschmann was less than motivated to get to the truth.

Granted, this is not the only inference that can be drawn from the foregoing evidence, but it is certainly a reasonable one. The very job of a detective is to solve crimes based on evidence. The new DNA evidence suggested that this crime had not been solved, at least not properly. And Buschmann himself had been responsible for the case that was made against someone else. Had Buschmann's

7

actions been innocent and/or in good faith, one would have expected him to immediately set out to correct the wrong. The fact that he (the lead detective) instead succeeded in effectively burying the DNA hit for another four years -- until 2007 when the DNA matched Mr. Ellis and other women, at which point Buschmann was no longer in control -- is powerful evidence that Buschmann knew that Mr. Hadaway's statement had been improperly procured. Because Buschmann is never going to "admit" a guilty state of mind, this evidence is as good as it is ever going to get. *Murrell v. Frank,* 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable").

### B. Even If Not The Predicate For A Stand-Alone Claim, The Evidence At Issue Remains Very Relevant, And Should Not Be Excluded Altogether

As stated, Plaintiff readily concedes that Buschmann is not liable to Plaintiff for failing to disclose the 2003 results. The Court has already held that Plaintiff had no constitutional right to receive them, and that Buschmann therefore cannot be liable in damages for the failure to disclose them. Given the Court's ruling, Plaintiff has no intention of arguing otherwise.

That said, Defendants' argument to bar as totally irrelevant any and all references to the failure to disclose the 2003 test results – "the 2003 test, its results, or its handling by anyone in the police department," dckt. 189 at 1 -- sweeps too broadly. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. This definition is expansive: to be relevant, evidence "need not conclusively prove the ultimate fact in issue . . . . ." *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985); *see Censke v. United States,* No. 09 C 3651, 2014 WL 3741340, at *7 (N.D. Ill. July 29, 2014) ("[T]he definition of relevancy adopted in Rule 401 is an expansive one, and for evidence to be relevant under this definition, it need not conclusively prove the

8

ultimate fact in issue, but only have any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Even if the proposition for which it is offered still seems improbable after the evidence is considered, the proffered evidence is not necessarily irrelevant. As Dean McCormick has aptly phrased it, to be relevant evidence need only be a brick, not a wall.") (internal citations omitted).

Applying that liberal standard, at least three ways exist in which evidence relating to the 2003 DNA testing and the attendant failure to disclose its results are relevant to the upcoming trial. First, Defendant Buschmann's failure to turn over the results of the testing is relevant for Plaintiff's conspiracy claim. Plaintiff has alleged that Buschmann, DeValkenaere and Simon conspired to deprive Plaintiff of his constitutional rights and frame him for a crime he did not commit. Conspiracies, by their nature, often involve hidden acts and have to be proved by inference and circumstance. *See Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (a conspiratorial "meeting of minds. . . may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"). One way to do that is through post-conspiracy -- or more specifically, post-conspiratorial agreement -- conduct. *See United States v. Boyd,* 595 F.2d 120, 126 (3d Cir. 1978) (using post-conspiracy conduct admitted by the trial court to prove the existence of conspiracy).

Such is the case with the 2003 DNA test results. Showing that Defendant Buschmann received but failed to disclose those exculpatory results corroborates Plaintiff's claim that the Defendants conspired back in 1995: But for that earlier understanding that they were setting up an innocent man, and Buschmann's attendant need to cover-up the Defendants' misconduct, Buschmann had no reason to bury the 2003 DNA test results. While the Defendants are entitled to inform the jury that Buschmann was under no legal obligation to disclose the test results, it is also proper for the jury to

9

infer that his failure to do so was a result of his intent to continue and cover up the conspiracy. *See*

*Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir. 1988) ("There is no such thing as accidental or

inadvertent participation in a conspiracy. There was, however, enough evidence to enable the jury to

infer that Deas, Griffith, and Palmer had known every false step taken by the subordinate officers, had

approved every false step, and had done their part to make the scheme work-by deep-sixing Laverty's

report (Deas), by trying to put Laverty off the scent (Griffith), and by signing a deceitful report for use

by the prosecution (Palmer).").

Second, evidence that Buschmann failed to disclose the 2003 DNA test results can be

introduced pursuant Fed. R. Evid. ("Rule") 404(b) to show Buschmann's absence of mistake in

withholding other exculpatory evidence from Ott relating to the Payne homicide investigation in 1995,

namely, the coercion used to secure Hadaway's false confession and Latonia Cooper's information

about Ellis' culpability. Fed. R. Evid. 404(b)(2) (evidence of a crime, wrong or other act "may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident"); *see also Molnar v. Booth,* 229 F.3d

593, 603-04 (7th Cir. 2000) ("Rule 404(b) allows the admission of evidence of other acts if it tends to

prove facts like intent, preparation, and absence of mistake. Booth's effort to establish a sexual

relationship with Kolavo (which was the way she saw it) suggests that he intended to do the same with

Molnar and that he was not accidentally engaged in behavior that could be misconstrued. This was not

the entirety of what Molnar needed to prove, but the request for sexual favors was a piece of the

evidentiary puzzle, and as such, evidence tending to make the existence of that fact more probable was

admissible."). Stated another way, Buschmann's failure to disclose the 2003 DNA report

notwithstanding its exculpatory value suggests that he intended to do the same with the other

10

exculpatory evidence in Ott's case and that his failure to do so was not a mere accident or due to negligence. Rather, his purpose was to unconstitutionally stack the cards against Ott. *See Molnar,* 229 F.3d at 603-04; *Jones,* 856 F.2d at 993 ("They had a hunch he was guilty and were not going to let a mere absence of evidence stand in their way.").

Finally, evidence that Buschmann withheld the exculpatory 2003 DNA results is undeniably relevant for purposes of punitive damages. In assessing how much to award in punitive damages, one factor is the "degree of reprehensibility of defendants' conduct." *Ibanez v. Velasco,* No. 96 C 5990, 2002 WL 731778, at *12 (N.D. Ill., April 25, 2002). In determining "reprehensibility," a jury can consider not only the defendants' initial conduct but also subsequent behavior; in other words, whether the defendant had remorse or tried to correct or ameliorate his or her misconduct. *Id.; See also Davis v. Rennie,* 264 F.3d 86, 115-16 (1st Cir. 2001) (punitive damages award justified not only by defendants' initial conduct, but also by subsequent behavior). Buschmann's failure to disclose the 2003 DNA results is therefore relevant for purposes of punitive damages against him. If a jury believed Plaintiff's version of events, Buschmann not only withheld evidence back in 1995, but then, when he had a chance to do right by Ott, again withheld testing results that could have - and ultimately four years later did - result in Ott's exoneration. That is the very type of unremorseful and outrageous conduct for which a punitive damages award is appropriate. *Id.*[3]

---

[3] Defendants' motion contends that the decision to bury the extraordinarily-relevant DNA results cannot possibly bear on Buschmann's state of mind because this Court has already determined he was under no 'legal duty' to disclose them. While it may be true that the law does not permit him to be sued for violating the Due Process Clause, that simply does not compel any conclusion that it made perfect sense for him to do nothing with these results. And, were there any danger that jurors might be confused about whether his actions in 2003 could independently support liability, the law deems limiting instructions to be sufficient protection against the risk. *Zafiro v. United States*, 506 U.S. 534, 540 (1993); *United States v. James*, 487 F.3d 518, 524 (7th Cir. 2007).

11

**IV.**     **Defendants' Motions in *Limine* Nos. 2 and 3 Excluding Evidence Gwin Was Coerced and Seeking to Admit Gwin's Prior Statement and Trial Testimony Should Be Denied**

The Defendants have filed two motions in *limine* relating to Richard Gwin: to bar any evidence that he was coerced into making statements to the police and at Plaintiff's criminal trial, and simultaneously, to introduce those statements falsely inculpating Plaintiff in the murder of Jessica Payne at Plaintiff's upcoming trial. In other words, the Defendants are seeking to admit Gwin's false statements through his testimony while simultaneously precluding Plaintiff from introducing the manner in which that fabricated evidence was procured. The law does not support this approach.

**A.     Testimony Relating to Coercion Used Against Gwin is Admissible**

Defendants first seek to exclude any testimony relating to the coercion the police used in securing Gwin's false statements implicating Ott in the Payne homicide. According to the Defendants, such evidence is hearsay, and thus not admissible. They are incorrect.

**1.     Theresa Jones Should be Permitted To Testify About Admissions Her Brother Made That He Was Coerced into Giving False Police Statements and Trial Testimony**

While Plaintiff concedes that testimony from John Pray would be double hearsay, a point this Court made in its summary judgment opinion, the same cannot be said of any testimony given by Gwin's sister, Theresa Jones. Plaintiff anticipates that Jones will testify that she spoke to Gwin prior to his death, and that during that conversation, Gwin told her that he (just like Mr. Hadaway) was coerced by the detectives into making false statements and giving false testimony inculpating Ott in the crime. As this Court's summary judgment opinion recognized: "[I]f Gwin's sister testifies at the trial the evidence may be admissible as the statement against interest of an unavailable witness." *See* Dckt. 183 (Summary Judgment Order, Sept. 19, 2014) at 11 n.8.

Indeed, Jones' proposed testimony satisfies Fed. R. Evid. ("Rule") 804. There is no dispute that Gwin is unavailable. He died in February 1997. Fed. R. Evid. 804(a)(4). Thus, Rule 804(b)(3) exempts statements made by Gwin that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to expose the declarant to . . . criminal liability." Fed. R. Evid. 804(b)(3). Gwin's statements to Jones fall within that exception. Given within a year of his testimony at Ott's 1996 trial, Gwin's statements to Jones that he lied during that testimony exposed Gwin to "criminal liability;" that is, to a charge of perjury. Fed. R. Evid. 804(b)(3)(A); Wis. Stat. §946.31 (perjury); Wis. Stat. §939.74(1) (six-year statute of limitations on perjury). As such, Jones' testimony recounting Gwin's admissions both that he lied and that he did so because of police coercion is admissible under the statement against hearsay exception. *See Whitlock v. Brueggmann,* 682 F.3d 567, 575 (7th Cir. 2012) (noting that witness Herrington's "out-of-court statement[]" recanting his trial testimony "would be admissible . . . because his death makes him unavailable, Fed. R. Evid. 804(a)(4), and his recantation is a statement that exposes him to perjury charges . . . .").

The Defendants only response is that Jones' testimony "should be excluded as unreliable." Dckt. 189 at 3. The Defendants do not provide any legal citation, and the argument improperly assumes its own conclusion.

As to the former, no separate "reliability" inquiry exists apart from the hearsay exemption itself, which, as noted, Jones' testimony satisfies. To the extent that the Defendants are actually referring to a "corroboration" requirement, that is only operable in criminal cases. On that score, Rule 804(b)(3)(B) is explicit: It requires that a statement admitted as a statement against interest be supported "by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as

13

one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). As this is not a criminal case, the requirement in Rule 804(b)(3)(B) does not apply.

But even if it were, ample corroboration exists in the record for Jones' testimony. A teenager, Gwin was only 17-years old when he was questioned and was held in custody for two days before finally implicating the Defendants' suspect, Mr. Ott, who we now know was actually innocent of the crime. Meanwhile, Mr. Hadaway was taken into custody at the same time and questioned by the same detectives who interrogated Gwin. *See* Dckt. 172 ( Plaintiff's Proposed Statement of Additional Facts) at ¶¶19-21 & 27. As Mr. Hadaway has testified, the Defendants coerced him by threatening him, feeding him information about the crime and offering him leniency in exchange for false testimony against Mr. Ott -- *i.e.,* the very same misconduct that Jones will testify that Gwin alleged. *Id.* at 29-31. Moreover, Ott's exoneration makes plain that both Gwin's and Hadaway's statements were false, which necessarily begs the question of how both boys came to be falsely implicating the Defendants' suspect. *Cf. Good v. Curtis,* 601 F.3d 393, 398 (5th Cir. 2010) ("[T]his case concerns a situation where the criminal defendant has been exonerated and was wrongly convicted because-taking the facts most favorable to Good-a police officer deliberately framed him. The DNA evidence that cleared Good and secured his freedom also removes all doubt as to the inaccuracy of Doe's identification. The reason for the misidentification, we must assume at this summary judgment juncture, was Curtis's concerted efforts to manipulate the photo.").

Defendants also suggest that Jones' testimony is unreliable because members of the Defendant Milwaukee Police Department claim she recanted it. To be clear, in arguing that Jones recanted any statements that she made about her brother being coerced, the Defendants have relied on a police report authored by Detective Hein. But nothing in Hein's report undermines or even impeaches Jones'

14

testimony that Gwin said he was coerced. To the contrary, in that report, Hein states that Jones told her that "her brother did tell her he felt pressured to talk to the police" and that Jones "believe[d] that her brother was pressured by the police," but that Jones thought Gwin's testimony was true. In other words, Jones never retracted her statement that Gwin confessed that he was coerced by the police, but even if she had, the most that would establish is a dispute of fact, leaving it up to the jury to decide what to believe.

In *Whitlock v. Brueggmann,* 682 F.3d 567 (7th Cir. 2012), the Seventh Circuit addressed a very similar issue. There, the plaintiff filed suit after being wrongfully convicted of murder. By the time of the civil lawsuit, one of the primary witnesses (Darrell Herrington) was deceased. Herrington had testified at Whitlock's criminal trial but "[y]ears later . . . gave [a] sworn statement[] recanting [his] trial testimony and alleging that the police had told [h]im what to say." *Whitlock,* 682 F.3d at 572. Herrington then "'retract[ed]' his recantation." *Id.* The Seventh Circuit nonetheless concluded that Herrington's recantation was admissible under Rule 804. *Id.* at 575.

The same is true here. Even if the jury chooses to credit the police officer claims that Jones recanted her statements about her brother confessing that he was coerced into falsely implicating Plaintiff, that would, at most, be grounds for impeachment and cross-examination. It would not be a basis to exclude Jones' testimony altogether. *See Whitlock,* 682 F.3d at 575.

> **2.      Plaintiff's Expert, Dennis Waller, Should Not Be Barred From Opining About Whether If the Police Used Certain Tactics Described By Gwin, That Was Inconsistent with Reasonable Police Practices**

Finally, because Jones' testimony is admissible, it is appropriate for Plaintiff's expert, Dennis Waller, to likewise opine on the reasonableness of the tactics described by Gwin from the perspective of standard police practices. *Jiminez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (police

15

practices expert testimony admissible in wrongful conviction case).

To be clear, Defendants' fear that Mr. Waller will testify that "Mr. Gwin was coerced" is entirely unfounded. Mr. Waller was not present during Mr. Gwin's interrogation, and makes no claim to have any personal knowledge of what actually happened. Instead, Mr. Waller proposes to provide the jury (none of whom are expected to be homicide detectives) with insight from a police practices as to whether the alleged actions are or are not consistent with the expectation of how they would be done. *See* Declaration of Heather Lewis Donnell ("Donnell Decl."), Exhibit 1 (Report of Dennis Waller) at 8, 13-14. Such an opinion, relying on Jones' testimony, which Plaintiff is seeking to introduce at trial, is proper. *See Cage v. City of Chicago,* 979 F. Supp. 2d 787, 810-11 (N.D. Ill. 2013) (explaining that expert is entitled to rely on one party's version of the facts and that cross-examination, rather than exclusion, is the appropriate way to attack expert opinion where the other party disputes the veracity of those underlying facts).

### B. The Admissibility of Gwin's Police Statements and Trial Testimony

In addition to seeking to bar any evidence of coercion, the Defendants are moving to introduce Gwin's 1995 police statements and 1996 trial testimony into evidence at Ott's upcoming trial. The Defendants have expressly stated that they are not seeking to admit either the statements or testimony for the truth of the matter asserted, but only to show what the Defendants knew during the criminal investigation and that Gwin "testified in a certain manner and without recantation" at Ott's criminal trial. Dckt. 189 at 4.

16

1. **The Police Statements Are Admissible Provided Plaintiff Can Explain the Manner in Which they Were Secured**

To the extent that the Defendants are seeking to introduce Gwin's police statements to show the course of the investigation, as long as Jones is permitted to testify about how those statements were obtained -- namely, through the use of unreasonable tactics -- then Plaintiff has no objection. If Jones' testimony were to be excluded, however, Gwin's statements should likewise be excluded under Rule 403. That is because the probative value of testimony about Gwin's statement will be "substantially outweighed by the danger of unfair prejudice" and potential for "misleading the jury." Fed. R. Evid. 403. Without some testimony about how Gwin's police statement was procured, the jury will be left with the erroneous and one-sided view that the statement was freely and voluntarily given and that the Defendants had no reason to contest its veracity and the fact that it inculpated Ott. *See Fox v. Hayes,* 600 F.3d 819, 840 (7th Cir. 2010) ("[T]he video [memorializing plaintiff's confession] represents just 23 of the 870 minutes or so of Kevin's interrogation, and thus cannot provide a complete picture of either the interrogation itself or Kevin's level of distress. Under those circumstances, we cannot say that the court abused its discretion in concluding that the video's prejudicial effect and potential for confusing the jury outweighed its probative value . . . .").

2. **Absent the Opportunity To Elicit Gwin's Explanation Through His Sister, Gwin's Trial Testimony is Not Admissible**

Defendants also are seeking to admit Gwin's trial testimony. However, they have disavowed any attempt to admit that testimony under Rule 804(b)(1), and have therefore waived any argument on that score. *See Hernandez v. Cook County Sheriff's Office,* 634 F.3d 906, 913-14 (7th Cir. 2011) (arguments not made in opening briefs waived). Instead, the Defendants argue that they intend to introduce Gwin's testimony only to show "that he testified in a certain manner and without

17

recantation;" that is, to rebut any claim of coercion or fabrication. Dckt. 189 at 4. The Defendants do not cite any legal authority for their claim that Gwin's testimony should come in to show that he testified consistent with his police statement and it is difficult to understand their argument on that score. Prior consistent statements are not admissible just to bolster the credibility of a witness; that is, that Gwin's police statement and trial testimony are the same so he must have been telling the truth. *See Tome v. United States,* 513 U.S. 150, 166-67 (1995) ("Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited . . . . The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told."). To the contrary, they may only be admitted to rebut a charge of recent fabrication. *See id.*; Fed. R. Evid. 801(d)(1)(B). The Defendants cannot and have not identified any motive to fabricate that arose after Gwin's trial testimony.

Moreover, to be admissible, Rule 801 requires that the declarant testify and be subject to cross-examination about the prior statement. Fed. R. Evid. 801(d)(1)(A). Gwin cannot be cross-examined on his prior consistent statement -- *i.e.,* his trial testimony -- because he is deceased and Ott only learned of the coercion used to secure his trial testimony after that testimony was taken and after Gwin was dead. As such the Defendants attempt to introduce Gwin's trial testimony as a prior consistent statement ("that he testified in a certain manner and without recantation") fails.

Indeed, even if the Defendants had been seeking to admit Gwin's testimony under Rule 804(b)(1), which the Defendants have expressly disavowed and therefore waived, the requirement of Rule 804(b)(1) would not be met. Rule 804(b)(1) exempts former testimony from the hearsay bar where that testimony "(A) was given as a witness at a trial . . . ." and (B) is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination."

18

Fed. R. Evid. 804(b)(1). While Plaintiff does not dispute that Gwin's 1996 testimony satisfies subsection (A), the same is not true for part (B) because Ott had neither the opportunity nor the motive to develop testimony about how Gwin was coerced because he did not know about that coercion in 1997. *See Dukes v. City of New York,* 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("It is not at all obvious to this Court that defendants would have attempted to ascertain at Dukes' criminal trial whether Ruben Espino, or any other witness, was available for interview by the police at the scene of the murder or on the day of plaintiff's arrest or what precisely they would have said at such an interview."); *see also Annunziata v. City of New York,* No. 06 Civ. 7637(SAS), 2008 WL 2229903, at *8-*9 (S.D.N.Y. May 28, 2008) (finding that "the DA had no motive to inquire about the alleged coercion exerted upon Mitchell by the police" where the DA only learned about that coercion during trial and not during his prior grand jury testimony). In fact, the first Ott learned that Gwin had been coerced was over a decade after his trial and after Gwin had passed away when his then-attorney John Pray spoke with Jones. The Defendants should not be able to benefit from their own failure to disclose the coercion they used by admitting into evidence trial testimony that was the by-product of that coercion and that was never challenged based on that coercion.

## V. Defendants' Motion In *Limine* No. 4 To Exclude Evidence Of The Destruction Of Defendants' Handwritten Notes Should Be Denied

Defendants moved for summary judgment on Plaintiff's "street files" *Monell* claim, but they lost. As the Court properly summarized, the case law recognizes a claim for municipal liability where there exists a policy and practice of segregating information in notebooks, and then destroying those notes rather than providing them to a criminal defendant. *See* Dckt. 183 (Summary Judgment Order) at 22-24, citing *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to

19

circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated.").

Without affirmatively labelling it a motion to reconsider, Defendants seek to re-argue the point in the form of a motion in *limine,* asking the Court to now bar the very evidence deemed sufficient to support the *Monell* claim for summary judgment purposes. This attempt should be rejected. This Court properly concluded that the systematic and intentional destruction of the Defendants' witness notes is of a character that could support a claim of the sort affirmed in *Jones.* As district court Judge Leinenweber of the Northern District of Illinois held in denying the post-trial motion in *Jones*:

> The City acknowledges that plaintiff did establish that Area 2 detectives investigating serious crimes created and maintained their own investigative notes and papers .... Notwithstanding this admission the City suggests that there was no evidence that the practice was pursuant to a policy or that it resulted in arrest of suspects without probable cause.
>
> After reviewing the trial transcript the court remains convinced that the instant situation presents a very strong example of a *Monell* policy. There was uncontradicted evidence that the policy of maintaining street files was approved by the department and used for a long time before it was discovered by plaintiff's counsel. The court also agrees with plaintiff that this policy effectively assured defendants that they could succeed in falsely arresting and prosecuting plaintiff by hiding evidence and omitting reference to official reports. The court concludes that the jury reasonably found that the policy was the proximate cause of the constitutional violation.

*Jones v. City of Chicago,* 1987 WL 16611, *7 (N.D. Ill. Sept. 1, 1987), *affirmed by Jones,* 856 F.2d at 995-96 ("There is little doubt that the clandestine character of the street files played a role in Jones's misfortunes. . . As the custom was department-wide and of long standing, the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department"). *See also Palmer v. Chicago*, 562 F. Supp. 1067, 1069-76 (N.D. Ill. 1983) (the Department's Street File practices prior to 1982 "unquestionably created a grave risk of non-disclosure of exculpatory materials and hence of the violation of constitutional rights. . .").

20

In support of their motion to bar, Defendants make several arguments, but none have merit. First, they contend that the destruction of their witness notes in this case (arguably a fertile source of cross-examination, given the allegations of witness manipulation) occurred "not only with respect to this particular investigation, but in all their homicide investigations for all witnesses or suspects." Dckt. 189 at 5. This argument is exactly backwards. The fact that the withholding was systematic, rather than isolated, is exactly why the evidence is relevant to a practice claim. *McTigue v. Chicago,* 60 F.3d 381, 382 (7th Cir. 1995) (isolated incidents do not suffice to establish *Monell* liability, which instead requires widespread practices "so permanent and well settled as to constitute a custom or usage with the force of law").

Defendants next argue that they destroyed their notes before the criminal trial, back when there was no particular prospect of any civil case. Dckt. 189 at 5. It is unclear why Defendants believe this fact carries any significance. The whole point of the constitutional violation is that it occurred during the criminal proceedings. While there obviously was no civil action pending at the time, the Defendants' actions arguably deprived a criminal defendant of potential impeachment.

Defendants' next argument is very difficult to follow. *See* Dckt. 189 at 5. To the extent Plaintiff understands it, Defendants may be arguing that they have since retired, and thus may very well have destroyed their notes years later even if they had not destroyed them before Plaintiff's criminal trial. It is unclear why that would change the analysis.

Finally, Defendants contend that Plaintiff cannot definitively prove what the notes would have shown prior to their destruction. While it is true that Defendants' actions make it impossible for Plaintiff to show exactly what those notes once memorialized, it does not follow that "no evidence" exists that the notes might have been exculpatory. Specifically, Mr. Hadaway claims to have first told

21

the detectives that he had no knowledge of this crime, and no reason to think Plaintiff was involved. If the jury credits Mr. Hadaway's testimony, and if it further accepts the not-so-crazy premise that homicide detectives would have written down what they were told, then the missing notes would have been highly exculpatory. Likewise, Latonia Cooper has stated that the police questioned her about Walter Ellis in 1995, and she told the police information that connected Ellis to the Payne homicide. That information was never memorialized in a police report, and DeValkenaere has admitted that he destroyed any notes that he took during his interview of Cooper, notes that were likely very exculpatory. In any event, the question of what inference to draw from the evidence is the province of the jury. *Hakim v. Outsourcing Sol., Inc.,* No. 02-0425, 2002 WL 31818961, at *5 (N.D. Ill. Dec. 16, 2002) (conspiracies to do illicit things are "rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances") (internal citations omitted).

## VI. Defendants' Motion In *Limine* No. 5 To Exclude Defendants' Complaint And Disciplinary Files Is Unopposed

Per an agreement with the Defendants regarding Plaintiff's prior arrests, Plaintiff does not oppose this motion.[4]

## VII. Defendants' Motion In Limine No. 6 To Exclude Evidence Of Ricky Burems Complaint Should Be Denied

Defendants seek to exclude evidence of Detective Ricky Burems' complaint in January 2007 to the Milwaukee Fire and Police Commission ("FPC") concerning the manner in which the Milwaukee

---

[4] To be clear, Defendants' motion to bar any reference to Defendants' disciplinary and citizen complaint history does not encompass the actions of former Defendant Burems with respect to the Maniece homicide because it is neither a citizen complaint not related to any disciplinary action for Defendant Burems.

22

Police Department had conducted its homicide investigations, particularly its investigations of cold cases. In *Avery v. Milwaukee,* a similar case involving another wrongful conviction related to another of Walter Ellis's victims, this Court recently denied a very similar motion to bar brought by the same Milwaukee Defendants, including DeValkenaere. The Court's *Avery* order, dated less than a month ago on the same issue, rejected the same arguments raised here. The Court explained "[t]his is relevant information related to the alleged pattern and practice of the Milwaukee Police Department in conducting homicide investigations." *See Avery v. City of Milwaukee,* No. 11-c-00408 (E.D. Wis. Jan. 20, 2015), attached to Donnell Decl. at Exhibit 2, [hereinafter "*Avery* Order"]. The same conclusion is equally appropriate here.

Indeed, the evidence of the Burems complaint that was found admissible in Avery, including Burems deposition testimony, was from the discovery conducted in this case. In addition, just as in Avery, Plaintiff's police practices expert, Dennis Waller, relied on the Burems complaint and Detective Burems' deposition in reaching his opinions in this case regarding how the Milwaukee Police Department conducts homicide investigations. *See* Donnell Decl. at Exhibit 1 (Waller Report) at 16-17. This evidence is additionally relevant in this case because it has to do with the conduct of Detective Buschmann and how he conducted another cold case investigation.

By way of background, the homicide investigation at the center of Burems' complaint concerned Debra Maniece, who was murdered just a year before Jessica Payne in 1994. *See* Donnell Declaration at Exhibit 3 (Burems Complaint) at 2. Detective Burems set forth a detailed account of how the Milwaukee Police Department under-investigated the homicides of poor, black, drug-addicted prostitutes in the City, precisely the demographic of most of Walter Ellis' victims. Specifically, Burems complained that Defendant Buschmann and his then partner Detective Wesolowski were assigned as

23

the lead detectives and they failed to investigate Maniece's murder because she was a poor, black, drug-addicted prostitute. *Id.* at 2.

While Burems worked on the Maniece file and followed up on the leads, he and his partner repeatedly experienced supervisors in the MPD thwarting their investigation and efforts to bring justice for Ms. Maniece's family, including taking evidence reports returned from the Crime Laboratory on the case. *Id.* at 3. Burems learned from District Attorney Mark Williams that the MPD had even told him not to issue charges on the Maniece homicide. *Id.* at 6. Burems went back to the file and to his surprise, he learned that in November 2001 the MPD had closed the Maniece homicide as "cleared" despite never having charged anyone. *Id.* at 8. In Burems' opinion, the MPD experiences pressure to close open homicide files each year around November in an effort to have fewer unsolved murders at the end of the year. *Id.* at 7.

For the reasons the Court accepted in *Avery,* Burems' testimony is relevant to several issues in this trial. In seeking to bar it, Defendants contend that the Burems' complaint does not specifically pertain to the Payne investigation, and it does not address the City's failure to disclose exculpatory information and/or address the *de facto* practice of detectives destroying their interview notes or Memo Books. As discussed in a prior Response to Defendants' Motion in *Limine* No. 1, with case citations, Defendants' view of relevance is unduly limited. Testimony need not bear directly on the elements of a claim in order to be probative and admissible.[5]

---

[5]    Moreover, as this Court properly concluded in *Avery,* the admission of this evidence will not require a "trial within a trial," nor will it mislead the jury. Dckt. 189 at 8. Defendants' citation to *Duran v. Town of Cicero,* Ill., 653 F.3d 632, 645 (7th Cir. 2011) does not compel a different result. *Duran* involved a six week jury trial against 17 defendants and a municipality. The court affirmed the exclusion of evidence of prior citizen complaints as to one of the defendant officer explaining that "this was a very complicated case, with many claims, plaintiffs, and defendants. The introduction of several old, unrelated misconduct complaints against a single officer risked creating a sideshow and sending the

24

## VIII.  Defendants' Motion In *Limine* No. 7 Response in Opposition to Motion In *Limine* Excluding Evidence of the State of Wisconsin Should Be Denied

Defendants also seek to bar any mention of the decision by the State of Wisconsin Claims Board, which found, after a hearing and by clear and convincing evidence, that Chaunte Ott was innocent of the murder of Jessica Payne for which he was wrongfully convicted. *See* Donnell Declaration at Exhibit 4 (State of Wisconsin Claims Board Decision). According to the Defendants, any evidence relating to the Claims Board decision is both irrelevant and unduly prejudicial. These arguments were rejected by this Court in *Avery*, No. 11 CV 408 (E.D. Wis.), a decision the Defendants somehow fail to even mention in their motion. The same result should obtain here.

### A.  The Claims Board Decision is Admissible

As an initial matter, there appears to be no dispute that the Claims Board decision is admissible under Fed. R. Evid. 803(8), the public records hearsay exception. *See Avery* Order at 6. Indeed, the Defendants do not make a hearsay objection, and "Rule 803(8) specifically exempts hearsay documents identified as public records or reports" such as the Claims Board ruling. *Id.*

### B.  The Claims Board Decision is Relevant

Instead, the Defendants argue that the Claims Board decision should be excluded because it is "irrelevant." Such a contention is erroneous. *See* Donnell Decl., Exhibit 5, Order, *Logan v. City of Chicago*, No. 09 C 5471 (N.D. Ill. Oct. 19, 2012), Dckt. 423 at 1 (ruling that similar "Certificate of Innocence" decision generated under Illinois Law is admissible for purposes of damages).

---

trial off track." *Id.* at 645. The evidence here is of an entirely different character.

25

### 1.     The Decision Is Relevant to Damages

Most centrally, the decision of the Claims Board is probative to the issue of Plaintiff's innocence.  This Court has already found as much in *Avery*.  *Avery* Order, at 6 ("As Avery explains, defendants will likely attempt to argue that Avery may actually be guilty of the Griffin homicide.  This evidence counters that line of argument.").  Perhaps recognizing the problem created by that holding (notwithstanding their failure to mention it), the Defendants argue that they "do not believe that the identity of the actual murderer is relevant and do not intend to argue that Ott killed Payne" because innocence is "not an element of Ott's *Newsome v. McCabe,* 256 F.3d 747, 752 (7th Cir. 2001) claim." Dckt No. 189 at 11.  The Defendants' claim, however, is not only contradicted by the evidence that they are seeking to admit (and bar), but also is incorrect under the law.

Although the Defendants state that they are not going to suggest Ott committed the Payne homicide, even a cursory review of their motions in *limine* defies that contention.  For example, the Defendants are seeking to admit the statement and trial transcript of Richard Gwin in which Gwin falsely implicated Ott in the Payne murder.  Dckt No. 189. at 2-4.  Likewise, the Defendants are seeking to exclude all evidence of Ott's innocence; namely, highly probative DNA evidence linking serial killer Walter Ellis to the Payne murder and to nine other similar murders.  *Id.* at 18-20.  Even if the Defendants do not expressly state during opening or closing arguments that Ott killed Payne, the import of these motions *in limine* and the attempt to shape the evidence introduced at trial is that Ott committed the crime.  The decision of the Claims Board "counters that line of argument," and therefore is relevant.  *Avery* Order, at 6.[6]

---

[6]   Likewise, the Claims Board decision counters any argument that the Defendants may make that Plaintiff was never actually exonerated.  See Parish v. City of Elkhart, 702 F.3d 997, 1002-03 (7th Cir. 2012) (discussing unfair prejudice that resulted from defendants arguing that plaintiff was never

But even if the Defendants were not seeking to inculpate Ott for the Payne murder at the upcoming trial, Plaintiff has an affirmative need to introduce evidence of his innocence, namely, for purposes of damages. As argued in response to prior motions in *limine* (see discussion, *supra* at 1-4), Plaintiff set forth case law establishing that evidence bearing on innocence in a wrongful conviction case is always relevant. *Parish,* 702 F.3d 997 (7th Cir. 2012) ("Because the district court's rulings improperly limited the introduction of evidence relating to Parish's innocence, and that evidence was critical to the damages issue, the award of damages cannot stand.").

Following *Parish,* Plaintiff should be permitted to introduce evidence of the Claims Board decision not only in support of his claim of innocence, but also as part of his journey to clear his name after his release from prison. The hearing and the process of obtaining that decision represent an important part of his post-release experience, and hence his damages story.

## 2. None of the Defendants' Arguments Are Meritorious

None of Defendants' arguments merit a different conclusion. Just as in *Avery,* here, the Defendants argued that the Claims Board determination was not relevant because (a) the City was not a part of the Claims Board hearing, (b) the decision of the Claims Board does not implicate any of the Defendants, and (c) the District Attorney did not contest Ott's petition before the Claims Board. Dckt. 189 at 10-11. This Court already considered these contentions in *Avery* - highly similar Section 1983 litigation - and rejected them. *Avery* Order, at 6. The same result should obtain here. Moreover, the fact that the Milwaukee County District Attorney's Office received notice and declined to respond to Ott's petition does not change the admissibility of the Claims Board's decision. The DA chose not to respond despite having the opportunity to do so. This choice may well have been based on a failure to

exonerated of crime when evidence of plaintiff's innocence was excluded from trial).

27

have any disagreement with the evidence presented.

Defendants also argue that even if relevant, introduction of the Claims Board decision will unfairly prejudice them. This, too, is unpersuasive.

First, the Defendants argue that the jury will be unduly influenced by the Claims Board decision "even if a cautionary instruction is provided." Dckt. 189 at 12. The Defendants cite no legal authority for that proposition nor is there any: Jurors are presumed to follow the law as given by the Court and are sophisticated enough to consider evidence only for the purpose permitted. *See Shannon v. United States*, 512 U.S. 573, 583 (1994) (explaining "the almost invariable assumption of the law that jurors follow their instructions") (citations omitted); *United States v. Lynwood*, 142 F.3d 418, 426 (7th Cir. 1998) ("[T]he law assumes that [juries] can and do follow the limiting instructions given to them."). As this Court explained in *Avery*:

> The jury will be properly instructed on the law, making clear that the Board's decision is simply another piece of evidence to weigh when applying that law. The Court is not convinced that the probative value of this evidence is outweighed by any danger of unfair prejudice. Fed. R. Evid. 403.

*Avery* Order, at 6.

Second, and similarly, the Defendants argue that the Claims Board decision would "confuse and mislead the jury" because it would suggest that the Claims Board had already reached a decision on the ultimate issue in this case "as opposed to the limited decision" it actually reached on Ott's innocence. Dckt. 189 at 13. There is absolutely no support for such an assertion. The Claims Board, as the Defendants themselves repeatedly emphasize, determined only that Plaintiff was innocent and that he did not by his actions or inaction contribute to his wrongful conviction. The Claims Board made no ruling whatsoever that Ott was denied due process, the legal issue at the heart of this litigation. The Defendants have offered no reason, let alone a legal cite, for why a jury would be unable

28

to understand this distinction. The Court's ruling in *Avery* that a jury could appreciate the difference and consider the Board's decision where appropriate should govern here. *Avery* Order, at 6; *see also Shannon*, 512 U.S. at 583; *Lynwood*, 142 F.3d at 426.

**IX.** **Defendants' Motion in Limine No. 9 Seeking To Exclude Evidence Or Testimony Pertaining To Defendant DeValkenaere As A Defendant In Avery Is Unopposed**

Plaintiff has no opposition to relief sought. Defendant DeValkenaere's status as a defendant in another lawsuit is not relevant *per se.* That concession does not, however, require the conclusion that DeValkenaere's actions during the Maryetta Griffin homicide investigation are irrelevant or inadmissible, and Defendants have not moved to bar them. To the extent Plaintiff can establish a foundation for the relevance of DeValkenaere's actions in the investigation of the other Ellis murders, the Court can rule on any objections in the context of trial.

**Conclusion**

For the reasons explained above, the Court should deny Defendants' Motions *In Limine* Nos. 1-11.

RESPECTFULLY SUBMITTED,

/s/ Jon Loevy
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

29

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on February 17, 2015, I filed a copy of the attached Plaintiff's Response To Defendants' Non-*Daubert* Motions *In Limine* Nos. 1-11 via the Court's CM/ECF filing system and thereby caused a copy of the same to be served on all counsel of record.

/s/ Jon Loevy

30