# EXHIBIT 1

# WALLER & ASSOCIATES, LLC

14665 W. Lisbon Road, Suite 2F
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 782-5521
www.wallerassociates.com

**Dennis Waller, CLI**
denny1@gdinet.com

March 28, 2013

Attorney Heather Lewis Donnell
Loevy & Loevy
312 N. May Street
Suite 100
Chicago, IL   60607

Re:     **Ott v. City of Milwaukee, et al.**

Ms. Donnell:

The following report is being presented per your request for my opinions on various issues related to this litigation.

*Background and Qualifications:*

I have served as a consultant/expert witness in more than 500 cases involving issues related to police policy, procedure, and practice.  I have been retained in thirty-five states and have served as an expert witness in federal courts, state courts, and before administrative hearings.  I have been retained by counsel for both plaintiff and defense.

I have a Bachelor of Science degree in Police Administration from Michigan State University.  I have a Master of Science degree in Public Administration from Florida International University.  I have received over 3,400 hours of law enforcement training including hundreds of hours of criminal investigation training from Michigan State University, the University of North Florida, Northwestern University, University of Wisconsin, International Association of Chiefs of Police; Metropolitan Police Institute; Milwaukee Area Technical College; and the Milwaukee County Medical Examiner's Office.  I have been trained as an assessor for the Commission on Accreditation for Law Enforcement Agencies.  I am a Fellow of the American College of Forensic Examiners.  I am a Diplomate of the American Board of Law Enforcement Experts.

I have served as a police detective, detective sergeant, lieutenant, department training officer, and chief.  I have been certified as a police training instructor in Michigan, Florida, North Carolina, and Wisconsin.  I have served as the director of a regional police training academy in

Raleigh, North Carolina.  I am a Certified Legal Investigator, one of approximately one hundred in this country.  Throughout my years as a trainer and supervisor, I have trained hundreds of officers in various aspects of criminal investigation, interviewing and interrogation, constitutional issues for police officers, and police ethics.

I have taught in a variety of law enforcement and related subject areas at the college and university level including the police function, police administration, criminal investigation, interviewing and interrogation, crime scene investigation, criminalistics, and policy development seminars in high liability areas.

Please refer to the attached curriculum vitae.

*Methodology:*

The methodology I use to examine police-related issues involved in litigation is explained below. This methodology is the same, or similar to, that utilized by experienced and respected expert witnesses in the field of police practice. The basic methodology I use has always been found acceptable in the 500 plus cases I have reviewed for matters before federal courts, state courts, and administrative hearings.

A.  Develop an Understanding of the Facts   Following a review of the information provided, I develop and state an understanding of the facts. The facts and circumstances are specific for each case. If you change the understanding of the facts, the opinions may change or no longer be applicable.

B.  Analyze the Actions of the Officers   The second step involves analysis of the actions of the involved law enforcement officers based on documentation by the officers, relevant testimony, departmental and/or external investigations, physical evidence, and any other relevant information. Determine what the officers did and their stated justification for what they did.

C.  Compare with Standards of Training and Practice   The third step involves comparing what and why the involved officers did with various standards of training and practice. Standards of training and practice include relevant Supreme Court cases; departmental policies and procedures; applicable statewide police training programs/systems; model policies, training, and research from such institutions as the International Association of Chiefs of Police, Police Executive Research Forum, National Criminal Justice Reference Service, and the Northwestern University Center for Public Safety.

D.  Define and Explain Consistencies and/or Inconsistencies   The fourth step involves explaining how what the officers did, or did not do, was consistent or inconsistent with the applicable standards of training and practice.

***Materials Reviewed:***

>    Complaint;
>    Response to Plaintiff's Requests for Production of Documents:
>        DNA Information;
>        Memorandum Books Rules/Policies;
>    Milwaukee PD Investigative File/Reports - Homicide of Jessica Payne;
>    Detective Carl Buschmann - Deposition;
>    Chief Arthur Jones - Deposition;
>    Chief Nanette Hegerty - Deposition;
>    Detective Ricky Burems – Depositions I & II;
>    Detective Percy Moore, Jr. - Deposition;
>    Captain Michael Dubis - Deposition;
>    Captain Eric Moore - Depositions I, II & III;
>    Latonia Cooper - Deposition;
>    Sam J. Hadaway - Deposition;
>    Assistant District Attorney Mark Williams - Declaration;
>    Chaunte D. Ott - Deposition;
>    Captain Diana Rowe - Deposition;
>    Detective Robert Simons - Deposition;
>    Detective James DeValkenaere - Depositions I & II.
>    Amended Criminal Complaint for Walter E. Ellis - Court Case No.: 09CF002396;
>    State of Wisconsin District 1 Court of Appeals pleadings and rulings - State of Wisconsin
>        v. Chaunte Ott;
>    Newspaper Article related to Walter Ellis;
>    Defendant Buschmann's Responses to Plaintiff's Fourth Set of Interrogatory Requests;
>    Defendant Buschmann's Responses to Plaintiff's First Set of Requests to Admit.

***Understanding of the Facts:***

Based on information reported in Milwaukee Police Department [MPD] documents and other documents reviewed in the course of this litigation, I have developed an understanding of the facts and circumstances surrounding the investigation and subsequent police activities related to the MPD death investigation of Jessica Payne.

On August 30, 1995 at approximately 7:45 a.m. the body of sixteen-year-old Jessica Payne was found behind an abandoned house at 3116 N. 7th Street in a predominantly black neighborhood of Milwaukee. Ms. Payne was discovered partially disrobed with her T shirt pulled up near breast level, her bra torn exposing her breasts, and her pants pulled down to about knee level.

During the autopsy, it was determined that Ms. Payne died from loss of blood due to an incised wound to the neck. The medical examiner ordered a complete sexual assault examination. Semen was found in her vagina and collected as evidence. DNA evidence was subsequently developed but was not initially linked to a particular individual.

A homicide investigation was initiated by the Milwaukee Police Department. Various detectives were involved in tracing Ms. Payne's activities during the days prior to her death. It was learned that Ms. Payne had left her home in South Milwaukee during the late evening of August 26, 1995, and went to the north side of Milwaukee with her friend, Rebecca Morrison. Between that time and the time of her death, information was developed that Ms. Payne and Ms. Morrison stayed in the north side in a house utilized for prostitution and drug sales. Ms. Morrison advised that she was sexually active over the course of those days. Investigative reports revealed anecdotal information indicating that Ms. Payne was likely involved in the sale of drugs.

During the course of the Payne homicide investigation numerous suspects were interviewed and/or interrogated and their information verified. Suspects, who were with Ms. Payne when she was last seen in a vehicle, were checked and the detectives did not consider them suspects. As the various leads were followed without success, the investigation stalled. In October 1995 Detectives Carl Buschmann and James DeValkenaere were assigned as primary investigators to work the Payne investigation as a cold case to follow up on any loose ends. One loose end was to locate a subject named "Cortez."

According to a Milwaukee PD report, on September 27, 1995, Detective DeValkenaere had learned from Antoinette Rozzell, AKA Inetha Waller, an inmate at the Criminal Justice Facility [CJF], that sometime after August 23, 1995, she was babysitting at the home of Charlotte Brown because Brown was in drug treatment. Brown's cousin, who she knew only as "Cortez" came over to Brown's house with two other black males, one with the nickname of "T-bone." Cortez came by to process some drugs. While there Cortez commented that they had a white bitch for sale. A few days later, Cortez stated that he and his friends had sex with the white girl and implied they killed her. Ms. Rozzell, AKA Waller, further indicated that Sandra Giles, another CJF inmate, had advised her that she had held a white girl in her home for four days. When the girl tried to get away, they killed her. Giles made a slashing motion at the throat.

Detectives were able to identify Cortez as Richard Gwin. At 1:30 p.m. on October 24, 1995, Richard Gwin came to the Criminal Investigation Bureau [CIB] with his mother. Gwin, an admitted drug dealer, was interviewed by Detectives DeValkenaere and Buschmann. Gwin denied any knowledge of the homicide or having ever stated anything about it. Gwin stated he was aware a girl had died as a result of her throat being slashed. The detectives made an issue about how he had obtained that knowledge [i.e. throat slashed] claiming it was not public knowledge. Because Gwin allegedly was displaying some knowledge of the incident, he was taken into custody at 4:50 p.m.

During an interrogation between 4:50 and 7:45 p.m. on October 24, 1995, Gwin denied any involvement in the death of Jessica Payne. He further denied saying to anyone that he had a girl for sale or that he had killed a girl. Gwin stated he heard something about the murder from a guy named Sammy Joe [identified as Sammy Hadaway], who lives next door to his sister on 19th and Galena. Gwin was not sure when it happened, maybe a couple months previously. Hadaway was on the porch with two white girls. He identified one as Jessica Payne after seeing her photo. Hadaway was with another black male who he thought may be Hadaway's cousin. About a month later Gwin was talking to Hadaway. Hadaway advised him that the girl he had been talking to was found behind an abandoned house with her neck cut.

On October 24, 1995, based on information that Sammy Hadaway had knowledge regarding the homicide of Ms. Payne, Detectives Ricky Burems and Michael Valuch brought Hadaway into the Detective Bureau. Hadaway was shown a picture of Payne. He denied having ever seen her. Hadaway also denied ever telling anyone that a white female had been present at his residence during a crap game. Hadaway admitted knowing Cortez from the neighborhood, but stated he rarely associates with him and has never been in Cortez' car. Hadaway advised that he is usually with Chaunte Ott. Hadaway agreed to provide biological samples to compare with evidence obtained from the homicide.

Also on October 24, 1995, Detectives Burems and Valuch interviewed Booker T. Edwards. Mr. Edwards related that a couple months prior, he had been shooting dice on the porch of 1929 W. Galena with Chaunte Ott and Sammy Hadaway. He recalled seeing a white female with dark hair go by. She appeared to be high or intoxicated. She was looking for the area of 19th and Keefe. Ten to fifteen minutes later she again passed by going in the other direction in the company of an unknown black male. Mr. Edwards recalled hearing about a white female being found dead under a mattress a couple days later.

At 3:25 p.m. on October 25, 1995, Hadaway, who was under arrest at the time, was interrogated by Detectives Eric Moore and Michael Dubis. Hadaway advised he had been drinking a lot when he saw the white girl a couple months ago. The white girl approached the porch where he was with Edwards, Ott, Gwin, and several others. The girl asked for directions. The girl left. A short time later she came by going in the other direction in the company of an unknown black male.

When the others left, Hadaway went inside, threw up on himself, and then went to bed. Hadaway also said Gwin had made comments about having a white female for sale; but, that was approximately two weeks before they saw the white girl in front of Hadaway's house. Hadaway denied any involvement in the murder and does not know why Gwin would say he did.

Gwin was interviewed again beginning at 5:15 p.m. on October 25, 1995, after he was administratively released from custody. In this version, Gwin was reported as advising that about three months ago he observed Hadaway and a black male called Chaunte talking with a white female. Gwin believed that Chaunte was Hadaway's cousin. Gwin saw Hadaway, Chaunte, and the white girl walking across the parking lot of the Sentry store. Gwin pulled up in his car and the three got in with the intention of going to a "dope" house. They purchased some marijuana and smoked it in the car while listening to music. Hadaway, Ott, and the girl got out of the car supposedly to buy more drugs. About fifteen minutes later, Hadaway and Ott came back to the car without the girl. Hadaway allegedly said, "She didn't have no money so Chaunte cut her throat." Ott also was quoted as saying, "I did that bitch." A couple of days after this happened, Gwin heard on the news that a girl was found dead behind the house where they had gone to purchase drugs.

At approximately 5:50 p.m. on October 25, 1995, Detectives Burems and Valuch arrested Chaunte Ott and conveyed him to the CIB. On October 26, 1995, between 7:10 and 11:40 p.m. Ott was interrogated by Detectives Stigler and Valuch. Ott stated that sometime in late summer he was playing dice with Hadaway, Booker, and three or four others at 1931 W. Galena. Gwin and several others also joined in the game. Sometime after midnight a white teenage female walked up asking for directions. She left by herself and he did not see her again.

About 12:30 p.m. on October 27, 1995, Hadaway requested to speak to detectives regarding his arrest. Hadaway reportedly advised Detectives Buschmann and DeValkenaere that about one and a half months ago on a weekend night he saw a white female, subsequently identified from a photograph as Jessica Payne, walking on the south side of W. Galena Street. At the time, Hadaway was rolling dice with five or six other people including Ott, Gwin, and Edwards. The girl appeared intoxicated and asked for directions. Five to ten minutes later the girl walked by with an unknown black male. After going inside, Hadaway came back outside and observed Ott with the white girl in the Sentry parking lot. Hadaway joined Ott and the girl. They were then joined by Gwin who invited them into his vehicle to obtain some marijuana. They smoked the marijuana in Gwin's vehicle. Ott, Hadaway, and the girl then exited the vehicle and walked behind a vacant house. Ott and the girl were all "hugged up." When the girl advised Ott to stop, Ott began striking her. The girl was fighting back. Ott struck the girl in the face. Ott threw her onto a mattress and attempted to remove her clothes. When Ott got up Hadaway observed blood on the girl's throat. When Ott and Hadaway returned to the car, Hadaway advised Gwin, "I think he killed her." Hadaway denied having any sexual contact, physical contract, or involvement in Payne's death.

At about 11:26 a.m. on November 1, 1995, after undergoing a polygraph examination, Detective Simons determined that Hadaway was not telling entire truth with regard to helping Ott kill Payne. Hadaway reportedly gave additional information to Detectives Simons and Buschmann in a subsequent interrogation. Hadaway stated he and Ott planned to rob the white girl after they got her into Gwin's car. Gwin stayed in the car when they took the girl behind the house.

Hadaway said he held the girl's hands above her head while Ott was grabbing at the girl's clothes.

Based solely on the statements of Gwin and Hadaway, and without any physical evidence linking them to murder of Jessica Payne, Chaunte Ott was charged with First Degree Intentional Homicide Party to a Crime and Attempted Robbery Party to a Crime. Hadaway was charged with Attempted Robbery Party to a Crime. Ott was found guilty by a jury and sentenced to life imprisonment. Hadaway pleaded guilty in exchange for a reduction in his sentence.

In return for his testimony against Ott, Hadaway was given a sentence of five years in prison. Following his prison term, Hadaway has given sworn testimony that the police advised him they had evidence that Ott killed the girl. Hadaway stated he did not know anything about the murder except for what the police told him. The police read reports to Hadaway and told him if he did not testify, they would blame him for the murder. He would do eighty years in prison. Before giving his statements, Hadaway was not allowed to speak to anyone. Hadaway described himself as "special ed," a "slow learner" who has seizures and cerebral palsy.

Gwin has since passed away. Before he died, Gwin advised family members that he had been interrogated by Milwaukee police about the murder for which Ott was convicted. During the interrogations, the police put severe pressure on him. In order to go home, he had to lie. At no time did Gwin ever mention to any family members that he, Ott, or Hadaway had any involvement in the Payne murder. It should also be noted that Gwin was not a close friend, or associate, of Ott.

On or about May 22, 2003, the Wisconsin Crime Laboratory linked the unknown male DNA profile obtained from Payne with the unknown male DNA profile obtained from Joyce Mims. The Crime Lab communicated that information to the Milwaukee Police Department on or about

May 22, 2003. A Copy of the report was received by the Milwaukee PD on June 18, 2013. On June 6, 2003, a Crime Lab report indicated the DNA evidence from the vagina of Jessica Payne was not linked to Ott, Hadaway, or Gwin. On June 13, 2007, the DNA evidence from Payne was linked to evidence from the same subject in the Mims' and Stokes' homicides. On May 18, 2009, DNA evidence linked the same subject to the homicides of Harris, Miller, McCormick, Farrior, Mims, and Payne. On September 16, 2009, DNA evidence from the vagina of Jessica Payne was linked to Walter Ellis.

Prior to Ms. Payne's murder, there had been at least three other homicides that had occurred within close geographic proximity to where Payne was found with similar factual circumstances surrounding the homicide: [sexual activity or assault; drug use; clothing removed; no known suspect] - Smith [11/28/92]; McCormick [4/24/95]; and, Farrior [6/27/95]. Other murders - Harris [10/10/86] and Miller [10/11/86] were also similar but occurred farther away from the location of Payne's body. Mims [6/20/97] and Stokes [4/27/07] also occurred within close

geographic proximity, but occurred after the Payne homicide [8/30/95]. On September 10, 2009, Walter Ellis, with the noticeable exception of the Payne and Griffin murders, was charged with these homicides. He has since pleaded no contest.

*Opinions:*

Based on the totality of my training, education, and experience in law enforcement; as a trainer; as an educator; and, as a consultant, I have developed the following opinions to a reasonable degree of professional certainty in the field of police practice.

A.      Strong indicia exists that the Defendants failed to comply with nationally accepted police practices in the Payne homicide investigation.

    1.      The purpose of any investigation is to determine the truth about what happened.

        a.      Detective Robert Simons [deposition, p. 135] admitted that solving a crime and obtaining a confession are not always the same thing. He further stated he was trained ".....to find out what happened and seek the truth."

        b.      According to the "Reid Technique," the most widely taught interrogation tactics taught to law enforcement personnel in this country, the objective of an interrogation is to elicit the truth from a suspect.

        c.      Police personnel are trained <u>not</u> to provide key information to suspects and/or witnesses.

            -1-      The purpose of an interview/interrogation is to obtain information.

            -2-      Throughout an interrogation the investigator's goal is to learn the truth.

    2.      Improperly providing an easily intimidated witness or suspect with specific information about a crime and then threatening that person with life imprisonment unless they implicate another party is inconsistent with the proper determination of the truth about what happened.

        a.      Sam Hadaway stated in an affidavit on September, 28, 2008, and confirmed in his subsequent deposition that:

            -1-      The police advised Mr. Hadaway they had evidence that Chaunte

Ott killed the girl [Hadaway deposition, p. 13]. The MPD detectives admitted in sworn testimony they had no such evidence.

-a-    Detective Buschmann admitted in his deposition [p. 89] that the whole case against Ott was the statements from Gwin and Hadaway.

-b-    Detective DeValkenaere admitted in his deposition [p. 127] that there was no evidence linking Ott to the Payne homicide other than the statements of Gwin and Hadaway.

-2-    Although Mr. Hadaway stated he did not know anything about the murder of Ms. Payne, the police told him stories about the girl getting her neck cut [pp. 14-6]. Hadaway went by what the police told him [p. 21].

-3-    "....a suspect who is vulnerable and confused....and who is given false evidence by a deceptive interrogator....may confess to the act...." [Hollida Wakefield, MA and Ralph Underwager, Ph.D., Coerced or Nonvoluntary Confessions, 1998, p. 4]

-4-    There have been a significant number of DNA exonerations whereby intellectually challenged persons have made false confessions. "Obviously, when dealing with such a suspect, the investigator should take extra efforts to corroborate the trustworthiness of the confession." [The Investigator Anthology, 1999, p. 467]

b.    Mr. Hadaway stated in his deposition that while keeping him locked up incommunicado and depriving him of his medications [p. 12], the Milwaukee PD detectives used threats of punishment and promises of leniency to pressure him into making a confession and testifying against Mr. Ott. The detectives used both coercion [threats] and promises of leniency. The police told Mr. Hadaway if he did not testify against Mr. Ott, they would switch it (i.e. responsibility for the murder) over to Hadaway and he [Hadaway] would do eighty years. Mr. Hadaway testified [deposition, p. 17] ".....I got to testifies [sic] against him [Ott] and plead to something so I get 5 years instead of 80 years."

-1-    ".....the general test governing the admissibility of confessions obtained from interrogation practices ....is....whether or not the interrogation tactic or procedure is likely to cause an innocent person to confess." [Professor Fred E. Inbau, Criminal Interrogations and Confessions, 3rd ed., 1987, p. 217]

-2- "Implied promises of leniency fall into the same category as implied threats....courts have ruled that they may cause an innocent person to confess....should not be permissible." [Brian C. Jayne and Joseph P. Buckley, The Investigator Anthology, p. 427]

-a- Implied promises of leniency should be disclosed under the Brady v. Maryland decision.

-b- "The Brady decision and subsequent rulings have made it a duty of all law enforcement agencies to (1) identify and provide to the prosecution any exculpatory material that would have a reasonable probability of altering the results in a trial, or any material that could reasonably mitigate the sentencing of a defendant…." [IACP Model Policy – Brady Disclosure Requirements]

-3- "Police deception can result in innocent people being convicted....police pressure to coerce false witnesses, suppression of exculpatory evidence, shoddy police work after a conclusion has been reached about guilty....[are] major factors in wrongful convictions." [Coerced or Nonvoluntary Confessions, p. 7]

c. In addition, once detectives interrogating Hadaway learned that he was being deprived of his medications, they should have assessed what medications Hadaway took and what the effects were of him not receiving his medications to determine whether he was able to provide a reliable and valid statement.

d. Of the three alleged suspects, the Milwaukee PD detectives coerced the weakest one, Hadaway, into making a confession. Hadaway was seventeen years old at the time and took anti-seizure medicine.

-1- "Consideration ....must be given to the suspect's mental health and cognitive abilities." [The Investigator Anthology, p. 424]

-2- Joseph Buckley from Reid [Reid Report, 2004] acknowledges that false confessions do occur. Some of the factors conducive to false confessions are:

-a- "*The suspect is a juvenile*." Sam Hadaway was seventeen when repeatedly interrogated by MPD detectives.

    -b-    *The suspect suffers from mental or psychological impairment*." Hadaway described himself [deposition, pp. 6-7] as "special ed," slow learner, having seizures, and having cerebral palsy.

        aa    Mr. Hadaway testified [p. 39] about having a bad memory. "I have seizures. So if I don't take my pill or something, I have a seizure. I don't remember half the stuff."

        bb    A Milwaukee PD report dated January 25, 2009, indicated Hadaway suffers from short-term memory problems due to the medication he takes for his seizures.

    -c-    "*The interrogation took an inordinate amount of time*." Hadaway was interviewed, interrogated, given a polygraph, and interrogated again during the period of October 24 through November 1, 1995. Hadaway stated [p. 12] he was in jail for days while being deprived of his medications.

    -d-    "*The interrogators engaged in illegal tactics and techniques*." The threat of being charged with murder and facing eighty years in prison is obviously coercive. Defendants' promise of leniency, doing only five years in prison, was also improper.

  -3-  G.H. Gudjonsson discussed key factors in obtaining false confessions from vulnerable individuals. [The Psychology of Interrogations and Confessions: A Handbook, 2003] Among those factors were:

    -a-    Vulnerable individuals include youth and immaturity.

    -b-    First time suspects with no interrogation experience.

    -c-    Low intelligence or mental retardation.

    -d-    Poor memory.

    -e-    Low self-esteem, highly suggestible, and acquiescent.

-4-     "A review of anecdotal accounts reporting false confessions includes a high proportion of mentally handicapped suspects. A suspect with legitimate mental disabilities generally lacks assertiveness and experiences diminished self-confidence.  In many cases he will....experience self-doubt...these traits may make the suspect more susceptible to offering a false admission when exposed to active persuasion."  "The Investigator should take great care in obtaining corroborative information to verify the trustworthiness of the statement." [Criminal Interrogation and Confessions, 5th ed., 2011, pp. 431-2 from information regarding false confessions provided by Americans for Effective Law Enforcement]

e.      The alleged confession about Hadaway's involvement in the Payne homicide that Hadaway was coerced into making was inconsistent with his [Hadaway's] physical abilities.

-1-     According to Hadaway's testimony [deposition, p. 82], "....I made the story, said I'm helding [sic] her down, I'm holding her down." This was referring to holding Payne's hands above her head while Payne was up against the house standing with her back against the wall.

-2-     Hadaway testified in his deposition [p. 17] that the police advised him that he had to be a part of the murder if he was to get five years in prison.  The police suggested to Hadaway that he held Payne down, so he agreed to that.

-a-     A polygraph on November 1, 1995, of Hadaway conducted by MPD Detective Robert Simons indicated "....Hadaway is not telling the entire truth in regards [sic] to the below listed questions." [11/1/95 Polygraph Examination Report by Detective Robert Simons]

-b-     One of the questions to which he responded "yes" to was, "Did Chaunte [Ott] cut that white girl's throat?"  Please note that Hadaway has testified he knew nothing about the Payne murder except what the police told him.  This would be consistent with him being deceptive regarding Ott cutting the girl's throat or him [Hadaway] holding the girl down while she was fighting.

-3- Following the polygraph, Hadaway was reported as having made the statement that "....he [Hadaway] did hold the victim, Jessica Payne's hands above her head while a co-actor searched her pockets."

-4- Referring to his cerebral palsy, Hadaway stated [deposition, p. 7] "My whole left side shut down. I was born like that. All my life.....no grip. No feeling. I can't do nothing with it."

-a- Assuming Hadaway's condition is factual and easily verifiable, it should have immediately brought into question to the detectives the legitimacy and value of Hadaway's confession.

-b- On October 25, 1995, Hadaway advised Detectives Dubis and Moore that he has cerebral palsy which affects his left side. He further advised the detectives that had had been shot in the left side of his chest in 1992.

-c- If Hadaway's condition is visibly obvious, the existence of that physical condition casts significant doubt on the ability of Hadaway to function in the manner indicated in his "confession." This would have caused a law enforcement officer legitimately seeking to determine the truth to consider and document his/her findings. No such documentation has been provided.

f. Hadaway has subsequently given sworn testimony repudiating his confession. This is noteworthy because it would definitely be against his self interest and he has nothing to gain personally.

-1- Hadaway admitted he committed perjury.

-2- Hadaway's efforts to be forthcoming has generated additional attention from Milwaukee PD personnel in the form of interviews and polygraph examinations.

g. Assuming that Richard Gwin was coerced into testifying about Chaunte Ott's involvement in the Payne homicide. Per the affidavit of John Pray, Esq., dated October 16, 2008, Theresa Jones, the sister of Richard Gwin (now deceased), stated that Gwin advised her:

-1-   He had been interrogated by the Milwaukee police about the murder for which Ott was convicted.

-2-   He advised her that during the interrogations the police put severe pressure on him to talk.  In order to go home he had to lie.

-3-   Gwin never told his sister that he, Hadaway, or Ott had any involvement in the murder for which Ott was convicted.

-4-   Gwin was not a close personal friend of Ott or Hadaway.

h.   Consistent with statements from Ott, Gwin, and Hadaway, Booker Edwards, an independent witness, confirmed in a MPD report dated October, 24, 1995, that the white female believed to be Payne was last seen with an unidentified black male.  DNA evidence from seminal material in Payne's vagina was subsequently linked to Walter Ellis, a convicted serial murderer who was active in the area in which Payne's body was found.

i.   Detective Carl Buschmann [deposition, p. 40] admitted he and Detective James DeValkenaere were the primary detectives assigned to the cold case investigation of the Payne homicide.

-1-   Detective Buschmann [p. 89] indicated the whole case against Mr. Ott were the statements of Gwin and Hadaway.  Furthermore, Detective Buschmann has admitted to providing information about the homicide, including Gwin's statement, to Hadaway during Hadaway's interrogation.  [Buschmann's Response to Request to Admit No. 41]

-2-   Likewise, Detective DeValkenaere stated in his deposition [p. 127] that he did not recall any other evidence to convict Ott other than Gwin's and Hadaway's statements.

-3-   There were no apparent efforts made by these detectives to corroborate the confession of a "vulnerable" person, Sam Hadaway.

3.   *The Law Enforcement Code of Ethics* was promulgated by the International Association of Chiefs of Police and widely adopted by police agencies throughout the country.  The Commission on Accreditation for Law Enforcement Agencies [Standard 1.1.2] calls for all sworn officers to abide by a canon of ethics adopted by the agency.  *The Law Enforcement Code of Ethics* is recommended as one such code.

a.   The Wisconsin Law Enforcement Standards Board requires *The Law Enforcement Code of Ethics* to be administered as an oath to all police officers attending basic recruit training in the State of Wisconsin.

b.   At the time, adherence to the Code of Ethics was included in Milwaukee Police Department Rules & Regulations.  From the Foreword to the Milwaukee Police Department Manual [05/2007]:

> "Underlying the specific rules contained in this manual is a set of values and beliefs which gives substance and meaning to the activities of the employees of this Department.  These values have been set forth in the Mission Statement and the Law Enforcement Code of Ethics for the Milwaukee Police Department and its employees."

c.   *The Law Enforcement Code of Ethics* states in part:

-1-   "As a law enforcement officer, my fundamental duty is to serve mankind.....and to respect the Constitutional rights of all men to liberty, equality and justice."

-a-   Due process considerations including the *Brady* requirements for making exculpatory evidence available to the prosecutor and defense counsel would be covered by this part.

-b-   This part would preclude a Milwaukee PD detective from developing a hypothesis and then excluding all evidence or information known to him or her that did not fit the hypothesis.

-2-   ".....be constantly mindful of the welfare of others."

-3-   "Honest in thought and deed.....I will be exemplary in obeying the laws of the land and the regulations of my Department."

-a-    This would include the requirement per MPD policy [4/080.00(16)], which was in effect at all times relevant to this issue, to record in his or her memorandum book "......the names of persons taken into custody by him/her and such particulars in each case as may be important in a trial....."

-b-    In a trial where due process and determining the truth about what happened is the goal [i.e. would the officer be willing for the judge and jury to observe what the officers learned and how they learned it], particulars such as changes in stories and the factors which may have influenced same should be recorded in the memorandum book and made available to the prosecutor.

-4-    "I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions."

Consistent with determining the truth about what happened, this part is consistent with the expectation and requirement for MPD personnel to make the prosecutor and defense counsel aware of exculpatory evidence [per <u>Brady</u> and related case law].

-5-    ".....I will enforce the law courteously and appropriately without fear or favor, malice or ill will....."

B.    The police are the gatekeepers to the criminal justice system. The actions of the police set the stage, and are critical to, the provision of due process for those with whom they interact.

1.    If false, slanted, incomplete, or manufactured evidence is introduced by the police, it creates an extremely difficult, sometimes insurmountable, task for an innocent person to overcome.

2.    On January 9, 2007, former Milwaukee PD Homicide Detective Ricky Burems filed a formal complaint with the Milwaukee Fire and Police Commission stating he wished to "......*chronicle questionable and unethical conduct on the part of several members of the Milwaukee Police Department's Homicide Division*......" [emphasis added]  The genesis of this complaint was the homicide investigation into the death of Debra Maniece, who was killed in 1994. Detective Burems stated in his formal complaint:

       a.      Homicides are sometimes cleared to boost the homicide clearance rate.

          -1-     Detective Burems quoted Homicide Lieutenant Jessup as saying, "Do you really care about these people? These people are pieces of shit. All that I care about is clearances." [Burems' 1/9/07 letter to the Milwaukee Police and Fire Commission; Burems' deposition, p. 84]

          -2-     The manner in which the Payne homicide was cleared is more consistent with an effort to simply clear a case than a comprehensive effort to determine the truth.

       b.      The Milwaukee Police Department cleared the Maniece homicide in a questionable manner. MPD records indicate Detective Buschmann was one of the detectives who filed the clearance report on November 14, 2001, even though no one was charged with the murder.

          -1-     "Under the guidelines set forth by the FBI the Maniece case did not meet the criteria for clearing the case by arrest….There was no arrest made, all leads had not been exhausted and detectives did not do everything possible to clear the case." [Burems' 1/9/07 letter]

          -2-     "......to allow us to continue without obstruction [i.e. the homicide investigation by Detective Burems and his partner] would expose questionable investigative and administrative practices by the Homicide Division...."

       c.      Detective Burems' involvement in the Maniece case occurred in 2004.

C.    Consistent with information provided in the course of discovery in this matter, the Milwaukee Police Department failed to hold detectives accountable for following Milwaukee PD directives. Per the <u>Milwaukee Police Department Manual</u>, Foreword, 9/94: "The provisions of these Rules and Procedures are binding upon all members of the Department as they may apply to the individual ranks and positions held by them. Violations may be made the subject of written disciplinary charges or may be otherwise dealt with as directed by the Chief of Police." [Rule 2/010.00; 010.00]

     1.     The failure to enforce mandatory rules and directives, or even be aware they were not being followed, is indicative of inadequate supervision. It demonstrates an obvious failure to hold personnel accountable.

    a.      Such behavior is conducive to an environment where conspiratorial acts of misconduct and abusive behavior can flourish, i.e. coercing weak individuals into making false and incriminating statements, such as those alleged here.

    b.      The failure and/or refusal of Homicide Division supervisors to require documentation and notes be made in the manner prescribed by MPD directives indicates the actual practice is to accept and condone inadequate, incomplete, and improperly slanted investigations.

    c.      The failure to take and maintain notes in the prescribed manner during the course of a homicide investigation is conducive to the effective concealment of <u>Brady</u> violations.  The obvious and deliberate indifference of MPD supervision to enforce mandated practices serves to effectively deny important "due process" considerations to those suspected of committing criminal acts.

2.      Although required to do so, key detectives involved in the Payne homicide investigation failed to maintain relevant information in the prescribed manner in their memorandum books.  If properly maintained as required by department directives, those memorandum books should have provided a chronological source of information to either support or contradict the information subsequently chronicled in the Milwaukee PD investigative reports.

    a.      During the relevant times covering this matter, Milwaukee PD detectives were required to maintain in memorandum books "**such particulars in each case as may be important in a trial**...." [Rule 2/310.00; 310.00; 4/080.00(16)] [emphasis added]

    b.      Key detectives in the Payne homicide investigation did not utilize their memorandum books to record important information and destroyed their notes after making departmental reports.

        -1-     Detective Carl Buschmann stated in his deposition:

            -a-     Detective Buschmann made notes on a steno pad.  After dictating his report he destroyed the notes.  [p. 50]

            -b-     Detective Buschmann claimed destroying his notes was consistent with the policy and actual practice of the Milwaukee PD. [p. 51]

    -c-  Detective Buschmann talked to Mr. Hadaway for a period of time during which he did not take notes and took notes after Mr. Hadaway allegedly made a statement implicating Mr. Ott and himself in the Payne homicide, which Mr. Hadaway is now denying.  That information was presented in a report summarizing what was said.  Per Detective Buschmann,  "There is no definite record of that conversation."  [pp. 102-3]

   -2-  Detective James DeValkenaere stated in his deposition:

    -a-  He is sure he took notes during the Payne homicide investigation but did not keep those notes. [p. 78]

    -b-  He used a steno pad in lieu of the memorandum book and would destroy his notes after the report was completed.  [p. 80]

  c.  Arthur Jones, MPD Chief from November 1996 through November 2003, indicated in his deposition [p. 19] that every member had a memorandum book.  The memorandum book was supposed to include all pertinent information.  However, Jones testified that the Department's policy was to not require police officers to retain memorandum books, and the policy and practice specifically permitted detectives not to turn over the memo books to the prosecutor [pp. 19-20, 21-22, 24].  The option of complying with the obligation to disclose exculpatory information, in other words, was left as a matter of policy and practice within the discretion of the individual officer.  This stands in marked contrast to the well-established police practice that criminal defendants have a right to police notes because those notes could constitute Brady material.

  d.  Nanette Hegerty, MPD Chief from November 2003 through November 2007 stated in her deposition [pp. 66-8] that detectives would take notes in their memorandum books then transpose those notes into an official report.  The detectives were expected to take notes in their official memorandum books and were required to maintain them.  Copies of relevant pages from the memorandum books were provided to the district attorney to make available to the defense as part of discovery.

  e.  Captain Diana Rowe, Milwaukee PD's [30.b.6] expert witness regarding the use of memorandum books from 1995 through December 2010, provided contradictory information.

-1-     Captain Rowe [deposition, p. 40; 46] initially testified ".....the practice to the best of my knowledge was to do what the policy stated."  The policy was [p. 39] to enter ".....**such particulars in each case as may be important in the trial......all matters of importance should be documented**." [emphasis added]

-2-     Captain Rowe subsequently stated [pp. 52-3] that as a result of this particular case it came to her attention from the city attorney's office that some detectives may not have followed that practice.

f.     Captain Eric Moore [deposition, p. 67] indicated there was no formal practice for homicide detectives to maintain their memorandum books. Individuals had their own practice.

g.     Latonia Cooper testified in her deposition [pp. 7-11] that shortly after the Payne homicide she was interviewed by the MPD detectives.  Ms. Cooper testified that during the interview she was shown a photograph of a person she knows to be Walter Ellis.  Ms. Cooper advised that Ellis hung around the area where Payne was last seen.  Ellis looked for women who were too high to defend themselves.  Ms. Cooper also stated she used to see Walter Ellis with Sandra Giles, one of the last persons known to have seen Jessica Payne before her death.  Per Department policy, this information should have been recorded in the interviewing detectives' "memo books" and provided in an official MPD report.  It was not.

3.     MPD Rule 2/225.02, which was in effect during relevant times of the Payne homicide investigation, require MPD personnel to ".....testify with the strictest accuracy.....and **neither suppress or overstate the slightest circumstance with a view to favoring or discrediting any person** [emphasis added].....tell the whole truth, whether it is for or against the defendant."

a.     For this rule to be meaningful, it would also require MPD personnel to properly consider, record, and forward to the appropriate component of the criminal justice system all information developed during the investigation.

b.     Failure to comply with this rule would also conflict with the duty of MPD personnel to adhere to the *Law Enforcement Code of Ethics* ".....to respect the constitutional rights of all men to.....justice."

c.   Consistent with the intent and spirit of this rule would be the requirement to conduct a complete and thorough investigation for all evidence which would support a conviction as well as all evidence obtained which did not support a conviction.

d.   With regard to the investigation of the Payne homicide and subsequent conviction of Chaunte Ott for Payne's murder, Detectives Buschmann and DeValkenaere failed to conduct a thorough investigation which would have required:

-1-   Verification and confirmation to the extent possible of all inculpatory and exculpatory information developed from the alleged confessions/statements from Hadaway and Gwin.

-2-   Recognition and consideration of a pattern of homicides ultimately linked to serial killer Walter Ellis with the Payne homicide.  See related parts of this report for a discussion of the similarities.

D.   The inconsistency regarding the manner in which homicide investigations are conducted by the Milwaukee PD create a situation in which it is extremely difficult to identify deliberate misconduct or hold individual detectives accountable.

1.   According to Brady v. Maryland, a failure by the prosecuting attorney to disclose exculpatory evidence is a violation of due process.  Subsequent cases have extended that obligation to law enforcement personnel.  A trained, experienced police officer would know and understand his/her duty to disclose exculpatory evidence and information related to credibility.  [IACP Model Policy – Brady Disclosure Requirements]

2.   Assistant District Attorney Mark Williams, lead trial counsel in State v. Ott, indicated in a sworn affidavit, "I do not recall receiving, in 2003, DNA reports or information that linked the unknown male STR profile developed from the vaginal swab from Ms. Payne with the unknown male STR profile developed from the vaginal swab of Ms. Joyce A. Mims.  Had I received the information contained in the Wisconsin Crime Laboratory's reports in 2003, I would have turned them over to Mr. Ott's attorney."

a.   A Wisconsin Crime Lab report dated May 22, 2003, linked the unknown male DNA profile obtained from Payne with the unknown male DNA profile obtained from Mims, linking the two homicides to a single suspect.  These results were communicated to Detective Wesolowski via telephone on May 23, 2003, by Daniel Haase, the Wisconsin DNA Databank Manager.

The May 22, 2003, DNA lab report was subsequently received by the Milwaukee PD. The copy in the Payne homicide file has Buschmann's name written on it in handwriting.

-1- Detective Wesolowski had an obligation to forward that information to the prosecutor and/or defense counsel.

-2- Detective Buschmann's handwritten name on the report is indicative that the information was forwarded to him. Consistent with Buschmann's name on the report, a proper functioning police department would have required that information to be forwarded as required <u>Brady</u>. In addition, the Homicide lieutenant or captain who assigned that information to Detective Buschmann, should have confirmed that Buschmann took the appropriate action.

-3- Both Detective Wesolowski and Detective Buschmann had an obligation per <u>Brady</u> to forward the information to the prosecutor and/or defense counsel. A properly managed police department would have in place appropriate supervisory mechanisms to ensure accountability, documentation, and compliance with these <u>Brady</u> requirements.

b. A Wisconsin Crime Laboratory report dated June 5, 2003, indicated the DNA standard collected from the vaginal swab of Jessica Payne did not come from Ott, Gwin, or Hadaway. Detective Carl Buschmann was assigned to follow up with this information. In addition, a memorandum from the Wisconsin State Crime Laboratory on June 13, 2007, indicated DNA evidence from the same unknown source was found in/on three homicide victims: Jessica Payne, Joyce Mims, and Ouithreaun Stokes. According to Milwaukee PD Homicide Division protocol, that information should also have been forwarded to some detective to pass on to the assistant district attorney who handled the original case.

c. Detective Carl Buschmann, one of the primary investigators in the Payne homicide, deposition, [p. 45] indicated he was <u>not</u> aware he had an obligation to turn over exculpatory evidence to the prosecutor's office.

d. According to Chief Jones, who was chief of the Milwaukee Police Department from 1996 until November 2003, Detective Buschmann would have been required to provide that information to ADA Williams. Chief Jones indicated [deposition, p. 70] that detectives must share all evidence with the district attorney including all post-conviction lab reports.

3.     Nanette Hegerty was chief of the Milwaukee Police Department from 2003-2007. She [deposition, p. 95] stated if a detective, who was in receipt of potentially exculpatory evidence, looked at an investigation and thought they had the correct man convicted the **detective would <u>not</u> necessarily be expected to notify the district attorney or defense counsel**. [emphasis added]

    a.    Under Chief Hegerty's tenure, the actual practice of the Milwaukee Police Department appears to have been leaving the decision to the detective whether or not exculpatory evidence was significant enough to bring to the DA's and/or defense counsel's attention.

    b.    Assuming revelation of exculpatory evidence would indicate an improper or inadequate investigation by the detective who was provided with potentially exculpatory evidence, that detective would have a vested information in <u>not</u> making that information available to the DA's office or defense counsel.

    c.    The Milwaukee PD failed to implement an official policy directing how DNA lab results are to be handled.  Instead, the actual practice was to leave it to the discretion of the detective who happened to be provided with that information.

        -1-    That practice has led to a *de facto* policy of ignoring DNA lab results with regard to further investigative consideration.

        -2-    It also appears to have created and institutionalized the practice of not reporting exculpatory information such as DNA reports to the prosecutor and/or defense counsel that would implicate other suspects and tend to exonerate innocent individuals.

        -3-    The Department's lack of policy regarding the disclosure of DNA reports resulted in the failure to disclose to the prosecutor or defense counsel in a timely manner the May 22, 2003, DNA lab report linking the DNA male profile from the Mims homicide to the Payne homicide.

    d.    By 2003 DNA analysis was well-established as critical forensic evidence to inculpate and/or exclude suspects.  By 2003, professional law enforcement agencies were aware of the need for an established policy with delineated procedures to properly deal with the distribution of these lab reports.

-1-   Exculpatory or exonerating should be reviewed and considered to ensure focus on the actual suspects.  Failure to focus on, and apprehend, actual suspects may unnecessarily result in additional victims.

-2-   Failure to have and enforce such a policy would very likely result in the concealment and nondisclosure of exculpatory information, such as occurred in this case.

4.   Captain Diane Rowe [deposition, p. 58] indicated the policy is if there is some type of exculpatory information, detectives were expected to make that information available to the prosecutor.

    a.   "......the policy would be that any pertinent information in your memo book would also be presented to the district attorney's office in a written format." [p. 61]

    b.   However, she is not aware [p. 62] of anyone ever comparing what was in the memorandum book with what was in the report.

E.   There was a marked difference between the diligence of the initial investigation of the August 30, 1995, murder of Jessica Payne and the subsequent cold case investigation conducted in October 1995 by Detectives Buschmann and DeValkenaere.

1.   Initially, various detectives diligently followed up leads and attempted to verify the information developed through examination of physical evidence.  When the lead failed to provide sufficient evidence, documentation was made and the detectives moved on.

2.   Subsequently, Detectives Buschmann and DeValkenaere were assigned the case.  Through unsupported information developed through questionable sources, unsubstantiated by any physical evidence, and contradicted by other witnesses, these detectives obtained a confession or statement from two people implicating a third, Chaunte Ott.

    a.   Although subsequently arrested and convicted, Mr. Ott never confessed or made any admissions indicating involvement in the Payne homicide.

    b.   Sam Hadaway [deposition, pp. 16-7] stated he testified against Ott from information provided to him by Milwaukee Police detectives.  Mr. Hadaway indicated he was forced by the detectives to implicate Mr. Ott in lieu of being charged as the murderer and being sentenced to eighty years.  After serving his prison sentence, Mr. Hadaway recanted his testimony.

c.    Richard Gwin, who has since died, indicated to family members that in order to be released from custody he was forced to lie about Ott's involvement in the Payne homicide.  Questionable circumstances surround Mr. Gwin's involvement as a suspect and witness.

-1-    Richard Gwin, aka "Cortez," was implicated as a possible suspect in the Payne murder by a jailhouse snitch known as Inetha Waller. Waller told Detective DeValkenaere that Cortez advised her that he and two friends ".....got this white bitch for sale."  A few days later after the body was found, Waller quoted Cortez as saying, ".....we did that shit, she deserved it, the white bitch deserved it."

-a-    Hadaway and Ott became suspects because they gave imprecise statements about an event that occurred approximately two months prior which had no significance to them.  In substance, they indicated they observed a white female pass by while they were playing dice late one night. Hadaway stated he went inside and threw up, then went to bed.  Ott indicated he walked home.

-b-    Booker Edwards, who was also playing dice that same night, indicated the white female, assuming it was Jessica Payne, was last seen in the company of an unknown black male.

-2-    Initial questioning of Gwin revealed nothing about the murder of Jessica Payne, but did result in Gwin's acknowledgment that he was a drug dealer.  After being held for some time, Gwin suddenly became cooperative and revealed information about Hadaway's and Ott's alleged involvement in the murder of Payne.  Gwin was then released from custody and was not charged.

-a-    Detective Buschmann [deposition, pp. 52-3] stated that initially Gwin did not admit to involvement in the Payne homicide.  However, Detective Buschmann indicated Gwin was aware that Payne's throat had been slashed, which supposedly was not known to the public at the time.

-b-    Detective Buschmann's assertion is clearly contradicted by an article which appeared in the Milwaukee Journal Sentinel shortly after Ms. Payne was murdered.  It stated, "Milwaukee detectives continue to search for the person

who cut Jessica's throat [emphasis added] and left her in a yard behind an abandoned Milwaukee home at N. 7th and W. Chambers streets."

   -c-    Another reason this appears disingenuous is an earlier report from an interview of jailhouse snitch Inetha Walker conducted on September 27, 1995, by Detective DeValkenaere, indicated Sandra Giles told her that she [Giles] was involved in slashing Payne's throat.

        a)     Jailhouse snitches are notoriously unreliable. Information, such as that provided in this case is frequently provided as a matter of self-interest for the informant without regard to the source, substance, and veracity of the information.

   -d-    The physical evidence recovered from the scene and victim was not linked in any way to Ott, Hadaway, or Gwin. In May 2003, the Wisconsin DNA Databank definitively linked the unknown male DNA profile obtained from the Payne homicide to the DNA profile obtained from the Mims homicide. This demonstrated the two homicides were identified to a single perpetrator. Detective Buschmann did <u>not</u> pass that information to ADA Williams or Ott's defense counsel when he received a copy of this report and/or after his partner, Detective Wesolowski, received a verbal report from Daniel Haase, the DNA Databank manager, on May 23, 2003.

  -1-    Based on my knowledge and experience, it is common for detective partners to be in open communication with one another about the investigatory developments in their cases. Based on my experience in law enforcement, I believe it very unlikely that partners would not have informed each other of developments in a case.

  -2-    Detective Wesolowski was Detective Buschmann's long-term partner and likely knew that Buschmann was the lead detective on the Payne case. Once Detective Wesolowski obtained the knowledge of the connection between the Mims and Payne homicides, it is reasonable to expect and assume he would have communicated this with Detective Buschmann.

e.     The physical evidence [DNA from the seminal material found in Ms. Payne's vagina] was ultimately linked to Walter Ellis, a serial murderer. MPD detectives were informed in 1996 that the seminal material was not linked to Chaunte Ott.  In 2003, the contributor of the DNA recovered from the Payne homicide was linked to the Mims murder.

-1-     Walter Ellis has since been convicted of a number of homicides which occurred before, and after, the death of Ms. Payne.

-2-     Although charged and convicted of homicides with similar characteristics, [i.e. sexual assaults, same general area of the city, bodies found in abandoned areas, DNA evidence] for some inexplicable reason Walter Ellis has <u>not</u> been charged with the Payne murder.

-3-     Interestingly, despite DNA evidence linking him to the bodies of Maryetta Griffin and Carron Kilpatrick, Ellis has not been charged in those homicides.  Similar to the Payne case, there was a wrongful conviction and a failed charge.

-a-     Griffin homicide - William Avery wrongfully convicted.

-b-     Kilpatrick homicide - Curtis McCoy acquitted.

f.     When Mr. Ott's murder conviction was reversed by the Court of Appeals in 2008, the Court stated:

"......the strong probative value of newly discovered DNA evidence linking someone other than Ott or the two State witnesses to all three murders.  This new evidence suggests that someone other than Ott may have killed Payne.  Accordingly, we conclude that the other acts evidence is probative of the identity of Payne's killer...."

3.     Despite obvious indications that Ms. Payne had been the victim of a sexual assault, inexplicably Detectives Buschmann [deposition, pp. 33, 43] and DeValkenaere [deposition, pp. 72-4] asserted they did <u>not</u> believe, or consider, that Ms. Payne had been sexually assaulted.  Their contention appears to be in conflict with the physical evidence, common sense, and investigative protocols.

a.      The  medical examiner's report and autopsy clearly indicate a possible sexual assault.  Indications include:

-1-     The body was found partially nude.

-2-     There was bruising to various regions of the body.

-3-     The body was clad in a bra which is torn in the center exposing her breasts.

-4-     Her T shirt was pulled upward to near breast level.

-5-     Her pants were pulled down to approximately knee level.

-6-     The medical examiner ordered a complete sexual assault examination with specimens.

-7-     A high concentration of seminal material was found in the vaginal area.

b.      Other homicides, some obviously accompanied by sexual assaults, had occurred in the vicinity where Jessica Payne's body was found.  If properly considered they could have, and eventually did, provide a link to the suspect.  However, Detectives Buschmann and DeValkenaere failed to consider, refused to consider, or recklessly neglected to consider the similarities between Jessica Payne's death and the murder of other women in the vicinity.

-1-     Irene Smith died of stab wounds and strangulation on November 28, 1992.  Her body was found in the alley near 3028 N. 7th Street in Milwaukee.  Serial killer Walter Ellis was subsequently convicted of her murder.

-2-     Florence McCormick died of strangulation on April 24, 1995.  Her body was found at 618 w. Locust Street in Milwaukee.  Vaginal and anal swabs were taken as part of the sexual assault evidence.  Serial killer Walter Ellis was subsequently convicted of her murder.

-3-     Sheila Farrior died of strangulation on June 27, 1995.  Her body was found at 1442 W. Chambers Street in Milwaukee.  She was found completely nude and appeared to have a bra bound around

her neck and mouth area.  Vaginal swabs were taken from Ms. Farrior's body.  Serial killer Walter Ellis was subsequently convicted of her mother.

-4-     Jessica Payne died of a laceration to her throat on August 30, 1995.  Her body was found at 3116 N. 7th Street in Milwaukee.  She was found partially unclothed, her bra torn and her pants pulled down.  Seminal material was recovered from a vaginal swab which produced DNA.  The DNA has subsequently been linked to serial killer Walter Ellis.  Even though a reasonably trained police detective would consider obvious patterns, physical evidence, and similarities, inexplicably Ellis has not been charged with the Payne murder.

c.      Questions related to the context of a sexual assault were asked of Hadaway when he was given a polygraph.  This should have indicated the obvious link of the Payne murder to similar homicides which had occurred in the area.

-1-     "While the white girl was fighting did you help hold her down?"

-2-     "Did you have any sexual contact with that white girl?"

4.      Latonia Cooper stated in her deposition [pp. 7-11] that shortly after she learned of Ms. Payne's death, she was taken to the Milwaukee Police Department and interviewed for a couple hours.

a.      During the interview, Ms. Cooper was shown a picture of the person she knows to be Walter Ellis.

b.      Ms. Cooper advised the police that Ellis lived elsewhere, but hung around the area looking for women who were a little too high to defend themselves.

c.      Ms. Cooper advised the police that she used to see Walter Ellis and Sandra Giles together.  Sandra Giles was one of the last persons to see Jessica Payne alive.

-1-     Jail informant Inetha Waller, the same informant who provided information about Gwin, also advised Detective DeValkenaere that Sandra Giles had held for four days the white girl who had been found dead.  Giles further advised Waller "....when the girl tried to

leave, 'we killed her'. She stated when Giles related this Giles made a motion as if someone were slashing a throat."

-2-     In addition to being a suspect early on in the investigation, Sandra Giles was linked as a suspect in the same manner by the same person who implicated Gwin.

d.     The information provided by Ms. Cooper in her deposition regarding Walter Ellis was not reflected in the Milwaukee PD homicide file. The information linking Ellis to Payne and the subsequent evidence linking the DNA to the same perpetrator of the Mims homicide should have required further investigation.

5.     Consistent with investigative protocols, Detectives Buschmann and DeValkenaere should have attempted to link their suspects in the Payne homicide [i.e. Ott, Hadaway, and Gwin] to, or exclude them from, other unsolved homicides that had occurred in the general area. However, there is no documentation or anecdotal information that these detectives attempted to do so.

a.     Serial killer Walter Ellis was linked to seven murders for which he was charged.

b.     Serial killer Walter Ellis was also linked to the Jessica Payne murder; but, has not been charged.

c.     When Chaunte Ott's conviction was reversed and remanded in December 2008, the Wisconsin Court of Appeals commented:

-1-     "....it is difficult to imagine more....distinct evidence than a single DNA profile found on all three victims [Payne, Mims, Stokes]....This new evidence suggest that someone other than Ott may have killed Payne."

-2-     Walter Ellis was convicted of the murders of Joyce Mims and Ouithreaun Stokes. Their deaths occurred respectively in 1997 and 2007; whereas, Payne was killed in 1995.

d.     Walter Ellis, dubbed the "North Side Strangler," was arrested in 2009 and pled guilty to seven counts of first degree murder. Based on overwhelming evidence that Ellis was also responsible for Payne's murder, on June 5, 2009, the State dropped all charges against Chaunte Ott.

F.       The acceptance of flawed investigations as a practice constitutes a *de facto* policy.  It promotes conspiratorial efforts to conceal unethical and improper conduct by police personnel as described above in this report.  It is antithetical to nationally accepted standards and is conducted in total disregard for the constitutional rights, particularly the right to due process, of those victimized by the practice.  It allows and/or facilitates the pursuit of wrongful convictions through coerced confessions, inadequate investigations, and unsubstantiated assumptions of guilt.  The failure to properly supervise and hold department personnel accountable for following department directives, standards of ethical conduct, and their training is indicative of the ratification of these unacceptable practices by the administration of the Milwaukee Police Department.

The conditions which exist, or existed during the relevant times of this matter, created a situation where abuse of professional conduct was tolerated.  The manner in which various tasks and activities were assigned created plausible deniability.  There was no apparent "lead" or responsible detective for a particular criminal investigation to establish accountability.  These conditions were allowed and encouraged to exist pursuant to the practices of the Milwaukee Police Department.

1.     Elements of the flawed, inadequate, and incomplete investigation into the Payne homicide include:

**Handling of information from jailhouse snitches or informants.**

Information from these sources is notoriously unreliable and generally motivated by the self-serving need to improve their circumstances while being locked up.

While all information related to a criminal investigation should be considered, information from jailhouse snitches should be treated warily and verified extensively by every means possible.  That was not done in this case.

Instead of pursuing all the information provided by several jailhouse snitches and attempting to verify it to the extent possible, Detectives Buschmann and DeVandevaere selected comments allegedly made to a person by "Cortez" [aka Gwin] that he and some friends were responsible for killing a white girl.  Information which led to Gwin, Hadaway, and Ott being suspects in the Payne homicide originally came from the unsupported allegations of this jailhouse snitch.

Other information from a jailhouse snitch indicating an initial suspect [Sandra Giles] was telling people about the manner of Payne's death was ignored. In addition, information already developed from Latonia Cooper linked Giles to Walter Ellis, the serial killer whose DNA was found in semen recovered from Payne's vaginal area, was also ignored.

Detectives Buschmann and DeVandevaere made an issue of Gwin knowing that Payne's throat had been slashed, which supposedly was not public knowledge. The detectives ignored the fact that Giles was providing a jailhouse snitch with that same information.

Although considered as a suspect who allegedly confessed to a jailhouse snitch that he had killed a white girl and was an acknowledged drug dealer, Gwin was released from custody and not charged with any crimes. To accomplish this, Gwin had only to link two casual acquaintances [Hadaway and Ott] as suspects to an improbable account of the murder of a white girl.

**Developing and considering only evidence that fit the detectives' theory of the crime**

There is significant indication that Detectives Buschmann and DeValkenaere made their theory fit the crime through coercion and promises. Mr. Hadaway's recantation is supported by the reversal of Mr. Ott's conviction. In conjunction with numerous similarities with other homicides linked to Walter Ellis, there is also strong physical evidence linking Ellis to the murder of Jessica Payne.

Once Detectives Buschmann and DeVandevaere learned of Hadaway, they focused their efforts on pressuring him to involve himself and implicate Ott in Payne's murder. Hadaway eventually gave an improbable story linking Ott to the homicide. Ott was convicted based primarily on the testimony of Hadaway. No meaningful effort was made to develop or consider physical evidence, contradictory witness statements, inconsistencies in Hadaway's statement(s), or comparison with other homicides with similarities. Eventually, Walter Ellis, a serial killer, was linked by physical evidence to many of these homicides including the Payne murder. Proper supervision of this homicide investigation would have required further investigation of all factors to the extent possible.

During, and subsequent to, the Payne homicide investigation, the principal investigators refused to consider evidence which would have, and subsequently has, linked the Payne homicide to similar murders by Walter Ellis occurring in the area.

**Inadequate supervision of interviewing and interrogation practices**

Pressuring a vulnerable person with diminished intellectual ability through threats [prison for 80 years] or promises of leniency [only 5 years if you admit some involvement and link another person] has been discussed at length earlier in this report.

Rather than an objective effort to determine the truth, there are significant indications that evidence was created during the Payne homicide investigation. Sam Hadaway subsequently recanted his statement/confession. Sam Hadaway indicated the police detectives provided him with information about the murder, advised him he had to be involved in the murder in some manner, threatened him with 80 years in prison, and promised he would only do five years in prison if he testified as directed.

2.    By either failing to supervise, deliberately maintaining a system of plausible deniability, or a combination of both, the Milwaukee Police Department exhibited a deliberate indifference to the consequences of using flawed and inappropriate investigative techniques.

   a.    Supervisors knew about, facilitated, approved and condoned a pattern and practice of conducting inadequate investigations and misconduct by detective personnel.  Such practices included:

        The failure to record and maintain investigative notes in the manner required by Department directives.

        The failure to hold detectives accountable for forwarding exculpatory information and evidence in a timely manner to the prosecutor and/or defense counsel.

        The failure to hold detectives clearing cases accountable for conducting a thorough investigation of all investigative leads.

        Considering only evidence which supports the detectives' theory of the crime.

        Failure to verify oral statements and confessions to the extent possible.

      b.   There was no effective system in place to track and coordinate the efforts of a large number of homicide detectives operating in a disparate manner.

          No one person was held accountable for developing an overall perspective of the case or seeing that all investigative leads were pursued.

          Detectives were randomly assigned tasks. Once specific tasks were accomplished, there was no incentive or motivation to further pursue investigative efforts.

          By and large, there was no particular person assigned to make a comprehensive and creative look at solving most homicide investigations.

G.     A push for convictions for homicides by improperly conducting investigations may actually result in an increase in the number of murders, such as in a situation where a predatory serial killer like Walter Ellis was inadequately addressed for more than two decades.

     1.    Chief Hegerty indicated in her deposition [p. 41] that she wanted to increase the clearance rate for homicides. She further indicated [p. 93] she expected that detectives would go through the files to determine if homicides were connected or could possibly be connected. This obviously was not done in the investigation of the Payne case.

     2.    Former Homicide Detective Burems stated in a January 9, 2007, letter to the Milwaukee Fire and Police Commission:

          a.   Homicides are sometimes cleared to boost the homicide clearance rate.

          b.   The Milwaukee Police Department cleared the Maniece homicide in a questionable manner inconsistent with guidelines set forth by the FBI.

     3.    Withholding exculpatory evidence serves to cover up faulty investigations. No system was in place to effectively ensure that exculpatory evidence was properly forwarded to the prosecutor and/or defense counsel. Whether because of a failure to train and supervise, a refusal to admit to prior flawed investigations, or because of an institutionalized effort to circumvent the due process requirements of the Brady and subsequent court decisions, the Milwaukee Police Department has failed to provide exculpatory evidence to the prosecutor and/or defense counsel in a timely manner.

          a.   During her tenure from 2003-2007, MPD Chief Hegerty indicated it was up to

the detective who handled the particular case to decide whether or not to hand over exculpatory evidence. According to my understanding of Milwaukee PD policy during the tenure of Chief Hegerty [deposition, p. 95], if the detective believed the subject was guilty of the charges, the detective was not obligated to forward exculpatory information to the prosecutor or defense counsel. That certainly is inconsistent with the guidance provided by the IACP Model Policy for Brady Disclosure Requirements, which states that is "…..a duty of all law enforcement agencies to (1) identify and provide to the prosecution any exculpatory material that would have a reasonable probability of altering the results in a trial, or any material that could reasonably mitigate the sentencing of a defendant and (2) and material relevant to the credibility of government witnesses…."

b.  There are indications that supervisory personnel did <u>not</u> ensure the designated detective actually forwarded exculpatory evidence when, or if, it was actually forwarded to that detective.

c.  At least one detective [Buschmann] involved in the Payne homicide investigation indicated he was <u>un</u>aware of the requirement to turn over exculpatory evidence. This would confirm a failure to train and/or supervise by the Milwaukee Police Department.

d.  Exculpatory evidence such as the 2003 match of suspect DNA between the Payne and Mims homicides was <u>not</u> turned over in a timely manner.

4.  Whether through an outright conspiracy or a reckless disregard of their obligations, several detectives and their supervisors were directly responsible for the wrongful conviction of Chaunte Ott.

a.  Detectives Buschmann, DeValkenaere, and Simons knew, or should have known, there was insufficient evidence to properly convict Chaunte Ott for the murder of Jessica Payne.

b.  A lack of supervision and accountability made possible an agreement among the three principle detectives to cover for each other [i.e. code of silence] during the conduct of this flawed investigation and the subsequent developments.

c.  There is no indication that any of the three detectives intervened or raised an issue with their supervisors regarding the insufficient and conflicting evidence.

1) A prudent, professional detective would require facts and/or conduct further investigation to validate the otherwise unsupported testimony.

2) There existed an obvious refusal to consider exculpatory evidence and to compare similarities with other homicides occurring in the area both prior, and subsequent, to Mr. Ott's conviction.

   a) According to Detective Buschmann [deposition]:

      (p. 43) The detectives did not consider that Payne had been sexually assaulted.

      (p. 73) The Payne murder did not fit the profile of similar homicides which had occurred in the area.

      (pp. 122-3)  Despite the fact that he has since been informed the DNA evidence from Payne has also been linked to the perpetrator of the Mims homicide, and which has been subsequently linked to serial killer Walter Ellis, he still believes (p. 128) that Ott killed Payne.

   b) According to Detective DeValkenaere [deposition]:

      (pp. 73-4)  The detectives did not believe, nor did their investigation reveal, that Payne was sexually assaulted.

      (p.204)  Despite evidence linking Ellis to the DNA recovered from Payne's vaginal area, he still believes Ott murdered Payne.

   c) Detective Simons, who conducted the polygraph examination of Hadaway before interrogating him, stated in his deposition [p. 22] "….obviously we know he did it if he failed the polygraph exam."  Another issue that the MPD administration did not want to consider is that Hadaway would also have failed the polygraph exam if he was given information by the detectives but did not believe it to be true.

H.    A professional police detective acting in accord with the Law Enforcement Code of Ethics, investigative training, department directives, and other nationally accepted standards of police practice would have raised an issue with supervisory personnel regarding the manner in which this investigation was conducted and the case prosecuted. To the great shame of the Milwaukee Police Department, there is no indication the issue was raised; and, if it was raised, that the actions taken here are consistent with the customs and practices of the Milwaukee Police Department.

My opinions may be amended, or added to, upon review of additional information.

Respectfully submitted,

Dennis Waller


Encl.
  CV
  FS
  Testimony List

14665 W. Lisbon Road, Suite 2F
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 782-5521
www.wallerassociates.com

**Dennis Waller, CLI**
denny1@gdinet.com

## CURRICULUM VITAE

### *DENNIS K. WALLER*

**CONSULTANT/EXPERT WITNESS** - law enforcement matters related to use of force; personnel; training; vehicle pursuits; and, the assessment of departmental administration, policy, procedures and practice.

## PROFESSIONAL EXPERIENCE

*Police Practices Consultant/Expert Witness; Certified Legal Investigator*   1988 - Present

*Regional Manager/Principal Investigator*
  API (Milwaukee, WI)   1991-92

*Lecturer/Outreach Coordinator*, Department of Criminal Justice
*Interim Director*, University Police Department
  University of Wisconsin-Platteville   1988-90

*Vice President*, Litigation Support Service
  Kevin Parsons and Associates, Inc. (Appleton, WI)   1987-88

*Chief of Police*
  Ripon Police Department (WI)   1983-87

*Director of Law Enforcement Training*
  Wake Technical College (Raleigh, NC)  1978-83

*Lieutenant*
  North Carolina State Fairgrounds Police Department (Raleigh, NC)  1980-83

*Coordinator*
  Criminal Justice Program, Craven Community College (New Bern, NC)  1976-78

*Sergeant*
  South Miami Police Department (FL)  1974-76

*Investigator*
  Carol Management Company (Miami, FL)  1973-74

*Police Officer*
  Metro Dade Police Department (Miami, FL)  1971-72

*Regional Police Planner*
  Southeast Michigan Council of Governments (Detroit, MI)  1970-71

*Deputy Sheriff*
  Washtenaw County Sheriff's Department (Ann Arbor, MI)  1970-71

## ADJUNCT LECTURER/INSTRUCTOR/PRESENTER

National Lawyers Guild Conference, National Police Accountability Project (Washington, D.C.) 2007
Defense Research Institute Conference, Government Liability Section (San Francisco) 2006
Annual Training Conference, Professional Association of WI Licensed Investigators
 (WI Dells) 2001, 2002; (Green Bay) 2004, 2007, 2011; (Waukesha) 2009;  Regional Seminar (Milwaukee) 2004, 2007
Annual Civil Rights Seminar, Individual Rights and Responsibilities Section, WI State Bar  (Madison, WI) 1998
Annual Intellenet Seminar, (Islamorada, FL) 1997, (Tucson, AZ) 1999
Milwaukee Area Technical College (WI) 1991-92
University of North Florida - IPTM  1990
International Association of Campus Law Enforcement Administrators (Superior, WI) 1990
Fox Valley Technical College (Appleton, WI) 1983-90
Southwest Wisconsin Technical College (Fennimore, WI) 1989-90
Internal Security Division, Internal Revenue Service (Lake Geneva, WI) 1988
Lakeshore Technical College (Cleveland, WI) 1988
Wisconsin Shorthand Reporters Association Conference  (Appleton, WI) 1988
National Association of Legal Investigators Regional Seminar (Milwaukee, WI) 1987
Marian University -Fond du Lac (WI) 1985-87
Mount Senario College (Ladysmith, WI) 1983-86
North Carolina State University (Raleigh, NC) 1979
Shaw University (Raleigh, NC) 1978-80

## PROFESSIONAL ASSOCIATIONS

The American College of Forensic Examiners   1994-present
 *Fellow; Executive Board* (2002); *Editorial Advisory Board, The Forensic Examiner*  (1999-2004)
 American Board of Law Enforcement Experts, *Diplomate; Executive Board* 1998-2003; *Chair* (2002)
American Society for Industrial Security  1987-1998
Commission on Accreditation for Law Enforcement Agencies, *Assessor*
Fond du Lac County Law Enforcement Executives Association  1984-87; *Vice President* (1984), *President* (1985)
Grant County Law Enforcement Administrators Association  1988-90
Intellenet  1992-present
International Association of Chiefs of Police  1980-present
International Association of Law Enforcement Firearms Instructors  1996-present
International Narcotic Enforcement Officers Association  1993-2005
International Wound Ballistics Association  1995-2002
Justice System Training Association  1985-88; *Psycho-Motor Skills Design Instructor*
Law Enforcement Alliance of America, *Life Member*
Law Enforcement Training Officers Association of Wisconsin  1984-94; *Executive Board* (1989-91)
National Association of Legal Investigators; *Certified Legal Investigator*  1988-present
National Council of Investigation & Security Services, Inc.  2003-present
National Rifle Association; *Life Member, Police Firearms Instructor*
Office of Lawyer Regulation , Supreme Court of Wisconsin  1997-2006
 *District Two Investigative Committee* (1997-2000); *District Six Investigative Committee* (2001-2006)
Police Marksman Association   1976-2008
Private Detective Advisory Committee, State of Wisconsin Department of Regulation & Licensing  2003-2005
Professional Association of Wisconsin Licensed Investigators  2000-2009
 *Board of Directors* (2001-2005);  *Professional Review Committee* (2001-2003);
 *Chair, Investigator Safety Committee* (2001-2009)
Wisconsin Chiefs of Police Association  1983-present
 *Training and Professional Development Committee* (1986-87, 1989)
Wisconsin Narcotics Officers Association  1991-2005

## EDUCATIONAL BACKGROUND
Florida International University - MS (Public Administration) 1975
Michigan State University - BS (Police Administration) 1970
Additional law enforcement training - 3,400 plus hours including courses from:
  Michigan State University; Northwestern University; University of North Florida; and, IACP

## PROFESSIONAL DESIGNATIONS

Certified Police Instructor
  Michigan  1971
  Florida  1974
  North Carolina  1976
  Wisconsin  1985
Police Defensive Tactics Instructor
  RISC  1985
  DAAT  1989
Psycho-Motor Skills Design Instructor  1985
Police Firearms Instructor  1986
Certified Legal Investigator  1988
OC Instructor  1992
Assessor, Commission on Accreditation for Law Enforcement Agencies  1994
Diplomate, American Board of Law Enforcement Experts  1998
Fellow, American College of Forensic Examiners  1999

## PUBLICATIONS

Contributor, *Strategic Plan for Extension Programming in Governmental Affairs/Criminal Justice* (University of Wisconsin-Extension, 1990)

*Officer-Initiated Activities: A Measurement of Productivity,* (Training Supplement - 1989) Department of Criminal Justice, University of Wisconsin-Platteville

"Investigating Jailhouse Suicides," *The Legal Investigator* (May 1988)

"State Fair Police," *NCLEOA Magazine* (November-December 1981)

Contributor, *Guidelines for Criminal Justice Programs in Community and Junior Colleges* (American Association of Community and Junior Colleges, 1977)

Chapter on *Crime Control, Regional: Problems, Goals, Programs, Projects for Region One - Law Enforcement and Criminal Justice Planning Council* (Southeast Michigan Council of Governments, 1970)

April 4, 2011

# WALLER & ASSOCIATES, LLC

14665 W. Lisbon Road, Suite 2F
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 782-5521
www.wallerassociates.com

**Dennis Waller, CLI**
denny1@gdinet.com

## FEE SCHEDULE - CONSULTANT/EXPERT WITNESS SERVICES

| | |
|---|---|
| Case Review - Retainer<br>    Includes authority to list as expert witness and up to<br>    twenty hours of case review and analysis; issue<br>    clarification; oral and/or written opinion | $4,000 |
| Hourly Rate<br>    Additional case review over twenty hours; site visits;<br>    interviews; conferences; travel; and testimony work up. | $ 200 |
| Deposition (per business day - payment due in advance)<br>    Plus expenses and travel time | $2,000 (minimum) |
| Trial (per business day)<br>    Plus expenses and travel time | $2,000 (minimum) |
| Travel - portal to portal<br>    Airline travel billed at coach fare | $ 200 per hour up to<br>$1,600 per day |
| Expenses<br>    Personal vehicle use - .80 per mile | Billed at actual cost |

## PAYMENT POLICY

All bills are due thirty days from the invoice date. A finance charge of 1.5% per month (18% per year) will be assessed on all past due invoices. Deposition fees are payable in advance.

Once Dennis Waller or one of our associates has been listed as an expert in a case, we take the position that our firm has been retained. At that time the retainer becomes due regardless of documents sent to our office or work done on the file.

All work performed in your case is done at your direction. You are our client. You are solely responsible for payment of all invoices for services and expenses.

**Federal ID# 39-2002184**          **Waller & Associates, LLC**          March 20, 2013

# Dennis K. Waller - Trial/Deposition Testimony List - January 2009 to Present

Joe N. Tatum
Tatum & Wade, PLLC
P.O. Box 22688
Jackson, MS 39225

Gray, et al. v. City of Raymond, et al.
Hinds Co. Circ. Ct., MS
Case No.: 251-07-755CIV

3/09 Trial

Michael J. Mahoney
Burke, Mahoney & Wise
161 North Clark Street
Suite 2240
Chicago, IL 60601

Stehlik v. Village of Orland Park
Cook Co. Circ. Ct., IL
Case No.: 06 L 231

10/08 Deposition
3/09 Trial

James J. DeSanto
DeSanto & Morgan
712 Florsheim Drive
Libertyville, IL 60048

Florek v. Village of Mundelein, et al.
USDC, No. Dist, East. Div., IL
Case No.: 05C 6402

3/09 Deposition

William H. Goodman
Goodman & Hurwitz, P.C.
1394 E. Jefferson Avenue
Detroit, MI 48207

Nierzwick v. St. Clair County, et al.
USDC, East. Dist., So. Div., MI
Case No.: 2:07-CV-12869

4/09 Deposition

Lawrence V. Jackowiak
Law Offices of Lawrence V. Jackowiak
20 North Clark Street
Suite 1700
Chicago, IL 60602

Aleman v. Village of Hanover Park, et al.
USDC, No. Dist., East. Div., IL
Case No.: 07 C 5049

4/09 Deposition
5/09 Deposition

Peter J. Fox
Fox & Fox, SC
735 W. Wisconsin Avenue
12th Floor
Milwaukee, WI 53233

Beckham v. City of Milwaukee, et al.
Milwaukee Co. Circ. Ct., WI
Case No.: 06CV007923

9/07 Deposition
5/09 Hearing

John S. Schiro
Schiro & Zarzynski
735 W. Wisconsin Avenue
12th Floor
Milwaukee, WI 53233

Aliota, et al. v. City of Fond du Lac, et al.
USDC, East. Dist., WI
Case No.: 08-CV-189

6/09 Deposition

Jeff Scott Olson
The Jeff Scott Olson Law Firm
131 West Wilson Street
Suite 1200
Madison, WI 53703

Shimko v. Rusk County, et al.
USDC, West. Dist., WI
Case No.: 08-414

3/09 Deposition
9/09 Trial

| | | |
|---|---|---|
| Warren L. Martin, Jr.<br>Sweet & Associates<br>158 E. Pascagoula Street<br>Jackson, MS 39201 | Cox v. City of Lexington, et al.<br>Holmes Co. Circ. Ct., MS<br>Case No.: 2006-0348 | 9/09 Trial |
| Diane M. Brown<br>Eric C. Deters & Associates, PSC<br>5247 Madison Pike<br>Independence, KY 41051 | Sparks v. Justice, et al.<br>Boyd Circ. Ct., Div. II, KY<br>Case No.: 08-CI-01068 | 10/09 Deposition |
| J. Christopher Klotz<br>Klotz Law Firm<br>P.O. Box 12906<br>Pensacola, FL 32591 | Thornton v. City of Jackson, et al.<br>Hines Co. Circ. Ct., MS<br>Case No.: 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 | 11/09 Trial |
| Jan Sussler<br>People's Law Office<br>1180 N. Milwaukee Avenue<br>Chicago, IL 60642 | Steidl v. City of Paris, et al.<br>USDC, Central Dist., IL<br>Case No.: 05-2127 | 11/09 Deposition |
| Ronald H. Balson<br>Michael Best & Freidrich LLP<br>180 North Stetson Avenue<br>Suite 2000<br>Chicago, IL 60601 | Whitlock v. City of Paris, et al.<br>USDC, Central Dist., IL<br>Case No.: 08 CV 2055 | 11/09 Deposition |
| Richard J. Rosenblum<br>Rubin, Machado & Rosenblum, Ltd.<br>120 W. Madison Street<br>Suite 400<br>Chicago, IL 60602 | Stack v. City of Burbank, et al.<br>USDC, North Dist., IL<br>Case No.: 08 C 1925 | 5/10 Deposition |
| Tom L. Stingley<br>Frascona Courtney, PLLC<br>P.O. Box 23126<br>Jackson, MS 39225-3126 | Gowdy, et al. v. City of Ridgeland, et al.<br>Madison Co. Circ. Ct., MS<br>Case No.: CI2008-0281-C | 10/10 Deposition |
| John D. Giddens<br>John D. Giddens, PA Law Firm<br>226 N. President Street<br>Jackson, MS 39201 | McBroom v. Payne, et al.<br>USDC, So. Dist., So. Division, MS<br>Case No.: 1:06 CV 1222 LG JMR | 12/10 Trial |
| Jeffrey S. Deutschman<br>Deutschman & Associates, PC<br>77 W. Washington Street<br>Suite 1525<br>Chicago, IL 60602 | Dandridge v. City of Chicago, et al.<br>USDC, No. Dist., East. Div., IL<br>Case No.: 08 C 6314 | 1/11 Deposition |

| | | |
|---|---|---|
| Mary E. Kennelly<br>Fox & Fox, SC<br>124 W. Broadway<br>Monona, WI 53716 | Haas v. City of Milwaukee, et al.<br>USDC, East. Dist., WI<br>Case No.: 05-C-785 | 7/09 Deposition<br>1/11 Trial |
| Dennis C. Sweet III<br>Sweet & Associates<br>158 E. Pascagula Street<br>Jackson, MS 39201 | Archey v. City of Jackson, et al.<br>Circuit Ct., Hinds Co., MS<br>Case No.: 251-08-312-CIV | 2/11 Trial |
| Paul Applebaum<br>Law Offices<br>332 Minnesota Street<br>Suite W1610<br>Saint Paul, MN 55101 | State of Minnesota v. Anthony Michael Clark<br>Dist. Ct., Ramsey Co., MN | 5/11 Trial |
| Matthew L. Williams<br>Salvi, Schostok & Pritchard PC<br>22 W. Washington Street<br>Suite 1600<br>Chicago, IL 60602 | Dominguez v. City of Harvey, et al.<br>Circ. Ct., Cook Co., IL<br>Case No.: 2008 L 000931 | 7/11 Deposition |
| Dennis C. Sweet, III<br>Sweet & Associates<br>158 E. Pascagula Street<br>Jackson, MS 39201 | Williams, et al. v. City of Cleveland, et al.<br>USDC, No. Dist., MS, Delta Div.<br>Case No.: 2-10 CV 215-A-S | 10/11 Deposition |
| W. Cort Frohlich<br>Wilkins Frohlich, PA<br>18501 Murdock Circle<br>6th Floor<br>Port Charlotte, FL 33948-1039 | Spann, et al. v. Verdoni, et al.<br>Circ. Ct., Sarasota Co., FL<br>Case No.: 2011 CA 002046 NC | 11/11 Deposition |
| Yao O. Dinizulu<br>Dinizulu Law Group<br>221 N. LaSalle<br>Suite 1100<br>Chicago, IL 60601 | Reese v. City of Chicago, et al.<br>Circ. Ct., Cook Co., IL<br>Case No.: 07-L-011998 | 12/11 Deposition |
| Jon D. Robinson<br>Bolen Robinson & Ellis, LLP<br>202 S. Franklin<br>2nd Floor<br>Decatur, IL 62523 | Carlock, et al. v. Williamson, et al.<br>USDC, Cent. Dist., IL, Springfield<br>Case No.: 3:08-cv-03075 | 12/11 Deposition |
| Oyvind Wistrom<br>Lindner & Marsack<br>411 E. Wisconsin Avenue<br>Suite 1800<br>Milwaukee, WI 53202-4498 | Eric Swan v. Polk County Labor Arbitration<br>Polk Co., WI | 2/12 Hearing |

| | | |
|---|---|---|
| Joseph R. Curcio<br>Curcio Law Offices<br>161 N. Clark Street<br>Suite 2550<br>Chicago, IL 60601 | Payne v. City of Chicago, et al.<br>Circ. Ct., Cook Co., IL<br>Case No.: 2010L007442 | 2/12 Deposition |
| Kathleen T. Zellner<br>Kathleen T. Zellner & Associates, PC<br>1901 Betterfield Road<br>Suite 650<br>Downers Grove, IL 60515 | Lofton v. City of Chicago, et al.<br>Circ. Ct., Cook Co., IL<br>Case No.: 08 L 13495 | 3/12 Deposition |
| Amy F. Scarr<br>Amy F. Scarr, SC<br>23 N. Pinckney Street<br>Suite 310<br>Madison, WI 53703 | Poff v. Daugherty, et al.<br>USDC, West. Dist., WI<br>Case No.: 11-CV-72 | 3/12 Deposition |
| Wright C. Laufenberg<br>Laufenberg Law Offices<br>805 E. First Street<br>Merrill, WI 54452 | State of Wisconsin v. Vicki A. Fritz<br>Circ. Ct., Lincoln Co., WI<br>Case No.: 10-CM-419 | 3/12 Trial |
| Donna Rizzuto<br>Howard & Howard<br>200 S. Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604-2402 | Wells v. City of Chicago, et al.<br>USDC, No. Dist., East. Div., IL<br>Case No.: 09 C 1198 | 4/11 Deposition<br>3/12 Trial |
| A. Vince Colella<br>Moss & Colella, PC<br>28411 Northwestern Highway<br>Suite 1150<br>Southfield, MI 48034 | Estate of Tony Smith v. Robert Miller, et al.<br>USDC, West. Dist., MI<br>Case No.: 1:10-cv-610 | 4/12 Deposition<br>5/12 Deposition |
| Amanda C. Antholt<br>Smith, Johnson & Antholt, LLC<br>112 S. Sangamon Street<br>3rd Floor<br>Chicago, IL 60607 | Gilfand, et al. v. City of Chicago, et al.<br>USDC, No. Dist., East. Div., IL<br>Case No.: 07 C 2566 | 11/10 Deposition<br>5/12 Trial |
| Christopher J. Lawler<br>The Lawler Firm, LLC<br>104. W. 9th Street<br>Suite 504<br>Kansas City, MO 64106 | Utter, et al. V. Thompson, et al.<br>USDC, Kansas<br>Case No.: 11-2360-KMV-KKH | 8/12 Deposition |
| Roshna Bala Keen<br>Loevy & Loevy<br>312 N. May Street<br>Suite 100<br>Chicago, IL 60607 | Doe v. Village of Forest Park, et al.<br>USDC, No. Dist., East. Div., IL<br>Case No.: 11 CV 6102 | 9/12 Deposition |

| | | |
|---|---|---|
| Heather Lewis Donnell | Clark, et al. v. City of Chicago, et al. | |
| Loevy & Loevy | USDC, No. Dist., East Div., IL | |
| 312 N. May Street | Case No.: 10-cv-1803 | 9/12 Deposition |
| Suite 100 | | |
| Chicago, IL 60607 | | |
| | | |
| A/AG Jonathan F. Weisbard | Morris v. Arizona Adult Probation Dept., et al. | |
| Office of the Attorney General | Superior Court, Maricopa Co., AZ | |
| State of Arizona | Case No.: CV2006-007863 | 1/11 Deposition |
| 1275 W. Washington | | 10/12 Trial |
| Phoenix, AZ 85007-2926 | | |
| | | |
| Daniel E. O'Brien | Maxson, et al. v. Seipler, et al. | |
| Winters Salzetta & O'Brien, LLC | USDC, No. Dist., IL | |
| 111 W. Washington Street | Case No.: 1:07CV5197 | 10/12 Deposition |
| Suite 1200 | | |
| Chicago, IL 60602 | | |
| | | |
| Steven J. Sersic | Rincon v. USA, et al. | |
| Smith Sersic | USDC, No. Dist., Hammond Div., IN | |
| 9301 Calumet Avenue | Case No.: 2 10CV268 | 10/12 Trial |
| Munster, IN 46321 | | |
| | | |
| Attorney Marvin a Brustin | Estate of Wojcik v. Michigan City, et al. | |
| Brustin & Lundblad, Ltd. | Superior Court, LaPorte County, IN | |
| 100 W. Monroe Street | Case No.: 46D02-1004-CT-0072 | 11/12 Deposition |
| Fourth Floor | | |
| Chicago, IL 60603 | | |
| | | |
| Scott D. Winston | Kennedy v. Schlosser, et al. | |
| Laufenberg, Stombaugh, & Jassak, SC | USDC, No. Dist., Cedar Rapids Div., IA | |
| P.O. Box 722 | Case No.: 11-1032 | 1/13 Trial |
| Platteville, WI 53818 | | |

March 12, 2013