# EXHIBIT 3

Ricky S. Burems
3310 W. Thurston Ave.
Milwaukee, WI 53209

January 9, 2007

Milwaukee Fire and Police Commission
200 E. Wells
Milwaukee, WI 53202

Dear Commissioners:

This situation is being brought to the attention of the Milwaukee Fire and Police
Commission at the suggestion of State of Wisconsin Department of Workforce
Development, Equal Rights Officer James Drinan. The enclosed documents chronicle
questionable and unethical conduct on the part of several members, past and present, of
the Milwaukee Police Department's Homicide Division, and Assistant District Attorney
Mark Williams of the Milwaukee County District Attorney's Office. This conduct is
centered on the cold case investigation of the 1994 homicide of 31 year-old Debra
Maniece, and the subsequent treatment of her family, in comparison to the cold case
investigation of the 1990 homicide of 24 year-old Darby Leigh Trebing, and the
subsequent treatment of her family. Both women were found brutally murdered, and due
to advances in DNA technology, suspects were recently identified. The key difference in
the two cases is that Debra Maniece was black and Darby Trebing was white. This
conduct also involves the mistreatment of me, and my former partner in the Violent
Crimes Unit, Detective Diedra Cole, by Homicide Division Supervisors and by Assistant
District Attorney Mark Williams.

In April of 2004, me and my partner, Detective Cole were assigned by Captain Eric
Moore to investigate the cold case homicide of Debra Maniece as a hobby case that
would be an invaluable learning process for Detective Cole, a newer detective, who was
prematurely assigned to work at a district station by herself. At the district station
Detective Cole did not have the benefit of working with more experienced detectives who
could aid in her development. Captain Moore who is my ex-partner in the Homicide
Division asked me to become Detective Cole's partner and work with her on the Maniece
homicide case. Captain Moore and I had previously worked on the case shortly after
Debra Maniece's death, and were familiar with the case. On November 20, 2006, Debra
Maniece was found deceased in a vacant building located at 1929A N. 12th Street. An
autopsy revealed that she had been beaten to death. Captain Moore became aware of a
2001 DNA development which identified a possible suspect in the homicide of Debra
Maniece. The suspect was identified as Kelvin D Strong, and his blood was found at the
scene of the homicide. Strong's blood was mixed with Debra Maniece's blood on the two
shirts that she was wearing on her body when she was discovered. Strong's blood was
also found inside of Debra Maniece's left shoe, which was found dislodged from her left
foot and away from her body at the crime scene. Debra Maniece's right shoe was on her
right foot. In 1995, six years before he was linked to the Debra Maniece homicide

OTT 002967

through DNA, Strong was convicted of two violent sexual assaults of women that occurred in the same general area of the vacant building where Debra Maniece's body was found. One of these sexual assaults occurred four months prior to Debra Maniece's homicide and the other occurred three months after her homicide. Captain Moore instructed us to read the Maniece investigative case file in its entirety, and try to identify some investigative measures that could be taken to get charges issued in the case.

Detective Cole and I read the case file as instructed and we found that in 2001, shortly after the Wisconsin Regional Crime Laboratory notified the Milwaukee Police Department of a cold case DNA link, Homicide Detectives Michael Wesolowski, and Carl Buschmann located Strong in a Whiteville, Tennessee prison, and interviewed him regarding his blood being found mixed with Debra Maniece's blood and soaked through the two shirts found on her body, and also, his blood being inside of her dislodged left shoe. Strong denied knowing Debra Maniece after he was shown a photograph of her. There were two significant investigative measures that could be taken. The first measure would be to send out previously unsubmitted evidence to the Wisconsin Regional Crime Laboratory. The evidence that we identified were bloody bricks found just outside of the rear entrance door of the vacant building that Debra Maniece was found in, along with a glass bottle and knife found inside of the building, and Debra Maniece's pants. The second measure would be to interview Debra Maniece's family members, friends, and associates to determine if they were aware of any type of relationship between Debra Maniece and Kelvin Strong. My partner and I were very surprised that these things had not been done because they would seem to be basic investigative measures to be taken in the case. Detective Cole and I sent the additional evidence out to the crime laboratory for DNA processing and we later contacted Debra Maniece's family.

Soon after the Homicide Division Supervisors were told that Detective Cole and I would be working on the Maniece case, Homicide Detective Louis Johnson told Captain Moore that Homicide Lieutenant David Zibolski told several of the dayshift homicide detectives that we shouldn't be allowed to work on the case.

Shortly after assigning Detective Cole and me to the Maniece case, Captain Moore ordered a set of enlarged homicide scene and morgue photos from the Maniece case, and had them delivered to his office by Identification Technician Sam Moody. Identification Technician Moody gave a large sealed envelope that was addressed to Captain Moore, and contained the photos, to Homicide Division Captain Timothy Burkee. The photos were stolen, and never seen again. Captain Burkee claimed that he had left the envelope on Captain Moore's desk, and had no idea of what happen to them. Captain Moore requested another set for us, and had them delivered straight to his hands.

In January of 2005, Detective Cole and I located the two women who were violently sexually assaulted by Kelvin Strong in 1994 and 1995. The first victim was sexually assaulted on 8-16-94, and the second on 2-27-95. At the time that they were assaulted by Strong both women were struggling with cocaine dependency. Debra Maniece was also struggling with cocaine dependency at the time of her death. The attacks on these two women could possibly relate to the Maniece homicide in a prosecution trial of Kelvin

OTT 002968

Strong, through Wisconsin State Statute 904.04 (2) (other crimes, wrongs, or acts) (prior bad acts). Both living victims stated that if needed, they would give testimony in court against Strong in the Maniece case. One woman still resides in Milwaukee, and the other lives in the State of Alabama.

On or around Wednesday February 23, 2005 when I reported for duty at the Criminal Investigation Bureau, I learned that Captain Moore and Homicide Division Captain Timothy Burkee were in Deputy Chief Brian O'Keefe's office because of a major disagreement about the Maniece case. Captain Burkee had gotten a hold of a faxed report from the Crime Laboratory regarding the evidence my partner and I had submitted the previous month. Captain Burkee knew that Detective Cole and I had been working the case exclusively, but when he received the fax informing the department that two additional identified DNA profiles had been discovered on the evidence that Detective Cole and I had submitted, he gave the follow-up to Detectives Wesolowski and Buschmann. The two Detectives had done nothing on the case since interviewing Kelvin Strong in 2001, and documenting his denial of involvement in Debra Maniece's homicide. Captain Burkee said he knew Captain Moore would be upset about him giving the new evidence results to Detectives Wesolowski and Buschmann so he talked to Deputy Chief O'Keefe before Captain Moore came into work on the early shift, and got O'Keefe's permission to kick Detective Cole and I off of the case, even though we were responsible for the new DNA evidence being discovered. When Captain Moore arrived at work, he became very upset after being told that we had been kicked off the case because the other two detectives should be entitled to work on the new evidence because it was originally their case. After Captain Moore protested the move, Deputy Chief O'Keefe changed his mind and said that Detective Cole and I could continue to work on the case. At this time, Detective Wesolowski had already announced his retirement to Scottsdale, Arizona in a matter of weeks, and giving the case back to him made no sense at all.

In early 2005, while Detective Cole and I were at the Wisconsin Regional Crime Laboratory (Milwaukee Office) regarding the homicide case, DNA Analyst Sharon Polakowski told us that the blood evidence that was recovered from Debra's two shirts and shoe was one of the most compelling DNA evidence cases that she had ever dealt with, and she could not understand A.D.A. Williams reluctance to go forward with a prosecution of Kelvin Strong. She also stated that when she got Strong's DNA profile in the bloodstains she was extremely excited. According to the Crime Lab, the probability of randomly selecting an un-related individual whose STR profile matches the evidentiary profile, that being the bloodstains on the victim's clothing, in the Black population, is approximately 1 in 14 quadrillion. Ms. Polakowski also handled the other evidence that Detective Cole and I sent to the crime laboratory in 2005. This included bloody bricks found just outside the vacant building that Debra's body was found in, a glass beer bottle and a knife also found inside of the vacant building, and Debra's pants. The bloody bricks suggest that part of the assault of the Debra Maniece occurred just outside of the building. An identified man's DNA profile (saliva) was found on the beer bottle, and Detective Cole and I located and interviewed that man and he was identified as Mr. Delano Dennis. Mr. Dennis is openly gay, and he stated that in the mid 1990's, he

OTT 002969

along with other alcoholics and drug users often went into the vacant building to get high. After viewing a picture of Debra Maniece he stated that he did not know her. Another identified man's DNA profile (semen) was found in the crotch of Debra's pants, and on anal swabs taken during Debra's autopsy. This person was identified as Mr. Lawrence Wimberly. Detective Cole and I located and interviewed Mr. Wimberly. Mr. Wimberly was shown a picture of Debra Maniece, and he recognized her from a "dope dating" encounter. Mr. Wimberly stated that the encounter consisted of oral sex. Mr. Wimberly stated that he had "dope dated" hundreds of women, and he denied any involvement in Debra Maniece's death. There were unidentified DNA cells found under Debra's fingernail which is not uncommon according to Ms. Polakowski. She stated that the DNA cells could have come from casual contact unrelated to Debra's death. Ms. Polakowski stated that despite of the other DNA profiles being discovered (due to the efforts of Detective Cole and myself), Strong's blood soaking into two of the Debra's shirts and mixing with her blood, along with Strong's blood being inside of the dislodged shoe was extremely compelling evidence.


Detective Cole and I traced Debra Maniece's family to 928 W. Meinecke Apt's #3 & #4, and we set up a meeting with them at Debra's mother's apartment.. Detective Cole was not available to attend the first meeting. When I arrived, I found a large number of Debra Maniece's family members, and friends present. Debra's mother Alice Maniece; Debra's sisters Doris Maniece, Velma Maniece, Glenda Maniece, and Linda Maniece; Debra's daughter Tamara Maniece; nieces, nephews, and several family friends. Debra's brothers Tyrone Maniece, and Danny Maniece were not able to make the meeting. Everyone was nervous and anticipating as I introduced myself, and told them that Detective Cole and I had been investigating Debra's homicide. Several family members became emotional and said a few "Thank you Jesus". When I said that we had been doing additional investigation on the DNA lead involving Kelvin Strong, everyone looked puzzled. No one knew anything about Kelvin Strong or blood being found on Debra's two shirts and shoe in 2001. Family members stated that they had not heard anything from the Milwaukee Police Department regarding Debra since the mid 1990's. I then explained all of the developments in Debra's case, starting with the Crime Laboratory's discovery of Strong's blood on the two shirts that were on Debra's body, and inside the one shoe that had been dislodged from her left foot. I also told them that Debra still wearing her right shoe on her right foot. I also explained how Strong's blood was mixed with Debra's blood in both of the shirts. I told the family members that Strong was in prison for two very violent sexual assaults that occurred within months of Debra's death, and in close proximity to where her body was found. Everyone was relieved to hear about the developments, but at the same time, very disappointed that the Milwaukee Police Department had not shared this information with them in 2001. Maniece family members told me that Debra's sister, Norma J. Miller was strangled to death by her boyfriend the year before Debra death, and the family had never really recovered from both of those tragedies. Before leaving the Maniece family, I showed Debra's adult daughter Tamara a photo array of several black males. In the photo array was a picture of Kelvin Strong and several fillers. Tamara immediately pointed to Strong's photo and identified him as an acquaintance of her mother. Tamara stated that Strong frequented a home that her mother

**OTT 002970**

would take her to around 13th & Walnut, and her mother would do drugs there. Tamara later pointed out the empty lot that the house use to sit on before it was razed. No one else at the Maniece residence recognized any of the black males depicted in the photo array.

After meeting with the Maniece family, Detective Cole and I continued to investigate the case. From Strong's Probation and Parole file we learned that around the time of Debra's death, Strong was periodically staying at the Guest House of Milwaukee Shelter at 1216 N. 13th Street, and at the Salvation Army Emergency Shelter at 1730 N. 7th Street. We contacted both shelters and neither had client overnight residency logs for 1994. Our intention was to find out if Strong was regularly staying at either of the shelters at the time of Debra Maniece's death, and possibly did not report in on night or morning of her death. Strong's Probation and Parole file also indicated that Strong worked through a temporary employment agency at Emmpak Foods at 200 S. Emmber Lane, in the Menomonee Valley. We were unable to obtain any employment records of Strong's. Around the same time period, Strong was arrested for Impersonating a Police Officer at the Welfare Office at 13th and Vliet, after flashing a badge and taking money from female visitors to the office. We learned that Debra Maniece was employed at the Welfare Office for a period of time but we were unable to connect her to Strong's activities at that location.

In early 2005, while discussing the Maniece case with Milwaukee County District Attorney Mark Williams, who is the head of the District Attorney's Office Homicide Prosecution Unit, A.D.A. Williams stated to me "I get the impression that certain people in your department don't want to see charges issued in this case." A.D.A. Williams said he was basing his opinion on conversations that he had with certain members of the Milwaukee Police Department's Homicide Unit. A.D.A. Williams also stated that the reason why he did not issue homicide charges against Kelvin Strong in 2001 was because the Milwaukee Police Department's Homicide Division did not want him to. A.D.A. Williams has a close friendship with Detectives Wesolowski and Buschmann, and A.D.A. Williams told me that while reviewing the new developments in the case that myself and Detective Cole were responsible for, he contacted Detective Buschmann and asked him if he would be upset if he (A.D.A. Williams) issued charges against Kelvin Strong. A.D.A. Williams said that Detective Buschmann said that he wouldn't be upset, but he would be disappointed that he didn't get to play a role in getting charges issued in the case. Detective Cole and I felt strongly that Detective Buschmann's ego should not be a factor in this case, and we were surprised that A.D.A. Williams felt the need to get Detective Buschmann's o.k. before issuing any charges in the case.

In early 2005, I asked A.D.A. Williams if he would go to a judge and request a John Doe Probe that would facilitate the transporting of Kelvin Strong from Fox Lake Correctional to Milwaukee so that we could re-interview him about the DNA evidence which linked him to Debra Maniece. A.D.A. Williams initially resisted that request because it involved a lot of work, and he suggested instead, that Detective Cole and I travel to Fox Lake Correctional to interview Strong. I told Mr. Williams that it would be difficult to make an impression on Strong while he was in an environment that was comfortable to

**OTT 002971**

him, and that he was accustomed to. I also asked Mr. Williams if he could attempt to obtain a subpoena for any of Strong's medical records that show him being treated for any injuries sustained around the time of Debra Maniece's death. The subpoena would be directed to local hospitals. Mr. Williams dismissed the subpoena for medical records idea, but after several weeks of me asking, finally agreed to request a John Doe Probe. On May 6, 2005, Circuit Court Judge William Brash commenced a John Doe proceeding into the death of Debra Maniece. On June 9, 2005, as part of the John Doe proceeding, Judge Brash signed an order to the superintendent of the Dodge Correctional Institution to transfer custody of Kelvin Strong to the Milwaukee Police Department. On June 20, 2005, I met with Milwaukee Police Detective Willie Huerta, and began to give him an in-depth briefing on the Maniece investigation because he was assisting me in Detective Cole's absence. At my request Detective Huerta was authorized by the Captain to assist me. I asked for Detective Huerta because of his excellent interviewing and interrogation skills and those skills would be needed when questioning Strong because he was a hardened and crafty criminal who had spent the majority of his adult life in prison. Detective Huerta was to accompany me to Fox Lake Correctional Institution to pick Strong up and convey him back to Milwaukee. Before I could complete my briefing of Detective Huerta, Lieutenant William Jessup the early shift homicide unit supervisor, gave him another assignment which caused him to work until sometime after 6:00 AM the next morning (June 21, 2006). Lieutenant Jessup knew that Detective Huerta was going to accompany me to Fox Lake to pick up Strong the morning that he worked until sometime after 6:00 AM (June 21, 2006). Detective Huerta and I drove two hours each way to convey Strong, a dangerous felon, from Fox Lake to Milwaukee, and during that trip Detective Huerta was completely exhausted.

On June 23, 2005, Detective Huerta and I were interrogating Strong about Debra Maniece's homicide when Lieutenant Jessup pulled Detective Huerta out of the interview and sent him out on another assignment. I was left to question Strong by myself. I have almost ten years of experience in investigating homicides, and I can say without reservation that, interference with an intense homicide investigation interrogation in the manner that Lieutenant Jessup had done was extremely disruptive and highly unusual. Lieutenant Jessup's conduct between June 20, 2006, and June 23, 2006, appeared to me to be acts of sabotage. Several years ago when I was assigned to the homicide unit, I along with my partner Matthew Quist requested a money draw from the department so that we could put a black female homicide witness up in a hotel after she was threatened. Detective Quist told me that in response to the money draw request, Lieutenant Jessup said "Do you really care about these people? These people are pieces of shit. All that I care about is clearances." Lieutenant Jessup was referring to our witness who had put herself in danger by telling us what she knew about the homicide. During our interrogation of Strong, he again denied knowing or killing Debra Maniece. Strong was subsequently taken back to Fox Lake Correctional. In a recorded collect phone call that he made to a family member after being returned to Fox Lake, Strong bragged that even if he did do it, meaning killing Maniece, he wouldn't admit it to police because "That's a case". This information was shared with A.D.A. Williams and he was not interested.

On July 25, 2005, Captain Moore sent A.D.A. Williams a 58 page information package to assist him in his review of the case. The package consisted of the original departmental memorandum (dated April 22, 2004) that he sent to me and Detective Cole assigning us to the case; a second departmental memorandum (dated July 7, 2005) that he sent to me and Detective Cole, regarding the murders of five elderly persons in the Milwaukee Metro area in 1988 which were solved in part by a bloodstain left on a stuffed toy donkey; a newspaper article from the Detroit Free Press which detailed the solving of a 35 year old cold case homicide that was solved by a DNA match; a Lexis/Nexis copy of State vs. Kevin P. Sullivan that was provided to me and Detective Cole for application to the prior acts portion of the Wisconsin State Statutes, which is often referred to as the whitty evidence statute. Soon after A.D.A. Williams received the information package, I came to his office to discuss the case. A.D.A. Williams was extremely angry that Captain Moore had sent the information package to him and he stated to me "I was leaning towards issuing this case, but stuff like this makes me not want to issue anything." The "stuff" that Mr. Williams was referring to was the information package. Mr. Williams thought that the package was sent for the purpose of pressuring him into issuing charges in the case.

In the fall of 2005, Detective Cole and I decided to go through Debra Maniece's entire homicide file again to see if there was anything that we had overlooked. During this task, we found a report that we had previously overlooked. For the both of us, this shocking report provided the answer to why Lieutenant Zibolski was complaining about Detective Cole and I being allowed to work on the case; why the first set of enlarged crime scene photos that Captain Moore ordered were stolen from his desk; why Captain Burkee and Deputy Chief O'Keefe tried to kick me and Detective Cole off of the case after we caused the discovery of 2 additional DNA profiles on evidence that should have been sent to the Crime Lab prior to our involvement, but never was; why unnamed members of the Homicide Unit did not want A.D.A. Williams to issue any charges in the case; why Lieutenant Jessup tried to sabotage me and Detective Huerta's interrogation of Kelvin Strong; why A.D.A. Williams is presently reluctant to issue any charges against Strong; and why the Maniece family was never told about the 2001 DNA match to Kelvin Strong, and that the case had been reviewed by A.D.A. Williams and no processed. THIS SHOCKING REPORT WAS A MILWAUKEE POLICE DEPARTMENT INVESTIGATION CLEARANCE REPORT. The case had been "cleared by arrest" in 2001, on this report which was filed by Detective Wesolowski on 11-14-01, and signed by Lieutenant Jessup. Prior to discovering this report we had no idea that the case had been cleared, and especially by the supposed arrest of Kelvin Strong on 11-5-01, which we don't believe ever happened.

The clearance report narrative explained how Kelvin Strong was linked to the homicide through DNA, and also how the case was reviewed by A.D.A. Williams and no processed. Detective Cole and I noticed that after Detectives Wesolowski and Buschmann interviewed Strong on 6-6-01, in the privately run Tennessee prison where he was serving his Wisconsin sentence, there is no record of any additional investigation being done by anyone before the case was cleared in November of 2001. This fact flies in the face of the last narrative sentence of Detective Wesolowski's 3 page supplementary

report dated 6-8-01. The sentence states "Mr. Strong's involvement in this case is pending further investigation." There was no further investigation ever done. The detectives or supervisors never evaluated the two violent sexual assaults that Strong was in prison for, for relatedness. Then on 11-14-06 the detectives file a clearance report, clearing the case by the supposed arrest of Kelvin Strong. From my considerable experience in the homicide unit I know that every year around November, the homicide unit supervisors become very concerned about what the year end homicide clearance rate or percentage will be. This is because they see the homicide clearance rate as a part of their reward system. History has shown that high clearance rates often lead to favorable department reputations and promotions for Homicide Division Supervisors. This is why it is no accident that you rarely see a person of color supervising in the Homicide Division. Also, this is how a homicide case involving a poor, black, cocaine addicted victim who occasionally traded sex for drugs, can be under investigated after receiving a significant evidentiary break, reviewed and no processed by the head of the District Attorney's Office Homicide Unit, and then falsely cleared by arrest, and the surviving family members are left completely in the dark. Detective Cole and I have no doubts that Debra Maniece's homicide was cleared five months after Strong was questioned, to boost the 2001 homicide clearance rate. They justified the clearance, and the fact that they didn't do a competent investigation after interviewing Strong, by saying "we know he did it, so we can just clear it." It was necessary not to contact the Maniece family about the DNA hit because most likely they would want prosecutorial action, which in turn would make additional investigation necessary. We also believe that to the Homicide Unit, Debra Maniece was worth more as favorable statistical points for the clearance rate, than as an unfortunate victim of a vicious murder that should have been investigated to the greatest extent possible.

On 10-4-2005, Detective Cole and I submitted a report requesting assistance from the FBI's National Center for the Analysis of Violent Crimes in relative to the Maniece investigation. Our specific aim was to get assistance in developing a post-suspect-identification behavioral analysis of Kelvin Strong. We had contacted the Center which is located in Quantico, Virginia, and an analyst informed us that the Center could assist us in the following areas of investigation:

1. Expert testimony regarding the violent behavior of the suspect.
2. Establishing signature characteristics for related crimes.
3. Assistance to the prosecutors regarding prosecution strategies.
4. The interrogation of the suspect.

The analyst informed us that a behavioral analyst from the FBI could come to the law enforcement agency to confer with investigators and prosecutors, or those investigators and prosecutors could travel to Quantico, Virginia, for the required assistance. All that was required to initiate the process was that an assistance request be made to FBI agent Matt Gibson of the FBI's Milwaukee Office. Agent Gibson is the Center's liaison for Southeastern Wisconsin. We eventually made contact with Agent Gibson who filed an assistance request with the Center on behalf of Detective Cole and me. Agent Gibson scheduled a conference call meeting with two analysts from Quantico. During that

**OTT 002974**

conference call meeting which was held at the FBI's Milwaukee Office, Detective Cole and I outlined the Maniece case. The analysts said that the blood evidence against Kelvin Strong, coupled with his long and recent history of violent predatory attacks on women was extremely compelling, and that if this case had occurred in Virginia, Strong would be on death row. The analysts further stated that the presence of Lawrence Wimberly's semen on Debra's pants, and on the anal swabs could be an issue for the defense, but it was not so much of an issue that the case could not be prosecuted. The presence of Mr. Wimberly's semen is indicative of a sex act. The presence of Kelvin Strong's blood mixed with Debra's blood in two shirts and inside the dislodged shoe is indicative of a dynamic act of violence. The analysts advised us to contact Ms. Polakowski at the crime laboratory, and ask her if the tails of the spermatozoa found in Lawrence Wimberly's semen, which was on the anal swab, were still attached. They explained that the tail usually detaches from the rest of the sperm cell after about twenty four hours. Debra Maniece was last seen alive approximately 8 hours before her body was discovered in the vacant building. If Mr. Wimberly's sperm cells still had their tails attached that would indicate that he had sex with Debra within 24 hours of the sperm cell collection. Before bringing the conference call meeting to an end, the analysts told us that we had an open invitation to contact them anytime that we needed their assistance. Before contacting Ms. Polakowski, I went to see Assistant District Attorney Norman Gahn who is probably the most experienced person in the District Attorney's Office when it comes to the use of DNA in criminal prosecutions. I asked A.D.A. Gahn about the sperm cells tails angle that the FBI analysts presented to Detective Cole and me. A.D.A. Gahn told me that the analysts' information was accurate, and he also advised me to get a determination on whether the tails were attached or detached. We contacted Ms. Polakowski at the crime laboratory and she informed us that the sperm cells were detached, but that fact was not as helpful as it could be because Debra was not autopsied the same day that she was found. The anal swab was taken during the autopsy. I later told A.D.A. Williams about the availability of prosecution assistance from the FBI's Center for the Analysis of Violent Crimes, and I also told him about the conversation that I had with A.D.A. Gahn. Coincidentally, a week or so later, I ran into a District Attorney's Office employee who was not aware of the Maniece investigation. The employee playfully asked me what had I and my former Homicide Division partner (Captain Eric Moore) done to A.D.A. Williams. I had no idea what the D.A.'s Office employee was talking about. The employee stated that it happened to hear a conversation between A.D.A. Williams and A.D.A. Gahn when the two men encountered one another, and my name and my former partner's name was mentioned. The D.A.'s Office employee stated that A.D.A. Williams approached A.D.A. Gahn and asked "Did Detective Ricky Burems come and talk to you about an old homicide case? A.D.A. Gahn stated yes, and explained that he spoke to me about a case. The D.A.'s Office employee did not hear all of the short conversation, but it said that at the end of the conversation A.D.A. Williams was mildly upset, and he stated to A.D.A. Gahn, "Burems and Eric Moore just insist on continuing to investigate this case." I am not placing the D.A.'s Office employee's name in this report at this time; because it could impact its employment status.

Not long after the conference call meeting, A.D.A. Williams told me to contact Dr. Jeffery Jentzen, The Milwaukee County Medical Examiner, and ask him if Debra

Maniece's injuries (which caused the blood flow) were contemporaneous to her death. I met with Dr. Jentzen and posed the question to him. Dr. Jentzen stated he would review Debra's autopsy file and get back to me. Dr. Jentzen did get back to me, and during a second meeting with him, he stated that all of Debra's injuries were contemporaneous to her death. He further stated that Debra had no healing wounds. I reported this information back to A.D.A. Williams.

In mid February 2006, Detective Cole and I learned that the Crime Laboratory made a DNA hit on a cold case homicide that occurred on 4-15-90. The victim was a 24 year old white female named Darby Leigh Trebing. Trebing was found dead in her home and had been strangled. The person whose DNA profile was matched is currently incarcerated in Oshkosh Correctional Institution on a sexual assault conviction, just as Kelvin Strong is. The Crime Laboratory notified the Milwaukee Police Department of the DNA hit on 2-6-06, and ten days later on 2-16-06, Homicide Detectives Randolph Olson and William Stawicki traveled to St. Louis, Missouri to meet with at least one of Trebing's surviving family members. Just ten days after the DNA hit was reported, detectives were traveling over 380 miles to meet with Trebing's family, but they never bothered to travel the two miles from the Police Administration building to 928 W. Meinecke to notify the Maniece family of the DNA hit or the very questionable clearance. The major difference in the two cases is obvious, Darbie Trebing was white and Debra Maniece was black, and the same is true for the surviving families. According to the out-of-town report that the Detectives submitted, the trip to St. Louis was authorized by Lieutenant Jessup.

Between Friday, February 24, 2006 and Monday, March 6, 2006, Lieutenant Jessup conspired with A.D.A. Mark Williams to secretly meet with a large group of Debra Maniece's family at the Career Youth Development (CYD) Social Services Agency, intentionally excluding Detective Cole and myself. The meeting was scheduled only after Ms. Jeanetta Simpson-Robinson the Director of CYD called District Attorney E. Michael McCann and demanded that the Maniece family be given information about Debra's investigation.

On February 24, 2006, Lieutenant Jessup approached me and told me that there had been a development in the Maniece case, and he was wondering if I knew where the investigative file was. I showed him the file which was in a box under my desk and offered it to him. Lieutenant Jessup stated that he didn't need the file at that particular time, but wanted to know where it was in the event that it was needed. On Friday, March 3, 2006, Ms Simpson-Robinson contacted Detective Cole and notified her of the March 6, 2006 meeting that A.D.A. Williams had scheduled with the family. On March 6th, I got tied up in court and was unable to make the meeting. Detective Cole went to CYD for the meeting and when she arrived she found A.D.A. Williams addressing the family and their supporters which included a representative from the NAACP, with Detectives Carl Buschmann and William Stawicki. When Debra Maniece's daughter Tamara asked A.D.A. Williams the identity of the District Attorney who in 2001, decided not to issue charges against the suspect whose blood was found on two shirts that were on the Debra's body and inside of one of her shoes that was off of her foot, A.D.A. Williams stated that he did not know. That answer was untrue and the family knew that because I

**OTT 002976**

had previously advised them that A.D.A. Williams reviewed the case in 2001 after the DNA discovery, and the no processed the homicide charge being sought against the suspect. Tamara then asked A.D.A. Williams the names of the two lead detectives on the case in 2001. A.D.A. Williams replied "I don't know", and that answer was untrue. Detective Carl Buschmann was standing right next to A.D.A. Williams. A.D.A. Williams also told the family that the case had not been cleared by the Milwaukee Police Department, and that statement was untrue. There were several times during the meeting that my partner had to publicly correct A.D.A. Williams regarding his misrepresentations. A.D.A. Williams told the family that he was conducting the present review of the case, and he was troubled by the other DNA profiles being discovered on evidence. When A.D.A. Williams declined to issue chargers in 2001, none of the additional DNA profiles had been discovered. A.D.A. Williams told the family that it should make them feel better that Strong was never going to get out of jail anyway. The meeting ended with A.D.A. Williams asking the family to give him a month to further review the case.

Following the meeting Tamara Maniece told Detective Cole that just before Detective Cole arrived at CYD, Tamara asked Mark Williams if Detectives Burems and Cole were going to attend the meeting. A.D.A. Williams replied "They will definitely not be at this meeting". Ms. Simpson-Robinson also spoke to Detective Cole after the meeting, and she told Detective Cole that when she was on the phone with A.D.A. Williams, scheduling the meeting, she specifically requested that Williams invite Detective Cole and me. She said that A.D.A. Williams told her that he would contact us himself and ask us to attend. A.D.A. Williams never tried to contact us about the meeting. Later that same day, I was approached by Detective Louis Johnson who is black and assigned to the Homicide Unit. Detective Johnson informed me that Lieutenant Jessup tried to get him to go to the meeting at CYD even though he knew nothing about the case. Detective Johnson's appearance as a black man was intended to disarm the family and give credibility to Mr. Williams's misrepresentations.

For Detective Cole and me, the CYD meeting incident was the last straw. On March 19, 2006, we went to the Equal Employment Opportunity Commission, at the Ruess Federal Building, and filed a charge of discrimination against the Milwaukee Police Department. After reviewing our complaint, EEOC investigator Reginald Linyear stated that the conduct we described in our complaint if true would be considered government corruption, and we may want to share the information with the United States Attorney's Office. A few days later Detective Cole and I followed Mr. Linyear's suggestion by going to U.S. Attorney's Office at the Federal Building located at 517 E. Wisconsin Ave. When we arrived we were told that there was no one that could help us at that moment. A secretary took our names and contact numbers and stated that someone would be contacting us soon. A few days later Detective Cole received a phone call from Assistant U.S. Attorney Paul L. Kanter, who is the Criminal Division Chief of the U.S. Attorney's Office. Mr. Kanter got a little background information from Detective Cole before scheduling a meeting with us. We met with Mr. Kanter at his office, and we let him read the document that we prepared for the EEOC, which summarized our complaint. After reading the document and then asking us several detailed questions about the Maniece investigation, Mr. Kanter said "you guys are being cut out of the case". Mr. Kanter said

that he knew Mark Williams and Chief Hegerty, and he offered to call either of them on our behalf. We declined that offer. Detective Cole and I believe that at the time Mr. Kanter did not understand how serious we were about our complaint. We were very concerned about the relationships between Mr. Williams and the homicide detectives and supervisors involved in the matter. We believed that if Mr. Kanter went to Chief Hegerty she would tell Deputy Chief O'Keefe, and he would initiate damage control because he was the C.I.B.'s Homicide Division Captain in 2001, and would have approved the clearance of the Maniece case, and also would have been responsible for compiling the department's Uniform Crime Reporting, homicide clearance rate statistics for 2001. Detective Cole and I told Mr. Kanter that we wanted our complaint investigated. Mr. Kanter said that the FBI was the investigating arm of the U.S. Attorney's Office, and he would contact that agency and have them investigate our complaint.

On April 17, 2006, I met with A.D.A. Williams to discuss the pros and cons of the Maniece case. During the meeting I asked A.D.A. Williams why he had not pursued certain strategies that were available to him, and would help in the successful prosecution of the case. A.D.A. Williams became upset and stated that members of the Milwaukee Police Department's Homicide Division felt that the case should not be issued, but, he might issue the case, but it would not be with me. A.D.A. Williams also asked me who had "drummed up" the Maniece family. This was in apparent reference to the Maniece family and supporters making inquiries regarding the prosecution of Kelvin Strong. After calming down, A.D.A. Williams suggested that I accompany him to the Crime Lab on the following Wednesday, and further that all detectives working the case should come to his office for a meeting. A.D.A. Williams also suggested that certain members of the Homicide Unit were feeling left out of the investigation. I readily agreed with A.D.A. Williams's suggestion that all detectives working on the case should meet. On the following Tuesday, I saw A.D.A. Williams in passing and I asked him what time should I pick him up the next day, for the trip to the Crime Lab. A.D.A. Williams stated that he had already gone to the Crime Lab on another matter, and he did not mention the meeting that he had proposed. A few days later I went to the Crime Lab to speak to Ms. Polakowski, and I observed Mr. Williams and Detective Carl Buschmann signed in on the same date and time in the Crime Lab's visitor's book. They had gone to the crime lab together not long after the meeting I had with him on April 17th. Ms. Polakowski stated that they met with her and discussed the evidence in the Maniece case. Detective Carl Bushmann was responsible for under investigating the Maniece case, and also, for claiming with supervisory approval that the Maniece case was cleared by the arrest of Kelvin Strong, and not sharing any of the information with the Maniece family. Detective Buschmann recently retired, and was immediately hired by the Milwaukee County District Attorney's Office as an Investigator.

Detective Cole and I received notifications from the EEOC that they had accepted the results of an investigation into our EEOC complaint by the Milwaukee Police Department's Professional Performance Division (PPD), and therefore were dismissing our complaint. The PPD investigation only focused on the CYD meeting incident, and it determined that the reason why we were not invited to the meeting was due to the

availability of two Dayshift detectives who were familiar with the investigation and available to go to the meeting. The persons interviewed by PPD were Captain Burkee and Lieutenant Jessup, who were both named in the complaint, and A.D.A. Williams. The PPD investigation was done by two Police Officers, instead of Detectives who would be familiar with criminal investigation procedures, and the Police Officers were in a situation where they were investigating the most powerful people in the Criminal Investigation Bureau. The EEOC did no investigating at all, and that is what we expected would happen with them. The State of Wisconsin Department of Workforce Development's Equal Rights Division conducted an investigation also, and concluded that the Fire and Police Commission should be the entity looking into the complaints of Detective Cole and Myself.

On Wednesday, July 19, 2006, Detective Cole called into radio station 1290 AM's, Eric Von Show to respond to several things that Chief Hegerty said as a guest of the show. The topic of discussion was a complaint Detective Cole made regarding workplace harassment by a person Chief Hegerty recommended for promotion. Approximately 20 minutes after Detective Cole finished her phone call to the station, her phone rang. The caller was Asst. U.S. Attorney Paul Kanter, who we had not heard from since our meeting with him months earlier. Neither I nor Detective Cole believes that the timing of Mr. Kanter's call was coincidental to the emotionally charged debate that Detective Cole had with Chief Hegerty on the Eric Von radio show. Mr. Kanter told Detective Cole that he wanted to meet with us as soon as possible. He said that a supervisor from the FBI would also be present at the meeting. We met with Mr. Kanter and FBI supervisor David Gorr On July 27, 2006. During the meeting we gave a detailed explanation of the Maniece homicide investigation to FBI supervisor Gorr, and he assured us that our complaint would be investigated. The Mr. Gorr stated that he would be in contact with us soon. As of the time of this letter, we have not heard anything else from either Mr. Gorr or Mr. Kanter.

Under the guidelines set forth by the FBI the Maniece case did not meet the criteria for clearing the case by arrest, clearing the case exceptionally, or clearing the case administratively according to agency policy. There was no arrest made, all leads had not been exhausted and detectives did not do everything possible to clear the case.

It was advantageous for the Homicide Division to obstruct myself and Detective Cole's investigation into the homicide of Debra Maniece because to allow us to continue without obstruction would expose questionable investigative and administrative practices by the Homicide Division in which race and socio-economic status are factors in determining the quality of police service. It is the duty of every police supervisor, who are the flagships of the Milwaukee Police Department, to discourage these types of practices not perpetuate them. The policies and philosophies of the Milwaukee Police Department are in place to serve the community and must not be compromised and tailored to serve the biases, prejudices, and especially, ambitions of its individual members.

The race or life station of a victim and that victim's family should have no bearing on the quality of police service that they receive. It is disturbing that these things were factors

**OTT 002979**

in how the Maniece case was handled. The case was under investigated despite the existence of viable leads, and cleared without competent investigation. My fear is that there are other cases out there that were handled in a similar manner, and there are other families who believe that one day they'll get a long-awaited phone call notifying them of the clearance of their loved one's homicide, but without their knowledge their loved one's homicide was cleared for the benefit of certain Homicide Division members professional reputations. When that case was cleared in 2001, the Detectives and supervisors knew that by clearing the case and barring the unlikely confession from the perpetrator, investigation into Debra Maniece's homicide was FINISHED, FOREVER, or so they thought. The way to make sure it stayed that way was to not involve Debra's family.

The only thing that I ask is that when reviewing this matter, you remain objective, and don't just say "oh boy, it's them again." The extremely important questions that should be asked about this investigation are:

Why wasn't there any additional investigation done in this case after Kelvin Strong denied knowing or killing Debra Maniece?

Why was Kelvin Strong's blood co-mingled with Debra Maniece's blood in the two shirts that were on Debra's body when it was discovered?

Why was Kelvin Strong's blood found inside of Debra's dislodged left shoe that was found in another part of the vacant building? Did he throw the shoe, and blood from a cut to his hand seep into the shoe? Why is Debra wearing her right shoe? Why is there no blood inside of the right shoe?

Why was Kelvin Strong's lengthy and remorseless history of physical violence against women not considered for use in a prosecution against him regarding Debra Maniece's homicide?

Is there any truth to A.D.A. Mark Williams claim to me that he didn't issue any charges against Strong in 2001 because the MPD Homicide Unit didn't want him to?

Who specifically, did not want A.D.A. Mark Williams to issue charges against Strong, and what would be their motivation?

Why was the set of enlarged homicide photos stolen from Captain Eric Moore's office?

Why did Captain Timothy Burkee and Deputy Chief O'Keefe try to have Detective Cole and me kicked off of the Maniece case after we caused the discovery of 2 additional identified DNA profiles, and no other detectives had touched the case since it was cleared in 2001? Normally, in such cases, detectives would be congratulated on their initiative and tenacity.

Why did Lieutenant David Zibolski tell other homicide detectives that Detective Cole and I should not be allowed to investigate the Maniece case?

Why didn't the Homicide Unit share the DNA discovery, or the clearance decision with the Maniece family, but did share similar information with the Trebing family.

Why wasn't a photo array containing a picture of Strong shown to the Maniece family, to determine if, as was the case, any of them knew of a connection between Strong and Debra Maniece?

Was Strong arrested at 749 W. State St. in 2001, as the case clearance report suggests?

Was the case cleared in a manner deemed acceptable by the F.B.I.? Please check the relevant pages from the FBI Uniform Crime Reporting Handbook that I sent with this letter.

Why did A.D.A. Mark Williams make several false statements to the Maniece family, in the presence of witnesses during the CYD meeting? Detective Diedra Cole is one of several witnesses to the false statements.

Why weren't Detective Cole and I invited to the CYD meeting by Lieutenant Jessup or A.D.A. Mark Williams, after A.D.A. Williams promised Ms. Jeanetta Simpson-Robinson he would invite us himself?

Why was Detective Louis Johnson asked to attend the CYD meeting when he knew nothing about the case?

Why was Detective Willie Huerta pre-empted twice, while assisting me during critical junctures of my investigation?

Why did A.D.A. Mark Williams state to A.D.A. Norm Gahn, "Burems and Eric Moore just insist on continuing to investigate this case?"

Was Debra Maniece deemed not worthy of an expensive State prosecution against Kelvin Strong, given that he was already serving lengthy prison sentences? If so, why was this determination not shared with the Maniece family?

Why haven't Detective Cole and I, been contacted by Mr. Kanter or Mr. Gorr since July of 2006?

Do you the Commissioners believe that the Maniece investigation was investigated properly, and do you the Commissioners believe that the Maniece family was treated with the fairness and respect that you would expect from the Milwaukee Police Department if one of your loved ones was the victim of homicide?

OTT 002981

Can homicide supervisors involved in this case be trusted to run a Homicide Review Commission with integrity?

I have been with the Milwaukee Police Department for 25 years, and for approximately 10 of those years I have been investigating homicides. I love my job, and I love the Milwaukee Police Department, and that is why it has been so disheartening for me to see some of my co-workers acting without professionalism, integrity, or empathy in this tragic case. What makes matters worse is that in my opinion and in Detective Cole's opinion, Assistant District Attorney Mark Williams is complicit in the matter. I realize that I could not look my son in the eye, if I did not speak out on the injustice that occurred in this case. With this letter, I have included a family photo of Debra Maniece, and also a photo of her in death, so that she's seen as she was in both cases, and not just as a name on paper. I trust that you will handle both photos with the utmost discretion. Please take note of the blood on Debra's outer shirt, because it also soaked through to the other shirt she's wearing under it. Kelvin Strong's blood is mixed in with Debra's blood in bloodstains found on both of those shirts.

Sincerely,

Ricky S. Burems
Detective
Milwaukee Police Department

OTT 002982

On Saturday, January 13, 2007, at 3:45PM, I received a phone call at home from Lieutenant of Detectives Kenneth Grams, who is one of my supervisors in the Criminal Investigation Bureau-Dayshift. Lieutenant Grams stated to me "Rick, I don't know what's going on with this but you're being taken off (squad) 114, and assigned to 107 at district seven. Lieutenant Grams further stated that I was being replaced with Detective Billy Ball who was coming back to the Criminal Investigation Bureau from the Background Investigation Unit. The complaint that I made to the Department of Workforce Development regarding the meeting with the Maniece family that Lieutenant William Jessup and A.D.A. Mark Williams attempted to exclude Detective Diedra Cole and myself from, is under appeal. I believe that all of the supervisors involved in this matter are aware of our EEOC complaint, the companion complaint with the Department of Workforce Development, the complaint made to the U.S. Attorney's Office, and the complaint made to the FBI. As I'm sure you recall I addressed your body last summer, to voice my opposition to the promotion of Lieutenant of Detectives Michael Dubis to Captain. Now I'm being transferred from my Violent Crimes assignment to a Property Crimes assignment, which will be viewed by my peers as a demotion of sorts. I will also be physically removed from the Criminal Investigation Bureau, so that I cannot witness the actions and decisions made by supervisors. My reassignment was postponed just long enough to appear that it is not connected to the Lieutenant Dubis matter. A black detective is replacing me on my squad so that it doesn't appear that race is a factor in the reassignment.

My last work performance evaluation was given to me approximately five months ago and it was exemplary, so I have to conclude that my reassignment was done for retaliatory reasons, and I'm positive that it came from Deputy Chief Brian O'Keefe who is a best friend of Lieutenant Dubis, and was the Captain of the Homicide Unit when the homicide of Debra Maniece was cleared, and he would have had to approve that clearance.

I will keep the Commission informed on future developments in this matter.


Ricky S. Burems
Detective

OTT 002983

# LAW ENFORCEMENT CODE OF ETHICS

"As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held as long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession ... law enforcement."

OTT 002984

Clearance Report
Homicide of Debra Maniece

**OTT 002985**

| PO-14B (3/95) CLEARANCE REPORT MILWAUKEE POLICE DEPARTMENT | PAGE 1 OF 3 | INCIDENT #94-91653/M2991 | |
|---|---|---|---|

| INCIDENT INFORMATION | INCIDENT HOMICIDE | DATE OF INCIDENT 11-20-94 | DATE OF REPORT 11-14-01 | REP CON# |
|---|---|---|---|---|
| | VICTIM MANIECE, Debra | LOCATION OF INCIDENT (ADDRESS) 1929A N. 12th St. | | DIST |
| | VICTIM'S ADDRESS 2509 W. Wright St. | REPORTED BY SAME | | |

PROPERTY CODES --- LIST CODE FOR EACH ITEM OF PROPERTY IN "CODE #" COLUMN---

| 01-AIRCRAFT | 09-CREDIT CARDS | 15-HEAVY EQUIPMENT | 21-NEGOTIABLE INSTRUMENT | 27-RECORD/AUDIO VISUAL | 34-STRUCT-STORAGE |
|---|---|---|---|---|---|
| 02-ALCOHOL | 10-DRUGS/NARCOTICS | 16-HOUSEHOLD GOODS | 22-NONNEGOT INSTRUMENT | 29-STRUCT-SINGLE DWL | 35-STRUCT-OTHER |
| 04-BICYCLES | 11-DRUG/NARC EQUIP | 17-JEWELRY/PREC METAL | 23-OFFICE EQUIPMENT | 30-STRUCT-OTHER DWL | 36-TOOLS |
| 06-CLOTHES/FURS | 12-FARM EQUIPMENT | 18-LIVESTOCK | 77-OTHER | 31-STRUCT-OTHER COMM | 38-VEH/PART/ACC |
| 07-COMPUTER WARES | 13-FIREARMS | 19-MERCHANDISE | 25-PURSE/BAG/WALLET | 32-STRUCT-INDUST MFG | 39-WATERCRAFT |
| 08-CONSUMABLES | 14-GAMBLING EQUIP | 20-MONEY | 26-RADIO/TV/VCR | 33-STRUCT-PUBLIC | 99- |

| QUANT | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | INVENTORY # | CODE # | VALUE |
|---|---|---|---|---|---|---|
| | | | | | | |

| RELATED INCIDENT #'S | | EVIDENCE INVENTORY #'S | ADDED PROPERTY ON ATTACHED PO-14 ☐ | TOTAL VALUE RECOVERED PROPERTY $ |
|---|---|---|---|---|

USE FOR WEAPONS IN POSSESSION OF PRISONER AT TIME OF ARREST -- CHECK ALL APPLICABLE ITEMS

| 1 2 | 1 2 | 1 2 | 1 2 | 1 2 |
|---|---|---|---|---|
| ○ ○ ALTERED STOCK | ○ ○ CHROME/NICKEL | ○ ○ HANDGUN | ○ ○ OTHER | ○ ○ REVOLVER | ○ ○ SHOTGUN |
| ○ ○ AUTOMATIC | ○ ○ DOUBLE BBL | ○ ○ IMPLIED WEAPON | ○ ○ OTHER FIREARM | ○ ○ RIFLE | ○ ○ SIMULATED WEAPON |
| ○ ○ BOLT ACTION | ○ ○ DRUG/NARCOTIC | ○ ○ KNIFE/CUTTING INSTR | ○ ○ PERSONAL WEAPON | ○ ○ SAWED OFF | ○ ○ SINGLE BBL |
| ○ ○ BLUE STEEL | ○ ○ EXPLOSIVES | ○ ○ LIQUID GAS | ○ ○ POISON | ○ ○ SEMI AUTO | ○ ○ THROWN OBJECT |
| ○ ○ BLUNT OBJECT | ○ ○ FIRE/INCENDIARY | ○ ○ MOTOR VEHICLE | ○ ○ PUMP ACTION | ○ ○ SHORT/SNUB BBL | ○ ○ UNKNOWN |

| ARRESTED #1 LAST NAME STRONG, | FIRST NAME Kelvin D. | MID | RACE B | SEX Male | DATE OF BIRTH 5-29-57 | AGE 44 | ETHNIC ORIGIN ○ HISPANIC X NON-HISPANIC |
|---|---|---|---|---|---|---|---|

| ADDRESS 5571 N. 40th St. | CITY Milwaukee | STATE WI | HEIGHT 6' | WEIGHT 170 | BUILD Med. | HAIR brown | EYES |
|---|---|---|---|---|---|---|---|

| ALIAS | SCARS, MARKS, MOLES, DEFORMITIES, AMPUTATIONS, FACIAL HAIR, SKIN TONE, TATTOOS, PECULIARITIES ETC. |
|---|---|

| I.D. DIV # 136550 | SOC. SEC. # | ADDED WEAPON INFO ARRESTED #1 |
|---|---|---|

| RESIDENT OF COUNTY | Y ○ | N X | GANG RELATED DRUG RELATED | Y N ○ X ○ X | LOCATION OF ARREST 749 W. State St. | DATE/TIME OF ARREST 11-5-01 @8:55 p.m. | TYPE OF ARREST | ○ ORDERED IN/CITED ○ W/WARR/SUSP CARD X ALL OTHER ARRESTS |
|---|---|---|---|---|---|---|---|---|

| CHARGES FIRST DEGREE INTENTIONAL HOMICIDE | POSSESSED SUSPECTED DRUGS AT TIME OF ARREST | Y ○ | N X |
|---|---|---|---|

| ARRESTED #2 LAST NAME | FIRST NAME | MID | RACE | SEX | DATE OF BIRTH | AGE | ETHNIC ORIGIN ○ HISPANIC ○ NON-HISPANIC |
|---|---|---|---|---|---|---|---|

| ADDRESS | CITY | STATE | HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|---|---|---|

| ALIAS | SCARS, MARKS, MOLES, DEFORMITIES, AMPUTATIONS, FACIAL HAIR, SKIN TONE, TATTOOS, PECULIARITIES ETC. |
|---|---|

| I.D. DIV # | SOC. SEC. # | ADDED WEAPON INFO ARRESTED #1 |
|---|---|---|

| RESIDENT OF COUNTY | Y ○ | N ○ | GANG RELATED DRUG RELATED | Y N ○ ○ ○ ○ | LOCATION OF ARREST | DATE/TIME OF ARREST | TYPE OF ARREST | ○ ORDERED IN/CITED ○ W/WARR/SUSP CARD ○ ALL OTHER ARRESTS |
|---|---|---|---|---|---|---|---|---|

| CHARGES | POSSESSED SUSPECTED DRUGS AT TIME OF ARREST | Y ○ | N ○ |
|---|---|---|---|

| V E H | VEHICLE USED | MAKE | MODEL | TYPE | COLOR | STATE | EXP | TYPE | V.I.N. # |
|---|---|---|---|---|---|---|---|---|---|

| REPORTING OFFICER MICHAEL WESOLOWSKI | PAYROLL # 48192 | LOC # | ASSISTING OFFICER | TOTAL ARRESTS 1 |
|---|---|---|---|---|

**CONFIDENTIAL**

OTT 002986

On 11-20-94, at 10:15 a.m. the victim, Debra MANIECE was found partial clothed, lying in a vacant abandoned building at 1929 N. 12th St.    It w. determined that the cause of death was that she had been beaten or stomped death.

On Friday, 4-27-01, the Milwaukee Police Department received a phone call fro Dirk JANSSEN, who is the head serologist at the Wisconsin Regional Crime Lab i Milwaukee.    Mr. JANSSEN indicated that he had information regarding a homicid which occurred in 1994.  He indicated that his lab had matched a blood sample whic is currently in the DNA data base, to blood found on the victim's clothes (victi Debra MANIECE).   He indicated that the person whose blood was found on MANIECE' clothing is currently incarcerated as a Wisconsin State prisoner.   He indicate that this person is Kelvin STRONG, Black male, DOB 4-29-57.  He indicated that Mr STRONG had submitted to a DNA test on 3-29-96, because he is a sexual offender He indicated that Mr. STRONG'S DNA was found on the clothing of Debra MANIECE He indicated that there were three different locations on the clothing of Debra MANIECE, where Mr. STRONG'S blood was located.  He stated that Debra MANIECE was wearing two shirts, and on the outer T-shirt, there was blood which was identified as that of Kelvin STRONG.   On the inner T-shirt there was a combination of Mr. STRONG'S blood, as well as Debra MAINIECE'S blood.   The third location of blood was on the victim's shoe, and this blood also matched to Kelvin STRONG.

Mr. JANSSEN also stated that the probability of randomly selecting an un-related individual, whose STR profile matches the evidentiary profile, that being the blood stains on the victim's clothing, in the Black population, is approximately 1 in 14 quadrillion.

Kelvin STRONG is currently incarcerated as a Wisconsin State prisoner in Whiteville Tennessee with his prisoner number being 592-30-A.   He has been in prison since 3-14-96 on two counts of Sexual Assault and Armed Robbery.   He is sentenced to prison until 4-13-75 and he is first eligible for parole on 4-12-25.

On 6-6-01, Detectives Michael WESOLOWSKI and Carl BUSCHMANN did interview Mr. STRONG at Whiteville Tennessee Correctional Facility.   At that time Mr. STRONG voluntarily submitted to a buccal swabs.   These swabs were again submitted to the Wisconsin Regional Crime Lab.   On July 18, 2001, another report was generated by the Wisconsin Regional Crime Lab in Milwaukee, confirming that the buccal swabs, which were obtained from Kelvin STRONG, while in prison, again matched the evidence found on Debra MANIECE'S clothing.

Report dictated by Detective Michael WESOLOWSKI
MW/whu 11-14-2001

CONFIDENTIAL2        99        OTT 002987

| REVIEWING D.A.<br>ADA Mark WILLIAMS | P.O./DET. ASSIGNED<br>Det. WESOLOWSKI/Det. BUSCHMANN | COURT CASE NUMBER |
|---|---|---|
| FINAL CHARGE | DISPOSITION/DATE | VICTIM NOTIFIED BY |

| INCIDENT<br>STATUS | X CLEARED BY ARREST 18 OR OVER<br>O PARTIAL CLEARANCE BY ARREST<br>O UNFOUNDED/BASELESS<br>O NO PROSECUTION DESIRED | O PROPERTY RECOVERED<br>O WARRANT REFUSED | O ARREST UNDER 18<br>O A. Detained at MCCC<br>O B. Ordered in to MCCC DATE: _____<br>O WAIVED AS AN ADULT |

----- C.I.B. ADMINISTRATIVE USE ONLY -----

| CLEARED<br>EXCEPTIONALLY | O A. Death of Offender<br>O B. Prosecution Declined | O C. Extradition Denied<br>O D. Refused to Cooperate | O E. Juvenile, no custody<br>O F. Not Applicable |

| JUSTIFIABLE HOMICIDE<br><br>INFORMATION | O A. SUSP ATTCKD PO AND SAME PO KILLED SUSP<br>O B. SUSP ATTCKD PO AND OTHER PO KILLED SUSP<br>O C. SUSP ATTCKD CIVILIAN<br><br>O D. SUSP ATTEMPTED FLIGHT FROM CRIME | O E. SUSP KILLED IN COMMISSION OF CRIME<br>O F. SUSP RESISTED ARREST<br>O G. UNABLE TO DETERMINE/NOT ENOUGH<br><br>O H. SUSPECT KILLED BY PRIVATE CITIZEN<br>O I. SUSPECT KILLED BY POLICE OFFICER |

STATE OF WISCONSIN       MILWAUKEE COUNTY

Page 1

STATE OF WISCONSIN,     Plaintiff(s)        **CRIMINAL COMPLAINT**

CRIME(S) OR VIOLATION(S)

vs

Armed Robbery
First Degree Sexual Assault
Habitual Criminality

STRONG, Kelvin D.      042957
5571 North 40th Street
Milwaukee, WI

STATUTE(S) OR ORDINANCE(S) VIOLATED

943.32(2)(b), 940.225(1)(b) & 939.62

Defendant(s)       COMPLAINING WITNESS

CASE NUMBER

F 95/715

THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE NAMED DEFENDANT(S) IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN

COUNT #01:     ARMED ROBBERY

On February 27, 1995, at 1902 West Brown, City of Milwaukee, with intent to steal and by the use or threat of use of a dangerous weapon, did take property from the presence of Rita Williams, the owner, by threatening the imminent use of force against the person of the owner with intent thereby to compel the said owner to acquiesce in the taking and carrying away of said property, contrary to Wisconsin Statutes section 943.32(2)(b).

COUNT #02:   FIRST DEGREE SEXUAL ASSAULT

On February 27, 1995, at 1902 West Brown, City of Milwaukee, did have sexual intercourse with Rita Williams without her consent and by threat of use of a dangerous weapon, contrary to Wisconsin Statutes section 940.225(1)(b) .

AS TO HABITUAL CRIMINALITY:

On August 5, 1993, defendant Kelvin Strong was convicted in the Circuit Court of Milwaukee County in case number F-930587 of the felony offense of Aggravated Battery in violation of section 940.19(1m) of the Wisconsin Statutes and that said conviction remains of record and unreversed and therefore defendant is a repeater pursuant to Wisconsin Statutes section 939.62.

AS TO COUNTS #01 AND #02:

Upon conviction of these charges, Class B Felonies, the maximum possible penalty is imprisonment for not more than 40 years.

AS TO HABITUAL CRIMINALITY:

Upon conviction of the charge of Habitual Criminality, the maximum possible penalty upon conviction of the abovestated charges of Armed Robbery and First Degree Sexual Assault may be increased to not more than 50 years imprisonment, as to each of the two offenses.

Complainant states she is a Milwaukee Police officer and this complaint is based upon her reading of reports and her investigation of this case, information from which sources your complainant believes because she knows that such information is kept in the ordinary course of Department business and because she has used similar information in the past and found it to be truthful and reliable:

Rita Williams, an adult citizen, reported that on the above date, she was in the vicinity of 22nd and North when the defendant approached her and held a gun in her direction and forced her to accompany him to 1902 West Brown Street. Complainant states that all of these locations are in Milwaukee County. Ms. Williams stated that the defendant made statements to her to the effect, "Don't scream, bitch, or I'll shoot you," or words to that substantial effect. Ms. Williams reported that at the Brown Street address, the defendant forced her to the basement and demanded her money and she handed him $17. Ms. Williams stated that the defendant demanded that she remove her clothes and because of her fear of the defendant's threats and the gun, she lowered her pants and he forced her to submit to an act of penis to vagina sexual intercourse. Ms. Williams stated that all of the above occurred without her consent and she was held against her will and forced to do these things that she didn't want to do by the defendant's threats and his use of the gun against her.

Complainant states that this complaint constitutes a short summary of the events described therein.

Complainant states she has examined the certified copy of the judgment of conviction and judgment roll as they relate to <u>State vs. Kelvin Strong</u>, Milwaukee County Circuit Court Case No.: F-930587, a copy of which is attached to this complaint and incorporated by reference herein. Said documents, the information therein which your complainant believes because she knows that such documents are maintained within the ordinary business of the Clerk's Office of Milwaukee County Circuit Court and because she has used similar information in similar records in the past and found it to be truthful and reliable, reflect that the defendant, Kelvin Strong, was convicted on August 5, 1993, of the felony offense of Aggravated Battery in violation of Wisconsin Statutes §940.19(1m) in Milwaukee County Circuit Court and said document reflects no reversal of that conviction.

****END OF COMPLAINT****

SUBSCRIBED AND SWORN TO BEFORE ME
AND APPROVED FOR FILING March 14, 1995

_Karen E. Christenson_
ATTY/ASST. DISTRICT ATTORNEY

_Darlene Jenkins_
COMPLAINING WITNESS

-- FELONY COMPLAINT --

ecfstrong

CONFIDENTIAL          OTT 002990

STATE OF WISCONSIN : CIRCUIT COURT : MILWAUKEE COUNTY
CRIMINAL DIVISION

---

STATE OF WISCONSIN,

      Plaintiff

v.

STRONG, KELVIN     042957
5571 N. 41st Street
Milwaukee, WI

      Defendant

AMENDED INFORMATION

Crimes:
Armed Robbery
First Degree Sexual Assaust
Kidnapping

Statutes:
943.32(2)(b)
940.225(1)(b),
940.31(1)(b)

CASE NUMBER F95-1715

**FILED**
AUG - 3 1995
GARY J BARCZAK
CLERK OF COURTS

---

I, E. MICHAEL MC CANN, DISTRICT ATTORNEY FOR MILWAUKEE COUNTY,
WISCONSIN, HEREBY INFORM THE COURT THAT THE ABOVE NAMED DEFENDANT
IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN,

COUNT #1:     ARMED ROBBERY  -DISMISSED 1-16-96

On February 27, 1995, at 1902 West Brown, City of Milwaukee, with
intent to steal and by use or threat of use of a dangerous
weapon, did take property from the presence of Rita Williams, the
owner, by threatening the imminent use of force against the
person of the owner with intent thereby to compel the said owner
to acquiesce in the taking and carrying away of said property,
contrary to Wisconsin Statutes section 943.32(2)(b).

COUNT #2:     FIRST DEGREE SEXUAL ASSAULT

On February 27, 1995, at 1902 West Brown, City of Milwaukee, did
have sexual intercourse with Rita Williams without her consent
and by use or threat of use of a dangerous weapon, contrary to
Wisconsin Statutes section 940.225(1)(b).

COUNT #3:     KIDNAPPING - DISMISSED 1-16-96

On February 27, 1995, at 1902 West Brown, City of Milwaukee, did,
by force or threat of imminent force confine another, to wit:
Rita Williams, without her consent and with intent to cause her


OTT 002991

to be held to service against her will, contrary to Wisconsin Statutes section 940.31(1)(b).

## AS TO HABITUAL CRIMINALITY —DISMISSED 1-16-96

On August 5, 1993, defendant Kelvin Strong was convicted in the Circuit Court of Milwaukee County in case number F93-0587 of the felony offense of Aggravated Battery in violation of section 940.19(1m) of the Wisconsin Statues and that said conviction remains of record and unreversed and therefore defendant is a repeater pursuant to Wisconsin Statues section 939.62.

## AS TO COUNTS #'s 1, 2 AND 3:

Upon conviction of these charges, Class B Felonies, the maximum possible penalty is imprisonment for not more than 40 years on each count. As an Habitual Criminal, the maximum possible penalty as to each offense may be increased to imprisonment for not more than 50 years on each count.

DATED

7/14/95

E. MICHAEL MC CANN
DISTRICT ATTORNEY

Assistant District Atty.

strong27

OTT 002992

State of Wisconsin, Plaintiff
-vs-

Melvin Strong, Defendant
/29/57
Defendant's Date of Birth

**TYPE OF CONVICTION (Select One)**
x  Sentence to Wisconsin State Prisons
   Sentence Withheld, Probation Ordered
   Sentence Imposed & Stayed, Probation Ordered
**COURT CASE NUMBER 95CF001715**

The defendant entered plea(s) of: [ ] Guilty  [x] Not Guilty  [ ] No Contest

The [x] Court [ ] Jury  found the defendant guilty of the following crime(s):

| CRIME(S) | WIS STATUTE(S) VIOLATED | FELONY OR MISDEMEANOR (F OR M) | CLASS (A-E) | DATE(S) CRIME COMMITTED |
|---|---|---|---|---|
| CT2: First Degree Sexual Assault | 940.225(1)(b) | F | B | 02/27/95 |
| CTS 1&3: DISMISSED | | | | |

IT IS ADJUDGED that the defendant is convicted on <u>February 6, 1996</u> as found guilty, and:

[x]  on <u>March 12, 1996</u> is sentenced to prison for <u>fifty (50) years, consecutive to F-951777 and each count therein.</u>

[ ]  on is sentenced to intensive sanctions for

[ ]  on is sentenced to county jail/HOC for

[ ]  on is placed on probation for

CONDITIONS OF SENTENCE/PROBATION

Obligations (Total amounts only)

Fine
(includes jail assessments; drug assessments; penalty assessments)

Court Costs         *To be determined
(includes service fees; witness fees; restitution surcharge; domestic abuse fees; subpoena fees; automation fees)

Attorney fees
Restitution         *To be determined

Other
Mandatory victim/witness surcharge(s)
      felony 1 counts     *$70.00
      misdemeanor counts

Jail: To be incarcerated in the county jail/HOC for

Confinement Order For Intensive Sanctions sentence only - length of term:

Miscellaneous
*Court directed there be sexual offender treatment and counseling, no contact with the victims and restitution to be paid from up to 25% of prison funds.

IT IS ADJUDGED that days sentence credit are due pursuant to s.973.155 Wis. Stats. and shall be credited if on probation and it is revoked.

IT IS ORDERED that the Sheriff shall deliver the defendant into the custody of the Department located in the City of Waupun, County of Dodge.

NAME OF JUDGE
Patricia D. McMahon

DISTRICT ATTORNEY
Gale Shelton

DEFENSE ATTORNEY
Brendan Rowen

BY THE COURT:

Circuit Court Judge/Clerk/Deputy Clerk
March 12, 1996        eecm
Date Signed

(83)

PO-15B SUPPLEMENTARY REPORT
MILWAUKEE POLICE DEPARTMENT
INCIDENT

Date of Report
02-27-95

Incident/Accident #
95-14021

Date of Incident/Accident

Rep. Code #

FIRST DEGREE SEXUAL ASSAULT/
ROBBERY-ARMED
VICTIM

02-27-95

WILLIAMS, Rita
JUVENILE Last Name          First

LOCATION OF INCIDENT

DIST

1902 W. Brown          #3

Middle          Date of Birth

QUANT          TYPE OF PROPERTY          DESCRIPTION     SERIAL #   CODE #   VALUE

On Monday, 02/27/95, at approximately 2:45PM, I, PO Janet SCHUSTER, Squad 208, responded to 1902 W. Brown St., to assist Detectives William STAWICKI and Patricia KRAUS with a sexual assault investigation.

Upon arrival we were met by Squad 33, PO Dan BARNEY, who gave us a summary of his investigation and will be filing a supplementary report regarding the same. I then conveyed the victim, Rita WILLIAMS, back to Sera-tec Biologicals, 2213 W. North Ave., where she first observed the suspect. I had the victim retrace the route that she and the suspect took, as he forced her to the crime scene, and then conveyed the victim to the Women's Assessment Center at Good Samaritan Hospital. I did an indept interview of the victim at the WAC, and she was subsequently examined by RN Carolyn SPLETT.

## INTERVIEW OF VICTIM

Ms. Rita WILLIAMS, F/B, dob 01/18/60, 1529 W. Burleigh, no phone. The victim stated that she is unemployed and she lives at the above address with her two sons, Antonio WILLIAMS, M/B, 18 yoa., and Eric MAHOLMS, M/B, 13 yoa. The victim related that she has two daughters, Tamika MAHOLMS, F/B, 17 yoa., and Keisha MAHOLMS, F/B, 15 yoa., who live with their uncle, Charles GRAY, ph. #442-0681. The victim moved to Milwaukee in September '1990 from Chicago and she has lived at the above address for approximately 1/2 years.

Regarding the offense, the victim stated that she left home, at approximately 9:30AM and took the number 12 bus to Mother Scott Church on Teutonia and Center, to get something to eat. The victim

CONFIDENTIAL          OTT 002994

stated that she stayed at the church, until approximately 10:30AM or 11:00AM, at which time she left alone and started walking westbound on Teutonia. The victim stated that she kept watching for the bus to come, as she continued walking westbound on Teutonia to Meinecke, then west on Meinecke to 16th St., and then north on 16th St. to North Ave. The victim stated that she then walked westbound on North Ave., to the Ser-tec Biologicals Center on 22nd and North. The victim related that she arrived at the Blood Center at approximately 11:30AM. The victim said that she signed up to donate blood and then waited in the waiting room for her name to be called. The victim stated that she isn't sure if the suspect was already in the Blood Center when she arrived, but she observed the suspect sitting in the waiting room. The victim stated that the suspect was talking to an acquaintance of hers, but she couldn't remember the subject's name. The victim related that the acquaintance, who was talking to the suspect, is the brother of the manager at Burger King on 16th and North Ave. whom she knows by the name "Pee Wee." The victim stated that Pee Wee's brother was friends with her, the victim's brother, Terry WILLIAMS, M/B, dob 03/31/63, 1531 W. Burleigh, ph. #374-0687. The victim stated that she was sitting across from the suspect in the waiting room, and that Pee Wee's brother was standing next to the suspect talking. The victim stated that Pee Wee's brother came over and sat down next to her, for just a few minutes, and asked about the victim's family. The victim stated that while Pee Wee's brother sat next to her, the suspect listened to their conversation, but didn't say anything to the victim. The victim related that Pee Wee's brother was also donating blood, and that his name was called just before hers. The victim said that the suspect was still sitting in the waiting room when her name was called to donate blood. The victim stated that she doesn't know if the suspect donated blood, and she never heard his name called. The victim said that her name was

called at about 12:05PM, and she went in to donate her blood. The victim then went up the window to get her $17, three fives and two singles, for donating blood. The victim went into the bathroom, for a little while, and left the Clinic at approximately 1:00PM. The victim said that when she left the Blood Center, the suspect was standing in the hallway smoking a cigarette. The victim walked passed the suspect in the hallway, and he didn't say anything to her, but followed her out the door. The victim walked eastbound on North Ave., and when she got to approximately the middle of the parking lot for the Blood Center, the suspect walked up on her right side and displayed a small black revolver. The suspect was holding the revolver in his right jacket pocket, pointing it in the victim's direction. The suspect told the victim to go that way and pointed south through the parking lot. The suspect held the gun in his right hand inside his jacket pocket, pointing it toward the victim, and he grabbed onto the victim's jacket with his left hand. The suspect then led the victim across the parking lot to 22nd St., where they went southbound on 22nd St. to Garfield. They then walked east on Garfield to 20th St., and then south on 20th St. about 1/2 a block. The victim stated that as they passed Brown Street School, they observed a Squad car driving passed, and the suspect let go of the victim's coat and stated *"Don't scream bitch or I'll shoot you."* The victim said that as soon as the Squad was out of sight, the suspect grabbed onto her coat again and led her across the street at which time they cut across a park. The victim said that while they walked through the park, the suspect kept talking and commented about how he got into it with someone at the Blood Center and talked about how someone that he saw at the Blood Center owed him money. The victim stated that they came out of the park into an alley, and the suspect led her across the alley into a backyard to an apartment building. The victim said that as they entered the yard, she observed a blind

woman come out of the rear apartment door. The victim stated that the woman was holding a red and white cane in her hand, but the victim didn't noticed which direction the woman walked. The suspect stopped talking until the blind woman was out of sight. The suspect then stated *"My name is T.C. and I don't play."* The victim related that they entered the rear door to the apartment building, and the suspect told the victim to walk down the stairs into the basement. Once in the basement, the suspect let go of the victim's arm and told her to walk to the back of the basement, where there was a laundry room. The victim stated that the door to the laundry room was opened and she walked in, as the suspect followed behind her. The victim said that there was a washer/dryer and dirty clothes on the floor in the laundry room. The victim asked the suspect why was he doing this, and she told him that she had kids at home. The victim asked the suspect to let her go, at which time the suspect told the victim to *"Break yourself."* The victim took that to mean that the suspect wanted her money and she took the $17, which she had received at the Blood Center, out of her front jacket pocket and handed it to the suspect. The suspect then told the victim that he heard some change, and the victim told the suspect that she didn't have any change. The suspect then told the victim to take off all of her clothes and the victim removed her two coats and dropped them on the floor. The victim stated that she was wearing a blue jean jacket with a multi-colored ski jacket over it. The suspect then told the victim to pull her pants down and the victim pulled her pants and panties part of the way down. The suspect then pulled the victim's pants down further, first with his left hand and then the suspect used his knee. The victim stated that she wearing tall boots, and that her pants wouldn't go down any further than her knees. The victim related that the suspect still had his right hand in his coat pocket, that he was pointing the gun at her. The suspect told the victim to

turn around and not to look at him. The victim stated that she did turn around, but she tried glancing back at the suspect to see what he was doing. The victim said that she was afraid that the suspect was going to shoot her in the back of the head. The suspect stated *"I told you not to look at me bitch."* And the suspect put his left hand on the back of the victim's neck. The suspect then told the victim to lean over a white chair that was sitting against the wall in the laundry room. The victim put one of her hands on the seat and the other on the back of the chair, trying to keep her balance. The victim told the suspect that the chair was going to break because the seat was starting to come apart. The suspect told the victim that he thought the chair would hold and the suspect stood behind the victim and forced an act of penis to vagina sexual intercourse, which lasted about five or ten minutes, until the suspect ejaculated. The victim stated that she didn't hear anyone come down the stairs into the basement, but that when she stood up, she observed an older black female standing next to the dryer in the laundry room. The black female said "oops" and started to leave the laundry room, but then stopped and stood next to dryer without saying anything. The victim said that she pulled up her pants, and she observed that the suspect was tucking his shirt in his pants. The suspect was standing between the chair and the washing machine, and the suspect told the victim *"Didn't I tell you to come on."* The victim stated that the suspect was acting like the knew each other so that the elderly woman wouldn't realize what was going on. The suspect and victim then walked out of the laundry room and across the basement to the stairs. The victim said that she was afraid to say anything to the elderly woman because she believed that the suspect would then hurt them both. The suspect told the victim to walk up the stairs and the suspect followed behind the victim to the first floor. The suspect then told the victim to continue walking up to the third floor and the

victim asked him why. The suspect told the victim that he wanted her to walk to the top floor so that she wouldn't see which way he left. The victim stated that she continued up the stairs and when she got to the second floor, she heard the back door slam. The victim turned around and started back down the stairs, at which time she observed the elderly woman standing in front of Apt. #4. The victim told the woman what happened and the woman took the victim to Apt. #4. The victim related that the door to Apt. #4 was slightly ajar and that the woman opened the door and hollered in to the tenants. The victim stated that she and the woman then went into the apartment and told the tenants what happened. The victim said that there was man in Apt. #4 who asked her to describe the suspect, and the man told the victim that the description sounded like a man "John" who lived in the building. The man asked the victim if she was sure that she didn't come there to do drugs and the victim told him that she hadn't. The man asked the victim if she had ever been in the apartment building before and she stated no. The man told the victim that she could use his telephone to call the police which the victim did.

The victim described the suspect as a black male in his 30s, 5'9" to 6', medium build, dark complexion, a mustache. The suspect was missing his two front upper teeth. The victim stated that she didn't see the suspect's hair because he was wearing a blue/gray baseball cap. The suspect was also wearing blue jeans, an unknown colored t-shirt, button up the front shirt, a green Army coat, that came down to just above the suspect's knees and old white tennis shoes. The victim then informed me that she remembered that while the suspect was talking, as they walked through the park, he commented about working at Children's Hospital, and that he worked with the children.

This offense is pending identification of the suspect.
Report Per. PO Janet SCHUSTER

02/28/95 JS/md

| REPORTING OFFICER | PAYROLL # | LOC. CODE | SUPERVISOR SIGNATURE |
|---|---|---|---|
| PO JANET SCHUSTER | 51371 | 89 | |

**CONFIDENTIAL**

OTT 003000

CIRCUIT COURT
STATE OF WISCONSIN
CRIMINAL DIVISION
MILWAUKEE COUNTY

STATE OF WISCONSIN,      Plaintiff(s)

vs

STRONG, Kelvin D.          042957
5571 North 40th Street
Milwaukee, WI

Defendant(s)

**CRIMINAL COMPLAINT**

CRIME(S) OR VIOLATION(S)
Armed Robbery
First Degree Sexual Assault
Habitual Criminality

STATUTE(S) OR ORDINANCE(S) VIOLATED
943.32(2)(b), 940.225(1)(b) & 939.62

COMPLAINING WITNESS
Stawicki, William

CASE NUMBER

F-951777

THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE
NAMED DEFENDANT(S) IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN

COUNT #01:     ARMED ROBBERY

On July 16, 1994, at 4110 West North Avenue, City of Milwaukee, with
intent to steal, and by the threat of use of a dangerous weapon, did take
property from the presence of Mia Campbell, the owner, by threatening the
imminent use of force against the person of the owner with intent thereby
to compel the said owner to acquiesce in the taking and carrying away of
said property, contrary to Wisconsin Statutes section 943.32(2)(b).

COUNT #02:   FIRST DEGREE SEXUAL ASSAULT

On July 16, 1994, at 4110 West North Avenue, City of Milwaukee, did have
sexual intercourse with Mia Campbell without her consent and by threat of
use of a dangerous weapon, contrary to Wisconsin Statutes section
940.225(1)(b) .

PENALTY ENHANCER - HABITUAL CRIMINALITY

On August 5, 1993, defendant Kelvin Strong was convicted in the Circuit
Court of Milwaukee County in case number F-930587 of the felony offense of
Aggravated Battery in violation of section 940.19(1m) of the Wisconsin
Statutes and that said conviction remains of record and unreversed and
therefore defendant is a repeater pursuant to Wisconsin Statutes section
939.62.

AS TO COUNTS #01 AND #02:

Upon conviction of these charges, Class B Felonies, the maximum possible
penalty is imprisonment for not more than 40 years.

TO HABITUAL CRIMINALITY:

Upon conviction of the charge of Habitual Criminality, the maximum
possible penalty upon conviction of the abovestated charge of Armed
Robbery may be increased to not more than 50 years imprisonment.  Further,
upon conviction of the charge of Habitual Criminality, the maximum
possible penalty upon conviction of the abovestated charge **OTT 003001**

Complainant states he is a Milwaukee Police detective and this complaint is based upon his reading of reports prepared by fellow officers, whose reports your complainant believes because he knows that such reports are kept in the ordinary course of Department business and because he has used similar reports in the past and found them to be truthful and reliable.

Mia Campbell reports that on the above date, she was at her home, at the above location, when the defendant pushed a hard object which Ms. Campbell believed to be a gun into her back and the defendant demanded that she give him all her money. Ms. Campbell stated that she gave the defendant money. Ms. Campbell stated that when she tried to turn around, the defendant would push the hard object deeper into her back. Ms. Campbell stated that the defendant then forced her to remove her clothes and to lie down and he forced her to submit to acts of penis to vagina sexual intercourse, without her consent and because of her fear of the defendant's threats and the hard object which she believed to be a gun which the defendant was using against her. Ms. Campbell stated that all of this occurred without her consent.

Complainant states that he has examined the certified copy of the judgment of conviction and judgment roll as they relate to State vs. Kelvin Strong, Milwaukee County Circuit Court Case No.: F-930597, a copy of which is ached to this complaint and incorporated by reference herein. Said documents, the information therein which your complainant believes because he knows that such documents are maintained within the ordinary business of the Clerk's Office of the Milwaukee County Circuit Court and because he has used similar information and similar records in the past and they have proven to be truthful and reliable, reflect that the defendant, Kelvin Strong, was convicted on August 5, 1993, of the felony offense of Aggravated Battery in violation of Wisconsin Statutes §940.19(1m) in Milwaukee County Circuit Court and said document reflects no reversal of that conviction.

****END OF COMPLAINT****

SUBSCRIBED AND SWORN TO BEFORE ME
AND APPROVED FOR FILING April 25, 1995

_____
DEPUTY ASST. DISTRICT ATTORNEY

_____
COMPLAINING WITNESS

-- FELONY COMPLAINT --

ecfstrong

OTT 003009

STATE OF WISCONSIN   :   CIRCUIT COURT   :   MILWAUKEE COUNTY
                         CRIMINAL DIVISION

---

STATE OF WISCONSIN,                    AMENDED INFORMATION

         Plaintiff                     Crimes:
                                       Armed Robbery
                                       First Degree Sexual Assault
                                            (two counts)
                                       Kidnapping

                                       FILED
                                       AUG - 3 1995
                                       GARY J BARCZAK
                                       CLERK OF COURTS

         v.

                                       Statutes:
                                       943.32(2)(b)
                                       940.225(1)(b),
                                       940.31(1)(b)

STRONG, KELVIN        042957
5571 N. 41st Street                    CASE NUMBER F95-1777
Milwaukee, WI

         Defendant

---

I, E. MICHAEL MC CANN, DISTRICT ATTORNEY FOR MILWAUKEE COUNTY,
WISCONSIN, HEREBY INFORM THE COURT THAT THE ABOVE NAMED DEFENDANT
IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN,

COUNT #1:     ARMED ROBBERY —

On approximately July 15-16, 1994 at 4110 West North Avenue, City
of Milwaukee, with intent to steal and by use or threat of use of
a dangerous weapon, did take property from the presence of Mia
Campbell, the owner, by threatening the imminent use of force
against the person of the owner with intent thereby to compel the
said owner to acquiesce in the taking and carrying away of said
property, contrary to Wisconsin Statutes section 943.32(2)(b).

COUNT #2:     FIRST DEGREE SEXUAL ASSAULT

On approximately July 15-16, 1994 at 4110 West North Avenue, City
of Milwaukee, did have sexual intercourse with Mia Campbell
without her consent and by use or threat of use of a dangerous
weapon, contrary to Wisconsin Statutes section 940.225(1)(b).

COUNT #3:     FIRST DEGREE SEXUAL ASSAULT

On approximately July 15-16, 1994 at 4110 West North Avenue, City
of Milwaukee, did have sexual intercourse with Mia Campbell

OTT 003009

without her consent and by use or threat of use of a dangerous weapon, contrary to Wisconsin Statutes section 940.225(1)(b).

COUNT #4:     KIDNAPPING — DISMISSED

On approximately July 15-16, 1994, at 4110 West North Avenue, City of Milwaukee, did, by force or threat of imminent force confine another, to wit: Mia Campbell, without her consent and with intent to cause her to be held to service against her will, contrary to Wisconsin Statutes section 940.31(1)(b).

AS TO HABITUAL CRIMINALITY

On August 5, 1993, defendant Kelvin Strong was convicted in the Circuit Court of Milwaukee County in case number F93-0587 of the felony offense of Aggravated Battery in violation of section 940.19(1m) of the Wisconsin Statues and that said conviction remains of record and unreversed and therefore defendant is a repeater pursuant to Wisconsin Statues section 939.62.

AS TO COUNTS #'s 1, 2 3 AND 4:

Upon conviction of these charges, Class B Felonies, the maximum possible penalty is imprisonment for not more than 40 years on each count. As an Habitual Criminal, the maximum possible penalty as to each offense may be increased to imprisonment for not more than 50 years on each count.


DATED                              E. MICHAEL MC CANN
_7/14/95_____              DISTRICT ATTORNEY
                                  _____
                                  Assistant District Atty.


strong28

OTT 003004

| State of Wisconsin, Plaintiff | TYPE OF CONVICTION (Select One) |
|---|---|
| -vs- | x Sentence to Wisconsin State Prisons |
| ⸱⸱⸱ in D. Strong, Defendant | Sentence Withheld, Probation Ordered |
| ⸱9/57 | Sentence Imposed & Stayed, Probation Ordered |
| Defendant's Date of Birth | COURT CASE NUMBER 95CF0017777 |

The defendant entered plea(s) of:  [ ] Guilty   [x] Not Guilty   [ ] No Contest

The  [x] Court  [ ] Jury  found the defendant guilty of the following crime(s):

| CRIME(S) | WIS STATUTE(S) VIOLATED | FELONY OR MISDEMEANOR (F OR M) | CLASS (A-E) | DATE(S) CRIME COMMITTED |
|---|---|---|---|---|
| CT1: Armed Robbery | 943.32(2)(b) | F | B | Approx 7-15-94 |
| CT2: First Degree Sexual Assault | 940.225(1)(b) | F | B | Approx 7-15-94 |
| CT3: First Degree Sexual Assault | 940.225(1)(b) | F | B | Approx 7-15-94 |
| CT4: DISMISSED | | | | |
| HABITUAL CRIMINALITY | 939.62 | | | |

IT IS ADJUDGED that the defendant is convicted on <u>February 6, 1996</u> as found guilty, and:

| | |
|---|---|
| x | on <u>March 12, 1996</u> is sentenced to prison for CT1: twenty (20) years, credit for 334 days, concurrent to pending revocation; CT2: fifty (50) years, consecutive to count 1; CT3: fifty (50) years, concurrent to count 2. |
| | on  is sentenced to intensive sanctions for |
| | on  is sentenced to county jail/HOC for |
| | on  is placed on probation for |

CONDITIONS OF SENTENCE/PROBATION

| Obligations (Total amounts only) | Jail: To be incarcerated in the county jail/HOC for |
|---|---|
| **Fine** (includes jail assessments; drug assessments; penalty assessments) | |
| **Court Costs**          To be determined (includes service fees; witness fees; restitution surcharge; domestic abuse fees; subpoena fees; automation fees) | **Confinement Order** For Intensive Sanctions sentence only - length of term: |
| **Attorney fees** **Restitution**          *To be determined | **Miscellaneous** *Court ordered restitution to be paid from up to 25% of prison funds. *Court directed there be sexual offender treatment and counseling, and no contact with the victims. |
| **Other** Mandatory victim/witness surcharge(s) felony <u>3</u> counts          $210.00 misdemeanor counts | |

IT IS ADJUDGED that  days sentence credit are due pursuant to s.973.155 Wis. Stats. and shall be credited if on probation and it is revoked.

IT IS ORDERED that the Sheriff shall deliver the defendant into the custody of the Department located in the City of <u>Waupun, County of Dodge</u>.

| NAME OF JUDGE Patricia D. McMahon | BY THE COURT: |
|---|---|
| DISTRICT ATTORNEY Shelton | _Circuit Court Judge/Clerk/Deputy Clerk_ |
| DEFENSE ATTORNEY Brendon Rowen | March 12, 1996          eecm Date Signed |

**OTT 003085**

PO-15B SUPPLEMENTARY REPORT
MILWAUKEE POLICE DEPARTMENT

| INCIDENT | Date of Report 07-16-94- | Incident/Accident # 94-50313 |
|---|---|---|
| FIRST DEGREE SEXUAL ASSAULT | Date of Incident/Accident 07-15-94 | Rep. Code # |

| VICTIM | LOCATION OF INCIDENT | DIST |
|---|---|---|
| CAMPBELL, Mia C. | 4110 W. North Ave. | 3 |

| JUVENILE Last Name | First | Middle | Date of Birth |
|---|---|---|---|

| QUANT | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |
|---|---|---|---|---|---|

On 07-16-94, at 2:35AM, I was dispatched to 4110 W. North
Avenue to meet with Det. RUZINSKI for a brief narrative in regards
to the above incident. While at the scene, I met with the victim,
Mia CAMPBELL, and conveyed her to Good Samaritan Hospital, to the
Women's Assessment Center located at 2100 W. Kilbourn. While at
the WAC, I interviewed CAMPBELL in regards to this incident, and
she related that her full name is Mia Colette CAMPBELL, 12-27-65,
of 4110 W. North Avenue. She further stated that she was born in
Cleveland, Ohio, and when a couple of months old, her parents moved
to Milwaukee, WI. She states that her natural father is one
Charles NELSON, who resides in Milwaukee, at an unknown address,
and her natural mother is one Pamela THOMPSON, who has remarried,
and resides at 2951 N. 24th St. (447-0867). She states that her
stepfather who raised her most of her life is one Albert THOMPSON,
who also resides at 2951 N. 24th St. Mia further stated that she
has no children, and that she is employed by the Wisconsin
Correctional Services as an Administrative Secretary. She states
that she works at 436 W. Wisconsin (271-2512). CAMPBELL further
related that at 9:30AM, she went to work and she left work at
4:30PM with her cousin, Joan MARTIN, who picked her up from work.
She states that she and her cousin then went to her mother's home
at 2951 N. 24th St. to visit her mother. CAMPBELL further related
that her mother is an invalid and is bedridden and she visits her
mother often. She states at about 5:15PM she left her mother's
home and she saw an ex-boyfriend by the name of Tony MC NEAL, who
lives in the area of 13th and Locust. She states that while in her
mother's neighborhood, she spoke with Mr. MC NEAL for a short time
and then she and him left together going on errands and Mr. MC

**CONFIDENTIAL**
OTT 003096

NEAL dropped her off at her home about 7:00PM. She states that once at home, she went inside and she watched TV for a while. She states that about 8:15PM, she went to the store to buy some soap and 2 cans of beer and she returned back to her home. She states that the store was in the area of 38th and North. She states that upon returning home, she spoke with a few neighbors outside of her home and then she went inside the house. She states that about 9:05, she had checked the time in her house, she drank the beer and then she sat around watching TV. She states about possibly 10:45, she cannot be sure because she had not really checked the clock again was when she decided to go out to use a phone booth located at Sherman and Grant Boulevard. She states that upon stepping outside of her door, is when she had her first contact with the suspect in this incident. She states that while standing at the door locking it, the suspect was walking up the sidewalk. She states she turned around and she made eye to eye contact with the subject and she felt that she has seen him somewhere before, that she remembered him from somewhere else. She states that they both had eye contact for a few moments and then she asked him if she knows him from somewhere, and he said, "Oh, you look familiar to me too." She states that the subject then asked her where did she think she knew him from and she told him possibly he had been through WCS and he went on to say, "no, I've never been a client of WCS, but I have been there when I worked for CYD, which is Career Youth Development Organization here in Milwaukee. She states that she further spoke with the subject for a few minutes, small talk only, and then his beeper went off. She states that when his beeper went off, he asked if she had a telephone. She states she does not have one and that she is on her way to the phone booth. She states that the suspect did give her a name, she said it was eitehr Kevin SEARS or Kevin SPEARS. She states that the suspect then asked her where the phone booth is located so that he could

also use the phone. She states she pointed him in a westerly direction and in an easterly direction and told him that the phone booths were one block each way. She states that she was preparing to go to the phone booth and he asked if he could walk with her. She states, "that's okay, come on." She states that upon getting to the phone booth, that the suspect used the phone booth first, she did not know who he talked with, nor did she really overhear the conversation. She states she used the phone booth second and then once she got off the phone, the party that she had called was not home, and that the party she called was a Billy HILL, (444-6167). She states that she spoke with an unknown party on the other end who stated that Billy was not in. She states that she then proceeded back to her home where both she and the suspect walked together. She states that outside of her door, she spoke with the suspect for a few moments and then he asked if he could have some water. She states at that point she invited him in for a glass of water, at which time he was telling her that he was thirsty because he had been drinking earlier some "Tangeray." She states that when she opened up the door, suspect went into the living room and sat in the chair. She states that she got the water and she gave it to him. She states that she herself sat down on a mattress which was lying in the living room floor. She states that they did continue to talk, some small talk, then she asked the suspect for a quarter because she needed to make another phone call. She states that she felt this was another way to try and get the suspect to leave her home, that she was truly waiting for someone else to arrive at her house. She states the suspect said he got a quarter for her, and states the suspect handed her a solid quarter and they both got up to leave. She states that as she was unlocking the back door, she looked back and noticed that the suspect was still standing in the living room fumbling through his pockets. Then he walked into the kitchen and he stepped out the

door to the hallway with her, and as she locked the door, she states when she had the key out of the lock, suspect placed a hand on her left shoulder and he then placed a hard object, like a gun in her back and he told her to open the door. She went on to say that the suspect said, "You must think I'm a fool." Victim states that she unlocked the door, and started walking into the kitchen and she states that the subject would not let her turn around. His hand was still on her left shoulder. She further states that he told her to empty her pocket and he reached over her left shoulder and placed his hand out and collected whatever she was taking out of her pocket. She states that she removed from her pocket a $10 bill a $5 bill, a $1 bill and about $2 worth of change. She placed this in his hand. He then said, "Is that all the money," and she replied "yes." She states that suspect went on to say, "Take your clothes off, remove all your clothing," and she states she removed all of her clothing and her underwear in the kitchen. She states that suspect told her to go in the living room. She states that she never turned around to look at him, and he was still holding a hard object to her back. She states that she walked into the living room and she stood in front of the mattress. She states that he told her to get the purse and empty it. Victim states that she did get her purse, emptied it on the floor. She states that he looked at the contents and then he asked, "Where is the money?" CAMPBELL states that she did not have anymore money. She states that suspect told her to lay face down, and he began to press the object harder and harder in her back and said, "Where is the jewelry. I know every black woman has jewelry." CAMPBELL states that the suspect was leaning down over her, pressing the gun in her back and saying, "Either the money or your ass." CAMPBELL states that she asked him, "What do you mean by ass, my life?" She states that suspect again said, "Money or your ass." CAMPBELL states she said, "my ass." Suspect went to her, unzipped his pants, pulled

out his penis. She does not believe he pulled his pants all the way down, but she never looked back. She states that she knows he did not take all his clothes off at this point. She states that he then put his penis into her vagina and moved up and down. She states that she is unsure if the suspect ejaculated inside of her. She states the suspect then saw the pair of socks laying on the side of the mattress and he stopped and picked up the socks and tied it into a knot. She states that he pushed the socks around her eyes so that she could not see, and he began having sex with her again, with her face down. CAMPBELL went on to say that he stopped again having the sexual contact and he told her to turn over. She states at this point, she noticed that he has no clothes on. She believed it could have been removed during the time when he was tying the socks around her eyes. She is unsure when he took his clothes off. She went on to say that she asked him if she could go to the bathroom and he told her, "you are a lie," and stated he went on to say, "Do you think I'm a fool?" CAMPBELL went on to say that the suspect told her to turn over. At this time she was placed on her stomach and he picked the socks up and he untied the socks. She stated that she was told to put her arms behind her back. She states that her arms were far behind her back and crossing over each other. She states he tied her arms at the wrist very thightly with one sock. She states that he then took the other sock and tied it tightly around her ankle. She states that she could hear cloth or tape ripping. At first she thought that it was some kind of tape, but she was on her stomach and she could not see. She states that this ripping sound ended after a while and he had the cloth and stuffed it in her mouth and took another piece of cloth and tied around her mouth in a gagging type motion. She states that this cloth was tied behind her head. She states he used another piece of this cloth to tie her arms again. She states her arms were tied real tight. Basically her arms were tied up.

She further states she can hear him dressing himself, and states suspect did not have all his clothes off in the beginning and she did not notice he had removed them until she had removed the socks from her eyes. She went on to say that the suspect told her, "any money in here," and started checking around the house. She states that she can hear him in different parts of the house and stating to her, "I know there is money in this house. If I find some money, I'm going to beat your ass." She states that she could hear him moving around in cabinets, in the refrigerator, and then going into kitchen drawers. She states that the suspect came over by her and put a blanket over her. She states she then heard keys, he was back in the living room again, and she did not hear anything for a while, then heard the key again in the door of her apartment. She states that she does not know exactly which door he is putting the keys into, the passage door or the outer door to the street, but usually there is some kind of squeaky noises and she can tell which door he is putting the keys in. She states she could hear the outer door now and the door closed. She states that it became quiet, and she is not sure if he was gone. She states she put her head up and tried to look around. She moved around on the mattress to look into the kitchen, she did not see him. She states that she cannot get loose. She states that she wiggled one hand loose from the rag tied on it and she got up and started hopping towards the kitchen. She sat down in front of the door to try and keep it closed if he should come back. She states at that point she started taking the ties off of her ankle and around her arms and started to put her clothing on. She states that she got up and tried to open the door to the kitchen, but the door was locked. She states that these are dead bolt locks and you need a key to get in and out. She states that she went over to the bathroom and banged on the bathroom wall to try and wake the landlord who lives above her. She states she got no response. She went from there to

the window and she observed a black male passerby and she asked him to ring the doorbell to wake up the landlord who lives in the upper. She states that the passerby did not get a response. She states after the passerby left, she then climbed out of the window of her lower duplex and she walked around the corner and she observed a woman on the upper porch. She states she told the woman that she needed to call the police and asked if she could use her phone. The woman came down and let CAMPBELL into her home to use the phone, at which time, CAMPBELL states that she called the police. CAMPBELL states that when she first left out of her home, she was unsure of what items were taken. She states that she reported the items taken during this incident to Det. RUZINSKI and Det. WELCH. CAMPBELL was also advised by Det. RUZINSKI to view photos at the SAU on today's date, or at her earliest convenience. At this time this interview was concluded, at 5:35AM, 7-16-94.

Report per P.O. Kimberly FOSTER

KF/rqg   07-17-94

| REPORTING OFFICER | PAYROLL # | LOC. CODE | SUPERVISOR SIGNATURE |
|---|---|---|---|
| P.O. Kimberly FOSTER | 53050 | 89 | |

**CONFIDENTIAL**

OTT 003012

Subsequently the Milwaukee Police arrived and conveyed Ms. Campbell to the Women's Assesstment Center for an examination. At the residence, Milwaukee police were able to abtain a finger print from a glass the suspect used to drink water. In March of 1993, the finger print from the drinking glass was identified as belonging to Kelvin Strong. During the police lineup in the same month, Ms. Campbell identified Kelvin Strong as her assailant.

On 2/7/95, Kelvin Strong failed to report to his agent as directed, and his whereabouts and activities were unknown until he was arrested by Milwaukee Area FBI Task Force on April 19, 1994.

3 1 6 0 4

**CIRCUIT COURT**
STATE OF WISCONSIN     **CRIMINAL DIVISION**     **MILWAUKEE COUNTY**

| | |
|---|---|
| STATE OF WISCONSIN,    Plaintiff(s) | **CRIMINAL COMPLAINT** |
| | CRIME(S) OR VIOLATION(S) |
| vs | SEE CHARGING SECTIONS BELOW |
| | STATUTE(S) OR ORDINANCE(S) VIOLATED |
| Strong, Kelvin Dewayne    04/29/57 | SEE CHARGING SECTIONS BELOW |
| 5571 North 40th Street | |
| Milwaukee, Wisconsin   53209 | COMPLAINING WITNESS |
| | Otto, Gregory |
| Defendant(s) | |
| | CASE NUMBER |
| | F-951736 |

THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE
NAMED DEFENDANT(S) IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN

COUNT #01: IMPERSONATING AN OFFICER
On April 4, 1995, at 1220 West Vliet Street, City and County of Milwaukee,
did feloniously impersonate a peace officer with intent to mislead others,
Wanda Harris, into believing he was actually a police officer and with
intent to commit another crime, theft, contrary to Wisconsin Statutes
946.70(1)(2).

COUNT #02: THEFT
On April 4, 1995, at 1220 West Vliet Street, City of Milwaukee, did
intentionally take and carry away movable property of Wanda Harris, having
a value not exceeding $1,000 without the consent of said person and with
intent to deprive the owner permanently of possession of such property,
contrary to Wisconsin Statutes section 943.20(1)(a) and 943.20(3)(a).

COUNT #03: IMPERSONATING AN OFFICER
On April 17, 1995, at 1220 West Vliet Street, City and County of
Milwaukee, did feloniously impersonate a peace officer with intent to
mislead others, Sharon McGill, into believing he was actually a police
officer and with intent to commit another crime, theft, contrary to
Wisconsin Statutes 946.70(1)(2).

COUNT #04: THEFT
On April 17, 1995, at 1220 West Vliet Street, City of Milwaukee, did
intentionally take and carry away movable property of Sharon McGill,
having a value not exceeding $1,000 without the consent of said person and
with intent to deprive the owner permanently of possession of such
property, contrary to Wisconsin Statutes section 943.20(1)(a) and
943.20(3)(a).

COUNT #05: IMPERSONATING AN OFFICER
 n April 18, 1995, at 1220 West Vliet Street, City and County of
 .ilwaukee, did feloniously impersonate a peace officer with intent to
mislead others, Mildred Peoples, into believing he was actually a police

officer and with intent to commit another crime, theft, contrary to
Wisconsin Statutes 946.70(1)(2).

COUNT #06: THEFT
On April 18, 1995, at 1220 West Vliet Street, City of Milwaukee, did
intentionally take and carry away movable property of Mildred Peoples,
having a value not exceeding $1,000 without the consent of said person and
with intent to deprive the owner permanently of possession of such
property, contrary to Wisconsin Statutes section 943.20(1)(a) and
943.20(3)(a) .

AS TO COUNTS #01, #03, and #05:
Upon conviction of the above stated charges, Class D Felonies, the maximum
possible penalty is a fine of not more than $10,000 or imprisonment for
not more than 5 years or both, as to each count.

AS TO COUNTS #02, #04 and #06:
Upon conviction of this charge, Class A Misdemeanors, the maximum possible
penalty is a fine of not more than $10,000 or imprisonment for not more
than 9 months or both, as to each count.

Complainant states that he is a Milwaukee County Deputy Sheriff and that
his information is based upon statements made to him, his personal
observations, his investigation, and his review of official Milwaukee
County Sheriff's Department records which records were prepared and filed
by fellow Milwaukee County Deputy Sheriffs, which type of records and
reports your complainant has utilized in the past and found to be truthful
and reliable.

Complainant states that his information is based upon his review of the
report prepared by Milwaukee County Deputy Sheriff Albert Brock who
reported that on Thursday, April 6, 1995, he spoke with Wanda J. Harris,
an adult citizen. Harris stated that on Tuesday, April 4, 1995, she was
coming out of a store at approximately 1227 West Vliet Street, City and
County of Milwaukee, State of Wisconsin, when she was approached by a
black male (who she later identified as the defendant Kelvin Strong) and
the defendant asked her if she wanted to sell some food stamps. Harris
stated she told the defendant that she did have some to sell. Harris
stated that while she was walking with the defendant in the area of 1220
West Vliet Street the black male displayed a badge and stated that he was
an undercover police officer. Wanda Harris stated that the badge was a
long chain that was hanging from his neck. Harris stated that the
defendant told her that it was fraud for her to sell her food stamps and
that she should give him a reason why he shouldn't take her to jail.
Wanda Harris stated that the defendant told her that he had to take her
food stamps which totaled about $25.00 and that he had to turn her food
stamps over to her case worker. Harris stated that she gave the defendant
her $25.00 in food stamps. Harris stated that the defendant then walked

OTT 003015

away and entered the welfare building.  Harris stated that she checked
with her case worker and she became suspicious when her case worker told
her that no one turned any food stamps in to her.  Harris stated she then
contacted Deputy Sheriff Albert Brock on April 6, 1995.  Harris stated she
did not give the defendant consent or permission to take her food stamps
and to keep her food stamps.

On the report of Milwaukee County Deputy Sheriff Paul Wallus who reported
that on April 17, 1995, he was working security at the Welfare Building
located at 1220 West Vliet Street, City and County of Milwaukee, State of
Wisconsin.  Wallus reported that on that date, he was approached by a
Bernard Neal and Sharon McGill.  Wallus reported that Bernard Neal
indicated that he was approached by a black male who wanted to buy food
Stamps.  Bernard Neal indicated that he didn't have any food stamps for
sale, but then he met Sharon McGill and Sharon McGill had food stamps that
she needed to sell.  Neal stated that he approached the black male with
Sharon McGill and the black male stated to Bernard Neal "cash or work" and
Neal responded "cash."  Neal stated that he and the black male who wanted
to buy stamps and Sharon McGill walked to the first floor where he (Neal)
and the black male entered the men's room.  Neal stated that he entered
the men's room with the black male and gave the black male $65.00 of
McGill's food stamps and at this time, the unknown black male opened his
coat and Neal observed what appeared to be a badge hanging on a chain
around the black male's neck and the black male stated, "I'm a police man,
you're under arrest."  Neal stated he and the black male exited the men's
room where McGill was waiting and this black male informed McGill she was
under arrest and showed McGill the badge hanging from her neck.  Neal
stated that he and McGill followed the black male who they thought was a
police officer to the first floor area where the black male requested both
his and McGill's County ID Cards and also confiscated about $50.00 of
McGill's remaining food stamps.  Neal stated this black male then told
Neal and began to follow him to the second floor general assistance area
where he told them to wait and he would return.  Neal stated that they
waited a ~~short~~ time and then decided to come to the Sheriff's Department
Security office to report this incident.

Complainant states that his information is based upon the statement to him
of Sharon McGill who positively identified a photograph of the defendant
Kelvin Strong on April 21, 1995, as the individual who took her food
stamps on April 17, 1995, at 1220 West Vliet Street, City and County of
Milwaukee, State of Wisconsin, without her consent or permission.

On the report of Milwaukee County Deputy Sheriff Gary Richards who
reported that on Tuesday, April 18, 1995, he was working security at the
Welfare Building located at 1220 West Vliet Street, City and County of
Milwaukee, State of Wisconsin.  Richards reported that Mildred Peoples, an
adult citizen, approached him and stated that she had just received her
allotment of food stamps of $202.00.  Peoples stated that she had just



OTT 00306

exited the doors of the welfare building when a black male (who she later
identified as the defendant Kelvin Strong) approached her. Peoples stated
the defendant stated, "You want something?". Peoples stated she told him
to leave her alone and she didn't want anything from him. Peoples stated
that the defendant then grabbed her umbrella and told her that he had seen
her trying to sell her food stamps. Peoples stated that the defendant then
opened his coat and displayed a gold badge pinned to his shirt and
told her that he was a police officer. Peoples stated she also observed a
wooden handle whichshe believed to be the handle of the gun on the
defendant's left hip. Peoples stated that the defendant reached into her
left coat pocket and took all of her food stamps and took her County ID
card from her hand. Peoples stated the defendant then displayed several
ID cards and told her that all these people are in trouble for the same
thing and to come with him. Peoples stated that the defendant escorted
her back into the welfare building and up to the second floor and he told
her to have seat and wait until he came back. Peoples stated the
defendant told her he was going to see her case worker and that if she
left before he came back she would be in more trouble. Peoples stated
that the defendant left and she waited for awhile and then she came to the
security office to report this incident.

Peoples stated that she did not give the defendant consent or permission
to take her food stamps which were worth $202.00.

Complainant states that while at the welfare building on Wednesday, April
19, 1995, he observed a black male who matched the description of the
individual involved in the taking of food stamps while posing as a police
officer. Complainant states that this individual was observed on the
corner of North 13th Street and West Vliet Street. Complainant states
while he approached the defendant who was standing on the corner, the
defendant ran. Complainant states after a foot chase, the defendant was
apprehended lying under a truck at the rear of 1540 North 14th Street,
which is about two blocks away from where he was first observed.
Complainant further states that the person apprehended was the defendant
Kelvin Strong. Complainant further states that recovered under the truck
where the defendant was apprehended was a silver and gold colored House of
Corrections Sergeant's badge. Complainant states around the defendant's
neck were two gold chains. Complainant further states recovered from the
defendant's pocket was the Milwaukee County ID cards of Mildred Peoples,
Bernard Neal and Sharon McGill, along with others.

Complainant further states that Deputy Sheriff Charles Zwicke showed Wanda
Harris on April 20, 1995, a photo array and that Wanda Harris positively
identified the photograph of the defendant Kelvin Strong as the individual
who said he was a undercover police officer and took her food stamps on
April 4, 1995.

Complainant further states that on April 21, 1995, he showed the same



OTT 00301

photo array to the said Mildred Peoples and the said Sharon McGill and both individuals positively identified the photograph of the defendant Kelvin Strong as the individual that took their food stamps on April 18, 1995 and April 17, 1995.

Complainant further states that on April 19, 1995, after advising the defendant of his Constitutional Rights, defendant admitted his involvement in these incidents.

****END OF COMPLAINT****

SUBSCRIBED AND SWORN TO BEFORE ME
AND APPROVED FOR FILING - APRIL 21, 1995

_____          _____
DEPUTY/ASST. DISTRICT ATTORNEY             COMPLAINING WITNESS
   SCHU
                        -- FELONY COMPLAINT --

LD0421KS.F

OTT 003018

ATE OF WISCONSIN

90,

COURT COPY

S .E OF WISCONSIN,     Plaintiff.     **CRIMINAL COMPLAINT**     Page 1

CRIME(S) OR VIOLATION(S)

Strong, DeWayne K.
5571 N. 40th Street
Milwaukee, Wisconsin

    AKA Kevin D. Strong.

041957   Aggravated Battery

STATUTE(S) OR ORDINANCE(S) VIOLATED

940.19(1m)

COMPLAINING WITNESS

Allen, Robert

Defendant(s)    CASE NUMBER   F930587

THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE
NAMED DEFENDANT(S) IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN

on June 16, 1990, at 633 E. Townsend, City of Milwaukee, did cause great
bodily harm to Laurencetta Jackson by an act done with intent to cause
bodily harm to Laurencetta Jackson without the consent of Laurencetta
Jackson, contrary to Wisconsin Statutes section 940.19(1m).

Upon conviction of this charge, a Class E Felony, the maximum possible
penalty is a fine of not more than $10,000 or imprisonment for not more
t  2 years or both.

Complainant states that he is a City of Milwaukee Police Officer and makes
this complaint based on his review of the reports of fellow City of
Milwaukee police officers.

The report of Officer Anderson indicates that he had occasion to
investigate an aggravated battery taking place on June 16, 1990 at 633 E.
Townsend, in the City of Milwaukee, Milwaukee County, Wisconsin, at
approximately 3:00 A.M. In investigating this matter he had occasion to
speak with Laurencetta Jackson, an adult citizen he believes to be truthful
and reliable. Ms. Jackson indicated that on June 16, 1990, at
approximately 3:00 A.M., at the above stated residence she had contact with
 subject who she knows as the abovenamed defendant and who had been a
ormer boyfriend of hers. She indicates they were involved in a dispute
here the abovenamed defendant requested his jewelry back which she
ttempted to take off and give him. She indicates that during her removing
f a necklace the abovenamed defendant punched her several times violently
n the left side of the face. She indicates she received medical treatment
or this and has three broken bones to her face area including bones in her
eft jaw, her left eye and her left mouth area. She indicates she did not
ave these injuries prior to being struck by the abovenamed defendant and
e did not give the abovenamed defendant consent or permission to strike
r in any manner.

 er Anderson indicates that he had occasion to confirm her
 talization and treatment through his own personal investigation into
e above alleged matter.



**OTT 0030197**

| STATE OF WISCONSIN, | Plaintiff, | CRIMINAL COMPLAINT | Page 2 |
|---|---|---|---|

Strong, DeWayne K.          041957
5571 N. 40th Street
Milwaukee, Wisconsin

**CRIME(S) OR VIOLATION(S)**
Aggravated Battery

**STATUTE(S) OR ORDINANCE(S) VIOLATED**
940.19(1m)

**COMPLAINING WITNESS**
Allen, Robert

**CASE NUMBER**

Defendant(s)

Based on the foregoing complainant believes this complaint to be true and correct.

**** END OF COMPLAINT ****

SUBSCRIBED AND SWORN TO BEFORE ME
AND APPROVED FOR FILING  June 27, 1990

DEPUTY/ASST. DISTRICT ATTORNEY          COMPLAINING WITNESS
KBERG

-- FELONY COMPLAINT --

.83f-STRONG-D

| STATE OF WISCONSIN, | Plaintiff, | **INFORMATION** | Page 1 |
|---|---|---|---|
| Strong, DeWayne K.<br>5571 N. 40th Street<br>Milwaukee, Wisconsin | 041957 | CRIME(S) OR VIOLATION(S)<br>Aggravated Battery | |
| | | STATUTE(S) OR ORDINANCE(S) VIOLATED<br>940.19(1m) | |
| | | COMPLAINING WITNESS<br>Allen, Robert | |
| | Defendant(s) | CASE NUMBER<br>F- 930587 | |

I, E. MICHAEL MC CANN, DISTRICT ATTORNEY FOR MILWAUKEE COUNTY, WISCONSIN,
HEREBY INFORM THE COURT THAT THE ABOVE NAMED DEFENDANT(S) IN THE COUNTY OF
MILWAUKEE, STATE OF WISCONSIN,

on June 16, 1990, at 633 E. Townsend, City of Milwaukee, did cause great
bodily harm to Laurencetta Jackson by an act done with intent to cause
bodily harm to Laurencetta Jackson without the consent of Laurencetta
Jackson, contrary to Wisconsin Statutes section 940.19(1m).

DATED

_3/5/93_

E. MICHAEL MC CANN
DISTRICT ATTORNEY

DEPUTY/ASST. DISTRICT ATTORNEY



MAR 5 1993

GARY J. BARCZAK
CLERK CIRCUIT COURT

| State of Wisconsin, Plaintiff<br>-vs-<br>Vayne K. Strong, Defendant<br>.9/57<br>Defendant's Date of Birth | TYPE OF CONVICTION (Select One)<br>x Sentence to Wisconsin State Prisons<br>   Sentence Withheld, Probation Ordered<br>   Sentence Imposed & Stayed, Probation Ordered<br>COURT CASE NUMBER 93CF000587 |
|---|---|

The defendant entered plea(s) of:   [ ] Guilty    [ ] Not Guilty   [x] No Contest

The [x] Court [ ] Jury   found the defendant guilty of the following crime(s):

| CRIME(S) | WIS STATUTE(S)<br>VIOLATED | FELONY OR<br>MISDEMEANOR<br>(F OR M) | CLASS<br>(A-E) | DATE(S)<br>CRIME<br>COMMITTED |
|---|---|---|---|---|
| Aggravated Battery | 940.19(1m) | F | E | 06/16/90 |

31613

IT IS ADJUDGED that the defendant is convicted on <u>August 5, 1993</u> as found guilty, and:

| | |
|---|---|
| x | on <u>July 10, 1996</u> is sentenced <u>after probation revocation</u> to prison for <u>two (2) years, concurrent to sentence now serving, credit for 77 days.</u> |
| | on   is sentenced to intensive sanctions for |
| | on   is sentenced to county jail/HOC for |
| | on   is placed on probation for |

## CONDITIONS OF SENTENCE/PROBATION

Obligations (Total amounts only)

**Fine**
(includes jail assessments; drug assessments; penalty assessments)

**Court Costs**      To be determined
(includes service fees; witness fees; restitution surcharge; domestic abuse fees; subpoena fees; automation fees)

**Attorney fees**
**Restitution**

**Other**
Mandatory victim/witness surcharge(s)
     felony <u>1</u> counts      $70.00
     misdemeanor counts

Jail: To be incarcerated in the county jail/HOC for

Confinement Order For Intensive Sanctions sentence only - length of term:

Miscellaneous

IT IS ADJUDGED that  days sentence credit are due pursuant to s.973.155 Wis. Stats. and shall be credited if on probation and it is revoked.

IT IS ORDERED that the Sheriff shall deliver the defendant into the custody of the Department located in the City of Waupun, County of Dodge.

| NAME OF JUDGE<br>Maxine A. White | BY THE COURT: |
|---|---|
| DISTRICT ATTORNEY<br>: Stoiber | Circuit Court Judge/Clerk/Deputy Clerk |
| DEFENSE ATTORNEY<br>Brendan Rowen | July 10, 1996      eem<br>Date Signed |

**OTT 003082**

90

STATE OF WISCONSIN

CIRCUIT COURT
CRIMINAL DIVISION

MILWAUKEE COUNTY

# CRIMINAL COMPLAINT

THE STATE OF WISCONSIN, Plaintiff,

vs.

Kelvin Strong          4/29/57
3322 N. 7th St.

Defendant(s)

CRIME(S) 1. Theft From Person
2. Armed Robbery
3. Robbery (PTAC)
4. Armed Robbery

STATUTE(S) VIOLATED 1. 943.20(1)(a) & (3)(d)(2)
2. 943.32(1)(b) & (2)
3. 943.32(1)(b) and 939.05
4. 943.32(1)(b) & (2)

COMPLAINING WITNESS
Ptm. Roger Hinterthuer

CASE NUMBER

The above named COMPLAINING WITNESS
being first duly sworn says that the above named DEFENDANT(S), in the County of Milwaukee. State of Wisconsin.

COUNT #1
on 9/8/74 at 3208 N. Bremen Street, City of Milwaukee, did intentionally
and feloniously take and carry away movable property from the person of Diana
H. Robillard, date of birth 7/26/1893, the owner, said property being purse
and $3.00 in U.S. currency, having a value of less than $2500, without
the consent of said owner and with intent to deprive said owner permanently
of possession of said property, contrary to Wisconsin statutes section(s)
943.20(1)(a) & (3)(d)(2).

COUNT #2
on 10/21/74 at N. 6th Street and W. Concordia Avenue, City of Milwaukee, with
intent to steal, did feloniously take property, one purse (valued at $5.00)
containing one handkerchief and one ballpoint pen, from the person of Vivian D.
Kostrzewa, date of birth 2/21/27, the owner, by threatening the imminent
use of force against the person of the owner, Vivian D. Kostrzewa,and while arme
with a dangerous weapon, to wit:  a knife, with intent thereby to
compel the said owner to acquiesce in the taking and carrying away of
said property, contrary to Wisconsin statutes section(s) 943.32(1)(b) & (2).

COUNT #3
on 10/29/74 at 3411 North 6th Street, City of Milwaukee, as party to a crime,
with intent to steal, did feloniously take property, $0.50 in U.S. coins, from
the person of Patricia A. Daniels, date of birth 11/24/33, the owner,
by threatening the imminent use of force against the person of the owner,
Patricia A. Daniels, with intent thereby to compel the said owner to acquiesce
in the taking and carrying away of said property, contrary to Wisconsin
statutes section(s) 943.32(1)(b) and 939.05.

COUNT #4
on 12/3/74 at 3353 N. Green Bay Avenue, (rear of), City of Milwaukee, with
intent to steal, did feloniously take property, leather purse and wallet
containing $23 in U.S. coin and currency, from the person of Mrs. Nell Gilbert,
date of birth 5/3/30, the owner, by threatening the imminent use of force
against the person of the owner, Mrs. Nell Gilbert and while armed with a
dangerous weapon, to wit:  a knife, with intent thereby to compel the said owner
to acquiesce in the taking and carrying away of said property, contrary
to Wisconsin statutes section(s) 943.32(1)(b) & (2).

Upon conviction of the charge, as stated in Count #1, the maximum possible
penalty may be a fine of not more than $5,000 or imprisonment for not
more than 5 years or both.

Upon conviction of the charge, as stated in Count #2, the maximum possible
penalty may be imprisonment for not more than 30 years.

Upon conviction of the charge as stated in Count #3, the maximum possible
penalty may be imprisonment for not more than 10 years.

CONTINUED ON PAGE -2-

Subscribed and sworn to before me and
approved for filing January 8, 1975.

_____
Asst. District Attorney
FJS/bk

_____
Complainant

OTT 003023

PAGE -2-
RE: Kelvin Strong

Upon conviction of the charge, as stated in Count #4, the maximum possible penalty may be imprisonment for not more than 30 years.

Complainant states that this complaint is based upon his personal observations as a City of Milwaukee police officer and upon his information and belief.

Regarding Count #1, complainant states that this count is based upon the statements to him by Mrs. Diana H. Robillard, d.o.b. 7/26/1893, who informed complainant that on 9/8/74 in the area of 3208 N. Bremen St., City and County of Milwaukee, as she was walking south on the east side of Bremen Street, she personally observed a Negro male come straight at her and when he got to her, grab her purse. She further states that she held onto the purse so hard that she was spun around and then fell to the sidewalk as the purse was grabbed away from her by said person. She states she observed the Negro male run off with the purse in a northerly direction on Bremen Street to an alley and then east through an alley. She states that in her purse she had three $1 bills. She further stated to complainant that she did not give this defendant or anyone else in the world consent or authority to take her purse from her person or to take any of the contents therein.

Complainant further states that on 10/30/74 he personally presented to the aforementioned Mrs. Robillard, five black and white photographs of equal dimensions portraying photographs of five black males of the approximate same age, height, and complexion. Complainant states that Mrs. Robillard picked out the picture of the defendant as being her assailant without any prior prompting or suggestion.

Upon the statements made by Ptm. Robert Kanack, a fellow Milwaukee police officer to complainant that the defendant on 12/10/74, after having been advised fully of his constitutional rights, which he acknowledged and waived, admitted to the above offense.

Regarding Count #2, complainant states that this count is based upon statements made to him by Mrs. Vivian D. Kostrzewa, d.o.b. 2/21/27 who informed complainant that she is an adult female resident of the City of Milwaukee, and states that on 10/21/74 as she was walking towards the corner of N. 6th Street and W. Concordia Ave., City and County of Milwaukee, she was approached by a black male who stated to her "Give me your purse, or you're dead". She states she personally observed said black male had an open bladed knife with an approximate 6 inch blade on it which was held in front of her and held towards her neck area. She states she complied with the demand by giving the male with the knife her purse which contained one handkerchief and one ballpoin pen. She states she then observed the black male with the knife run off with her purse west on Concordia Ave. She states she did not give this person consent or authority to take any of her personal property and did so only at the threat of injury at knifepoint.

Complainant further states that this count is based upon his personally showing to the abovementioned Mrs. Kostrzewa, on 10/27/74 at her home, a series of five color Polaroid photographs of equal dimensions portraying photographs of five black males of the same approximate age, and complexion from which he personally observed Mrs. Kostrzewa pick out the defendant's photograph as being her assailant without any prior prompting or suggestion on the part of any police personnel.

Complainant further states that this count is based upon statements made to him by fellow City of Milwaukee police officer Robert Kanack, to complainant, that defendant on 12/10/74, after being advised of his constitutional rights, which he acknowledged and waived, admitted to the above offense.

Subscribed and sworn to before me and approved for filing    January 8, 1975

CONTINUED ON PAGE -3-

FJS/bk      Deputy. Assistant District Attorney

     Complaining Witness

OTT 003024

# CRIMINAL COMPLAINT

CASE NUMBER

PAGE -3-
RE: Kelvin Strong

Regarding Count #3, complainant states that this count is based upon his information and belief as a City of Milwaukee police officer and upon the collective police files and investigations into this matter.

Complainant states that this count is based upon his personal review and familiarity with the official Milwaukee police department felony offense file #978784, wherein it is contained that one Patricia A. Daniels, 3411 N. 6th St., d.o.b. 11/24/33, on 10/29/74, in the area of 3411 N. 6th St., Milwaukee, Wisconsin, was approached on the street by two black males as she was walking towards her home and as she reached the front of her premises at 3411 N. 6th St., City and County of Milwaukee, one of the black males displayed what appeared to be a handgun stating to her "Give me your money or you are dead". She states that the second black male then stepped behind her and she replied that she only had $0.50 and pulled it out of her pocket which then fell to the ground and the first black male told her to pick it up which she did and handed it to him. She states at this time both black males fled the scene heading east through the yards towards Green Bay Ave. She states she immediately went into her residence and called the police who arrived shortly thereafter.

Complainant states further that this count is based upon his personal custody and review of the aforementioned felony offense report of the Milwaukee Police Department and the supplementary report contained therein signed by detectives Roosevelt Harrell and Leroy Jackson, both Milwaukee police detectives and both of whom are known to the complainant. Complainant states that the official report written by these two detectives reflected that on the same date 10/29/74, detectives Jackson and Harrell investigated the above complaint made by said Patricia Daniels and after being informed of the complaint by Mrs. Daniels, commenced a search of the area and upon observing the defendant and another juvenile in the area arrested both the defendant and said juvenile. Upon searching the defendant a black toy revolver was recovered in his coat pocket, both the defendant and the juvenile companion were taken back to the scene within a matter of minutes and Mrs. Patricia Daniels identified the defendant and the other person as the two black males who had robbed her approximately 45 minutes earlier.

Complainant further states that this count is based upon the statements made to him by fellow Milwaukee police officer Robert Kanack, who informed complainant that the defendant on 12/10/74, after having been fully advised of his constitutional rights, which he acknowledged and waived, admitted to the above offense.

Regarding Count #4, complainant states that this count is based upon his information and belief as a City of Milwaukee police officer and upon the statements of the following persons whom he believes to be truthful and reliable.

Complainant further states that this count is based upon statements made to him by his partner fellow Milwaukee police officer William Matson, who in the process of investigating the offense indicated in count #4, was informed personally by the victim therein Mrs. Nell Gilbert, d.o.b. 5/3/30, that on 12/3/74 at the store located at 3353 N. Green Bay Ave., City and County of Milwaukee, she was approached by a black male who had a long sharp object in his left hand and stated to her as he put the object up to her neck, "I just want your money, I just want your purse, give it up". She further informed officer Matson at this time that she complied this demand and the black male obtained from her her black leather purse containing a leather wallet, said wallet which contained $23 in U.S. coin and currency as well as personal identification of Mrs. Gilbert. She states she acquiesced in the taking of

CONTINUED ON PAGE -4-

Subscribed and sworn to before me and approved for filing    **January 8, 1975**

_____
Deputy Assistant District Attorney

JS/bk      PAGE -3-

_____
Complaining Witness

OTT 003025

# CRIMINAL COMPLAINT

PAGE -4-
RE: Kelvin Strong

the purse and money because of fear induced by the sharp object (which appeared to be a knife) that was pointed at her.

Complainant further states that on the same day of this offense Ptm. Matson informed him that he showed the victim (Mrs. Gilbert) five colored Polaroid equally sized photographs of five black males of the same approximate age and complexion from which she picked out the defendant's photo as being her assailant, without any prior suggestion or prompting by the police.

Complainant further states that this count is based upon statements to him by fellow Milwaukee police officer Robert Kanack, that the defendant on 12/10/ after being advised of his constitutional rights, understanding and waiving them, admitted to the above offense, and admitted using a knife to commit thi offense.

Subscribed and sworn to before me and approved for
filing    **January 8, 1975**

Deputy Assistant District Attorney

Complaining Witness

FJS/bk

PAGE -4-

OTT 003026

# MILWAUKEE POLICE DEPARTMENT

## DEPARTMENTAL MEMORANDUM



**Date:** July 7, 2005

**To:** Detectives Ricky BUREMS & Diedra COLE (Sqd. 114-Early)

**From:** Eric J. MOORE
Captain of Police

**Regarding:** Cold Case Investigation M2991 (Victim-Debra MANIECE)

---

Please find attached to this memo 11 "cut-out", newspaper articles from the former Milwaukee Journal and the former Milwaukee Sentinel that ran between January 5, 1988 and September 10, 1990. These articles centered on the murders of five elderly persons in the Milwaukee Metro area during the early part of 1988. Also, attached is a copy of the criminal complaint charging Robert J. WIRTH, W/M, DOB 11/07/59, with four of the murders along with five burglary offenses. WIRTH was arrested and charged in the cases after a lengthy multi-jurisdictional investigation linked him to the offenses which occurred in Milwaukee, New Berlin, Franklin and Greenfield.

A circumstantial case was built on WIRTH who never admitted his involvement (to police) in the offenses. Nevertheless, he was convicted on all counts by a jury who determined that the circumstantial evidence linking WIRTH to the crimes was overwhelming. The Milwaukee Police Department was the lead law enforcement agency in the investigation and then Detective Vincent VITALE was the lead Detective investigating the case. The murder victims were as follows:

1. Ms. Ruth BRESNAHAN, age 83 whose body was found in her home (3938 W. Fairmount, Milw.) on January 4, 1988. BRESNAHAN died from either strangulation or a blow to the throat.

   *Louis*
2. ~~Luis~~ and Lillian BUCHTA, both 76 of age whose bodies were found dead in their home (12623 W. Greenfield Ave., New Berlin) on January 12, 1988. Both husband and wife died as a result of blows to the neck.

3. Ms. Eva HOLMAN, age 79 whose body was found dead in her home (2810 W. Rawson Ave., Franklin) on January 22, 1988. HOLMAN died from strangulation.

What turned out to be the linchpin of the State's case against WIRTH in the BRESNAHAN case was a quantity of his blood, which was found on a bloodstained toy found in the BRESNAHAN residence.

The following information is excerpted from the criminal complaint charging WIRTH:

On January 5, 1988, Doctor John TEGGATZ, Chief Medical Examiner for Milwaukee County, performed an autopsy on the body of Ruth BRESNAHAN and determined that the cause of death was asphyxia due to crushing neck injuries in that there were multiple fractures to the thyroid cartilage and circoid cartilage. Doctor John TEGGATZ further reported that there was blunt force trauma to the chest in that there were fractures to the ribs. Your complainant further states that the blood stained toy animal which was found in the BRESNAHAN residence was submitted to the Wisconsin State Crime Laboratory for analysis as well as a sample of the blood of the above named defendant. Your complainant states that Elizabeth DIETMEYER, A Microserologist with the Wisconsin State Crime Laboratory, reported that the blood on the toy animal was consistent with the blood of the above named defendant in that they matched in ABO blood typing and in ten enzyme groups. Furthermore, your complainant states that a sample of the blood from the toy animal and a sample of the defendant's blood were submitted to Cellmark Diagnostics, Germantown, Maryland, for DNA testing and that AMY COREY, a staff molecular Biologist and Laboratory Supervisor for Cellmark Diagnostics, reported on May 25, 1989, that high molecular weight DNA was abstracted and DNA banding patterns where obtained from the blood on the toy animal and the blood of the defendant and that these banding patterns matched each other. Your complainant further states that on November 3, 1989, George HERRIN, PhD., Bio-Chemistry and Staff Scientist for Cellmark Diagnostics, reported that the frequency in the Caucasian population of this DNA banding pattern is approximately one in 460 thousand.

**CONFIDENTIAL**

**OTT 003027**

The MANIECE case is similar to the BRESNAHAN case insofar as Ms. MANIECE and Ms. BRESNAHAN were both killed by violent blunt force trauma and that a known person (identified by DNA profile) left blood at each respective scene. Kelvin STRONG's blood was found inside of MANIECE's discarded shoe, which was found at the scene. Additionally, in the MANIECE case a significant amount of STRONG's blood was inter-mixed with MANIECE's blood on two articles of clothing that were on her deceased body when it was discovered. Keep in mind that DNA profiling as it related to criminal investigation was an emerging science in the late 1980's.

Another similarity between the two cases is an established pattern of violent and predatory criminal behavior in the suspect's background.

I believe you will find that certain aspects of these serial murders of elderly persons will have valuable application to your investigation into the death of Debra MANIECE.

**CONFIDENTIAL**

# Police compare slayings of elderly woman, couple

By LEONARD SYKES JR.
of The Journal staff

As Milwaukee police compared the murder of an 83-year-old woman who was found dead Monday to other slayings of elderly people, the most recent victim's relatives and friends portrayed her as independent and loving, a churchgoer who "wouldn't hurt a fly."

Ruth Josephine Bresnahan, who lived alone at 3938 W. Fairmount Ave., died either of strangulation or a blow to the throat, the medical examiner's office told police. An autopsy was to be done Tuesday.

Deputy Inspector Rudolph R. Will said Tuesday the slaying bore similarities to the murders of Paul Kaminski, 83, and his wife, Dorothy, 76, last Feb. 24. The couple lived at 2860 N. 49th St., about 10 blocks west and several blocks south of Bresnahan's house.

In both slayings, detectives found no signs of forced entry, Will said.

Will said that police were considering the possibility that the killer could have been someone who shoveled the snow, a deliveryman, anyone who might have been let inside the house.

Milwaukee Police Lt. Kenneth Meuler said Milwaukee detectives were to confer later Tuesday with

West Allis authorities to explore possible links between the case and the fatal stabbing Saturday of Hattie M. Doll, 68, of 9409 W. Lincoln Ave., West Allis.

But Meuler added: "I don't believe there's any connection. [The Milwaukee case] was not a typical burglary."

Chief Deputy Medical Examiner John Teggatz told police he thought that Bresnahan had been dead since Monday afternoon. She was found dead about 6:30 p.m. Monday in the doorway of her bedroom by her two sons. She was fully dressed for outdoors.

Please see Slaying, Page 8B

## Slaying
From Metro Page

Doll, too, was found dead in the ransacked home where she lived alone. Her house is about eight miles from Bresnahan's, although officials said they had no specific link between the two cases.

There were no signs of a struggle in Bresnahan's small, two-bedroom home, but police said several rooms had been ransacked.

Bresnahan last was seen alive Sunday night by one of her sons, James R. Bresnahan of Milwaukee. He told police he tried to telephone his mother Monday morning, but no one answered the phone.

Meuler said that though there had been many reports of garage burglaries in Ruth Bresnahan's Northwest

Side neighborhood, there had been no signs of a break-in at her home.

Detectives, however, did discover several missing items from the home and Meuler said whoever killed Bresnahan apparently also had robbed her.

Funeral arrangements were being made Tuesday morning at the Jelacic Funeral Home, 5639 W. Hampton Ave.

Bresnahan's relatives and friends called her an independent woman who lived alone without any fears of being robbed or harmed by anyone.

"She was very independent, the kind of person who gave completely of herself," Bresnahan's daughter-in-law, Bonnie Bresnahan, who is married to James, said Tuesday morning. "She was very caring and loving, the kind of person who wouldn't hurt a fly. She didn't deserve this."

Bonnie Bresnahan said she and her husband had last seen her mother-in-law alive Sunday night, when family members gathered at Bonnie and James' home for dinner.

She said her mother-in-law was an active member of the Holy Redeemer Catholic Church, 4740 N. 39th St.

"She was the type of person who made crafts for people younger than herself at Christmas and Easter," Bresnahan said.

Margaret Mueller, the victim's neighbor, said she had known the woman since moving into the neighborhood in 1961.

"She was a very nice person, very friendly and cheerful," Mueller said. "She had a lot of friends, but she didn't go out a lot."

Mueller said Bresnahan spent a lot of her time with her family.

OTT 003029

# AUKEE JOURNAL

, January 23, 1988 — Latest Edition   II

# 5th elderly slaying case brings police warning

With the discovery of the area's fifth elderly murder victim in three weeks, Milwaukee police Saturday urged elderly residents not to let strangers into their homes — even people wearing police uniforms.

The murder of Eva F. Holman, 78, in Franklin prompted investigators Saturday to look further into the possibility that there are connections between the recent killings in Milwaukee and its south and southwest suburbs.

Milwaukee police said they were considering asking the FBI for help in compiling a psychological profile of someone who might have committed the murders.

But investigators from several local law enforcement agencies said they still had no indication the killings were connected.

"The possibility does exist, I suppose, but

---

*Journal reporters Joanne Weintraub, Larry Sussman, Craig Gilbert and Mark Lisheron contributed to this story.*

---

it's somewhat removed," said Franklin Police Lt. Don Hareng, who is leading the investigation for his department. The biggest similarity is the age of the victims, he said.

Holman, who lived alone, was found dead Friday evening in her home at 2810 W. Rawson Ave., Franklin. Her body was discovered shortly before 5 p.m. by her son-in-law, Edward Esche, who lives next door.

Esche said that the family preferred not to speak to reporters.

Police in Franklin said they had found

---

evidence that Holman's killer forced open the front door to get into the house. A uniformed Franklin police officer was going door to door Saturday, asking neighbors whether they had seen anything suspicious.

Medical Examiner Jeffrey Jentzen said there was evidence of trauma on Holman's head and neck. An autopsy was being done Saturday.

Esche told police that he found his mother-in-law dead after entering the house through a rear door that was ajar. Her body, fully clothed, was in a hallway between the living room and two bedrooms.

Esche also found papers strewn about the living room and a chair tipped over near the body.

Please see **Slaying,** Page 20A

OTT 003030

# Slaying
From Page 1A

The medical examiner's report says blood was found spattered on the living room floor.

Before the discovery of Holman's killing, police were looking into possible connections between these three incidents:

■ On Jan. 2, the body of 68-year-old Hattie Doll was discovered in her ransacked home at 9409 W. Lincoln Ave., West Allis. Doll, a retired teacher who lived alone, was found in her bed with numerous stab wounds. The back door was ajar.

■ On the evening of Jan. 4, the body of 83-year-old Ruth Josephine Bresnahan, who lived alone at 3838 W. Fairmount Ave., was found by her two sons. She had died of a blow to the throat.

■ On Jan. 12, an elderly couple were found dead in their New Berlin home, 12623 W. Greenfield Ave. The victims were Louis Buchta, 76, and his wife, Lillian, 75. He died from blows to the head, she from blows to the neck.

Milwaukee Police Lt. Bill Vogl said police in Milwaukee had been puzzled over why Bresnahan, "a very cautious person," would have let her assailant in. Either she knew him, investigators believe, or "the guy's got some kind of line."

For that reason, he urged elderly residents not to let people into their homes without being sure of their identity. Even if the stranger is wearing a police uniform, Vogl said, the person should call police to confirm the officer's identity.

Police have said that the slayings seem too far apart to be connected. And there are differences in the way the victims were killed. Also, while some of the homes were burglarized, West Allis police have not determined that anything was stolen from Hattie Doll's house, said West Allis Police Detective Don Bartels.

According to Hareng in Franklin, authorities there had been in "preliminary contact" with police in Milwaukee, West Allis and New Berlin about possible links between the slayings.

Ten Franklin police officers and four people from the State Crime Laboratory were investigating Saturday morning. West Allis police said they sent two officers to Franklin Friday night to look into any connections between Doll's killing and Holman's.

Vogl said that Milwaukee police might ask the FBI to compose a profile of a killer based on the circumstances of the five killings. The FBI Academy in Quantico, Va., has a behavioral sciences unit that has compiled such profiles in cases such as the serial child killings in Atlanta.

Paul Schumacher, an FBI spokesman, said Saturday that like any of the FBI's services, "it's available [to local police] just on request."

A profile might suggest the perpetrator's approximate age, race, occupation and other factors, but police routinely are cautioned not to exclude other suspects based on



**The bodies of five murder victims age 68 or older have been found in four area homes in the last three weeks**

those, Schumacher said. Such a profile turns up only characteristics, not a list of actual suspects, he said.

Asked why someone might seek out elderly victims, Vogl said, "They're easy. It's a cowardly act."

In Franklin, Hareng had no comment on a possible motive for the Holman slaying, and he would not say whether a weapon was found inside the home.

Rawson Ave. is a busy street, Hareng pointed out, but Holman's house is about 90 feet off the street and trees shield the residence somewhat. He had no comment on whether police found tracks in the snow.

Neighbors were uneasy Saturday morning.

"I'm a little scared," said Susan Krolicki, who has lived across the road from Holman's tan and brown, two-story home for 16 years. "I never used to be."

But several burglaries in the past year or two have had an effect on this neighborhood, not far west of the North-South Freeway.

Another neighbor who spoke on the condition that her name not be used, said, "I didn't get any sleep at all last night after I found out." The neighbor said her own house had been broken into last year.

The neighbor, who knew Holman for many years, called her "a won-

derful, kind person, a wonderful neighbor."

Krolicki recalled that Holman was a special favorite with Krolicki's two children because she would give them extra treats at Halloween and invite them into her home to ask them about school and vacations.

Krolicki said that Holman's daughter, Norma Esche, told her that Holman had been very ill and was not doing well. Krolicki had not seen Holman outside for about a year, she said.

Esche and her husband, Edward, live next door to Holman in a brick house that is connected to hers by a common driveway.

Neighbors said that Holman, whose husband, John, died about 13 years ago, also had a son living near LaCrosse, as well as several grandchildren and great-grandchildren.

Joyce Zieman, who, like Krolicki, lived across the road from Holman for 16 years, called her "a survivor. She was such a strong lady."

Zieman, who affectionately called her "Grandma," said that Holman had broken a hip last year. Even on the way to the hospital, Zieman said, Holman said, "Oh, honey, I'm OK, I'm OK. Please don't worry."

Holman was active in local Catholic Church groups until her health began to decline, Zieman said.

Milw Journal
1-23-88

OTT 003031

# Arrest

From Metro Page

The man came to the woman's rear door about 7:20 p.m. He showed her an identification card and introduced himself as a detective, Will said.

The man said the woman's garage had been broken into and asked to use her telephone to call for police assistance.

The woman refused to let the man in, locked the door and called police.

The suspect threw a brick through the window of the rear door and unlocked it. He pulled a handgun and held it to the woman's head, demanding money, Will said.

Just as officers LaRon Glover and Karl Robbins arrived, Will said.

Glover and Robbins followed the suspect's 1974 Cadillac and made the arrest without incident, he said.

"The woman was sharp," Will said. "She wouldn't let the guy in. She heeded the warnings police have been issuing in the papers."

The suspect has been on parole for a burglary conviction since April 1987 from the Green Bay Correctional Institution, Will said.

"We are quite interested in him for a series of elderly victim crimes," Will said. "We will be questioning him for a while."

# Suspect in robberies, assaults held by police

By MARK LISHERON
of The Journal staff

Police questioned a 25-year-old man Tuesday in a series of Northwest Side crimes, including the January slaying of Ruth Bresnahan, after he was arrested in an armed robbery Monday night.

The man was captured by police about 7:30 p.m. Monday at his mother's home in the 5600 block of W. Congress Ave.

old woman was robbed at gunpoint in her home in the 5800 block of W. Philip Pl., Deputy Inspector Rudolph R. Will said.

Bresnahan's body was found in her home, 3938 W. Fairmount Dr., on Jan. 4.

The suspect also will be questioned about a series of robberies and assaults of elderly people in the past two months in the area of Capitol Court shopping center, 5500 W. Capitol Dr., Will said.

A man posing as a shopping center security guard has committed several robberies in the area in the past two months, Will said.

was committed the woman robbed Monday night for resisting her assailant.

Please see Arrest, Page 7B

MJ-3-8-88

Mil w
Journal
3-8-88

OTT 003032

# Victims' families wait in frustration

## They hope detectives will solve murders of their elderly relatives



Journal photo by Benny Sieu

nes Bresnahan with a photo of his mother, Ruth, o was murdered in her Milwaukee home Jan. 4

James Bresnahan remembers the poems his mother used to write. They are part of the reason he writes poetry now.

The verses of Ruth Josephine Bresnahan, who was 83 when she was slain on Jan. 4, were about life — about her children, her grandchildren, her neighbors and even her lawyer.

Her son's poems, haunted by whoever attacked the elderly woman in the doorway of the home where she lived alone at 3938 W. Fairmount Ave., are verses of frustration.

Frustration is common to the relatives of the elderly people who were murdered in the Milwaukee area this year, and whose cases remain unsolved. While they said they were satisfied with the police work, the uncertainty takes a toll.

The 43-year-old son wrote of his mother's death:

"Because I was old, you murdered me that cold winter day.

"Because I was old, you acted in such a cowardly way.

"Because I was old and my days may have been few, my life didn't mean that much to you . . .

"It didn't give you the right to take my life on that cold winter night . . ."

Like James Bresnahan, on the other side of the city Jane Doll follows the twists and turns of the investigation into the murder Jan. 2 of her sister-in-law, Hattie M. Doll, 68, of 9409 W. Lincoln Ave., West Allis.

"I don't have any faults with the investigation at all," said Jane Doll, also 68. "I wish they had lots of leads and lots of things to go on. But it was just so weird. There was not much there."

Hattie Doll's death, from multiple stab wounds inflicted while she was in her home, was the first in a spate of slayings of elderly residents of the Milwaukee area. Ruth Bresnahan's death, from a blow to the throat, was the second.

Since then, four more murders with elderly victims have been added to detectives' workloads:

■ On Jan. 12, Louis Buchta, 76, and his wife, Lillian, 75, were found dead in their New Berlin home, 12623 W. Greenfield Ave. He died from blows to the head, she from blows to the

Please see **Slayings,** Page 4B

---

Police continue search for clues in slay

## Slayings, from Metro Page

neck.

■ On Jan. 22, the body of Eva Holman, 79, was discovered by her son-in-law in Franklin. She, too, had lived alone in her home. An autopsy showed that she had been strangled.

■ Finally — after a lull and a change of seasons — Raymond A. Kingl, 74, was found dead May 26. His skull was crushed with a crowbar by an intruder in his home at 2139 S. 5th St.

There have been attempts to link the murders or to rule the links out. Before the Kingl slaying, the FBI completed a psychological profile of a prospective killer, though the composite has not been released publicly.

Inspector Ronald Mehl, head of the Milwaukee Police Department's Criminal Investigation Bureau, said detectives were working around the

clock on each of the murders in the city.

While Mehl saw no link between the Kingl slaying and the others, he said there was "always the possibility that there's a connection" among the Doll, Bresnahan, Buchta and Holman cases.

"You follow up on things as they come along," he said.

One investigator from each shift works on at least one of the unsolved homicides daily, Mehl said. Several are at work on the Bresnahan case.

Mehl said the investigation had had highs and lows, particularly because of the media attention.

"We had a guy confess to Bresnahan," he said. "But it turned out he read it all in the paper."

Despite blind alleys, Mehl said there almost always was a line to a suspect. Information from the crime lab, for example, may create new leads.

But he acknowledged that waiting for a break could take its toll on the families of victims.

Norma J. Esche, 55, is Eva Holman's daughter. She still lives next door to the house where her mother was found strangled to death.

"I'm still not over the emotional part of it," Esche said. "It's been four or five months and I'm still not over it."

She said that her mother's death had left her terrified, but that she was satisfied with the Franklin Police Department's investigation.

Police investigators have kept the family abreast of developments, Esche said. "I don't know what else they can do," she added.

With the spring have come memories.

Jane Doll said her sister-in-law would have put in a plant or a vegetable garden. But there is no garden

Milw Journal 6/5/88

00003033

# layings of area elderly people MJ 6/5/88

this year. Instead, Hattie Doll's son Paul, 42, who lives in New Orleans, calls to keep up with the police progress.

Like Esche in Franklin, Jane Doll is satisfied the police work.

"We don't have any _aun with the investigation at all," she said. "As far as what happens from here, if anyone is apprehended, we'll be glad that they're taken out of society so that they don't hurt anyone else."

James Bresnahan said he had kept in contact with the detectives investigating his mother's death. His mood: "I'm discouraged and confused."

"I know they're working on it," he said. "But it's still hard to take when you're on the other end. I try to talk with police every two weeks. But like I say, the longer it goes on, the more discouraged everyone becomes.

"Sure, they've solved all the murders where someone has a gun and there are six witnesses who know who did it. But what about cases where no one has seen a killer and there's no weapon?"

Louis Buchta's brother, Walter Buchta, 68, of Milwaukee, said that while he was content that police were doing their job, he would not be fully satisfied "until the person who did it is caught."

He added: "At first, the way the police went at it you thought they'd get the guy in a couple of hours. Then it just kind of died."

He said that he and his brother were close and that despite their age, they had continued to work in masonry, their lifelong profession.

"I felt real proud of my brother," Buchta said.

He, too, is frustrated that the case has lingered since January. He suspects someone in his brother's neighborhood has information about the killing that they are withholding. Someone had to see something that afternoon, he said.

New Berlin Police Chief Michael Hanrahan said last week that a detective assigned for once to the case was sorting through leads from the first three to four weeks.

The number of leads has dwindled and the case is not on the verge of being solved, but the detective continues to follow the old clues, Hanrahan said.

Hanrahan and Franklin Police Chief Norman J. Pollman, whose department is working on the Holman case, said they were optimistic about successfully concluding their investigations.

"We have not exhausted leads yet," Pollman said. "In this case, the scope was very wide in the beginning and has been narrowed."

OTT 003034

# Blood may be key to solving slaying

By LORI SKALITZKY
and CROCKER STEPHENSON

Blood taken from a Milwaukee County Jail inmate Wednesday might be the key needed to solve the slaying of Ruth Josephine Bresnahan, who was found dead in her home more than seven months ago, police said Wednesday.

The blood, obtained from the 35-year-old inmate on a search warrant, was taken to the State Crime Lab for comparison with blood samples taken from the scene, police said.

Two vials of blood were drawn from the man at the nursing station at the County Jail

by a registered nurse, according to the warrant, which was signed Wednesday morning.

The warrant said that "reasonable force" could be used to execute the warrant. A police official said the inmate did not resist having the blood drawn.

Results from the tests are expected Thursday.

The man is being held in the County Jail on charges of armed robbery and a felon in possession of a firearm.

authorities were unable to collect the information needed for a search warrant.

The man was one of several people brought in for questioning shortly after the slaying, police said.

"We never ruled him out as a suspect," a spokesman said. "But we ran into some stumbling blocks and could not get the search warrant."

However, police said they recently "came across additional information that led them to" the slaying.

Police declined to say what that information was.

Police declined to discuss the man's record Wednesday, saying it was still too soon to tell if he was involved in the slaying.

Bresnahan, 83, of 3838 W. Fairmount Ave., was found dead Jan. 4 in her ransacked home by her two sons. The medical examiner's office said she died from a crushing blow to the throat.

She was one of five elderly people slain in the area in less than a month. However, police connected.

## BLOOD SAMPLES MAY SOLVE SLAYING

By MARK LISHERON
of The Journal staff

Police hope the results of a blood test on a convicted armed robber will bring them closer to finding the killer of Ruth Josephine Bresnahan.

A nurse drew two vials of blood Wednesday from a 35-year-old man in the Milwaukee County Jail in response to a search warrant, police said. The blood will be compared with samples taken from the home of Bresnahan, whose body was found there Jan. 4.

The vials were sent to the State Crime Lab for analysis. The results of the blood test was expected Thursday, police said.

Bresnahan, 83, died from a blow to the throat. Her body was found in

the ransacked home by her two sons.

Police said at the time that robbery probably was the motive for the killing.

Traces of blood that was not Bresnahan's were found at the home at 3838 W. Fairmount Ave.

Lt. William Vogt, who on Wednesday obtained the warrant from Reserve Judge Elliot N. Walstead, said the tests were part of an ongoing investigation into Bresnahan's death.

Vogt, who has headed the investigation, declined to say why the warrant for blood tests on the man was obtained.

The man has been in police custody since his arrest in February for the armed robbery of a cab driver in

Greenfield. He was convicted July 15 on the armed robbery charge and was scheduled for sentencing Sept. 6 before Circuit Judge John E. McCormick.

The man also is being held for allegedly violating parole associated with a four-year sentence on a burglary conviction in 1985.

In addition, he was sentenced to three years on another burglary conviction in 1979 and was found delinquent on burglary charges as a juvenile in Illinois.

Bresnahan was one of five elderly people slain in the Milwaukee and Waukesha Counties in January.

Police have searched for links in the killings but have not found any. None of the cases has been solved.

# Inmate told informant
# of burglaries, slayings

A 28-year-old prison inmate, the focus of investigations into the slayings of elderly people in the metropolitan area last winter, allegedly spoke about committing house burglaries and killing any occupant he encountered.

The inmate, a prisoner at Dodge Correctional Institute, made the statement to a confidential police informant, according to a document filed Monday in Circuit Court.

The document is a transcript of a hearing last week when Milwaukee Police Lt. William Vogl asked Reserve Judge Elliot N. Walstead for permission to have blood taken from _____ in prison for an armed robbery conviction.

Six older adults were killed in their homes in Milwaukee and Waukesha Counties between Dec. 22 and Jan. 22.

According to the transcript, Vogl told the judge he wanted to compare the blood sample with a large blood stain found in the home of Ruth J. Bresnahan, 83, who was found dead in her home on Jan. 4. The blood stain did not match Bresnahan's blood type, the transcript said.

The suspect had painted the interior of Bresnahan's house, 3938 W. Fairmount Ave., several months before she was killed, the transcript said.

The transcript also contains more testimony from Vogl about statements from the police informant. The informant quoted the suspect as saying that he picked out target houses by riding buses and got to and from his burglaries by taxi.

Vogl told the judge that it was intriguing that Bresnahan's house was near a bus line.

The suspect is a convicted burglar awaiting sentencing in the armed robbery of a cab driver Feb. 7 in Greenfield. The suspect's parole was revoked, and he was sent back to prison because of the robbery conviction.

The transcript confirmed that the Jan. 22 murder of Eva Holman, 79, 2810 W. Rawson Ave., Franklin, is among other slayings in which the inmate is regarded as a suspect.

The suspect came to the attention of Franklin authorities because they developed information that he probably had been burglarizing homes in the area, Vogl testified.

Police sources said last week that the suspect also was being investigated in connection with the slayings of a South Side man Dec. 22 and a New Berlin couple Jan. 12.

Eugene McCoy, 59, of 938 S. Layton Blvd., was killed Dec. 22 by crushing blows to the neck.

The couple, Louis and Lillian Buchta, both 76, lived at 12623 W. Greenfield Ave. Lillian Buchta died of blows to the neck. Louis Buchta died of blows to the head.

The sixth victim in the series of elderly slayings was Hattie M. Doll, 68, of 9409 W. Lincoln Ave., killed Jan. 2 by stab wounds to the neck.

OTT 003036

# Evidence problem tangles murder case

By JAMES GRIBBLE
of The Journal staff

A bloodstain on a stuffed animal may be the key to the murder of 83-year-old Ruth J. Bresnahan, one of six elderly people slain in their Milwaukee and Waukesha County homes in late 1987 and early 1988.

But the stain itself would be consumed in the process of determining its genetic makeup: a high-tech test needed to link the stain to the one suspect in all six killings.

The destruction of the physical evidence could jeopardize efforts to get a murder conviction, sources close to the investigation say.

The suspect is now in prison on an unrelated conviction.

The US Supreme Court says a defendant has the right to examine evidence in the case against him before a trial. In this case, that evidence — the blood sample — would be destroyed even before charges were filed.

That problem recently prompted a drastic step: The prosecutor in charge of the case divulged the evidence dilemma to the suspect's attorney at a closed-door hearing, in effect telling the suspect where the investigation was headed. That was designed to ensure that the legal record in the case showed that the suspect's lawyer had a

Please see Murders, Page 16A

*Milwaukee Journal 2-19-89*

OTT 003037

# Suspect's lawyer invited

### Murders, from Page 1A

chance to observe the test.

The evidence is a small human bloodstain found on a stuffed donkey at the home of Bresnahan, a widow who lived alone at, 3938 W. Fairmount Ave.

With the bloodstain, the Milwaukee Police Department hopes to tie the suspect to the murder scene through genetic fingerprinting, in which the genetic information from one blood sample can be matched definitively with another.

The still-exotic lab procedure was tried once in the investigation, unsuccessfully. Now a second test is planned. The hitch is that there will not be enough of the specimen left to introduce as evidence at the man's trial.

Dist. Atty. E. Michael McCann and those directly involved in the investigation will not discuss the recent developments because of a secret John Doe investigation in the case. But it is known that the suspect is a 29-year-old man who once did painting at Ruth Bresnahan's house. A John Doe is an investigatory proceeding convened before a judge to take sworn testimony that might lead to criminal charges.

Bresnahan was one of six older people killed in their homes more than a year ago. Each case involved a burglary. The intruder ransacked the houses, apparently in search of cash. The fatal attacks were extremely vicious, and four of the victims died the same way: crushing blows to the neck.

The victims were:

■ Eugene McCoy, 59, on Dec. 22, 1987. He was killed by blows to the neck.

■ Hattie M. Doll, 68, on Jan. 2, 1988. She died of multiple stab wounds in the neck and chest. So ferocious was the attack that the blade of the assailant's knife shattered in pieces, which were found on the bed beside her.

■ Bresnahan, on Jan. 4, 1988. She died of blows to the neck.

■ Louis and Lillian Buchta, both 76, on Jan. 12, 1988. Lillian Buchta died of blows to the neck; Louis Buchta died of blows to the head.

■ Eva F. Holman, 79, on Jan. 22. She died of blows to the neck.

There is only one suspect in all six killings, according to a transcript of a search warrant hearing in November. Milwaukee Police Lt. William Vogl testified at the hearing that the suspect told a police informant "that he was responsible for the deaths of the elderly people" and that he had taken a taxi home after one of the killings.

Police later followed up on the informant's tip and found that the suspect indeed had taken a cab ride from the area where one of the slayings occurred.

When the suspect was arrested Feb. 7, 1988, for robbing a cab driver at gunpoint in Greenfield, the killings ended.

Sources say that in the last six months, the Bresnahan case has become the focus of the investigation, because it's the only murder in which a suspect can be tied by physical evidence: the bloodstained

# to send observer to genetic tests



Map showing Milwaukee area with victim locations:
- Ruth J. Bresnahan, 83 / 3938 W. FAIRMOUNT AVE. / Jan. 4 1988
- Louis and Lillian Buchta, 76 / 12623 W. GREENFIELD AVE. / New Berlin, Jan. 12, 1988
- Eugene McCoy / 938 S. LAYTON BLVD. / Dec. 22 1987
- Hattie M. Doll, 68 / 9409 W. LINCOLN AVE. / West Allis, Jan. 2, 1988
- Eva F. Holman, 79 / 2810 W. RAWSON AVE. / Franklin, Jan. 22, 1988

(Milwaukee Journal 2-19-89)

After the blood type was matched, the police decided to try genetic testing. Viewed as the wave of the future in criminology, it still has some limitations. The chief one is that the quality of the results depends on the quality of the sample material.

DNA (deoxyribonucleic acid) is the genetic blueprint contained in the chromosomes of each human cell. Except for identical twins, that blueprint is unique to each person.

Earlier this month, a Kenosha County assistant district attorney credited genetic evidence with clinching the conviction of Archie Banks, sentenced to 48 years in prison in a sexual assault and burglary case. Brian Holmgren, the prosecutor

been drawn under power of a search warrant when the suspect was in jail here.

What went wrong, according to a source, was that the State Crime Laboratory did not send Cellmark enough of the stain for the process to work.

Cellmark technicians then said there was enough of the bloodstain left for another test, but all of the remaining specimen would be consumed in that test.

That has placed the district attorney's staff in a tricky tactical posture, because defendants have the constitutional right to examine the physical evidence used against them, just as they have the right to cross-examine witnesses.

probe, Asst. Dist. Atty. Norman Gahn. The suspect's lawyer, who is a state public defender, was invited to send an expert to observe any second round of genetic tests when they are conducted. A record of the offer was made at the secret John Doe hearing before Circuit Judge Frank T. Crivello.

The hearing before Crivello was extraordinary because its purpose was to allow the defense to see some of the prosecution's cards not just before trial, but even before any charges had been filed.

The new round of tests, which probably will be done by Cellmark, could get under way in the next several weeks, but the results would not be known for several months.

Meanwhile, sources say the Police Department has asked the State Crime Laboratory for further lab analysis of numerous tiny blood splatterings found at Bresnahan's house. If these came from the suspect, they just might yield enough cumulative material for more genetic tests, if necessary.

The suspect's criminal record consists mainly of burglaries. Until his robbery of the cab driver, they were for nothing more serious than petty break-ins. Since 1977, he had been convicted of burglary four times, but these had been mostly spur-of-the-moment crimes committed under the influence of alcohol.

A presentence report once described him as having had "a life-style marked by loose ties and poor self-image, with a minimal tendency to take a look at his own mistakes and accept responsibility for them.... His life reflects a person who has had a bad start and has never dealt with his problems, nor has he had the assertiveness to rid himself of negative influences."

The suspect, who was born in Minnesota, had a turbulent and nomadic youth. The presentence report notes wife-beating and child abuse in his family. The report also noted that both parents had drinking problems, and the suspect began drinking in his early teens.

The suspect was convicted of robbing the cab driver and is awaiting sentencing. He also is awaiting trial on a related charge of possessing a firearm as a convicted felon.

He is now an inmate at Columbia Correctional Institution at Portage, where he has eight months left to serve on the parole revocation that followed his armed robbery arrest.

He could receive up to 20 additional years, plus two more years if he is convicted on the

## Suspect

from Page 1A

...at the suspect could be charged ...ter in the day. He declined to ...iscuss the number or the nature of ...e charges.

Gahn is expected to charge the ...uspect in the beating deaths of ...ugene McCoy, 59, of 938 S. Lay...n Blvd.; Ruth J. Bresnahan, 83, of ...938 W. Fairmount Ave.; Louis ...nd Lillian Buchta, both 76, of ...2623 W. Greenfield Ave., New ...erlin; and Eva F. Holman, 79, of ...810 W. Rawson Ave., Franklin.

All of the victims were killed in ...eir homes by numerous blows to ...e neck and head.

The charges result from a long ...nd arduous investigation capped ...y the results of genetic testing on ...lood samples found in the homes ...f two of the victims, authorities ...id.

Gahn earlier had said the results ...the tests would determine how he ...ould prosecute the suspect. Such ...netic tests have been praised by ...osecutors and recently challenged ... court by defense attorneys.

Police Capt. Craig Hasting ...clined to comment on the charges ...t praised Milwaukee, New Berlin ...d Franklin investigators for per...sistence in the case.

Hasting also praised Gahn, who had been criticized by so...e investigators and some relati...s of the victims for taking his tim... in bringing the case to trial.

Police Lt. William V...t, who at one time headed the ...ilwaukee investigation, said Wedn...day that he hoped prosecutors co...l get convictions in all five deaths.

"In my opinion, the ...charges should have been issued ...ong time ago," Vogl said. "History ...ows that homicide cases deteriorat... with age. But I hope these charges ...ecome a reality."

Vogl said investigators ...were able to place the suspect in t...e area of each of the killings at the ...time they were committed.

The suspect reported...y worked as a house painter for ...resnahan within weeks of the sla...ng, Vogl said.

Weeks after the killin...,, abruptly stopped, investigators ...nked the suspect to burglaries near ...he homes of the Buchtas and Holm...

An FBI profile of t...e suspect drawn at the outset of th... investiga-tion — that of a man with a drinking problem and a violent streak, who was abused by his father as a child — matched almost precisely a report on the suspect presented in court before his sentencing for the Greenfield armed robbery, Vogl said.

Investigators were also aided by informants who bunked with the suspect in prison.

Informants told Vogl and other investigators that the suspect admitted the killings to them, providing vivid details in various ramblings.

Investigators initially considered a sixth killing — the stabbing death of Hattie M. Doll, 68, of 9409 W. Lincoln Ave., West Allis, on Jan. 2, 1988 — to be part of the slaying spree, but that killing was not expected to be included in the charges filed Thursday.

# Prosecution won't ease their pain

### Slaying victims' kin not comforted by news of charges

Relatives of se...ral elderly Milwaukee area resi...nts killed in a series of slayings ...more than two years ago say thei...pain will not be erased with the an...cipated charging of a suspect Thur...y.

Walter Bucht..., of Milwaukee, whose brother ...d sister-in-law were among the ...e victims, said Thursday mornin... that memories of the crime ma... it difficult for him to discuss ...he anticipated charges.

The suspect, a ...0-year-old Milwaukee man, face... charges in five slayings between E... 22, 1987, and Jan. 22, 1988.

"The only thin... I feel right now is that I hope th... suspect will be prosecuted quickly," Buchta said. "I still feel bad about what happened."

James R. Bresnahan, whose mother was among those killed, expressed muted gratitude about the charges.

"I'm happy that he's being charged, but the way things have gone so far, I think we still have a long way to go," Bresnahan said Wednesday.

The man — whom investigators had treated as the lone suspect for much of the investigation — is serving a 10-year sentence at Columbia Correctional Institution in Portage for an armed robbery that occurred Feb. 7, 1988, in Greenfield.

Assistant Dist. Atty. Norman Gahn ordered the suspect transferred to the Milwaukee County Jail on March 22 for questioning and charging.

Gahn said Thursday he hoped

Please see Suspect, Page 10A

OTT 003040

# Charges expected in elderly slayings

## Convicted burglar being held in series of 1987-'88 deaths in area

By DAVID DOEGE
Sentinel staff writer

A convicted burglar is expected to be charged Thursday in the slayings of five elderly Milwaukee-area people, all of whom are 'victims of break-ins in the Milwaukee and Waukesha Counties.

All the victims were found dead in their homes in Milwaukee and Waukesha Counties.

The suspect is not expected to be charged Thursday in one of the deaths.

The 30-year-old man has been under investigation for more than a year in the unsolved murders of elderly men and women, a source familiar with the investigation said.

Authorities have been working to link the man to the killings since they ended in 1981, shortly after his arrest for a bolding.

The probe has included a secret John Doe proceeding and specialized DNA testing — a key of taking the man's blood type to blood found in the home of Ruth J. Bresnahan, 83.

Authorities also have taken hair samples from the man to determine whether they match hair found on the clothing of another victim, Eva Holman, 79.

Milwaukee and suburban police have been working together on the case for months under the direction of Asst. Dist. Atty. Norman A. Gahn.

Gahn declined to comment on the case Wednesday. Police officials also refused to discuss the investigation.

The suspect became the focus of the probe because of his history of break-ins and reported burglary activities in the areas of the slayings.

He also has been convicted twice, once for burglary and was found delinquent of the same charge as a

Court transcripts from a hearing seeking hair samples from the suspect indicate 'that a man matching the suspect's description was seen acting suspiciously near Holman's home the day she was killed.



### Slaying sites

### Charges expected today in slayings of elderly

**SLAYINGS / FROM PAGE 1**

home at 94 W. Lincoln Ave., West Allis.

● Bresnahan, whose body was found Jan. 1, 1988, in her home at 3938 W. Fairmount Ave. She died of crushing neck injuries from being strangled.

Blood spot found on a stuffed animal in Bresnahan's house did not match her type and are believed to have come from her attacker, leading to the DNA tests.

● Louis and Lillian Buchta, both 76, of 1262 W. Greenfield Ave., New Berlin, they died from blows to the neck. Their bodies were found in their home Ja. 12, 1988.

● Holman, found slain in her home at 2810 W. Hawson Ave., Franklin, Jan. 22, 1988. She died of crushing neck injuries caused by strangulation.

It could not be learned Wednesday night which slaying will not be involved in Thursday's charges.

The convicted burglar and armed robber was being held in the Milwaukee County Jail Wednesday.

Jail personnel reported that the man, who is serving a 10-year prison sentence, was brought to the jail March 22 from the Dodge Correctional Institution in Waupun to appear in lineups.

The man was on parole for burglary at the time of the slayings.

His parole was subsequently revoked. He was resentenced to four years on the burglary conviction early last year and sentenced to a concurrent 10-year prison term for an armed robbery he committed in Greenfield Feb. 7, 1988.

### New career is topic

A meeting for women interested in starting or changing careers will be held from 7 to 8:30 p.m. Thursday at Alverno College, 3401 S. 39th St.

Internship placements also are offered. The program costs $5.

The victims in the unsolved murders were:

● Eugene McCoy, 59, who died at his home at 938 S. Layton Blvd., Dec. 22, 1987, from blows to the neck.

● Hattie M. Doll, 65, who died from multiple stab wounds to the neck and chest.

OTT 003041

Sentinel 5-30-90

# 'Killing someone like anything else'

## Suspect, charged in elderly slayings, allegedly made comment to inmate

By DAVID DOEGE
Sentinel staff writer

"Killing someone is just like anything else. After you've done it once, it just keeps getting easier."

Robert J. Wirth, charged Thursday with murdering four elderly Milwaukee-area people in their homes during burglaries in January 1988, allegedly made that statement to a fellow jail inmate while admitting to six slayings, the criminal complaint said.

Wirth, 30, told a House of Correction inmate how he identified elderly victims' homes for break-ins, and said he wouldn't hesitate to kill residents if they caught him in the act, a police lieutenant testified in court minutes before signing the criminal complaint.

"He said that elderly people were easy because they were weak, that they trusted people and were easy to control," Franklin Police Lt. Donald M. Hareng testified at the close of a John Doe proceeding that led to the murder charges against Wirth.

"He said that if anyone came home while he was ransacking the place or if he encountered anyone inside, he would kill them so they couldn't "I.D." him."

Wirth told the House of Correction inmate that he watched for elderly people outside their homes shoveling snow or hanging Christmas decorations, and would return later to break in, the complaint said.

Wirth told the inmate that he was responsible for the four slayings with which he later was charged, and two others, the complaint said.

SEE PAGE 12 / SLAYINGS

# Suspect allegedly told inmate of killings

SLAYINGS / FROM PAGE 1

Wirth was charged with four counts of first-degree murder and five counts of burglary, leaving two slayings included in the two-year

Wirth was expected as late as Wednesday to be charged with a fifth count of homicide, a source familiar with the investigation said.

Asst. Dist. Atty. Norman A. Gahn, who spearheaded the investigation, declined to make any statements about the killings with which Wirth was not charged, or about whether Wirth remained a suspect in those cases.

The complaint charged Wirth with killing:

● Ruth Bresnahan, 83, whose body was found Jan. 4, 1988, in her home at 3938 W. Fairmount Ave. She died of crushing neck injuries.

The evidence used to charge Wirth included blood spots found on a stuffed toy donkey in her home. The blood did not match Bresnahan's, but tests revealed that "banding patterns" in genetic markers in the blood matched those in Wirth's blood.

The complaint indicated that Bresnahan's assailant apparently was pricked by a safety pin attached to her undergarments.

The pin was used by Bresnahan to attach a small purse to her undergarments. A relative said Bresnahan usually kept $50 to $60 in the purse.

The complaint also said Wirth admitted to the House of Correction inmate that he killed a woman on Fairmount Ave.

● Louis and Lillian Buchta, both 76, of 12623 W. Greenfield Ave., New Berlin. Mr. Buchta died from a skull fracture, while his wife died from crushing neck injuries. Their bodies were found in their home Jan. 12, 1988.

A neighbor saw a man running from the rear of the Buchta home the night before their bodies were found. The woman identified Wirth as the man at a lineup in January, the complaint said.

The complaint also said Wirth admitted his role in the killings to a second House of Correction inmate.

The inmate said Wirth reported that Mr. Buchta struggled, but Wirth wrestled Mr. Buchta to the floor and stomped on his head.

● Eva F. Holman, 79, of 2810 W. Rawson Ave., Franklin, who died of crushing neck injuries.

The complaint said a woman living a block from Holman's home saw Wirth in her neighborhood acting suspiciously the day of the slaying.

The complaint also said Holman died from the same crushing neck injuries as Bresnahan and Mrs. Buchta.

Milwaukee County Medical Examiner Jeffrey M. Jentzen, his top assistant, and Waukesha County Medical Examiner Helen Young all concluded the injuries the three women suffered were unusual, and were consistent with having been inflicted by the same person.

Wirth told the first House of Correction inmate that he went to bars in the morning, got drunk, then took bus rides in the afternoon looking for homes to burglarize, the complaint said.

Wirth said he selected suburban areas because they were less frequently patrolled by police, the complaint said.

Once inside homes, he said he searched between mattresses, in cookie jars and shoe boxes, and he said those were frequent hiding places used by elderly people, the complaint said.

Three of the burglary counts included the Bresnahan, Buchta and Holman homes. The other two burglary counts concerned break-ins in Greenfield and Franklin in 1987 and 1988.

The unsolved homicides being probed include the Jan. 2, killing of Hattie M. Doll, 68, of 94 Lincoln Ave., West Allis, and the Dec. 22, 1987, slaying of Eugene McCoy, 69, of 338 S. Layton Blvd.

Wirth, who is serving a 10-year prison sentence at the Dodge Correctional Institution in Waupun, was brought to Milwaukee last week as the John Doe proceeding neared a close. He is expected to make his initial court appearance on the new charges Friday morning.

# Officials unveil pieces to be presented in trial

## Man accused of killing 4 elderly people

By DAVID DOEGE
Sentinel staff writer

Robert J. Wirth isn't scheduled to stand trial until January on charges that he killed four elderly Milwaukee-area people during a burglary spree in 1988, but for three days last week, he got his first extensive look at some of the witnesses essential to the case against him.

What Wirth, his lawyers and a small handful of spectators saw was an assortment of ordinary people whom police and prosecutors have gathered together in hopes of convicting Wirth of a series of brutal murders committed during a three-week period.

It was an assortment that included a reluctant witness, an unexpected witness and an anonymous witness who took months to track down.

By themselves, the witnesses supplied separate links that authorities allege connect Wirth to the serial slayings.

As Asst. Dist. Atty. Norman A. Gahn said at one point, "You can take any one of the aspects of this case and say, 'So what?' You take all the evidence as a whole to get the picture."



Wirth: Got first look at witnesses

Wirth, 30, is awaiting trial on four counts of first-degree murder and five counts of burglary issued in March after a John Doe investigation into a series of unsolved break-ins and killings in the winter of 1987-'88.

In addition to the burglaries, Wirth is charged with the following slayings:

- Ruth Bresnahan, 83, whose body was found Jan. 4, 1988, in her home at 3938 W. Fairmount Ave.

- Louis and Lillian Buchta, both 76, of 12623 W. Greenfield Ave., New Berlin. They were found dead in their home Jan. 12, 1988.

- Eva F. Holman, 79, of 2810 W. Rawson Ave., Franklin. Her body was found in her home Jan. 22, 1988.

Authorities tried unsuccessfully to link Wirth to two other unsolved slayings, although they came close to issuing charges against him for one of those deaths, sources have said.

Last week, the witnesses appeared in Circuit Judge Janine P. Geske's court as defense lawyers sought rulings that would bar testimony of how the witnesses identified Wirth in lineups.

Defense lawyer Scott Roberts argued that police were overzealous in persuading the witnesses to cooperate and that their identification of Wirth was tainted because of that. Geske disagreed.

"I think that it is the obligation of the police to get citizens involved," Geske said.

She denied all the lawyers' identification motions except one.

That motion, which still is under consideration, concerns the "anonymous witness" whom authorities located after months of door-to-door canvassing. The witness long was known only as a female caller who contacted the Oak Creek Police Department the day after Holman was found dead.

The woman, who said she lived near Holman

### Background of the news

reported seeing a man in a blue parka prowling her neighborhood the day before Holman's body was found. The man matched Wirth's description and the coat matched one he allegedly owned.

Franklin police Detective Daniel Loomis finally tracked the caller down in July 1988 in a door-to-door search. She admitted being the caller, but did not want to get involved any further by viewing a lineup.

"My husband and I became concerned that people would bother us if I became a witness," she testified last week.

A month later, when Wirth was in custody on an unrelated charge but still a suspect in the unsolved murders, Loomis and Franklin police Lt. Donald Hareng visited the woman and urged her to become a witness. She looked at photos the officers brought, but still did not want to view a lineup.

"They said the person I picked from the photographs was in custody," the woman recalled. "They said the information I had was very important and that I should come forward, that it was important to the case."

It wasn't until March 1990 that the woman finally viewed a lineup.

"There were about six people in the room with me," she said. "The officer explained that the people on the other side (of the mirror) couldn't see us.

"I was able to choose the person immediately."

Another witness who took some coaxing was a woman who lived across the street from the Buchtas and allegedly saw a man running from their yard the night before their bodies were found. The woman's husband opposed her involvement.

That woman's first interview with police came 22 months after the slayings when a friend of hers contacted police and convinced her to come forward.

New Berlin police Sgt. Roger Wiedmeyer said he talked with the woman and her friend more than a dozen times after that initial meeting. She finally viewed a lineup in January 1990.

One witness who didn't need any coaxing was Jerry Martini, who didn't become involved until the day Wirth was charged and his image was displayed on television during evening newscasts. Martini said he was in bed when he watched one of those newscasts.

"I sat up and I saw his (Wirth's) face and I said, 'This is the guy who tried to get in our house,'" Martini recalled.

The incident Martini recalled allegedly occurred in his home near Holman's on Jan. 21, the day before her body was found. A man Martini eventually identified as Wirth, knocked on the door to the Martini home and tried to force his way in when Mr. Martini answered.

The intruder quickly turned and left after seeing Mr. Martini, who ordered him out, according to the Martinis.

Police obviously were interested in the incident because it placed Wirth in the vicinity of Holman's home around the time of her death.

OTT 003043
Mil. Journal 10-90

| STATE OF WISCONSIN, | Plaintiff. | CRIMINAL COMPLAINT | Page 1 |
|---|---|---|---|

Wirth, Robert J.
815 N. 57th Street
Milwaukee, WI

110759

**CRIME(S) OR VIOLATION(S)**
SEE CHARGING SECTION BELOW

**STATUTE(S) OR ORDINANCE(S) VIOLATED**
SEE CHARGING SECTION BELOW

**COMPLAINING WITNESS**
Hareng, Donald M.

**CASE NUMBER**

Defendant(s)

THE ABOVE NAMED COMPLAINING WITNESS BEING DULY SWORN SAYS THAT THE ABOVE
NAMED DEFENDANT(S) IN THE COUNTY OF MILWAUKEE, STATE OF WISCONSIN

COUNT 01:  BURGLARY
On December 14, 1987, at 3506 West College Avenue, City of Greenfield,
County of Milwaukee, did intentionally enter a dwelling at the abovestated
location without the consent of the person in lawful possession and with
intent to steal therein, contrary to Wisconsin Statutes section
943.10(1)(a).

COUNT 02:  BURGLARY
On January 2, 1988, at 6361 S. 27th Street, #107, City of Franklin, County
of Milwaukee, did intentionally enter a dwelling at the abovestated
location without the consent of the person in lawful possession and with
intent to steal therein, contrary to Wisconsin Statutes section
943.10(1)(a).

COUNT 03:  MURDER-FIRST DEGREE
On January 4, 1988, at 3938 W. Fairmount Avenue, City of Milwaukee, did
feloniously and with intent to kill Ruth Bresnahan, cause the death of Ruth
Bresnahan, another human being, contrary to Wisconsin Statutes section
940.01.

COUNT 04:  BURGLARY
On January 4, 1988, at 3938 W. Fairmount Avenue, City of Milwaukee, did
intentionally enter a dwelling at the abovestated location without the
consent of the person in lawful possession and with intent to steal
therein, contrary to Wisconsin Statutes section 943.10(1)(a).

COUNT 05:  MURDER-FIRST DEGREE
On or about January 11, 1988, at 12623 W. Greenfield Avenue, within 1/4 of
a mile of the boundary between Milwaukee and Waukesha Counties, City of New
Berlin, did feloniously and with intent to kill Louis Buchta, cause the
death of Louis Buchta another human being, contrary to Wisconsin Statutes
section 940.01.

OTT 003044

| STATE OF WISCONSIN, | Plaintiff. | CRIMINAL COMPLAINT | Page 2 |
|---|---|---|---|
| Wirth, Robert J. | 110759 | CRIME(S) OR VIOLATION(S) | |
| 2815 N. 57th Street | | SEE CHARGING SECTION BELOW | |
| Milwaukee, WI | | STATUTE(S) OR ORDINANCE(S) VIOLATED | |
| | | SEE CHARGING SECTION BELOW | |
| | | COMPLAINING WITNESS | |
| | | Hareng, Donald M. | |
| | Defendant(s) | CASE NUMBER | |

### COUNT 06: MURDER-FIRST DEGREE

on or about January 11, 1988, at 12623 W. Greenfield Avenue, within 1/4 of a mile of the boundary between Milwaukee and Waukesha Counties, City of New Berlin, did feloniously and with intent to kill Lillian Buchta, cause the death of Lillian Buchta another human being, contrary to Wisconsin Statutes section 940.01.

### COUNT 7: BURGLARY

on or about January 11, 1988, at 12623 W. Greenfield Avenue, within 1/4 of a mile of the boundary between Milwaukee and Waukesha Counties, City of New Berlin, did intentionally enter a dwelling at the abovestated location without the consent of the person in lawful possession and with intent to steal therein, contrary to Wisconsin Statutes section 943.10(1)(a).

### COUNT 8: MURDER-FIRST DEGREE

on or about January 21, 1988, at 2810 W. Rawson Avenue, City of Franklin, County of Milwaukee, did feloniously and with intent to kill Eva Holman, cause the death of Eva Holman, another human being, contrary to Wisconsin Statutes section 940.01.

### COUNT 9: BURGLARY

on or about January 21, 1988, 2810 W. Rawson Avenue, City of Franklin, County of Milwaukee, did intentionally enter a dwelling at the abovestated location without the consent of the person in lawful possession and with intent to steal therein, contrary to Wisconsin Statutes section 943.10(1)(a).

### HABITUAL CRIMINALITY

ON September 6, 1984, the defendant Robert Wirth, was convicted in the Circuit Court of Milwaukee County in Case Number K-9061 of the felony offense of Burglary in violation of statute sections 943.10(1)(a) of the Wisconsin Statutes and that said conviction remains of record and unreversed and therefore defendant is a repeater pursuant to Wisconsin Statutes 939.62. A certified copy of the Judgment Roll and Judgment of Conviction is hereby attached to this criminal complaint and incorporated herein.

**OTT 003045**

| STATE OF WISCONSIN, *Plaintiff.* | CRIMINAL COMPLAINT Page 3 |
|---|---|
| | CRIME(S) OR VIOLATIONS |
| Wirth, Robert J.    110759 | SEE CHARGING SECTION BELOW |
| 2815 N. 57th Street | |
| Milwaukee, WI | |
| | STATUTE(S) OR ORDINANCE(S) VIOLATED |
| | SEE CHARGING SECTION BELOW |
| | COMPLAINING WITNESS |
| | Hareng, Donald M. |
| *Defendant(s)* | CASE NUMBER |

AS TO COUNTS 1, 2, 4, 7 and 9:
Upon conviction of these charges, each a Class C Felony, the maximum
possible penalty is a fine of not more than $10,000 or imprisonment for not
more than 10 years or both per each count.

AS TO COUNTS 3, 5, 6, and 8:
Upon conviction of these charges, each a Class A Felony, the penalty is
life imprisonment per each count.

AS TO COUNTS 1, 2, 4, 7, and 9:
Upon the finding that the defendant is a habitual criminal, the maximum
possible penalty for conviction of the charge of Burglary, as stated above,
may be increased to not more than 16 years for each count.

AS TO COUNTS 3, 5, 6, and 8:
Upon the finding that the defendant is a habitual criminal, the maximum
possible penalty for conviction of the charge of First Degree Murder, the
maximum possible penalty may be increased by not more than 10 years for
each count.

Complainant states that he is a Detective employed by the City of Franklin
Police Department and bases this complaint upon records and reports of the
City of Greenfield Police Department, City of Milwaukee Police Department,
City of Franklin Police Department and the City of New Berlin Police
Department;  upon information received from City of Milwaukee Police
Detectives James Gauger and Vincent Vitale, City of Franklin Police
Detective Daniel Loomis and City of New Berlin Police Detective Roger
Wiedmeyer;  and upon your complainant's personal knowledge and information.

As To Count 1:
Upon the statement of Karl Hoese, who stated that Hoese resides at 3506 W.
College Avenue, City of Greenfield, County of Milwaukee, Wisconsin, and
that at approximately 5:15pm, on December 14, 1987, Hoese arrived at his
residence and upon entering the residence Hoese observed a white male in
one of the rooms and when the white male saw Hoese, the white male ran
toward Hoese and punched Hoese in the face several times and removed
Hoese's wallet from his pants pocket and then fled the residence.  Hoese
further stated that approximately $20.00 in coins was also removed from the

OTT 003046

TATE OF WISCONSIN,                    Plaintiff.          **CRIMINAL COMPLAINT**

irth, Robert J.
815 N. 57th Street
ilwaukee, WI

CRIME(S) OR VIOLATION(S)

110759   SEE CHARGING SECTION BELOW

STATUTE(S) OR ORDINANCE(S) VIOLATED

SEE CHARGING SECTION BELOW

COMPLAINING WITNESS

Hareng, Donald M.

CASE NUMBER

                                       Defendant(s)

---

esidence. Hoese stated that he did not give this person permission or
onsent to enter his residence nor to remove any property from Hoese or
rom the residence. Upon the statement of Jose Ortiz, an adult citizen,
ho stated that he is a bartender at Joanne's Tavern at 2625 W. National
venue, and that on February 13, 1988, the abovenamed defendant's father,
ranklin Wirth, gave Ortiz a ring and that Franklin Wirth stated that he
ound the ring at his residence and did not know to whom the ring belonged.
omplainant states that this ring was a 1934 class ring from Horicon High
chool, inscribed with the initials "MELH". Your complainant states that
arl Hoese identified this ring as belonging to his sister, Margaret Emma
ouise Hoese, and that this ring was on his dresser in his residence prior
o the burglary on December 14, 1987. Your complainant further bases Count
 of this complaint upon the statements of Allen Wiedenhoeft, an adult
itizen, who stated that he was an inmate in the Milwaukee County House of
orrection in 1988 and that he had numerous conversations with the
bovenamed defendant, who was also an inmate at the House of Correction,
nd that during one of those conversations, the abovenamed defendant stated
hat the defendant's father found a class ring that the defendant took in a
urglary and that his father took it to a bar and offered to sell it to the
artender to buy drinks but that the bartender thought it was stolen and
ave the ring to the police. Your complainant further states that on March
7, 1990 a line-up was conducted at the Milwaukee County Sheriff's
epartment and that the abovenamed defendant was one of five individuals
tanding in that line-up. Your complainant states that Karl Hoese viewed
hat line-up and identified the abovenamed defendant as the person who
ttacked him in his home on December 14, 1987.

s to Count 2:
pon the statements of City of Franklin Police Officer Leif Eggum who
tated that on January 2, 1988, Eggum was investigating burglaries that
ccurred on West College Avenue and that he followed footprints in the snow
o 6361 S. 27th Street, and that at that location Eggum interviewed Robert
cGuff, an adult citizen, and that McGuff reported that McGuff resides in a
railer court at 6361 S. 27th Street, City of Franklin, County of
ilwaukee, Wisconsin, and that at approximately 11:30pm, on January 2,
988, McGuff heard noises coming from the kitchen and upon entering the
itchen, McGuff observed a white male standing in the hallway. McGuff
tated that this white male removed a pocket knife and stated, "Don't do

| | | |
|---|---|---|
| STATE OF WISCONSIN, Plaintiff. | | **CRIMINAL COMPLAINT** Page 5 |
| Wirth, Robert J. | 110759 | CRIME(S) OR VIOLATION(S) SEE CHARGING SECTION BELOW |
| 2815 N. 57th Street Milwaukee, WI | | STATUTE(S) OR ORDINANCE(S) VIOLATED SEE CHARGING SECTION BELOW |
| | | COMPLAINING WITNESS Hareng, Donald M. |
| Defendant(s) | | CASE NUMBER |

anything that will make me kill you," at which time McGuff grabbed the hand
which held the knife and fought with the intruder. McGuff stated that an
altercation ensued but that McGuff pushed the intruder out the back door
where the intruder fell down the steps into the snow. McGuff stated that
he did not give this person permission to enter his trailer. Your
complainant further states that four additional burglaries in the vicinity
of the McGuff residence were reported on the night of January 2, 1988.
Your complainant further states that Robert McGuff viewed a police line-up
at the Safety Building on February 10, 1988, and that McGuff selected the
abovenamed defendant as the person he struggled with in his trailer on
January 2, 1988, but that he could not be 100 per cent sure because the
person was wearing a stocking cap at the time of the incident. Your
complainant further bases Count 2 of the criminal complaint upon the
statements of Allen Wiedenhoeft who stated that during a conversation with
the abovenamed defendant at the House Of Correction the abovenamed
defendant stated that he committed a burglary on 27th and College Avenue in
a trailer court, that he kicked in the back door and after entering the
trailer he was confronted by a man, that the defendant had a knife and
struggled with the man in the trailer, that the defendant fled the trailer
and that the defendant did four other burglaries in the same area that
night and had left his footprints in the snow. Your complainant states
that the 6300 block of South 27th Street intersects with College Avenue.

As to Counts 3 and 4:
Upon the statements of City of Milwaukee Police Detective Darrel Mischka
who stated that at approximately 7:40pm, on January 4, 1988, he was
dispatched to 3938 W. Fairmount Avenue, City and County of Milwaukee,
Wisconsin, and upon arrival at that location he observed the lifeless body
of an elderly white female lying in the hallway next to the bedroom and
that there were obvious injuries to her throat area. Your complainant
states that this person was subsequently identified as Ruth Bresnahan and
that Ruth Bresnahan was 83 years old. Mischka further reported that a
small cloth purse was found next to the body and that a safety pin was
attached to the victim's under garments. James Bresnahan, the son of the
victim, stated that his mother usually carried somewhere between $50 and
$60 in this small purse and kept it pinned to her under garments. Mischka
further reported that the bedrooms of the residence were extensively
ransacked, that drawers where removed from the dressers with the items

**OTT 003048**

| | | | Page 6 |
|---|---|---|---|
| STATE OF WISCONSIN, | Plaintiff. | | CRIMINAL COMPLAINT |
| | | CRIME(S) OR VIOLATIONS: | |
| Wirth, Robert J. | 110759 | SEE CHARGING SECTION BELOW | |
| 2815 N. 57th Street | | | |
| Milwaukee, WI | | | |
| | | STATUTE(S) OR ORDINANCE(S) VIOLATED | |
| | | SEE CHARGING SECTION BELOW | |
| | | COMPLAINING WITNESS | |
| | | Hareng, Donald M. | |
| | Defendant(s) | CASE NUMBER | |

strewed about the floor and beds. Mischka further reported that a small
stuffed toy animal was lying on the sofa in the living room and that this
toy animal had fresh blood stains on it. Complainant states that Franz
Buchholz, an adult citizen, reported that he visited Ruth Bresnahan at her
residence at approximately 4:00pm, on January 4, 1988, and that when he
left the residence, Ruth Bresnahan locked the door behind him. James
Bresnahan reported that approximately 7:00pm on January 4, 1988, he went to
his mother's residence to check on her and found that the front door was
unsecured. James Bresnahan stated that his mother was extremely security
conscious and that she would not open the door for anyone unless she knew
the person. Your complainant further states that Arlon Deford, an adult
citizen, reported that in August of 1987, he owned the A&D Painting Company
and that the abovenamed defendant worked for him and painted the house of
Ruth Bresnahan in August of 1987 and that Ruth Bresnahan informed him that
she would give the defendant dinner while he worked there and that she was
pleased with his work. Your complainant further states that on January 5,
1988, Doctor John Teggatz, Chief Medical Examiner for Milwaukee County,
performed an autopsy on the body of Ruth Bresnahan and determined that the
cause of death was asphyxia due to crushing neck injuries in that there
were multiple fractures to the thyroid cartilage and circoid cartilage.
Doctor John Teggatz further reported that there was blunt force trauma to
the chest in that there were fractures to the ribs. Your complainant
further states that the blood stained toy animal which was found in the
Bresnahan residence was submitted to the Wisconsin State Crime Laboratory
for analysis as well as a sample of the blood of the abovenamed defendant.
Your complainant states that Elizabeth Dietmeyer, a Microserologist with
the Wisconsin State Crime Laboratory, reported that the blood on the toy
animal was consistent with the blood of the abovenamed defendant in that
they matched in ABO blood typing and in ten enzyme groups. Furthermore,
your complainant states that a sample of the blood from the toy animal and
a sample of the defendant's blood were submitted to Cellmark Diagnostics,
Germantown, Maryland, for DNA Testing and that Amy Corey, a Staff Molecular
Biologist and Laboratory Supervisor for Cellmark Diagnostics, reported on
May 25, 1989, that high molecular weight DNA was abstracted and DNA banding
patterns where obtained from the blood on the toy animal and the blood of
the defendant and that these banding patterns matched each other. Your
complainant further states that on November 3, 1989, George Herrin, Ph.d.,
Bio-Chemistry and Staff Scientist for Cellmark Diagnostics, reported that

OTT 003049

| STATE OF WISCONSIN, | Plaintiff. | CRIMINAL COMPLAINT | Page 7 |

TATE OF WISCONSIN,                          CRIMINAL COMPLAINT          Page 7

Plaintiff.

Tirth, Robert J.          110759    CRIME(S) OR VIOLATIONS:
815 N. 57th Street                  SEE CHARGING SECTION BELOW
ilwaukee, WI

STATUTE(S) OR ORDINANCE(S) VIOLATED
SEE CHARGING SECTION BELOW

COMPLAINING WITNESS
Hareng, Donald M.

CASE NUMBER

Defendant(s)

he frequency in the Caucasian population of this DNA banding pattern is
approximately one in 460 thousand. Your complainant states that the
abovenamed defendant is a Caucasian male.  Your complainant further bases
this complaint upon the statements of Damon Murdock, an adult citizen, who
stated that he was an inmate in the Milwaukee County House of Correction in
1988 and that he had numerous conversations with the abovementioned
defendant, who was also an inmate at the House of Corrections, and that
during one of the many conversations he had with the defendant at the House
of Corrections, the defendant talked about killing a woman on Fairmount
Avenue.

As To Counts 5,6 and 7:
Upon the statements of City of New Berlin Police Detective Gary Blunt who
reported that at approximately 7:40am, January 12, 1988, he went to a
residence at 12623 W. Greenfield Avenue, City of New Berlin, County of
Waukesha, Wisconsin, and observed the lifeless body of a white male lying
at the bottom of the basement steps in a pool of blood and further observed
severe trauma to the victim's head.  This person was subsequently
identified as Louis Buchta and he was 76 years old.  Blunt further reported
that he observed the lifeless body of a white female lying in a bed in the
master bedroom and that her neck appeared to have considerable bruising.
Blunt further reported that the two bedrooms of the house were ransacked,
dresser drawers where open and emptied on the floor, furniture appeared to
be pulled away from the wall, a small metal box had been pried open and the
contents removed, and that numerous items from the dresser had been dumped
on to the beds.  Your complainant states that John Buchta, the son of the
Louis and Lillian Buchta, stated that at approximately 2:30pm, on January
11, 1988, he and his uncle Walter Buchta, along with Louis Buchta, picked
up Lillian Buchta from the hospital after she under went eye surgery.  John
Buchta stated that they returned to the residence at 12623 W. Greenfield
Avenue and that he took his mother into the residence while Walter and
Louis Buchta went on an errand.  John Buchta stated that he left the
residence at approximately 3:30pm and assumed that his mother went to bed.
Your complainant further states that Walter Buchta stated that after
completing the errand with Louis Buchta, he drove Louis back to the Buchta
residence at approximately 3:30pm and that everything appeared to be normal
at that time.  Walter stated that at approximately 7:30am, on January 12,
1988, he went to his brother's house to pick him up for work and that is

**OTT 003050**

| | | | Page 8 |
|---|---|---|---|
| TATE OF WISCONSIN, | Plaintiff | **CRIMINAL COMPLAINT** | |
| | | CRIME(S) OR VIOLATION(S) | |
| irth, Robert J. | 110759 | SEE CHARGING SECTION BELOW | |
| 315 N. 57th Street | | | |
| ilwaukee, WI | | | |
| | | STATUTE(S) OR ORDINANCE(S) VIOLATED | |
| | | SEE CHARGING SECTION BELOW | |
| | | | |
| | | COMPLAINING WITNESS | |
| | | Hareng, Donald M. | |
| | Defendant(s) | CASE NUMBER | |

hen he found his brother at the bottom of the basement stairs. Your
omplainant further states that William Golubeff, an adult citizen,
eported that on March 12, 1988, he observed a brown wallet in a ditch at
4430 W. Greenfield Avenue, and that upon examining the wallet he noted
hat it contained the driver's license of Louis Buchta as well as other
dentification cards for Louis Buchta.

omplainant further bases this complaint upon the statements of Maria
ricson, an adult citizen, who stated that her residence is across the
treet from the Buchta residence. Ericson stated that on January 11, 1988,
hat sometime between 5:30pm and 5:45pm, she was looking out a window from
er residence when she observed a man running from the rear of the Buchta
esidence and proceed down the driveway adjacent to the Buchta residence
owards Greenfield Avenue and then continued running west on Greenfield
venue. Your complainant further states that on January 18, 1990 a line-up
as conducted at the Milwaukee County Sheriff's Department and that the
bovenamed defendant was one of five individuals standing in that line-up.
our complainant further states that Maria Ericson viewed that line-up and
dentified the abovenamed defendant as the same person that she saw running
rom the Buchta residence on January 11, 1988. Your complainant further
tates that on January 12, 1988, Doctor Helen Young, Waukesha County
ledical Examiner, performed an autopsy on the body of Louis Buchta and that
he determined that the cause of death of Louis Buchta was due to multiple
kull fractures with cerebral damage. Doctor Young further reported that
he conducted an autopsy on January 12, 1988, on the body of Lillian Buchta
nd that she determined the cause of death was asphyxia due to
trangulation as evidenced by fractures to the thyroid cartilage and hyoid
one and that there was a fracture of the sternum and fractures of the
ibs. Your complainant further bases this complaint upon the statements of
)amon Murdock who stated that during one of his conversation with the
bovenamed defendant at the House of Correction that the defendant stated
:hat he killed an elderly couple during the winter out on 100th and
;omething on Greenfield, that he entered the home but was surprised by the
?lderly man when he returned home, that he hid in a bedroom, but was found
)y the elderly man in the home, that the old man started to choke him but
:hat he wrestled the old bastard to the floor, that he punched the old man
ind once on the floor he stomped on him in the head, that he stomped on him
;o hard he broke the heel off one of his boots, that while looking for

**OTT 003051**

| STATE OF WISCONSIN, Plaintiff | CRIMINAL COMPLAINT | Page 9 |
|---|---|---|

Wirth, Robert J.
815 N. 57th Street
Milwaukee, WI

110759

**CRIME(S) OR VIOLATION(S)**
SEE CHARGING SECTION BELOW

**STATUTE(S) OR ORDINANCE(S) VIOLATED**
SEE CHARGING SECTION BELOW

**COMPLAINING WITNESS**
Hareng, Donald M.

Defendant(s)

**CASE NUMBER**

money he hid in the basement, that he also killed the old women, and that he got cash from the old man's wallet, and that the defendant further stated that the location of this double murder was in the same neighborhood as a home from which he stole a gun that he used in the robbery of a taxicab driver for which he was arrested. Your complainant further states that on February 8, 1988, the abovenamed defendant was arrested for an armed robbery which occurred on February 7, 1988, in the 3200 block of West College Avenue, that the gun which was used in that armed robbery by the defendant was reported stolen in a burglary on February 4, 1988, at a residence at 12465 W. James Street, City of Brookfield, Wisconsin, and that this residence is approximately 1-1/2 blocks from the Buchta's residence. Your complainant further states that John Graber, City Engineer for the City of New Berlin, reported that the Buchta residence at 12623 W. Greenfield Avenue, City of New Berlin, County of Waukesha, is located within 1/4 mile of the westerly limits of Milwaukee County.

**As To Counts 8 and 9:**
Upon the statements of City of Franklin Police Officer Michael Martens, who stated that at approximately 5:00pm, on January 22, 1988, he went to a residence at 2810 W. Rawson Avenue, City of Franklin, County of Milwaukee, Wisconsin, and observed in that residence the lifeless body of an elderly female lying on her back in a hallway in the residence. Martens reported that he observed severe bruising around the neck of this person. This elderly woman was subsequently identified as Eva Holman, and that Eva Holman was 79 years old. Martens further reported that cabinets in the dining room were open and the contents from the cabinets were strewed on the floor and that a jewelry box in the bedroom of the residence had been forcibly opened. Your complainant further states that Edward Esche, an adult citizen, reported that he is the son-in-law of Eva Holman and that at approximately 4:45pm, on January 22, 1988, he found the body of his mother-in-law when he went to her residence to deliver some mail. Esche further stated that the last time he saw Eva Holman alive was at approximately 3:30pm, on January 21, 1988, and that she was seated in a chair at the dining room table. Your complainant further states that on January 23, 1988, Doctor Jeffrey Jentzen, Medical Examiner for Milwaukee County, performed an autopsy on the body of Eva Holman and determined that the cause of death was asphyxia do to crushing neck injuries in that the thyroid cartilage and hyoid bones were fractured. Your complainant further

**OTT 003052**

| | | |
|---|---|---|
| | **Plaintiff.** | **CRIMINAL COMPLAINT**     Page 10 |

STATE OF WISCONSIN,

Wirth, Robert J.
2815 N. 57th Street
Milwaukee, WI

110759

RIME(S) OR VIOLATION(S)
SEE CHARGING SECTION BELOW

STATUTE(S) OR ORDINANCE(S) VIOLATED
SEE CHARGING SECTION BELOW

COMPLAINING WITNESS
Hareng, Donald M.

**Defendant(s)**   CASE NUMBER

---

bases this complaint upon the statements of Linda Mathwig, an adult
citizen, who stated that she resided approximately one block from Eva
Holman and that at approximately 3:00pm, on January 21, 1988, she observed
a white male walking away from her front door toward the breeze way door of
her residence. Mathwig stated that she spoke to this individual and that
this individual was looking for directions. Your complainant further
states that on March 27, 1990 a line-up was conducted at the Milwaukee
County Sheriff's Department and that the abovenamed defendant was on of
five individuals standing in that line-up. Your complainant states that
Linda Mathwig viewed that line-up and identified the abovenamed defendant
as the person who came to her door at approximately 3:00pm on January 21,
1988.

AS TO COUNTS 3, 5, 6, and 8:
Your complainant further bases this complaint upon the statements of Doctor
John Teggatz, Doctor Jeffrey Jentzen, and Doctor Helen Young who all stated
that they have reviewed the autopsy protocols, photographs and slides from
the autopsies of Ruth Bresnahan, Lillian Buchta and Eva Holman, and that
the internal and external injuries inflicted upon them are very
characteristic, exhibit very similar trauma, are unusual in nature and
extent and that this combination of injuries is consistent with having been
inflicted by the same person.

As To All Counts:
Your complainant further bases this complaint upon the additional
statements of Allen Wiedenhoeft who stated, in part, that during the
numerous conversations Wiedenhoeft had with the defendant while
incarcerated with him, that the defendant stated that the defendant would
get up in the morning and go to a bar and drink; would then get on a bus
in the afternoon and look for homes to burglarize; that he chose old
people because they were weak and trusted people; that while riding the
bus he would pick out old people who would be out shoveling snow or putting
up Christmas decorations; that he would return later by bus and case the
place, if no one was home he would break into the home and if they came
home while he was ransacking the place, that he would not leave anybody who
could ID him later; that killing someone is just like anything else in
life, that after you have done it once, it just keeps getting easier each
time after that; that he usually picked out old people's homes which were

**OTT 003053**

| STATE OF WISCONSIN, | Plaintiff. | CRIMINAL COMPLAINT | Page 11 |
|---|---|---|---|

STATE OF WISCONSIN,

Wirth, Robert J.    110759
2815 N. 57th Street
Milwaukee, WI

Defendant(s)

**CRIME(S) OR VIOLATION(S)**
SEE CHARGING SECTION BELOW

**STATUTE(S) OR ORDINANCE(S) VIOLATED**
SEE CHARGING SECTION BELOW

**COMPLAINING WITNESS**
Hareng, Donald M.

**CASE NUMBER**

---

near the suburbs because the police did not patrol that area very well;
that once he entered the residence he would check for money in cookie jars,
between mattresses, in shoe boxes and closets, or he would take the dresser
drawers out and look on the bottom of them because old folks tape envelopes
filled with money to them;  that he would go to the bar early in the
morning and that he would get drunk, feel like doing burglaries and feel
gutsy and not give a damn;  that he would get on a bus and pick out a home
and break into the home in the early afternoon just before darkness;  that
he did not give a damn what he was doing or if he had to hurt someone;
that he would then call a cab or take a bus and have his pockets full of
change and dollar bills and return to the bar and buy drinks for everyone.
Wiedenhoeft further stated that at one time Wiedenhoeft asked the defendant
if he was the one who killed all of the elderly people in the burglary
homicides, and that the defendant stated, "Yeap, but you didn't ever hear
me say that and if you ever mention that I did say it, I'll call you a
liar."

**** END OF COMPLAINT ****

SUBSCRIBED AND SWORN TO BEFORE ME
AND APPROVED FOR FILING  March 29, 1990

FRANT T. CRIVELLO
CIRCUIT COURT JUDGE
JOHN DOE MAGISTRATE

COMPLAINING WITNESS

APPROVED FOR FILING
MARCH 29, 1990

DEPUTY/ASST. DISTRICT ATTORNEY
NGAHN

OTT 003054

*216 Wis. 2d 768, \*; 576 N.W.2d 30, \*\*;*
*1998 Wisc. LEXIS 42, \*\*\**

State of Wisconsin, Plaintiff-Respondent, v. Kevin P. Sullivan, Defendant-Appellant-Petitioner.

No. 96-2244-CR

SUPREME COURT OF WISCONSIN

216 Wis. 2d 768; 576 N.W.2d 30; 1998 Wisc. LEXIS 42

January 8, 1998, Oral Argument
March 25, 1998, Opinion Filed

**PRIOR HISTORY:** [\*\*\*1] ON REVIEW OF A DECISION OF THE COURT OF APPEALS. Reported at: 209 Wis. 2d 603, 568 N.W.2d 39 (Ct. App. 1997). UNPUBLISHED. COURT: Circuit. COUNTY: Kenosha. JUDGE: S. Michael Wilk.

**DISPOSITION:** Reversed and cause remanded.

**CASE SUMMARY:**
**PROCEDURAL POSTURE:** Defendant sought review of a decision by the Court of Appeals (Wisconsin), which upheld the trial court's judgment of conviction for battery and disorderly conduct. The defendant challenged the admission of other acts evidence under Wis. Stat. § 904.04(2) by the trial court.

**OVERVIEW:** The defendant was convicted of battery and disorderly conduct against his girlfriend. The other-acts evidence consisted of the testimony of the defendant's ex-wife and a neighbor regarding verbal abuse and threats two years earlier. The defendant appealed his conviction on the ground that other acts evidence was improperly admitted at trial. The appellate court affirmed the trial court, and the defendant appealed. The court held that: (1) the other acts evidence was proffered to establish the defendant's intent or absence of accident under Wis. Stat. § 904.04(2); (2) the other acts evidence was dissimilar enough from the charges in this case that the evidence was not probative of the defendant's intent; (3) any probative value of the other acts evidence was substantially outweighed by the prejudicial effect to the defendant; (4) the admission of the other acts evidence was reversible error; (5) the trial court's cautionary instruction to the jury was too broad and had a diminished effect; and (6) the prosecution had not proven beyond a reasonable doubt that the erroneous admission of the evidence did not contribute to the conviction.

**OUTCOME:** The court reversed the appellate court decision, which upheld the judgment of conviction by the trial court against the defendant for battery and disorderly conduct.

**CORE TERMS:** probative value, ex-wife, deputy, motive, unfair, prosecutor, substantially outweighed, probative, cautionary instruction, relevance, admitting, battery, admissible, probable, absence of mistake, erroneously, similarity, threatening, analytical, companion, abusive, court of appeals, consequential, preparation, propensity, three-step, verbally

## LexisNexis(R) Headnotes

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion

**OTT 003055**

*HN1* ⊕ The applicable standard for reviewing a circuit court's admission of other acts evidence is whether the court exercised appropriate discretion. An appellate court will sustain an evidentiary ruling if it finds that the circuit court examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach. A circuit court's failure to delineate the factors that influenced its decision constitutes an erroneous exercise of discretion. When a circuit court fails to set forth its reasoning, appellate courts independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion.

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
*HN2* ⊕ In Wisconsin, the admissibility of other acts evidence is governed by Wis. Stat. §§ 904.04(2), 904.03.

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
*HN3* ⊕ Wis. Stat. § 904.04(2) precludes proof that an accused committed some other act for purposes of showing that the accused had a corresponding character trait and acted in conformity with that trait. Section 904.04(2) forbids a chain of inferences running from act to character to conduct in conformity with the character. Section 904.04(2) precludes the admission of character or propensity evidence, but does permit the admission of other acts evidence if its relevance does not hinge on an accused's propensity to commit the act charged. The second sentence in § 904.04 (2) sets forth a series of evidential propositions that do not violate the propensity inference: motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. This list is not exhaustive or exclusive.

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
*HN4* ⊕ If intent is not an issue in the case, the exception for intent under Wis. Stat. § 904.04(2) does not apply.

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
*HN5* ⊕ Under Wis. Stat. § 904.01, the concept of consequential facts replaces the common law term of materiality.

Criminal Law & Procedure > Evidence > Impeachment Evidence > Prior Bad Acts & Uncharged Crimes
*HN6* ⊕ Legal prejudice is the potential harm in a jury's concluding that because an actor committed one bad act, he necessarily committed the crime with which he is now charged.

Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors
*HN7* ⊕ The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction. The conviction must be reversed unless the court is certain the error did not influence the jury. The burden of proving no prejudice is on the beneficiary of the error, who must establish that there is no reasonable possibility that the error contributed to the conviction.

**COUNSEL:** For the defendant-appellant-petitioner there were briefs and oral argument by Steven D. Phillips, assistant state public defender.

QTT 003056

For the plaintiff-respondent the cause was argued by William C. Wolford, assistant attorney general with whom on the brief was James E. Doyle, attorney general.

**JUDGES:** SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. N. PATRICK CROOKS, J. (Dissenting). Justice DONALD W. STEINMETZ and Justice JON P. WILCOX join this dissent.

**OPINIONBY:** SHIRLEY S. ABRAHAMSON

**OPINION: [\*\*32]**
**[\*770]**
P1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of an unpublished decision of the court of appeals, State v. Sullivan, 209 Wis. 2d 603, 568 N.W.2d 39, unpublished slip op. (1997), **[\*771]** affirming judgments of conviction of the Circuit Court for Kenosha County, S. Michael Wilk, Judge.

P2. This case involves the admissibility of "other acts" evidence under Wis. Stat. § (Rule) 904.04(2)(1995-96). n1 Kevin P. Sullivan, the **[\*\*\*2]** defendant, was convicted of battery to a woman with whom he was romantically involved (hereafter, the complainant) and of disorderly conduct. n2 The other acts evidence admitted was the testimony of the defendant's ex-wife and a neighbor that two years earlier the defendant had abused his ex-wife, not physically, but by using insulting and intimidating words including threats to assault her.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 All further references are to the 1995-96 Wisconsin Statutes unless otherwise indicated.

n2 The jury acquitted the defendant of false imprisonment and intimidation of a witness.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -P3. Two issues are raised in this review. First, did the circuit court erroneously exercise its discretion in admitting the other acts evidence? See Wis. Stat. §§ (Rule) 904.04(2) and 904.03. Second, if the circuit court erred in admitting the other acts evidence, was the error harmless?

P4. The first issue, the admissibility of other acts evidence, is addressed by using the three-step analysis set forth below. This analytical **[\*\*\*3]** framework (or one substantially similar) has been spelled out in prior cases, n3 **[\*772]** in Wis JI -- Criminal No. 275 Comment at 2 (Rel. No. 28--12/91) and in Wis JI -- Criminal No. 275.1 Comment: Other Acts Evidence (Rel. No. 24-1/90).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Some cases set forth these three steps as a two-step analysis, with the first step having two parts. The two-step analysis is set forth as follows: First, the circuit court must consider whether the proposed evidence is being offered for a valid purpose as identified in Wis. Stat. § (Rule) 904.04(2). Implicit in this first step is the determination that the evidence is relevant to an issue in the case. Second, the court must determine whether the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. See, e.g., State v. Friedrich, 135 Wis.

OTT 003057

2d 1, 19, 398 N.W.2d 763 (1987); State v. Alsteen, 108 Wis. 2d 723, 729, 324 N.W.2d 426 (1982). See also 7 Daniel D. Blinka, Wisconsin Practice: Evidence § 404.5, at 113 (1991).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [***4]

P5. The three-step analytical framework is as follows:

P6. (1) Is the other acts evidence offered for an acceptable purpose under Wis. Stat. § (Rule) 904.04(2), such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident?

P7. (2) Is the other acts evidence relevant, considering the two facets of relevance set forth in Wis. Stat. § (Rule) 904.01? n4 The [**33] first consideration in assessing relevance is whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action. The second consideration in assessing relevance is whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 See 7 Daniel D. Blinka, Wisconsin Practice: Evidence § 401.1, at 63 (1991); 1 McCormick on Evidence, § 190, at 773-74 (John W. Strong, ed., West Publishing Co. 4th ed. 1992).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [***5]

P8. (3) Is the probative value of the other acts evidence substantially outweighed by the danger of [*773] unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence? See Wis. Stat. § (Rule) 904.03.

P9. If the other acts evidence was erroneously admitted in this case, the second issue presented is whether the error is harmless or prejudicial.

P10. The circuit court admitted the other acts evidence. The court of appeals affirmed the judgments of conviction of the circuit court. For the reasons set forth, we reverse the decision of the court of appeals. We conclude as follows:

P11. (1) The other acts evidence in this case was proffered to establish the defendant's intent or absence of accident under Wis. Stat. § (Rule) 904.04(2).

P12. (2) With regard to relevance, the other acts evidence relates to a consequential fact in this case, namely the defendant's intent or absence of accident. The other acts evidence is dissimilar enough from the incident upon which the charged offenses were based that the evidence is not probative of the defendant's intent or absence [***6] of accident.

P13. (3) Even if the other acts evidence had probative value with regard to the defendant's intent or absence of accident, the probative value of the other acts evidence is substantially outweighed by the prejudicial effect to the defendant.

P14. (4) The admission of the other acts evidence in this case is reversible error.

I

OTT 003058

'P15. We first comment on the circuit court's and the court of appeals' mode of addressing other acts evidence. In this case, the circuit court admitted the other acts evidence. Although the prosecutor, the proponent **[\*774]** of the evidence, and the circuit court referred to the three-step framework described above, they failed to relate the specific facts of this case to the analytical framework. The prosecutor and the circuit court did not carefully probe the permissible purposes for the admission of the other acts evidence; they did not carefully articulate whether the other acts evidence relates to a consequential fact or proposition in the criminal prosecution; they did not carefully explore the probative value of the other acts evidence; and they did not carefully articulate the balance of probative value and unfair prejudice.

P16. **[\*\*\*7]** The proponent and the opponent of the other acts evidence must clearly articulate their reasoning for seeking admission or exclusion of the evidence and must apply the facts of the case to the analytical framework. The circuit court must similarly articulate its reasoning for admitting or excluding the evidence, applying the facts of the case to the analytical framework. This careful analysis is missing in the record in this case and has been missing in other cases reaching this court. Without careful statements by the proponent and the opponent of the evidence and by the circuit court regarding the rationale for admitting or excluding other acts evidence, the likelihood of error at trial is substantially increased and appellate review becomes more difficult. The proponent of the evidence, in this case the State, bears the burden of persuading the circuit court that the three-step inquiry is satisfied.

P17. The court of appeals affirmed the judgments of the circuit court, concluding that the other acts evidence was relevant to the issues of intent and absence of accident and was admissible to show the defendant's propensity to commit the charged offenses. See Sullivan, unpublished **[\*\*\*8]** slip op. at 9-10. In reaching **[\*775]** this conclusion, the court of appeals expressed concern that the supreme court and the court of appeals over the years **[\*\*34]** have chipped away at Whitty v. State, 34 Wis. 2d 278, 149 N.W.2d 557 (1967), this court's seminal decision regarding other acts evidence. Referring to State v. Friedrich, 135 Wis. 2d 1, 398 N.W.2d 763 (1987), and State v. Plymesser, 172 Wis. 2d 583, 493 N.W.2d 367 (1992), the court of appeals concluded that "the supreme court has signaled that a defendant's motive to commit the charged offense can be established by prior acts which demonstrate the defendant's propensity to commit such acts. That seems contrary to Whitty and § 904.04(2)." Sullivan, unpublished slip. op. at 7-8. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The Criminal Jury Instructions Committee has analyzed the cases involving other acts evidence, commenting that "although many of the decisions . . . have approved the admission of other acts evidence and have tended to expand the range of admissible evidence, there are also many cases that have found admission to be error." Wis. JI -- Criminal No. 275.1 Comment at 4 (Rel. No. 24-1/90) (citations omitted). The Criminal Jury Instructions Committee also commented that the cases demonstrate that a "'greater latitude of proof' applies to the admission of other-crimes evidence in sex crimes cases, especially those dealing with children as victims." Wis. JI -- Criminal No. 275.1 Comment at 3 (Rel. No. 24-1/90).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*\*9]**

P18. In light of the decision and comments of the court of appeals, we take this opportunity to reaffirm the vitality of Wis. Stat. § (Rule) 904.04(2) and Whitty, as both the State and the defendant have urged us to do.

OTT 003059

II

P19. The defendant was convicted after a jury trial of battery to the complainant contrary to Wis. **[\*776]** Stat. § 940.19 and disorderly conduct contrary to § 947.01. The conviction stems from an incident which occurred in the early morning hours of October 3, 1994, between the defendant and the complainant, his then girlfriend.

P20. The complainant and the deputy sheriff who responded to the complainant's call for help gave different accounts of what happened that day.

P21. According to the deputy, on October 3, 1994, at approximately 5:20 a.m., he responded to a call made from the American Legion Hall in Silver Lake. Inside the Legion Hall, he found the complainant upset and crying. The deputy observed that the complainant's lips were swollen and bloody and that there were blood spots on her left cheek. The inside of her mouth was also cut. The deputy photographed the complainant's injuries. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 The deputy's testimony at the preliminary hearing and trial was substantially the same.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*\*10]**

P22. The deputy testified that the complainant said she and the defendant had been fighting and that she feared the defendant. According to the deputy, the complainant said she and the defendant had been out earlier that night, the defendant had started drinking, and she had left him to go home. The complainant also told the deputy that the defendant becomes hostile and violent when intoxicated.

P23. According to the deputy, the complainant said she went to bed and awoke to find the defendant standing over her. She attempted to leave the bedroom, but the defendant pushed her back onto the bed. When she tried again to leave, he punched her in the mouth. She pleaded with him to let her leave the house, but he punched her in the cheek.

**[\*777]** P24. According to the deputy, the complainant said that at one point she told the defendant she was going to call the sheriff's department, whereupon the defendant pulled the telephone cord out of the wall. The complainant stated that the defendant kept her in the bedroom for about 30 minutes, after which time he fell asleep; she then ran from the house, got into the defendant's car and drove to the American Legion Hall. The bartender there **[\*\*\*11]** called for help. According to the deputy, the complainant said she had been in such a panic to get away from the defendant that she drove through the yard and over a small fence.

P25. The deputy further testified that the complainant said she did not want the defendant to be arrested or charged. She refused to give the deputy a written statement and refused medical treatment. The complainant said she wanted only to be safe from the defendant and to have him out of her house. **[\*\*35]** She gave the deputy permission to go to her house to find the defendant.

P26. The deputy testified that when he arrived at the complainant's residence, he found the defendant intoxicated and arrested him. The deputy observed that a telephone cord in the living room was unplugged. He also observed that gravel from the driveway was scattered on the street. Later, upon inspecting the car, he found a dent in the rear bumper and a piece of fence hanging from the undercarriage.

**OTT 003060**

P27. At trial a secretary who worked at the Kenosha County District Attorney's Office testified that she received a telephone call on October 3, 1994, from a woman who identified herself as the complainant. The caller indicated [***12] that she was upset about the charges against the defendant and said that if necessary, she would change her story to stop the charges.

[*778] P28. The complainant testified at the preliminary hearing on October 2, 1994, that she and the defendant had gone to the Auctioneer's Inn in Burlington. n7 When the defendant started drinking, the complainant became upset, stormed out of the tavern and drove home.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 The complainant's testimony at the preliminary hearing and trial was substantially the same.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -P29. According to the complainant's testimony, when she arrived home she took a tranquilizer and fell asleep. She awoke to find the defendant in her bedroom, saying he wanted to talk. When she got out of bed and began pacing between the bedroom and the living room, the defendant followed her, insisting that they talk. She yelled at him, telling him she did not want to talk.

P30. The complainant testified that while in the bedroom, she turned around to push the defendant away from her, whereupon she fell backwards, [***13] hitting the back of her head on either a dresser or the bed footboard. The complainant testified that there was no physical contact between the defendant and her that morning.

P31. Finally, the complainant testified that she walked out of the house and got into the defendant's car. As she was leaving, she drove over a piece of fencing, through the yard, and through a ditch. She went to the Legion Hall, where someone called 911.

P32. The complainant did not cooperate with the prosecution. She was not responsive to the district attorney's attempts to interview her, and at trial she testified that she still had feelings for the defendant.

P33. In a pretrial motion the State sought the circuit court's permission to admit evidence of ten separate episodes involving the defendant and his ex-wife [*779] that had occurred between 14 and 26 months before the incident involving the complainant. n8 The State sought admission of the other acts evidence for the purposes of showing "an intent on the part of the defendant to threaten, intimidate, control, and harass women with whom he is involved in relationships." The State also argued that the other acts evidence would demonstrate "what [***14] kind of an individual the defendant [was], in terms of how he related to women." Over the objection of defense counsel, the circuit court admitted evidence of one of these other acts.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 The other acts evidence not admitted included violation of non-contact orders, making threatening telephone calls to his ex-wife, throwing paint cans and stones, pulling a telephone off a tavern wall, and threatening his ex-wife's attorney.

OTT 003061

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -P34. The other acts evidence admitted by the circuit court was the testimony of the defendant's ex-wife and a neighbor about a domestic disturbance on July 24, 1992. At trial the ex-wife testified that the defendant, while intoxicated, refused to leave her home and insisted on talking with her. After she repeatedly asked him to leave, he called her a "bitch" and threatened to assault her. She testified that she went to a neighbor's house and called the police. The neighbor's testimony confirmed the wife's account of the incident.

P35. In admitting the other acts evidence, the circuit **[\*\*\*15]** court reasoned as follows:

Section (Rule) 904.04(2) does permit the State to establish the defendant's intent, in the absence of accident in this case, and to establish the defendant's knowledge and **[\*\*36]** motive and establish credibility of the witnesses testifying at trial. [The] court believes that, in as much as there has been **[\*780]** essentially a recantation by the complaining witness, that the credibility of the complaining witness in recanting and also the credibility of the arresting officer, in terms of taking . . . the statement . . . are at issue.

P36. The circuit court gave a cautionary instruction to the jury that the other acts evidence is to be considered only on the issues of motive, intent, knowledge, absence of mistake or accident, or credibility. The circuit court further instructed the jury that the other acts evidence is not to be used to conclude that the defendant is a bad person and for that reason guilty of the offense charged. The cautionary instruction tracks for the most part the list of permissible purposes set forth in Wis. Stat. § (Rule) 904.04(2), with the exception of the issue of credibility, which is not enumerated as a purpose in § (Rule) 904.04(2). **[\*\*\*16]** The circuit court did not tailor the cautionary instruction to the facts of the case.

P37. The defendant argues that the admission of the testimony of his ex-wife and the neighbor as to the other act was not probative of his intent or absence of accident, unfairly prejudiced him at trial and constituted reversible error.

III

P38. *HN1*⊀The applicable standard for reviewing a circuit court's admission of other acts evidence is whether the court exercised appropriate discretion. See State v. Pharr, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). An appellate court will sustain an evidentiary ruling if it finds that the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a **[\*781]** reasonable judge could reach. See Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982) (citing McCleary v. State, 49 Wis. 2d 263, 182 N.W.2d 512 (1971)).

P39. A circuit court's failure to delineate the factors that influenced its decision constitutes an erroneous exercise of discretion. See McCleary, 49 Wis. 2d at 282. When a circuit court fails to set forth its reasoning, appellate courts **[\*\*\*17]** independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion. See Pharr, 115 Wis. 2d at 343.

IV

P40. *HN2*⊀In Wisconsin the admissibility of other acts evidence is governed by Wis. Stat. §§ (Rule) 904.04(2) and 904.03. Section (Rule) 904.04(2) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the

OTT 003062

evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Wisconsin Stat. § (Rule) 904.03 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[*782] P41. *HN3*Wisconsin Stat. § (Rule) 904.04(2) precludes proof that an accused committed some other act for purposes of showing that the accused had a corresponding character [***18] trait and acted in conformity with that trait. n9 In other words, § (Rule) 904.04(2) forbids a chain of inferences running from act to character to conduct in conformity with the character. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 7 See Daniel D. Blinka, Wisconsin Practice: Evidence § 404.5, at 110.

n10 The chart below depicts the theory of admissibility banned by Wis. Stat. § (Rule) 904.04 (2).

**Item of evidence** a

**Intermediate inference** a

**Ultimate inference**

The accused's other act

The accused's subjective,

personal character, disposition, or propensity

The accused's conduct in conformity with his or her character on the charged occasion

See Edward J. Imwinkelried, The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines that Threaten to Engulf the Character Evidence Prohibition, 130 Mil. L. Rev. 41 (1990).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**37]** P42. The reasons for the rule excluding other acts evidence were set forth by the court in Whitty, 34 Wis. 2d at 292, **[***19]** as follows:

(1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts; (2) the tendency to condemn not because he is believed guilty of the present charge but because he has escaped punishment from other offenses; (3) the injustice of attacking one who is not prepared to demonstrate the attacking evidence is fabricated; and (4) the confusion **[*783]** of issues which might result from bringing in evidence of other crimes.

OTT 003063

Id. at 292. In short, the exclusion of other acts evidence is based on the fear that an invitation to focus on an accused's character magnifies the risk that jurors will punish the accused for being a bad person regardless of his or her guilt of the crime charged.

P43. Although Wis. Stat. § (Rule) 904.04(2) precludes the admission of character or propensity evidence, it permits the admission of other acts evidence if its relevance does not hinge on an accused's propensity to commit the act charged. The second sentence in § (Rule) 904.04(2) sets forth a series of evidential propositions which do not violate the propensity inference: motive, opportunity, intent, preparation, plan, knowledge, [***20] identity, or absence of mistake or accident. This list is not exhaustive or exclusive. See State v. Kaster, 148 Wis. 2d 789, 797, 436 N.W.2d 891 (Ct. App. 1989).

P44. In determining whether to admit other acts evidence, counsel and courts should engage in the three-step analytical framework we outlined earlier.

P45. The first step in the analysis is to determine whether the other acts evidence is offered for a permissible purpose under Wis. Stat. § (Rule) 904.04(2), such as to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

P46. At trial, the prosecutor argued that the other acts evidence was related to intent, motive and purpose. His language, however, indicated that the evidence was aimed at the defendant's character and propensity. The prosecutor said:

[*784] What [the other acts evidence] tells us is that this is an individual who's not going to be told what to do. But anybody, whether it's a woman, God forbid it should be a woman, telling him what to do . . . This is a man who lives a life outside of the norms and rules of society, outside of any control. It tells us volumes about his motivation, [***21] about his intent, about his purpose.

P47. The circuit court admitted the other acts evidence, stating that it was probative of motive, intent, knowledge, absence of mistake or accident, and credibility. On appeal the State concedes that the circuit court's list of exceptions applicable to the other acts evidence in this case is too broad. The State argues, however, that the conviction can be saved because the other acts evidence is admissible for the purpose of establishing intent or absence of accident, which are closely intertwined in this case. Criminal intent is the state of mind that negatives accident or inadvertence. Evidence of other acts may be admitted if it tends to undermine an innocent explanation for an accused's charged criminal conduct. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 See 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 404.22 [1][a], at 404-70 (Joseph M. McLaughlin, ed., 2d ed. 1997).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -P48. With regard to the defendant's intent or absence of accident, the State argues that [***22] to convict the defendant of battery, it had to prove the defendant intended to cause bodily harm to the complainant. Based on the complainant's testimony at the preliminary hearing, the State assumed that she would testify [**38] at trial that her injuries were the result of an accident, [*785] not the result of the defendant's intent to cause bodily harm. n12

**OTT 003064**

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 In this case the defendant did not take the stand at trial. The theory developed by the defense counsel in cross-examination of the complainant and in summation was that the complainant accidentally caused her own injuries.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -P49. Dean Wigmore offers a famous example of the use of other acts evidence to show intent or absence of accident. In Wigmore's example, a hunter is charged with having shot a companion, and the hunter claims that the shooting was accidental. Under these circumstances evidence of the hunter's having fired at the companion on other occasions becomes admissible to disprove the claim of accidental shooting. n13

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 See 2 Wigmore, Evidence § 302, at 241 (Chadbourn rev. 1979). See also United States v. Hillsberg, 812 F.2d 328, 334 (7th Cir. 1987) (in murder prosecution, evidence of the defendant's use of gun two other times on the same day was properly admitted to show that the firing of the gun was intentional rather than accidental or inadvertent).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [***23]

P50. We agree with the State that the use of other acts evidence in this case to prove intent or absence of accident is permissible. We therefore conclude that the State has met its burden to show that the purpose is permissible under step one of the three-step analysis.

P51. We now turn to the second step in the analysis: Is the other acts evidence relevant? Under Wis. Stat. § (Rule) 904.01, relevance has two facets. The first consideration in assessing relevance is whether the evidence relates to a fact or proposition that is of consequence to the determination of the action. n14 The [*786] substantive law determines the elements of the crime charged and the ultimate facts and links in the chain of inferences that are of consequence to the case. Thus the proponent of the evidence, here the State, must articulate the fact or proposition that the evidence is offered to prove. The parties agree, as does this court, that intent or absence of accident is of consequence to the case and that the evidence was offered to prove intent or absence of accident. n15

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 *HN4* If intent is not an issue in the case, the exception for intent under Wis. Stat. § (Rule) 904.04(2) does not apply. See State v. Danforth, 129 Wis. 2d 187, 201, 385 N.W.2d 125 (1986)(in prosecution for cruel maltreatment of children, evidence that the defendant had struck the child on two prior occasions was irrelevant since intent to injure was not an element of the offense). See also Judicial Council Committee Notes, § (Rule) 904.04, 59 Wis. 2d R79 (1973). [***24]

n15 Some might use the terminology of materiality instead of consequence and say that intent or absence of accident is a material issue in the case. *HN5* In Wis. Stat. § (Rule)

OTT 003065



904.01 the concept of consequential facts replaces the common law term "materiality." 7 Daniel Blinka, Wisconsin Practice: Evidence § 401.1, at 64 (1991).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -P52. The second consideration in assessing relevance is probative value, that is, whether the evidence has a tendency to make a consequential fact more probable or less probable than it would be without the evidence.

P53. The probative value of the other acts evidence in this case depends on the other incident's nearness in time, place and circumstances to the alleged crime or to the fact or proposition sought to be proved. See Whitty, 34 Wis. 2d at 294. Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the probative value lies in the similarity between the other act and the charged offense. The stronger the similarity between the other acts and the charged offense, the greater will be the probability **[***25]** that the like result was **[*787]** not repeated by mere chance or coincidence. n16 In other words, "If a like occurrence takes place enough times, it can no longer be attributed to mere coincidence. Innocent intent will **[**39]** become improbable." State v. Evers, 139 Wis. 2d 424, 443, 407 N.W.2d 256 (1987).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 As described by Dean Wigmore, who labeled the theory "the doctrine of chances," the relevance of similar acts evidence on the issue of intent rests on "that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." 2 Wigmore, Evidence § 302, at 241 (Chadbourn rev. 1979). One accidental discharge of a hunter's gun in the direction of the companion is plausible. However, if two shots from the gun narrowly miss the companion and a third shot kills the companion, "the immediate inference . . . is that [the hunter] shot at [the companion] deliberately." Id.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

P54. The required degree of similarity **[***26]** between the other act and the charged offense and the required number of similar other acts cannot be formulated as a general rule. The greater the similarity, complexity and distinctiveness of the events, the stronger is the case for admission of the other acts evidence. n17 How many similar events are enough depends on the complexity **[*788]** and relative frequency of the event rather than on the total number of occurrences. n18

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17 For cases discussing whether other acts evidence is relevant to show intent or absence of accident, see State v. Evers, 139 Wis. 2d 424, 443, 407 N.W.2d 256 (1987) (other acts evidence not admissible on intent); Barrera v. State, 99 Wis. 2d 269, 280-81, 298 N.W.2d 820 (1980) (other acts evidence admissible on intent); King v. State, 75 Wis. 2d 26, 46, 248 N.W.2d 458 (1977) (other acts evidence admissible on intent and absence of mistake or accident); State v. Bustamante, 201 Wis. 2d 562, 575-76, 549 N.W.2d 746 (Ct. App. 1996) (other acts evidence admissible to negate statements defendant made suggesting he had accidentally caused his infant son's fatal injuries). **[***27]**

OTT 003066

n18 For instance, if the hunter in Wigmore's example fired thousands of shots over the course of decades of hunting with the same companion, only three of which passed near the companion, the possibility that all those shots were accidental remains plausible. See Mark Cammack, Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered, 29 U.C. Davis L. Rev. 355, 382 (1996).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -P55. The State argues in this court that there were numerous similarities between the other incident and the incident being prosecuted, and thus that the other acts evidence was probative of the issue of intent or absence of accident. The State sets forth the similarities of the two incidents as follows: In both incidents the defendant was intoxicated; the defendant was at the home of a woman with whom he had been romantically involved; the defendant repeatedly insisted on talking to the woman; the woman refused to talk; the defendant became verbally abusive when the woman rejected his demands to talk; the woman asked him to leave; the defendant remained [***28] in the woman's home.

P56. We agree with the State that many circumstances of the two incidents are similar. Nevertheless, the other incident does not support the inference, urged by the State, that the defendant intentionally hits women with whom he has been romantically involved.

P57. First, the State's comparison involves only one other incident, not a series of incidents. Second, the factual descriptions of the incidents do not involve particularly complex or unusual facts. Third, and most important, the State glosses over one significant and telling difference between the two incidents: The prior [*789] incident involved a domestic disturbance between the defendant and his ex-wife in which they argued but there was no physical contact between them. The charged offense in this case, by contrast, involved the defendant punching the complainant.

P58. That the defendant could have confronted and argued with his ex-wife, threatened her, swore at her and refused to leave her house does not make it more probable that he intentionally hit the complainant during an argument two years later.

P59. Accordingly, we conclude that the other acts evidence was not probative of the [***29] defendant's intent or absence of accident and that the circuit court erroneously exercised its discretion in admitting the other acts evidence.

P60. We need not go further in the three-step analysis, but if we were persuaded that the other acts evidence is a permissible purpose under Wis. Stat. § (Rule) 904.04 (2), the final step of our analysis would be to determine whether the circuit court erroneously exercised its discretion in weighing the probative value of the other acts evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time or needless presentation of cumulative evidence.

P61. Were we to reach the third analytical step, we would conclude that the circuit court erroneously exercised its discretion in the balancing test under Wis. Stat. § (Rule) 904.03. The probative value, if any, [**40] of the other acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant.

P62. Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by [*790] improper means or if it appeals to the jury's sympathies, arouses its sense [***30] of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case. See State v.

**OTT 003067**

Mordica, 168 Wis. 2d 593, 605, 484 N.W.2d 352 (Ct. App. 1992) (citing Lease Am. Corp. v. Insurance Co. of N. Am., 88 Wis. 2d 395, 401, 276 N.W.2d 767 (1979)). In this case the danger of unfair prejudice was that the jurors would be so influenced by the other acts evidence that they would be likely to convict the defendant because the other acts evidence showed him to be a bad man. n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 *HN6* "The legal prejudice of which we speak here is the potential harm in a jury's concluding that because an actor committed one bad act, he necessarily committed the crime with which he is now charged." State v. Fishnick, 127 Wis. 2d 247, 261-62, 378 N.W.2d 272 (1985) (citing State v. Tarrell, 74 Wis. 2d 647, 657, 247 N.W.2d 696 (1976)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -P63. The State relies on two factors to show that there was no unfair prejudice: the defendant was acquitted [***31] of two charges, and the circuit court gave the jury cautionary instructions.

P64. First, the State argues that the jury apparently bore the cautionary instruction in mind since it acquitted the defendant of two of the four counts with which he was charged. We are not persuaded that acquittal of two charges in this case demonstrates that the jury was not influenced by the other acts evidence in convicting on the other two charges. In this case the defendant's character traits inferred from the other acts evidence seems more pertinent to the convicted offense of battery than to the acquitted offenses of false imprisonment and intimidation of a witness. Acquittal of the two charges does not demonstrate that the jury [*791] was not influenced by the other acts evidence in convicting the defendant on the battery charge.

P65. Second, the State correctly points out that the circuit court gave a cautionary instruction. As courts have stated, a cautionary instruction, even if not tailored to the case, can go "'far to cure any adverse effect attendant with the admission of the [other acts] evidence.'" State v. Mink, 146 Wis. 2d 1, 17, 429 N.W.2d 99 (Ct. App. 1988) (quoting State v. [***32] Fishnick, 127 Wis. 2d 247, 262, 378 N.W.2d 272 (1985)).

P66. We are not persuaded by this argument. Although cautionary instructions reduce the risk that a jury will find an accused guilty simply because he or she is a bad person, in this case the cautionary instruction to the jury about the other acts evidence was too broad and its cautionary effect was significantly diminished.

P67. Furthermore, the prosecutor referred to the other acts evidence extensively in both the opening and closing statements and urged the jury to consider what the evidence revealed about the defendant's character. In the opening statement, the prosecutor said the defendant was a man who would not let a woman tell him what to do. The prosecutor indicated that the evidence would show "what [the defendant] does when he drinks and becomes disruptive," namely that he "engages in threatening behavior, abusive behavior, even behavior that takes place in the presence of law enforcement officers."

P68. During his closing argument, the prosecutor explained that the other incident placed the current charges "in context," revealing the defendant's "motives" for committing these crimes.

P69. The [***33] prosecutor explained how the other incident showed that the defendant "knows exactly [*792] what is going on, what is and is not allowed because he's been

**OTT 003068**

arrested before for similar type behavior in the past." The prosecutor returned to this theme during his rebuttal argument.

P70. In light of the prosecutor's repeated references to the other acts evidence in the opening and closing statements, and the fact that the cautionary instruction was not limited to evidence of the defendant's intent or absence of accident, we conclude that the cautionary instruction was insufficient to cure the prejudicial impact of the other acts evidence.

[**41] P71. Were we to reach the third analytical step, we would conclude that the circuit court erroneously exercised its discretion in the balancing test under Wis. Stat. § (Rule) 904.03. The probative value, if any, of the other acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant.

V

P72. Having concluded that it was error to admit the other acts evidence, the remaining question is whether the error was harmless in this case. *HN7* The test for harmless error is whether there is a reasonable possibility that [***34] the error contributed to the conviction. See State v. Dyess, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985); Fishnick, 127 Wis. 2d at 265. The conviction must be reversed unless the court is certain the error did not influence the jury. See Dyess, 124 Wis. 2d at 541-42.

P73. The burden of proving no prejudice is on the beneficiary of the error, here the State. The State must establish that there is no reasonable possibility that [*793] the error contributed to the conviction. See Dyess, 124 Wis. 2d at 543.

P74. After a careful reading of the record we conclude that the State has not proven that the error did not contribute to the conviction.

P75. The State was unable to present a witness who could link the complainant's injuries to the defendant's intentional conduct. Although the deputy testified to the statements the complainant made to him on October 3, 1994, the complainant's testimony at trial conflicted with the deputy's account of her earlier statements. The jury had to decide at what point the complainant was telling the truth--the morning of the incident or at trial. Was she telling the truth in her out-of-court statements to the deputy implicating the [***35] defendant or in her in-court statements exonerating the defendant? In light of the complainant's inconsistent statements, any evidence that tended to support one version over the other necessarily influenced the jury.

P76. By his own words the prosecutor conceded the weakness of the State's case and the critical need for the other acts evidence if the State were to carry its burden of proving guilt beyond a reasonable doubt. In the hearing on the motion to admit other acts evidence the prosecutor argued:

In this particular case, we're going to have a victim who is not going to offer testimony that evidence is the defendant's state of mind. She's completely recanted on that, and all we have are the bare minimums of what she informed the police of on that day as well as her behavior in fleeing from the defendant . . . . That's why the prior acts evidence is demonstrably critical to a full presentation of the [*794] facts and to flush out those specific elements of the offense.

. . .

I submit that . . . a defense attorney can easily argue that when the State's burden is beyond reasonable doubt, and we have a victim saying one thing on one occasion and saying totally opposite [***36] on another, that there is clearly doubt, a reasonable doubt as to what

occurred, and that the State has not met its burden of proof, and that is the scenario that comes across if none of the prior acts evidence come in. (Emphasis added.)

P77. Based on our review of the record and the prosecutor's own view of the case, we conclude that there is a reasonable possibility that the other acts evidence contributed to the defendant's convictions. Accordingly we conclude that the State has not met its burden of proving beyond a reasonable doubt that the error did not contribute to the verdict.

P78. In sum, we conclude as follows:

P79. (1) The other acts evidence in this case was proffered to establish the defendant's intent or absence of accident under Wis. Stat. § (Rule) 904.04(2).

P80. (2) With regard to relevance, the other acts evidence relates to a consequential fact in this case, namely the defendant's intent or absence of accident. The other acts evidence is dissimilar enough from the incident upon which the charged offenses were **[\*\*42]** based that the evidence is not probative of the defendant's intent or absence of accident.

P81. (3) Even if the other acts evidence **[\*\*\*37]** had probative value with regard to the defendant's intent or absence of accident, the probative value of the other **[\*795]** acts evidence is substantially outweighed by the prejudicial effect to the defendant.

P82. (4) The admission of the other acts evidence in this case is reversible error.

P83. Accordingly we reverse the judgments of conviction and remand the cause to the circuit court.

**DISSENTBY:** N. PATRICK CROOKS

**DISSENT:** N. PATRICK CROOKS, J. (Dissenting).

P84. I dissent. Although I agree with many portions of the majority opinion, I disagree with the majority's conclusions in four respects. First, there is substantial evidence in the record that the circuit court judge delineated the factors influencing his decision to admit the other acts evidence. As such, this court's review of the admission of other acts evidence is limited to determining whether the circuit court erroneously exercised its discretion. Second, the other acts evidence is significantly similar to the charged offenses in several respects and is therefore probative of the defendant's intent or absence of accident in the present case. Third, the probative value of the other acts evidence is not substantially outweighed **[\*\*\*38]** by any unfair prejudice to the defendant. Fourth, the jury instruction given on other acts evidence was not so overly broad that it significantly diminished any cautionary effect.

P85. The majority correctly states that "the applicable standard for reviewing a circuit court's admission of other acts evidence is whether the court exercised appropriate discretion." Majority op. at 12. The majority also correctly states that a circuit court's evidentiary ruling will be sustained provided the circuit **[\*796]** court considers the relevant facts, applies the appropriate standard of law, and uses a demonstrative rational process to reach a reasonable conclusion. See Majority op. at 13. In the present case, the circuit court engaged in a thorough discussion of: (1) the facts surrounding the July 24, 1992, incident and the evidence in the present case; (2) the application of Wis. Stat. §§ 904.04(2) and 904.03 under the circumstances; and (3) the probative value of the other acts evidence, including the conclusion that the probative value of the evidence was not substantially outweighed by any prejudicial effect.

P86. In addressing the State's request to admit evidence of the July 24, 1992, **[\*\*\*39]**

**OTT 003070**

incident, the circuit court made the following detailed analysis of the facts:

In terms of, first of all, the elements, there's an allegation that the defendant at that time was intoxicated and verbally abusive. I should note, in terms of the intoxication element in the instant case, the facts allege that the complaining witness and the defendant ended up at [an establishment] . . . and the defendant began to drink . . . .

. . .

The Court is not going to speculate as to whether [the defendant] was either under some order not to drink or was-- had a drinking situation in which he had been committed from the drinking. Whatever it was, that was an issue, and the Court will accept, for purposes of prior acts, that drinking was some kind of a problem for the defendant. [In the present case] the officer had indicated that, in the preliminary, that the [defendant] appeared in the [complainant's] bedroom, that he had been drinking.

. . .

   [*797] And [the officer in the present case] reported that [the complainant] said that [the defendant] and she had been out . . . and when he became too intoxicated, she left him; and he becomes hostile and violent when he drinks [***40] alcohol. . . .

This prior act on July 24, 1992, with reference to that, the officer from the Burlington Police Department was dispatched in the city of Burlington to a domestic disturbance in progress. And, upon arrival, he indicated that he located a female standing [**43] by a van crying and obviously upset; and that was [the neighbor] indicating that the man later identified as [the defendant] had been at the address causing trouble between [the defendant] and his ex-wife . . . . And she indicated that [the defendant] had been verbally abusive and refused to leave upon request.

And then the officer interviewed [the] ex-wife, apparently, of the defendant; and she indicated that the defendant was seated on the porch and had recently arrived at her home and refused to leave, and that the defendant was intoxicated and verbally abusive to her and to her children and [her neighbor], and that [her neighbor's] husband was also present.

And the officer approached the defendant, asked him his name. The defendant told the officers his last name was Sullivan and then said that was all he was going to tell me.

The ex-wife [] indicated that the defendant had approached--- [***41] she had approached the defendant while in the driveway of the home when he arrived. An argument ensued. She stated that [the defendant] began yelling at her; in the process of doing this, called her [derogatory names], and that he was going to take her in the backyard and beat her up.

   [*798] In light of the similarities in the two instances, the circuit court concluded that "it would seem appropriate on those issues, that under 904.04, that so much of the July 24, 1992 incident, as I've discussed, be admitted as a prior act."

P87. The circuit court also made a determination on the record that the probative value of the evidence of the July 24, 1992, incident was not substantially outweighed by any unfairly prejudicial effect.

[The] Court believes that while the information is obviously prejudicial to the defendant, that it is not unfairly prejudicial, in that the issue before the Court is his actions on the night in question. And in as much as there has been a recantation, the Court believes that it is appropriate for the State to be able to, under 904.04, to establish the defendant's intent in

**OTT 003071**

the absence of accident . . . . The Court believes that while the acts are **[\*\*\*42]** similar, for which they must be in order to qualify under 904.04, that they do not unfairly prejudice the defendant.

P88. Although the circuit court determined that the evidence was prejudicial, it concluded that it was not unfairly prejudicial. This is an accurate analysis since under Wis. Stat. § 904.03 the probative value of the other acts evidence is appropriately "weighed against the danger of misleading the jury and unfair prejudice, not prejudice." State v. Grande, 169 Wis. 2d 422, 434, 485 N.W.2d 282 (Ct. App. 1992).

P89. These excerpts from the record evince the circuit court's extensive analysis in finding the other acts evidence admissible. Our review involves an analysis of whether the circuit court erroneously exercised its discretion in admitting the evidence of the incident involving the defendant and his ex-wife. See State v. Pharr, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). **[\*799]** "The question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts **[\*\*\*43]** of record." State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979) (citing McCleary v. State, 49 Wis. 2d 263, 182 N.W.2d 512 (1971).

P90. The cases cited by the majority for the proposition that this court's review should be independent are factually distinguishable from the present case. For example, in McCleary, 49 Wis. 2d at 282, the circuit court judge failed to provide any reason why a nine year near-maximum sentence for a non-violent crime (forging a $ 50 check) was appropriate where the defendant was a first offender. In that case, the judge "very well and properly stated his reasons why probation was not appropriate, but gave no reason for the sentence he did impose." n1 Id. (emphasis supplied).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The circuit court's only discussion of the sentence imposed consisted of the following: "I intend to follow the recommendation of the Probation Department, and I will not grant probation in this case. I'm prepared to make disposition thereon. The laws of society apply to every member thereof, whether in a nichey type attitude he considers himself to be above them or not." McCleary v. State, 49 Wis. 2d 263, 268, 182 N.W.2d 512 (1971).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*\*44]**

**[\*\*44]** P91. Similarly, in Pharr, 115 Wis. 2d at 343, this court independently reviewed the record where the circuit court "had not explicitly engaged in the balancing test required by sec. 904.03, Stats., nor had the [circuit] court articulated clearly the reasons for admitting the [other acts] evidence." The circuit court's entire discussion of the evidence in Pharr was as follows: "I think that the evidence of [the shooting] would be admissible for reasons [the prosecution] stated. Evidence of any **[\*800]** armed robbery of any bank would appear to me to be highly prejudicial and would appear to me to be inadmissible." Id. at 339.

P92. In the present case, the circuit court made an in-depth analysis of the facts surrounding the July 24, 1992, incident and determined that the evidence would be properly admitted to show the defendant's intent and absence of accident under Wis. Stat. § 904.04(2). n2 The circuit court also considered the prejudicial effect of the evidence under Wis. Stat. § 904.03, and concluded that its probative value was not substantially outweighed by any unfair prejudice.

OTT 003072

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 The circuit court also admitted the other act evidence to show motive, knowledge, and witness credibility.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[***45]

P93. The majority states that the incident on July 24, 1992, "relates to a consequential fact in this case, namely the defendant's intent or absence of accident." Majority op. at 28. However, the majority concludes that "the other acts evidence is dissimilar enough from the incident upon which the charged offenses were based that the evidence is not probative of the defendant's intent or absence of accident." Id.

P94. The majority concedes "that many circumstances of the two incidents are similar." Majority op. at 21. These similarities include the defendant's intoxication, the defendant being at the homes of women with whom he had a romantic relationship, the defendant insisting on speaking with the women, the women refusing to speak with the defendant, the defendant physically threatening the women and becoming verbally abusive, the women asking him to leave their residence and the defendant refusing, and the women contacting law enforcement officers for assistance. These numerous similarities evince that the other acts evidence of the incident on July 24, 1992, [*801] is probative of the defendant's intent or absence of accident in the present case. The evidence is particularly [***46] relevant to the defendant's absence of accident regarding the battery charge since the complainant recanted her story and claimed that the bodily harm resulted from an accident. The defendant's physical threats and verbal abuse, intoxication, and refusal to leave his ex-wife's home under circumstances significantly similar to the present case make it more probable that the intoxicated defendant intended to physically threaten and batter the complainant.

P95. The majority's main concern with the other acts evidence appears to be the fact that the prior incident did not involve any bodily harm to the defendant's ex-wife. Thus, the majority concludes that the prior act makes it no more probable that the defendant physically assaulted the complainant in the present case. Although the other acts evidence is probative to the battery charge in any event, the majority's conclusion fails to recognize that the defendant was facing charges on three separate counts -- battery, false imprisonment, intimidation of a victim -- all of which require intent as an element of the offense and only one of which requires the element of bodily harm. n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The counts for which the defendant was charged that include intent as an element of the crime are battery contrary to Wis. Stat. § 940.19(1); false imprisonment contrary to Wis. Stat. § 940.30; and intimidation of a victim contrary to Wis. Stat. § 940.44(1). The defendant was also charged with disorderly conduct contrary to Wis. Stat. § 947.01.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[***47]

OTT 003073

P96. The defendant's intoxicated state, physical threats, and refusal to leave his ex-wife's residence on a prior occasion make it more probable that the intoxicated defendant threatened the complainant, refused to leave the complainant's residence and intentionally **[\*\*45]** **[\*802]** refused to let her leave. Moreover, the defendant's intoxication and repeated threats and verbal abuse of his ex-wife on July 24, 1992, make it more probable that the defendant intentionally prevented the complainant from calling law enforcement officers to report that the defendant caused her bodily harm and refused to let her leave her residence. The complainant was able to escape her residence and report the incident only after the defendant had fallen asleep. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Although the complainant's claim of accident was specifically directed at the battery charge, the proffered other acts evidence is relevant to the defendant's intent as well as absence of accident. As stated, intent is an element of the battery charge, the false imprisonment charge, and the intimidation of a victim charge.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*\*48]**

P97. The majority also fails to consider that not only did the circuit court undertake a thorough analysis of the particular incident that was ultimately admitted as other acts evidence, but the circuit court carefully considered and denied several other instances of prior acts that the State sought to introduce. n5 More importantly, the circuit court undertook **[\*803]** such a detailed analysis of the July 24, 1992, incident that it went so far as to prohibit the State from presenting to the jury certain portions of the incident that were not similar to the present case. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The majority opinion finds it relevant that the State's other acts evidence "involves only one other incident, not a series of incidents." See Majority op. at 21. A single instance of other acts evidence is not per se inadmissible. See State v. Roberson, 157 Wis. 2d 447, 455 n.1, 459 N.W.2d 611 (Ct. App. 1990), review denied, 464 N.W.2d 424 (Wis., Oct 16, 1990). Several other incidents were proffered as evidence; however, the circuit court denied the State's request to admit other acts evidence of incidents that occurred on July 26, 1992 (defendant's telephone calls to neighbor verbally abusing and threatening the neighbor and defendant's ex-wife); September 7, 1992 (defendant's telephone calls to ex-wife threatening her and her male friend); September 8, 1992 (defendant was intoxicated and creating a disturbance at a local tavern, and defendant threw items and pulled the phone out of the wall); September 10, 1992 (defendant threatening ex-wife's divorce attorney at the attorney's office); September 11, 1992 (defendant abusive and intoxicated at ex-wife's divorce attorney's office, resulting in defendant's arrest); February 4, 1993 (defendant's verbally abusive and threatening telephone calls to ex-wife); June 2, 1993 (defendant contacting ex-wife in spite of bond conditions ordering no contact); August 11, 1993 (defendant's contact with ex-wife in violation of court orders). **[\*\*\*49]**

n6 There was evidence in the police report from the July 24, 1992, incident that the neighbor believed the defendant had a weapon in his van at that time, that the defendant recklessly handled weapons, and that the defendant bought and resold a number of guns. The circuit

**OTT 003074**

court denied admission of any testimony referencing a weapon, stating "the Court does not believe that that testimony is similar or relevant."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

P98. In addition to the thorough analysis of the other acts evidence, the circuit court gave a cautionary instruction to the jury that the evidence of the July 24, 1992, incident was probative only of the defendant's motive, intent, knowledge, absence of mistake or accident, and credibility. See WI JI -- Criminal 275. Although the use of the evidence in the present case is only permissible to prove defendant's intent or absence of accident, the circuit court's instruction was not so "broad that its cautionary effect was significantly diminished." Majority op. at 24.

P99. In State v. Fishnick, 127 Wis. 2d 247, 378 N.W.2d 272 (1985), the circuit court admitted other acts [***50] evidence under Wis. Stat. § 904.04(2) for the purpose of showing the defendant's motive, intent, preparation or plan. Accordingly, the cautionary [*804] instruction given to the jury in Fishnick stated that the other acts evidence was admitted to show motive, intent, preparation or plan. See id. at 260. On appeal, this court determined that the circuit court did not erroneously exercise its discretion in admitting the evidence because the evidence was relevant for purposes of motive and identity. See id. However, this court determined that the evidence was inadmissible to show plan, preparation, or intent to do the act. Although the jury instruction in Fishnick was broad, this court upheld the admission of the evidence concluding that "the jury was properly instructed that the evidence was introduced on the issue of motive." Id. at 261.

P100. Furthermore, in State v. Roberson, 157 Wis. 2d 447, 459 N.W.2d 611 (Ct. App. 1990), review denied, 464 N.W.2d 424 (Wis., Oct. 16, 1990), the court of appeals upheld the circuit court's admission of other acts evidence. In [**46] admitting the evidence, the circuit court instructed the jury that the other act was admissible [***51] because it was relevant to the issue of the defendant's alleged plan. See id. at 452. The court of appeals concluded that the evidence was not admissible to show the defendant's plan, but that it was admissible to show the defendant's intent. See id. at 454. The court of appeals affirmed the circuit court, stating that "although the trial court articulated the wrong reason for admission of the [other acts] evidence, we will affirm if the ruling is proper on other grounds." Id. at 453-54.

P101. I agree with the majority that the vitality of Wis. Stat. § 904.04(2) and Whitty should be reaffirmed. See Majority op. at 7. Whitty states that other acts evidence should be used sparingly and only when reasonably necessary. See Whitty, 34 Wis. 2d at 297. However, a determination of admissibility must [*805] be made on a case-by-case basis, using a detailed analysis of the facts. There is neither a presumption of exclusion nor a presumption of admission regarding other acts evidence. See State v. Speer, 176 Wis. 2d 1101, 1114, 501 N.W.2d 429 (1993). If the evidence is relevant for an admissible purpose under Wis. Stat. § 904.04(2), it will be admitted unless [***52] its probative value is substantially outweighed by unfair prejudice. See id. at 1115.

P102. In the present case, the circuit court articulated its reasons why the July 24, 1992, incident was probative to show the defendant's intent or absence of accident and applied the proper Wis. Stat. § 904.03 analysis. The circuit court considered the relevant facts, applied the appropriate standard of law, and demonstrated a rational process in reaching the conclusion to admit the other acts evidence. The other acts evidence had definite probative value on the issues of intent and absence of accident. That probative value was not substantially outweighed by the dangers set forth in Wis. Stat. § 904.03, such as unfair prejudice. There was no erroneous exercise of discretion by the circuit court judge in allowing

OTT 003075

the other acts evidence to be presented to the jury. Furthermore, consistent with our prior decisions, the cautionary instruction given was appropriate, since the jury was instructed that the evidence was admitted for the purposes of showing the defendant's intent and absence of accident.

P103. For these reasons, I respectfully dissent.

P104. I am authorized to state [***53] that Justice DONALD W. STEINMETZ and Justice JON P. WILCOX join this dissent.

Service: **Get by LEXSEE®**
Citation: **216 wis2d 768**
View: Full
Date/Time: Tuesday, February 1, 2005 - 3:54 PM EST

\* Signal Legend:
● - Warning: Negative treatment is indicated
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

OTT 003076

# MILWAUKEE POLICE DEPARTMENT

## DEPARTMENTAL MEMORANDUM



**Date:** July 25, 2005

**To:** Mark WILLIAMS
Assistant District Attorney - Milw. County D.A.'s Office

**From:** Eric J. MOORE
Captain of Police - Criminal Investigation Bureau

**Regarding:** Cold Case Homicide Investigation - (Victim Debra MANIECE)

---

Greetings Mark,

I am sending you four documents that relate to your prosecutorial review of the Debra MANIECE investigation (as that investigation relates to Kelvin D. STRONG). The first document is a copy of the original departmental memorandum (dated April 22, 2004) that I sent to Detectives Ricky BUREMS and Diedra COLE assigning them case follow-up on the MANIECE homicide.

The second document is a copy of a second departmental memorandum (dated July 7, 2005) that I sent to Detectives BUREMS and COLE regarding the murders of five elderly persons in the Milwaukee Metro area during the early part of 1988. The investigation into these murders and the subsequent arrest and conviction of Robert J. WIRTH are facts that I believe you are familiar with. It is my belief that in investigations like the MANIECE case it can be helpful to look for resonance from the past. By this I mean looking at past cases which have parallels to the case that is presently being investigated, with the hope that certain aspects of those past cases could provide helpful insight in the present case. With that thought in mind I selected the WIRTH case. I contacted former Police Captain Vincent VITALE who was my Supervisor during my tenure in the Homicide Unit, and was also the lead investigator in the WIRTH case. Mr VITALE is now the Dean of MATC's Police Science Program. I discussed with Mr. VITALE the parallels between the MANIECE case and the elderly murders. The most significant similarity between the cases was the recovery of Kelvin STRONG's blood from the clothing/body of Debra MANIECE and the recovery of Robert WIRTH's blood from a bloodstained toy donkey in homicide victim Ruth BRESHNAHAN's living room. Another significant similarity was an established pattern of violent and predatory criminal behavior in the suspects background. Also, it is extremely important to note the sexual assaults that Kelvin STRONG committed antecedant and subsequent to the homicide of Debra MANIECE.

The third document is a copy of a newspaper article that I was fortunate enough to come across while I was in Detroit, MI. attending Major League Baseball's All-Star game. The article was published on Monday, July 11, 2005 in the Detroit Free Press. The article focused on the cold case investigation into the death of college student Jane MIXER in March of 1969. Using modern forensic science Michigan State Police Detective Sergeants Eric SCHROEDER and Denise POWELL who were assigned to review the then 35 year old case, matched DNA found on the pantyhose MIXER was wearing at the time of her death to the DNA of 62 year old retired nurse Gary LEITERMAN. As you will find in reading the article LEITERMAN denied any knowledge of MIXER and ostensibly her death. Nevertheless, LEITERMAN was charged with MIXER'S homicide. As is the case in the MANIECE homicide the DNA match is the most significant evidentiary aspect in the MIXER case. LEITERMAN's trial began on Monday, July 11, 2005 (the same day the aforementioned newspaper article was published) and ended on Friday, July 22, 2005. After four hours of deliberation LEITERMAN was unanimously found guilty of the homicide of Jane MIXER by a jury of his peers. I have since been in contact with Detective Sergeant Eric SCHROEDER and I expect to speak to him at length regarding the MIXER case on Monday, August 1, 2005.

The fourth document is a LEXIS/NEXIS copy of State vs. Kevin P. SULLIVAN which was provided to Detectives BUREMS and COLE for application to the Prior Acts portion of the Wisconsin State Statutes.

Thanks in advance for your review of this memo and it's related attachments.

Eric

**CONFIDENTIAL**         **OTT 003077**

Haunting image of college student
pushes police to find answers in unsolved slaying

# PICTURE OF PERSISTENCE



ERIC SEALS/Detroit Free Press

Michigan State Police Detective Sgt. Eric Schroeder is profiled against his computer screen, which has a picture of Jane Mixer, who was found slain in March 1969. He was a child when she was killed, but uncovering the picture prodded him to find a suspect.

By MARYANNE GEORGE
FREE PRESS ANN ARBOR BUREAU

In the photograph, Jane Mixer is full of life, her auburn hair brushing her shoulders, a radiant smile on her face reflecting the bright future that awaited her.

But in a cruel twist of fate, the picture, taken in 1967 with Mixer's own camera, was not discovered until after her brutal killing. Police said they found the film while searching Mixer's room at the University of Michigan Law Quad, shortly after she was found shot in the head and lying on a grave in 1969.

Today, 36 years later, Gary Leiterman, will stand trial in a Washtenaw County courtroom in connection with Mixer's killing. Leiterman, 62 of Gobles, was charged last year after his DNA was found on Mixer's pantyhose. He has denied killing her.

Modern forensic science cracked the unsolved slaying, but the lovely picture of Mixer helped to keep the case alive.

State Police Detective Sgt. Eric Schroeder, one of two troopers at the Ypsilanti Post assigned to review the case in 1997, found the picture among other evidence and kept it as a reminder not to give up.

Last year, he gave the black and white picture to Mixer's father and then developed a color picture from the old negative. Deeply af-



Gary Leiterman, a retired nurse, is charged with murder in the slaying. His DNA was linked to the victim in 2004.

fected by the vibrant new image, Schroeder made it the screen saver on the computer in his Lansing office.

"When I saw the picture, it made me very sad," Schroeder, now a member of the State Police Violent Crimes Unit, said recently. "Here was a woman with a lot of potential who got robbed of it. I had been looking at crime scene photos of her for years and it was nice to see her alive and in color. That picture was telling me not to forget about her."

## A troubling case

Mixer, 23, a promising law student from Muskegon, was found on March 21, 1969, shot twice in the head with a .22-caliber pistol and lying on a grave in Denton Cemetery in Van Buren Township. She had been on her way home to tell her parents about her engagement to her fiance, Phil Weitzman. Weitzman last talked to her about 6 p.m. on March 20. She told him she had found a ride home from a student bulletin board with a man named David Johnson.

But she never made it. Mixer was found about dawn the next morning by a neighborhood boy on his way to the school bus. She was the third of seven young women brutally slain in a string of highly publicized homicides in the Ann Arbor-Ypsilanti area between 1967-69 that terrorized the college towns.

In 1970, John Norman Collins was convicted in the 1969 slaying of Karen Sue Beineman, an 18-year-old Eastern Michigan University freshman from Grand Rapids. He is serving a life sentence.

The killings stopped after

See PICTURE, 9B



Sgt. Eric Schroeder, 40, of Lansing, said the case of Jane Mixer, a student found slain in Van Buren Township in 1969, has touched him like no other. "You ask any detective and there is always one case that hits them hard; this is the one for me," he said.

ERIC SEALS/Detroit Free Press

# 'ICTURE | Image haunted investigators

### From Page 5B

lins was arrested. But for rs, the Mixer case haunted ice.

Most of the other victims 'e found in places where y could be easily discovered l were beaten in the head, angled, sexually assaulted l were nude or semi-nude. But Mixer's killing did not tch the pattern. She had n shot twice in the head with 2-caliber pistol and was not ually assaulted. She was ngled with a nylon stocking which did not belong to her after she died, according to ice

Mixer had been placed gent- n the cemetery on top of a ve, according to police. Al- ugh her pantyhose had been led down and her jumper ved up near her head, she l been carefully covered h her coat, a bloody scarf l piles of clothes — still on hangers. Her suitcase, se, shoes and a copy of the el "Catch 22" were placed tly nearby.

Someone made a lot of trips k and forth from a vehicle that was significant behav- that was not attributed to other crimes," Schroeder l. "I always felt someone got iy with something. I heard 'e was a lot of political pres- ə at the time to wrap up these cases, but a little voice said to me, 'If someone got away with something, they could have gotten away with something else.' "

### Waiting on technology

In 2000, Schroeder joined the State Police Violent Crimes Unit and entered information from Mixer's killing into a national FBI database that analyzes criminal behavior patterns. The next year Schroeder, Sgt. Denise Powell, Sgt. Fred Farkas from the Ypsilanti Post and retired Lt. Earl James, who had worked on the original investigation, met in Lansing and decided to submit evidence to the State Police DNA laboratory for analysis.

"Other people had not forgotten about the case," Schroeder said. "This was a case waiting for science and technology to catch up."

But then the case took a bizarre turn.

On Dec. 17, 2003, scientists matched a drop of blood from Mixer's hand to John D. Ruelas. At the time of the killing, Ruelas, now 40, from Jackson, was only 4 years old. He was convicted in 2002 of beating his mother to death. On Aug. 26, 2004, scientists matched stains from Mixer's pantyhose to Leiterman's DNA that had been collected in another case.

After further investigation, Leiterman was arrested and charged with murdering Mixer on Nov. 24, 2004. But police have not been able to connect Ruelas with Leiterman or Mixer, a troubling detail that Leiterman's attorney, Gary Gabry hopes will provide a jury with enough reasonable doubt to acquit Leiterman.

On Tuesday Washtenaw County Trial Judge Donald Shelton dismissed a motion brought by Gabry to throw out Leiterman's DNA because it was illegally obtained after Leiterman was convicted in 2002 of forging prescriptions. Leiterman's conviction was dismissed in 2003 after he completed a drug treatment program.

Leiterman, a nurse who retired from Borgess Medical Center in Kalamazoo in 2002, was not a suspect in the original investigation of Mixer's killing, according to police. He has repeatedly denied killing her, Gabry said.

"A DNA match in a cold case provides you with a suspect, but it isn't the whole case," Gabry said. "When investigation leads you to other suspects like John Ruelas, the prosecutor must prove not just that Mr. Leiterman's DNA got on her pantyhose. He must prove beyond a reasonable doubt that he killed her."

Washtenaw County Deputy Chief Assistant Prosecutor Steve Hiller declined to comment. Schroeder said there is other evidence beyond the DNA against Leiterman that will be presented at the trial, which is expected to last about three weeks.

### Reopened wounds

The case has been an ordeal for both the Mixer and Leiterman families.

Leiterman's wife and children have sat stoically through several lengthy court hearings and smile when Leiterman blows them a kiss on the way out of the courtroom. They have declined to comment. Leiterman could be sentenced to a maximum of life in prison if convicted in the case.

Several members of Mixer's family are planning to attend the trial and her 90-year-old father is expected to testify.

Mixer's sister, Barbara Nelson, said the trial means the revival of painful memories, but it may also provide some comfort as details of her sister's short life are revealed.

"If the trial provides recognition of what a vital, wonderful human being she was, it's an odd tribute," Nelson said.

*Contact MARYANNE GEORGE at 734-665-5600 or mageorge@freepress.com.*



| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 443-2006-00865 |

| Wisconsin Equal Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ricky Burems** | **(414) 578-9648** | **10-09-1959** |

| Street Address | City, State and ZIP Code |
|---|---|
| **3310 West Thurston Avenue, Milwaukee, WI 53209** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **MILWAUKEE POLICE DEPARTMENT** | **500 or More** | **(414) 935-4444** |

| Street Address | City, State and ZIP Code |
|---|---|
| **749 W. State Street, Milwaukee, WI 53203** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-24-2006**  Latest **03-06-2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.  I was hired by the Respondent in February of 1982 as a Police Officer. My most recent position is that of a Detective assigned to the Violent Crime Division. I am currently involved in an investigation that my supervisors and management have undermined my work and intimidated me by allowing white detectives to assume responsibility for my work. On February 24, 2006, I was not informed of a meeting involving my case. On March 6, 2006, I was intentionally excluded from another meeting. A white detective was assigned to present my case at this meeting.

II.  Captain Timothy Burkee and Lieutenant William Jessup gave me no reason for being subjected to intimidation or being excluded.

III.  I believe that the Respondent discriminated against me in that I was subjected to intimidation and different terms and condition of employment because of my Race, Black, in violation for Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | *[signature]* |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| _____  _____  Date   Charging Party Signature | 3-19-06  *[signature]* |

OTT 003080

| PO-15B SUPPLEMENTARY REPORT | Date of Report | Incident/Accident # |
| MILWAUKEE POLICE DEPARTMENT | 11-20-94 | 94-91653/M2991 |
| INCIDENT | Date of Incident/Accident | Rep. Code # |
| HOMICIDE | 11-20-94 | |
| VICTIM | LOCATION OF INCIDENT | DIST |
| DOE, JANE | 1929A N. 12th St. | 5 |
| JUVENILE Last Name    First | Middle    Date of Birth | |
| QUANT      TYPE OF PROPERTY | DESCRIPTION    SERIAL #    CODE #    VALUE | |

On Sunday, 11-20-94, we, Squad 126A Days, Detectives Michael WESOLOWSKI and Gordon BRADLEY, were sent to 1929A N. 12th St., regarding a body being found there. We were informed that Squad 50, Police Officer DRAKOS, was dispatched at 10:28 a.m., to check for a body in an abandoned laundromat. Police Officer DRAKOS subsequently located the for *m.w.* body and called for additional assistance and the following personnel responded to the scene. Other uniformed persons at the scene were Squad 5, Police Sergeant Cal BARRY, Squad 51, Police Officer Prince RILEY, Squad 59, Police Officer Vickie KROWELL, Squad 10, Police Officer Jeff MANTZ, Squad 310, Police Officer SLIGA, Squad 565, Police Officer TAYLOR, Squad 575, Police Officers FOSTER and MORRIS.

From the Criminal Investigation Bureau, in addition to ourselves, Squad 165, Detective Lieutenant James ARDIS, Squad 112, Detective Peter PINCHAR, and Squad 115A, Detective Patrick KENNEDY. Also responding was Squad 296, Police Officer Gordon FRANK, who took a total of 33 photos of the scene. Squad 384, ID Technician David GORECKI, also responded and checked for latent fingerprints on evidence and also took blood samples at the scene. This will be referred to in his reports and has a latent case of 94-3845.

Also responding from the Milwaukee Fire Department was Engine 13, manned by the following personnel. Captain Randolph ZINGLER, Fire Fighter Michael SCHNEIDER, Fire Fighter Thomas KIZEWSKI, and Fire Fighter Karl KRAAI.

Responding from the Milwaukee County Medical Examiner's Office was Dr. Jeffrey JENTZEN and Forensic Investigator William KASSULKE. The victim, who at the time of this dictation is still unidentified, was pronounced dead at 10:54 a.m., on 11-20-94 by Forensic Investigator William KASSULKE.

**CONFIDENTIAL**    **OTT 003081**

The scene of this offense is 1929A N. 12th St.  This address is located in a building on the southwest corner of 12th and Brown. The building is abandoned and vacant and very unkept and unclean, with a large amount of debris scattered throughout the inside of the building.  The lower windows of building are boarded up.  The front of the building has one address on it, that being 1931 N. 12th St.  There are two signs on the front of this building, one for McNeal's Grocery and also another sign for Variety Gifts.  The front of this building is boarded up.

The victim's body was located at the rear of the building, which again is 1931A N. 12th St., just inside of the building.  The victim is *mw* is described as being a black female in her 20's, approximately 5'2" to 5'3" tall, 110 to 120#, medium complected and also having a short pony tail, was lying on the steps.  The entrance to 1929A N. 12th St., which is on the west side of the building, there are three steps, a total of 24" high, which leads to the entrance.  On the top step was a blood droplets, and upon our arrival, they still appeared to be fresh and moist.  *upon* one *mw* entering into the building, there is a space of 41" x 41", which is a landing, which is right before steps leading to the second floor. There are a total of 20 steps which go to the second floor and the steps are 8-1/2" deep x 36" wide, with the stair-well being a total 40" wide.

The victim who's lying face down with her face slightly turned to the right, with her head being on the third step *2w* from the bottom.  She was naked from the waist down and was wearing two shirts on the upper portion of her body, which were pulled up above the waistline.  There was a white tee shirt under a gray short sleeve short shirt, with the writing of Chicago White Sox on the front.  She was also wearing a black bra, which was snapped in the back, but pulled above the breast in the front.  Her legs were spread with her left leg bent and extending to the bottom step, and

onto the landing.  Her right leg extended backward and her right leg extended back onto the landing and her ~~hands~~ *PANTS mw*, which were green plaid, were still around her right ankle, which had a black shoe on it.  The left foot did not have a shoe on it.

The victim was also wearing a gold ring on her right hand, ring finger.  Upon closer examination, there was blood on the left and right side of her face and ears and contusions to the right eyebrow and cheek bone and nasal area.  There were also marks on the right side of her neck, which possibly could be from fingernails.  Located on the landing, next to the body was a blue jean jacket with the brown leather trim, and this was taken by the Medical Examiner's Office, as well as her pants and the clothing that she was wearing.

Also located on the outside steps leading into the building was a orange peel, which was next to the blood droppings.  There were also some blood droppings on the landing and also on a door, just north of where the victim was lying.  Located in an adjoining room, which is 10'2"x23'5" in length, with entrances to three other rooms, was the second shoe of the victim.  This shoe was found on the south wall of this room, between two entrances to the two other rooms.   This shoe, which is a black shoe size 6-1/2, Coasters brand, was placed on Inventory #1500404.  Also located by this shoe was another piece of a orange peel.  It should be noted that both orange peels appeared to be fresh in nature, which differs from most of the other items located in this building, which appeared to have been there a long length of time.  There was also a lot of plaster, dust and debris located throughout the building.  The victim also had, what appeared to be, plaster residue on her body.

Located on the outside of the building, just west of the front entrance, which leads to the outside steps, was a group of bricks which was approximately 93 inches west of the steps.  This group of bricks, 11 in total, which included bricks and pieces, had blood on

them.   These bricks were placed on Inventory #1500405.   These bricks were among numerous other bricks and other debris lying on the ground.   Also found outside was a earring, round gold costume type earring for pierced ear, and this was located also, west of the steps.   Also located was a piece of costume jewelry, which could have come from a pendant or necklace, and this was gold with fake diamonds on it.   These two items were subsequently placed on Inventory #1500405.   Located near the sidewalk, which would be on W. Brown St., was a silver key and a white plastic pearls, which were broken.   It is unknown if these items were related to this incident.   The key and the pearls were also placed on Inventory #1500405.

Additional evidence that was taken at the scene is as follows. Two empty bottles of 40 oz. Silver Thunder Malt Liquor, which were located in the landing next to the body.   Both bottles were empty. Next to these two bottles was another bottle of Mogan David 20/20 Wine.   This bottle was also empty.   All three bottles were placed on Inventory #1500404, Items #1, #2, and #3.   Also located on the landing, by the body, was a gray and red sock, with gray being the predominant color.   This was placed on Inventory #1500404, Item #4. Also located underneath the body, after the body was moved by Medical Examiner's Office was a partially full, Old Style Classic Draft beer can, and this was placed on Inventory #1500404, Item #5. Located in the door jam of the entrance was a silver kitchen knife with a 4" blade, and this was placed on Inventory #1500404, Item #6.

Located in the adjoining room was a prescription bottle that has a prescription for a <u>Carl ROBINSON</u>, given to him by <u>Dr. Robert TRUPPE</u>.   The prescription is from Sinai Samaritan Medical Center, East Campus Pharmacy, 950 N. 12th St.   Also located in this room was a business card from Wisconsin Correctional Service, for a <u>Helen ROBERTS</u>, who was a Coordinator for Job Development at

CONFIDENTIAL                    OTT 003084

436 W. Wisconsin, 3rd floor, (271-2512).  Also on this card were two names which were printed in pencil on the card and these names *one mw.* had a <u>Robert HENRY</u> and a <u>Kurtis CRAMRA</u>.  Also located in this room was a white piece of paper that said interview sheet and job lead sheet, with the name of <u>R. L. HENRY</u> on it and it was dated 10-18-94.  Also located in this room was a yellow envelope from Department of Social Services addressed to a <u>Debra D. OWENS</u>, with an address of 2677 N. 39th St.  The prescription, the business card, the interview sheet and the yellow envelope were all placed on Inventory #1500404.

Located in the basement of this building by Police Officer <u>Prince RILEY</u> was a newspaper, the Chicago Tribune, dated 11-19-94, the Home Guide section, next to this was a small bag of Dorrito Tortilla Chips and an empty Newport cigarette pack.  These items were placed on Inventory #1500405.

Located outside, and across the street from where this incident occurred, in the gutter, at approximately 1218 W. Brown, was a pair of glasses, brown with wire frame, which had the name of Polo Ralph Laren, printed on the lens.  These glasses were placed on Inventory #1500405.

It should be noted that ID Technician <u>David GORECKI,</u> dusted the following items for any type of latent prints, that being the 3 bottle, the beer can, the knife, which were all found near the body, along with the newspaper, the potato chip bag and the cigarette pack, for any type of latent prints and this met with negative results.

Report dictated by:  Detective Michael WESOLOWSKI

MW:sa   11-20-94

| REPORTING OFFICER | PAYROLL # | LOC. CODE | SUPERVISOR SIGNATURE |
|---|---|---|---|
| *Michael Wesolowski* | | | |
| Detective Michael WESOLOWSKI | 48192 | 91 | |

CONFIDENTIAL      OTT 003085

| PO-15A 3/98 SUPPLEMENTAL REPORT MILWAUKEE POLICE DEPARTMENT | ☐ INCIDENT SUPPLEMENT<br>☐ ACCIDENT SUPPLEMENT<br>☐ JUVENILE SUPPLEMENT | | DATE OF REPORT<br>6/8/01 | INCIDENT/ACCIDENT #<br>94-91653/M2991 | |
|---|---|---|---|---|---|
| **INCIDENT INFORMATION** | INCIDENT<br>HOMICIDE | | DATE OF INCIDENT/ACCIDENT<br>11/20/94 | | |
| | VICTIM<br>MANIECE, Debra | | LOCATION OF INCIDENT/ACCIDENT<br>1929 A N. 12th St. | | DIST. #<br>5 |
| JUVENILE LAST NAME | FIRST | MIDDLE | DATE OF BIRTH | ☐ DETAINED<br>☐ ORDERED TO MCCC<br>☐ OTHER | |
| QUANTITY | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |

This report is dictated by **Detective Michael WESOLOWSKI** of the Criminal Investigation Bureau, Day Shift.

On Friday, 4/27/01, the Milwaukee Police Department received a phone call from **Dirk JANSSEN**, who is the head Serologist at the Wisconsin Regional Crime Lab located in Milwaukee. Mr. JANSSEN at that time indicated that he had information regarding a homicide that occurred in 1994. He indicated that his lab had matched a blood sample which is currently in the DNA Data Base to blood found on the victim's clothes. He indicated that the victim that his blood matched is a **Debra MANIECE**, B/F, DOB: 10/26/63. He indicated that the person whose blood was found on MANIECE'S clothing is currently incarcerated as a Wisconsin State prisoner. He indicates that this person is a **Kelvin STRONG**, B/M, DOB: 4/29/57. He indicated that Mr. STRONG had submitted to a DNA test on 3/29/96 because he is a sexual offender. He indicated that Mr. STRONG'S DNA was found on the clothing of Debra MANIECE. He indicated that there were three different locations on the clothing of Debra MANIECE where Mr. STRONG'S blood was located. He stated that Debra MANIECE was wearing two T-shirts and on the outer T-shirt there was blood which was identified as that of Kelvin STRONG. He indicated that on the inner T-shirt there was a combination of Mr. STRONG'S blood, as well as Debra MANIECE'S blood. He indicated that the third location of the blood was on the victim's shoe and this blood was also matched to Kelvin STRONG.

It should be noted that Debra MANIECE was killed on 11/20/94, at 1929 A N 12th St. Upon reviewing this file, there is no mention of Kelvin STRONG in the file. Mr. STRONG is currently incarcerated as a Wisconsin State prisoner in Whiteville, Tennessee, with his prisoner number being 592-30-A. He has been in prison since 3/14/96 on 2 Counts of Sexual Assault and an Armed Robbery. He is sentenced to prison until 4/13/75 and is first eligible for parole on 4/12/25

On Wednesday, 6/6/01, we, Squad 126A, Detectives Michael WESOLOWSKI and **Carl BUSCHMANN** did interview Mr. Kelvin STRONG at the Whiteville Tennessee Correctional Facility

**CONFIDENTIAL**

OTT 003086

The summary of this interview is on form PA-45B which was prepared by myself, Detective Michael WESOLOWSKI. This form reads as follows.

The following interview took place at Whiteville Tennessee Prison in a security room. The interview started at 11:00 a. m., 6/6/01. I, Detective Michael WESOLOWSKI, in the presence of Detective Carl BUSCHMANN advised subject Kelvin STRONG, B/M, DOB: 4/29/57, of his Constitutional (Miranda rights). The rights were read from a State of Wisconsin Constitutional rights card. Mr. STRONG stated that he understood his rights and would voluntarily talk to us without an attorney present.

Born in Milwaukee, graduated from Washington High School in 1974. Also attended UW Green Bay for 13 months. Knows how to read and write English, is not currently high on drugs or intoxicated and does understand our conversation. Has been in prison since 1996. Was convicted of 2 Counts of Sexual Assault and 1 Count of Armed Robbery. He is sentenced until the year 2075 and is eligible for parole in 2025.

Regarding the death of Debra MANIECE, M2991, which occurred on or about 11/20/94 at 1929 A N. 12th St., Mr. STRONG relates the following.

Back in 1994, STRONG states that he was living with his sister, **Michelle** and her husband Booker at 5571 N. 40th St. States that Michelle still lives there. States that he was working for a Temp Service located at 76th and Greenfield and was working at Mecca at different events States he cannot recall the name of the Temp Service. States that his last job before getting arrested and sent to prison was at Ember Foods.

States that he does not know the victim of the homicide, Debra MANIECE. States that to his knowledge, he has never met the woman in his life. States that back in 1994 that he was using crack cocaine and weed. States that he was also selling cocaine back then. States that he was selling in the area of Lapham Park and 21st and Walnut.

STRONG states that in his life that he may have been involved in about twenty dope dates States that he would give women drugs in exchange for sex back then, including in 1994. States that he would never dope date in a vacant building. States he would never get in a situation that he could not control. States in his two convictions for Sexual Assault, both women were dope dates. Both of

**CONFIDENTIAL** **OTT 003087**

these incidents took place at the woman's residence. States that he is not familiar with the area of 12th and Brown. States that he had passed through the area in the past.

Mr. STRONG viewed a crime lab report that indicated that his blood was found on Debra MANIECE'S clothing. Mr. STRONG agreed that the report did state that his blood was on her clothing. Mr. STRONG states that he does not know how his blood got on her clothes. States that in the past, that he has hit women, but would never do something so extreme as to kill someone. STRONG denies any involvement or knowledge regarding the death of Debra MANIECE. STRONG states that he has no explanation as to how his blood was found on her clothes.

The interview with Mr. STRONG again took place at the Whiteville Tennessee Correctional Facility in a security room. The only people present at that time were myself, Detective WESOLOWSKI, along with Detective BUSCHMANN and Mr. STRONG. Neither myself or Detective BUSCHMANN had any type of weapons on our person. The interview with Mr. STRONG started at 11:00 a. m. and concluded at 12:50 p. m., on 6/6/01. In addition to form PA- 45B, the handwritten summary of the interview, PA-45A was also completed which is a pedigree or background sheet. Following the completion of the handwritten statement, I, Detective WESOLOWSKI did have Mr. STRONG read the first line out loud to ascertain if he could read. Mr. STRONG did read the line clearly. At that point, I, Detective WESOLOWSKI while seated directly next to Mr. STRONG did read out loud the entire statement following line by line with my pen. Following this, Mr. STRONG did sign this statement in four different locations and did initial any type of mistakes or cross offs that were in the statement. Mr. STRONG did not make any request during our interview with him for any type of creature comforts. Mr. STRONG also voluntarily submitted to the taking of buccal or oral swabs. These swabs, along with the consent form that he signed, were subsequently placed on Inventory No. 162775. These swabs will be transported to the Wisconsin Regional Crime Lab and checked against the blood evidence that was recovered at the crime scene. Mr. STRONG'S involvement in this case is pending further investigation.

Report dictated by: Detective Michael WESOLOWSKI

MW: lm 6/8/01

| REPORTING OFFICER | | | SUPERVISORS SIGNATURE |
|---|---|---|---|
| Detective Michael WESOLOWSKI | Payroll | Loc Code | LT/D Christopher Domagalski |
| *Michael Wesolost* | 48192 | 91 | |

3

CONFIDENTIAL

| | | |
|---|---|---|
| ☐ INCIDENT SUPPLEMENT | DATE OF REPORT | INCIDENT/ACCIDENT # |
| ☐ ACCIDENT SUPPLEMENT | 02/05/05 | 94-91653/M2991 |
| ☐ JUVENILE SUPPLEMENT | | |

| INCIDENT INFORMATION | INCIDENT HOMICIDE | DATE OF INCIDENT/ACCIDENT 11/20/94 | | |
|---|---|---|---|---|
| | VICTIM MANIECE, Debra | LOCATION OF INCIDENT/ACCIDENT 1929A N. 12th Street | | DIST. # 5 |
| JUVENILE LAST NAME | FIRST          MIDDLE | DATE OF BIRTH | ☐ DETAINED ☐ ORDERED TO MCCC ☐ OTHER | |

| QUANTITY | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |
|---|---|---|---|---|---|
| | | | | | |

This report is dictated by <u>Detective Diedra COLE</u>, assigned to the Criminal Investigation Bureau, Early Shift.

On Monday, January 24, 2005, at approximately 1:30 p.m., I, Detective Diedra COLE along with <u>Detective Ricky BUREMS</u>, Squad 114 Early, conducted follow-up investigation regarding the above listed offense. This follow-up was done at the Milwaukee Police Department, Investigative Support Section (I.S.S.) the purpose of this investigation was to attempt to locate an individual identified as <u>Rita WILLIAMS</u>, B/F, DOB: 01/18/60, Social Security #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, formerly of 1529 W. Burleigh, Milwaukee. Ms. WILLIAMS was sexually assaulted and robbed by the suspect, <u>Kelvin D. STRONG</u>, B/M, DOB: 04/29/57 on February 27, 1995. STRONG was, in fact, convicted of 1st Degree Sexual Assault and Armed Robbery in connection with those offenses. The Milwaukee County Felony Case No. is F-930587. The Milwaukee Police Department Complaint Number is 95-14021.

The attack of Ms. WILLIAMS by STRONG in 1995 may relate to this (<u>MANIECE</u>) investigation through Wisconsin State Statue 904.04 (2) (other crimes, wrongs, or acts) (Prior Bad Acts).

I.S.S. personnel were able to identify a possible address of 8404 S. Muskegon Avenue, Chicago, Illinois for Ms. WILLIAMS, this is the address that is listed for Rita WILLIAMS on her Illinois State Identification Card.

On Tuesday, January 25, 2005, at approximately 6:45 p.m., we, (Squad 114 Early), did make contact with <u>Detective Mike BAKER</u> of the Chicago Police Department, assigned to Violent Crimes, Area 2. Per our request, Detective BAKER did check the South Muskegon Avenue address for Ms. WILLIAMS. Detective BAKER informed us that after checking that address, he discovered that Ms. WILLIAMS moved just prior to Thanksgiving 2004 and is currently living in Tuskeege, Alabama at the address of 2403 Barrow, home telephone no. 334-725-1235.

**CONFIDENTIAL**          OTT 003089

At approximately 9:30 p.m., (January 25, 2005), we contacted Ms. WILLIAMS by phone. We informed her of the fact that we were investigating the death of Ms. MANIECE and furthermore that Kelvin STRONG was a part of our investigation. Ms. WILLIAMS was specifically asked if she would be willing to give Court Testimony, in Milwaukee, if needed regarding STRONG'S 1995 attack on her. WILLIAMS further stated that she is very willing to testify in any setting about what Kelvin STRONG did to her. She added that if that included returning back to Milwaukee then she would. Ms. WILLIAMS stated that we could contact her at anytime if her assistance were further needed.

Report dictated by: Detective Diedra COLE

DC:omr/lm   02/05/05

| REPORTING OFFICER | | | SUPERVISORS SIGNATURE |
|---|---|---|---|
| DETECTIVE DIEDRA COLE | Payroll 65148 | Loc Code 92 | Lt William Jerrup |

**CONFIDENTIAL**          **OTT 003090**

| INCIDENT INFORMATION | INCIDENT | | DATE OF INCIDENT/ACCIDENT | | |
|---|---|---|---|---|---|
| | HOMICIDE | | 11/20/94 | | |
| | VICTIM | | LOCATION OF INCIDENT/ACCIDENT | | DIST # |
| | MANIECE, Debra | | 1929 A N. 12th St. | | 5 |
| JUVENILE LAST NAME | FIRST | MIDDLE | DATE OF BIRTH | DETAINED ORDERED TO MCCC OTHER | |

| QUANTITY | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |
|---|---|---|---|---|---|
| | | | | | |

This report is being dictated by Detective Ricky BUREMS, Squad 114, Criminal Investigation Bureau, Early.

On Saturday, February 5, 2005, at 8:45 P.M., we, Squad 114, Detectives Ricky BUREMS and Diedra COLE, conducted follow-up investigation into the above homicide. This follow-up consisted of locating and interviewing Mia C. CAMPBELL-F/B, dob-12/27/65 of 2551B N. 23rd, phone #265-4459. It should be noted that Mia CAMPBELL was a victim of a sexual assault and robbery on 8/15 to 8/16/94, Milwaukee Police Department file #94-50314. This incident was prosecuted by the Milwaukee County District Attorney's Office, Case #F9551777 along with Case #F951715, which was the sexual assault and robbery of Rita WILLIAMS, which occurred on 2/27/95. The suspect in both of these cases as well as the homicide of Debra MANIECE is Kelvin D. STRONG-M/B, dob-4/29/57.

A check of STRONG'S criminal history disclosed that he has a pattern of violence against women dating back to September of 1974. The acts perpetrated by STRONG range from robbery, aggravated battery to sexual assault.

The reason for locating and interviewing Mia CAMPBELL was to determine whether or not she would cooperate with the investigation of the homicide of Debra MANIECE. Mia indicated that she would cooperate to the fullest extent with police investigators and the staff of the District Attorney's Office. She further stated that she would be willing to testify in court. Mia CAMPBELL'S cooperation and testimony could be vital in the establishment of prior bad acts under Wisconsin Statute 904.04 (2). This statute is pertinent in this investigation because it addresses STRONG'S pattern of violence towards women.

It should be noted that the sexual assault/robbery of Mia CAMPBELL, which occurred in August of 94 was followed by the homicide of Debra MANIECE, which occurred in November of 94 and then the sexual assault robbery of Rita WILLIAMS, which occurred in February of 95. All

**CONFIDENTIAL**          **OTT 003091**

occurred within a six month period.

Report per Detective Ricky BUREMS.

RB:jaj 2/11/05

| REPORTING OFFICER | | Payroll | Loc Code | SUPERVISORS SIGNATURE |
|---|---|---|---|---|
| DET. RICKY BUREMS | | 50519 | 92 | Lt William Jersey |

# MILWAUKEE POLICE DEPARTMENT

## DEPARTMENTAL MEMORANDUM

**Date:** April 22, 2004

**To:** Detectives Ricky BUREMS & Deidra COLE (Sqd. 114-Early)

**From:** Eric J. MOORE
Captain of Police

**Regarding:** Cold Case Investigation M2991 (Victim-Debra MANIECE)



Please be advised that you are being assigned case follow-up on a cold case homicide. This is the first of several cold cases that will be assigned to Early Shift Violent Crimes Squads.

Your assigned case will be M2991 (Complt #94-91653). Victim-Debra NMN MANIECE, B/F, 31 yoa, D.O.B. of 10/26/63. MANIECE's body was discovered on the rear inner stairway of the vacant building located at 1929 A N. 12th St., on 11-20-94 at 10:15AM. MANIECE had a documented history of cocaine dependency and drug related prostitution (otherwise known as "dope dating"). The autopsy of Ms. MANIECE revealed that she died as a result of blunt force trauma to the head MANIECE was killed during a time when several other females with similar lifestyles were found murdered in or around vacant buildings. No definitive relationship between MANIECE's homicide and the others has been established.

In late 1995 and early 1996 a re-examination of a number of un-cleared homicides of females in the City of Milwaukee was conducted. I participated in that re-examination and was specifically responsible for collaborating with asst. D.A. Norm GAHN and also the State Crime Lab RE: DNA transmittals connected to the aforementioned cases. The MANIECE case was included in the re-examination.

On July 18th, 2001, the Wisconsin State Crime Lab sent our Department a lab report (lab case #94-3809), which stated that Kelvin D. STRONG is the source of the following Blood Evidence:

1. Bloodstained Chicago Cubs (White Sox) T-shirt worn by victim (Item 12C).
2. Victim's shoe located in an adjoining room where victim was found (Item P).
3. Bobby Brown T-shirt (Item J2) – STRONG's blood and victim's blood are co-mingled.

Further investigation revealed that STRONG was serving a prison sentence of essentially 70 years after being convicted of Armed Robbery and First Degree Sexual Assault (2 counts).

On 6/6/01, Detective BUSCHMANN and WESOLOWSKI interviewed STRONG at Whiteville prison in Tennessee (as a Wisconsin prisoner) and STRONG denied knowing or killing MANIECE and he had no explanation for his blood being on this victim's body.

After the aforementioned interview, A.D.A. Mark WILLIAMS conducted a prosecutorial review of Kelvin STRONG's involvement in the MANIECE homicide and he declined to prosecute solely based upon the DNA hit. Your responsibility in this case will be to conduct further investigation into this case with an emphasis placed on Kelvin STRONG, who should be considered the prime suspect. Things to be taken into account are as fol **CONFIDENTIAL** **OTT 003093**

**Prior History of violent attacks on female victims:**

On 9-8-74 at 3208 N. Bremen St., STRONG attacked a Mrs. Diana H. ROBILLARD, 7/26/18 (81 yoa) on the street. ROBILLARD was knocked to the ground and STRONG snatched her purse from her.

On 10-21-74 at North 6th Street and West Concordia Ave., STRONG approached Mrs. Vivian D. KOSTRVEWA, 2/21/27 (47 yoa) and displayed a 6" bladed knife. STRONG demanded and obtained KOSTRVEWA's purse, while threatening to kill her.

On 10-29-74 while wielding a toy gun, STRONG approached Patricia A. DANIELS, 11/24/33 (40 yoa) outside of her residence and announced a robbery. STRONG stated, "Give me your money or you're dead". STRONG obtained 50 cents, which was all that the victim had.

On 12-3-74 at the store located at 3353 N. Green Bay Ave., STRONG approached Mrs. Neil GILBERT, female, 5/3/30, while armed with a long sharp object. STRONG put the sharp object to Mrs. GILBERT's neck and stated, "I just want your money, I just want your purse, give it up". STRONG obtained GILBERT's purse, which contained 23 dollars.

STRONG was arrested and convicted of these offenses in early 1975 and was sent to Green Bay Reformatory on a mixture of 15 year, 10 year, and 5 year sentences. It should be noted that STRONG was 17 years old at the time of the four aforementioned crimes. Prior to those crimes, STRONG had been adjudicated delinquent in 3 similar type offenses, which are as follows:

1). 5/22/73 – Theft From Person (Purse Snatching) – County Supervision
2). 6/19/73 – Theft From Person (Purse Snatching) – Supervision by Milwaukee County
3). 8/07/73 – Strong Armed Robbery – Found guilty by Children's Court & placed in Kettle Moraine's school for boys.

The 8 page pre-sentence report prepared on 2-28-75 by Probation & Parole Eileen RUECHEL is very telling with respect to STRONG's deviant behavior. On page 3, in the paragraph entitled "Offender's Attitude Towards Offense", RUECHEL wrote in part, "Kelvin STRONG does not appear to be remorseful, but is concerned about the consequences he has to pay." *"When asked how he felt about the people he robbed, Kelvin stated, 'When I was robbing them, I had no consideration for them people. I felt they had it (money) and I needed it'".*

On page 7, in the paragraph entitled "Drugs", RUECHEL wrote, *"Kelvin stated that he has experimented with marijuana. He stated that he used it every now and then. He further indicated that he would go a month or so without it. He said he did not like marijuana that much because it makes him mad. He said, 'girls tell me that I act crazy.' Kelvin denied using amphetamines, heroin, cocaine or other drugs".*

On page 8, in the paragraph entitled, "Agents Impressions", RUECHEL wrote, *"Kelvin STRONG appears to be a 17 year old black male whose origins from one parent inner city family and whose associations with delinquent peers has culminated in deviant behavioral patterns of stealing money. He appears to have little or no concern for the fears his victim felt and little or no concern over taking their property. Kelvin impresses me as being a dangerous person capable of violent, aggressive acts. Kelvin appears to be a hedonistic and immature young man. He jokes and at times is too playful when he should be serious. His desire for immediate gratification and pleasure which takes such forms as wanting to "party" and wanting expensive clothes without having to work toward these ends has resulted in his present situation."*

CONFIDENTIAL

OTT 003094

Lapham Park and 21st and Walnut. It should be noted that the western edge of the Lapham Park housing development is just four blocks from the vacant building where MANIECE's body was found. 1929 A N. 12th St. is just 0.5 miles from the now vacant apartment building where STRONG sexually assaulted Rita WILLIAMS. 1929 A N. 12th St. is just 0.9 miles away from the intersection of 21st and Walnut. I think that if you could obtain an aerial photo of this area from the Dept. of Transportation, you would get an appreciation for the closeness in proximity that these locations are to one another.

### Suggestions on how to proceed:

1.) Carefully examine the crime scene and morgue photos (8x10's) that I have ordered for you. Take note of MANIECE's partially nude body, which is in a contorted, and sexually degrading position. What immediately struck me when I recently saw these photos again was how MANIECE's rear end was prominent to an observer. (Remember that the rear entry (vaginally) position was favored by STRONG in the WILLIAMS and CAMPBELL assaults). This preferred sexual intercourse position, similarity was pointed out by the State Court of Appeals in 1997 and also by Circuit Court Judge Patricia MCMAHON in 1995, when she ordered the joinder of the CAMPBELL and WILLIAMS cases. Also, the Court of Appeals took notice of the relatively short time interval between the CAMPBELL and WILLIAMS cases.

2.) Read the entire M-File (#2991) and also read the entire Sexual Assault investigative reports involving Mia CAMPBELL and Rita WILLIAMS (I have provided copies of these reports for you). Be sure that you are conversant with all of the important facts of the MANIECE case (i.e. victim's personal history, cause of death, homicide scene, physical evidence, witness statements, etc.)

3.) Meet and discuss this case with Detectives Carl BUSCHMANN and Michael WESOLOWSKI, who met with suspect Kelvin STRONG and interviewed him RE: his blood being found on Debra MANIECE's deceased body. (Note: Detective WESOLOWSKI conducted the original homicide scene investigation.)

4.) Meet and discuss the Sexual Assault cases with Captain Darlene JENKINS, who was one of the lead investigators.

5.) Meet and discuss this case with Asst. D.A. Gale SHELTON, who prosecuted STRONG RE: the WILLIAMS and CAMPBELL Sexual Assaults and Robberies. A.D.A. SHELTON has a vivid recollection of this case and she stated that she would lend any assistance she can in this matter. SHELTON further stated that STRONG was convicted (In WILLIAMS & CAMPBELL cases) after a stipulated court trial where several charges were dismissed and where STRONG requested that evidence be read into the court transcript from reports in lieu of live witnesses. STRONG knew that he would probably be convicted of the remaining charges, but the fact that there was a trial preserved his appellate rights (If he plead guilty – most appeal issues would be lost). Originally STRONG thought that he had a decent appeal issue, which involved the inadvertent destruction of Sexual Assault evidence by a MPD Detective. STRONG eventually appealed on the issue of the joinder of the CAMPBELL & WILLIAMS offenses.

6). Meet and discuss this case with Lt. John ANDREWS, who as a Detective (8-6-93) investigated an Armed Robbery offense (Complt #93-219-0034). Victim-Patsy A. JOHNSON, B/F, 4/3/51, of 2824 N. 44th St., reported being accosted on the street, a shiny object placed against her side and subsequently robbed. Kelvin STRONG was arrested in that offense but for some reason not formally charged by the District Attorney's office.

7). Contact retired MPD Captain Vincent VITALE, who is the Dean of MATC's Police Science Program. Also, VITALE is Detective BUREMS former Homicide Unit supervisor. VITALE was the lead investigator in two homicide related DNA cases (Victims: Eugene MCCOY, W/M, 8-28-28, of 938 S. Layton Blvd. #5A, M2009, 12/22/87, and Ruth BRESNAHAN, W/F, 4-4-04, of 3938 W. Fairmount, M2014, 1/4/88). Those cases, which were committed by the convicted actor, have some investigative similarities (relative to recovered DNA) to the MANIECE case and VITALE may be able to offer some helpful suggestions.

8). Familiarize yourselves with the concepts of "Whitty Evidence" as those concepts should be applied in the MANIECE investigation, to the greatest extent possible. It is very obvious that STRONG has a predilection for violent attacks on women, and we have at our disposal "living victims", who can provide first hand testimony as to STRONG's violent tendencies.

9). Utilize Probation & Parole records on STRONG, which may contain information which is helpful to your investigation.

10). Revisit scenes if possible (Note: 1929 A N. 12th St., the vacant building where MANIECE was found has been demolished, now there is a vacant lot there).

11). Familiarize yourselves with the attached Departmental Memorandum (RE: Cold-Case Unit, authored by Lt. David ZIBOLSKI, dated 2/14/04). Please adhere to the parameters RE: follow-up.

12). Keep Lt. SPINGOLA, Lt. JESSUP, and myself advised RE: the progress of this investigation. Assignment of this case does not relieve you of your regular Violent Crimes Squad duties. You are expected to complete regular assignment follow-up. You are to work on this case during your unobligated times.

CC:   D/C O'KEEFE
      Capt. BURKEE
      Capt. JENKINS
      Lt. SPINGOLA
      Lt. JESSUP
      Lt. RUZINSKI
      Lt. WELCH
      Lt. KLABUNDE
      Lt. PIERCE

**CONFIDENTIAL**   **OTT 003096**

# MILWAUKEE POLICE DEPARTMENT

Criminal Investigation Bureau, early shift (92)
Tuesday, October 4, 2005

REPORT

**In the Matter of: Request for Assistance from the FBI's National Center for the Analysis of Violent Crimes**

To: Eric J. MOORE

Captain of Police

Sir,

This report is being dictated by Detective Ricky BUREMS, assigned to the Criminal Investigation Bureau, early shift.

During the past year-and-a-half, we, Detectives Ricky BUREMS and Diedra COLE, of Squad 114, have been conducting investigation into the homicide (blunt-force trauma) of Debra MANIECE (B/F, DOB: 10/26/1963) (homicide case #M2991, offense report #94-91653). MANIECE's body had been discovered in a vacant building at 1929A North 12th Street on November 29, 1994. Due to advancements in DNA-typing technology, a suspect, Kelvin D. STRONG (B/M, DOB: 04/29/1957), has been identified. STRONG's blood was found to be mixed with MANIECE's blood on the shirts that she had been wearing at the time that her body was discovered, and also in a shoe which was recovered in another part of the crime scene.

STRONG is currently incarcerated at the Fox Lake Correctional Institution as a result of convictions for two sexual assaults that occurred both prior to and after the homicide of MANIECE. The first sexual assault was that of a Mia C. CAMPBELL (B/F, DOB: 12/27/1965) (offense report #94-198-0053), and the second was that of a Rita WILLIAMS (B/F, DOB: 01/18/1960) (offense report #95-058-0248).

Assistant District Attorney Mark WILLIAMS is currently reviewing this case, and in regards to the implication of Kelvin STRONG as the suspect, A.D.A. WILLIAMS suggests that a list of similarities between the sexual assaults of Mia CAMPBELL and Rita WILLIAMS and the homicide of Debra

**CONFIDENTIAL** **OTT 003097**

MANIECE be compiled. We, Detectives BUREMS and COLE, did observe obvious similarities, such as the geographical locations of the incidents (which had all occurred within a two-mile radius), the physical builds of the victims (all of whom were petite), and the lifestyles of the victims (who were all crack cocaine users and involved in prostitution-related activities). It should be noted that STRONG also has a history of predatory behavior towards women that dates back to his teenage years.

In order to further fortify this case, we, Detectives BUREMS and COLE, are asking for permission to seek assistance from the FBI's National Center for the Analysis of Violent Crimes in developing a post-suspect-identification behavioral analysis of Kelvin STRONG. An analyst at the Center informed us that they could assist us in the following areas of our investigation:

1. Expert testimony regarding the violent behavior of the suspect.
2. Establishing signature characteristics for related crimes.
3. Assistance to the prosecutors regarding prosecution strategies.
4. The interrogation of the suspect.

The analyst further informed us that a behavioral analyst from the FBI could come to the law enforcement agency to confer with investigators and prosecutors, or that investigators and prosecutors could travel to Quantico, Virginia, for the required assistance. All that is required to initiate this process is that an assistance request be made to FBI agent Matt GIBSON of the FBI's Milwaukee Office, who is the Center's liaison for Southeastern Wisconsin.

We believe that the MANIECE case would greatly benefit from the input of the FBI's National Center for the Analysis of Violent Crimes.

Respectfully submitted,

Ricky S. BUREMS
Detective
Payroll 50519, Peoplesoft 003558
Criminal Investigation Bureau, early shift

Diedra Y. COLE
Detective
Payroll 65148, Peoplesoft 010988
Criminal Investigation Bureau, early shift

B:jwk  10/04/2005

Victim:    TREBING, Darbie Leigh w/f 1-25-66 of
           1348 N. 40 Street

Occurred:  In victim's home, 1348 N. 40 street, victim
           found on Monday, 4-16-90 at 10:55 AM

Suspect:

Victim was ████████████████████████████████████

"VERONICA" TREBING

Hm (314) ███████████

*CELL (314) ███████████

WK (314) ███████████

St Louis, Missouri

Gone to Fla. 1st or 2nd week
of Sept. or Oct.

**CONFIDENTIAL**     **OTT 00310**



STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

IN THE MATTER OF A
JOHN DOE PROCEEDING
COMMENCED ON MAY 6, 2005

FILED
JUN - 9 2005

ORDER TO PRODUCE

WHEREAS it has been determined that Kelvin Dewayne Strong, DOB 05/29/1957, will be a witness in the John Doe proceeding and it is necessary to call Kelvin Dewayne Strong, DOB 05/29/1957, as a witness in the John Doe. It is ordered that Kelvin Strong be produced from the Dodge Correctional Institution and must be produced for said testimony.

IT IS HEREBY ORDERED that the superintendent of the Dodge Correctional Institution who has physical custody of the named Kelvin Strong make available to the Chief of Police of the Milwaukee Police Department or her designee the above-named inmate, Kelvin Strong, and that the Chief of Police of the Milwaukee Police Department or her designee convey that inmate to Milwaukee for the purposes of being called in the John Doe proceeding.

IT IS FURTHER ORDERED that the Chief of Police of the Milwaukee Police Department or her designee, return the above-named inmate to the above institution at the conclusion of that proceeding.

IT IS FURTHER ORDERED that pursuant to this order to produce that the Milwaukee Police Department be permitted to interview Kelvin Dewayne Strong prior to being called at the John Doe proceeding in order to determine his position as to testimony and what testimony if any Kelvin Strong will render at the John Doe proceeding. This Court orders that this interrogation will also be for the purpose of determining whether Kelvin Strong will be a target of the John Doe proceeding into the death of Debra Maniece.

Dated at Milwaukee, Wisconsin this 9th day of _June_ , 2005.

Hon. William Brash
Circuit Court Judge, Branch 21
Milwaukee County, Wisconsin

**CONFIDENTIAL**     **OTT 003101**

# MILWAUKEE POLICE DEPARTMENT
## OUT—OF—TOWN REPORT

O: DEPUTY CHIEF OF POLICE
CRIMINAL INVESTIGATION BUREAU

MONDAY, FEBRUARY 13, 20 06

I AM
WE ARE    LEAVING THE CITY AT _____ 8:00 ____ A.M.  ON __THURS__ / __FEBRUARY__ / __16__ / 2006
                                                        DAY          MONTH        DATE

ESTINATION: __St. Louis, Missouri__ _____
                    CITY              STATE              JURISDICTION (PD, SHF, ETC.)

A: ____ DEPARTMENT VEHICLE _____
        (DEPARTMENT VEHICLE - AIRLINE - BUS - RAILROAD)

RETURN
INTERVIEW,
TESTIFY IN THE CASE OF __Family of Homicide Victim Darbie Trebing M2247__
                                   NAME                                    D.O.B.

B AT: __2434 Walton Rd, St Louis Missouri__ _____
         ADDRESS                            CITY & STATE OR INSTITUTION

ED FOR
PECTED OF: __Re: DNA Hit for Suspect__ ████████████████
                    CHARGE(S)   __DNA Grant  CS331060500__WARRANT NUMBER

AUTHORIZED BY:   DEPUTY / ASSISTANT D / A: _____

          DEPARTMENT AUTHORITY: __Lt William Jessup__

DVANCES: $ _____

TY ADVANCES: $ _____

          __Randolph Miller__          DETECTIVE
              NAME                        RANK

**CONFIDENTIAL**          **OTT 003102**

Victim:    TREBING, Darbie Leigh wf 1-25-66 of
           1348 N. 40 Street

Occurred:  In victim's home, 1348 N. 40 street, victim
           found on Monday, 4-16-90 at 10:55 AM

Suspect:

Victim was ███████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

"VERONICA" TREBING

Hm (314) ████████████

*CELL (314) ████████████

WK (314) ████████████

ST LOUIS, MISSOURI

GONE TO FLA. 1ST OR 2ND WEEK
OF SEPT. OR OCT.

**CONFIDENTIAL**      **OTT 00**

GRANT F. LANGLEY
City Attorney

RUDOLPH M. KONRAD
LINDA ULISS BURKE
VINCENT D. MOSCHELLA
Deputy City Attorneys



**CITY OF MILWAUKEE**
**Office of the City Attorney**

THOMAS O. GARTNER
BRUCE D. SCHRIMPF
ROXANE L. CRAWFORD
SUSAN D. BICKERT
STUART S. MUKAMAL
THOMAS J. BEAMISH
MAURITA F. HOUREN
JOHN J. HEINEN
MICHAEL G. TOBIN
DAVID J. STANOSZ
SUSAN E. LAPPEN
JAN A. SMOKOWICZ
PATRICIA A. FRICKER
HEIDI WICK SPOERL
KURT A. BEHLING
GREGG C. HAGOPIAN
ELLEN H. TANGEN
MELANIE R. SWANK
JAY A. UNORA
DONALD L. SCHRIEFER
EDWARD M. EHRLICH
LEONARD A. TOKUS
VINCENT J. BOBOT
MIRIAM R. HORWITZ
MARYNELL REGAN
G. O'SULLIVAN-CROWLEY
KATHRYN M. ZALEWSKI
MEGAN T. CRUMP
ELOISA DE LEÓN
ADAM B. STEPHENS
KEVIN P. SULLIVAN
Assistant City Attorneys

August 17, 2006

James Drinan
Equal Rights Officer
Department of Workforce Development - ERD
819 North 6th Street, Room 255
Milwaukee, WI 53203

    Re:    Cole, Diedra Y. v. Milwaukee Police Department
            Case No. CR200601055
            Burems, Ricky S. v. Milwaukee Police Department
            Case No. CR200601056

Dear Mr. Drinan:

I am responding to both of the above captioned matters together because they are based on the same events. Two copies are enclosed for your convenience in filing this response in each file.

This is in response to your letter of July 25, 2006 requesting a copy of the information that has been submitted to the EEOC during their investigation of these complaints.

Enclosed are copies of my position statement dated April 24, 2006 with exhibits, as well as a follow up submission dated May 31, 2006 and its attachments.

Please feel free to contact me if you need anything further.

Very truly yours,

Miriam R. Horwitz
Assistant City Attorney
Enc.
MRH/mrh
1032-2006-1071.001

**GRANT F. LANGLEY**
City Attorney

**RUDOLPH M. KONRAD**
**PATRICK B. McDONNELL**
**LINDA ULISS BURKE**
Deputy City Attorneys



THOMAS O. GARTNER
BRUCE D. SCHRIMPF
ROXANE L. CRAWFORD
SUSAN D. BICKERT
HAZEL MOSLEY
STUART S. MUKAMAL
THOMAS J. BEAMISH
MAURITA F. HOUREN
JOHN J. HEINEN
MICHAEL G. TOBIN
DAVID J. STANOSZ
SUSAN E. LAPPEN
JAN A. SMOKOWICZ
PATRICIA A. FRICKER
HEIDI WICK SPOERL
KURT A. BEHLING
GREGG C. HAGOPIAN
ELLEN H. TANGEN
MELANIE R. SWANK
JAY A. UNORA
DONALD L. SCHRIEFER
EDWARD M. EHRLICH
LEONARD A. TOKUS
VINCENT J. BOBOT
MIRIAM R. HORWITZ
MARYNELL REGAN
G. O'SULLIVAN-CROWLEY
KATHRYN M. ZALEWSKI
MEGAN T. CRUMP
ELOISA DE LEÓN
ADAM B. STEPHENS
KEVIN P. SULLIVAN
VINCENT D. MOSCHELLA
Assistant City Attorneys

May 31, 2006

Ms. Monica Loser
Equal Employment Opportunity Commission
310 West Wisconsin Avenue, Suite 800
Milwaukee, WI 53203-2292                    <u>Via Fax and Mail</u>

Re:    Burems, Ricky v. Milwaukee Police Department
       EEOC Charge No. 443-2006-00865
       Cole, Diedra v. Milwaukee Police Department
       EEOC Charge No. 443-2006-00861

Dear Ms. Loser:

By email, you asked whether or not the original homicide involved in this case occurred in 1990 or 1994, and then further, the identity of the detectives who were originally assigned to investigate the homicide. I asked the Professional Performance Division to review the homicide investigation file for a timeline to see who had been assigned at various times. I learned that several detectives have been assigned over time. Enclosed is a memo dated May 30, 2006 that identifies the detectives and the time periods based on written reports in the department file. Note, however, that the memo does not reflect follow up investigative work by detectives that did not result in a written report to the file.

On the question of the dates (1990 v. 1994), I see that my letter to you of April 24, 2006 stated 1990, based on the report by P. O. Klemstein (dated April 12, 2006) in which she noted that Lieutenant Jessup stated the homicide occurred "approximately around the year 1990." November 20, 1994 is the exact date the homicide occurred.

My letter reported that Detective Bushman was originally assigned, and the department file reflects that he was, along with other detectives: Michael Weslolowski, Gordan Bradley and Michael Valuch. In addition, in April and November 2001 Detectives Wesolowski and Buschmann provided follow up in regard to new information on a DNA match. Detective Wesolowski had retired by the time the Assistant District Attorney wished to meet with the victim's family in 2006. Thus, it is my understanding that the

**CONFIDENTIAL**
OFFICE OF THE CITY ATTORNEY

**OTT 003105**

Milwaukee City Hall Suite 800 • 200 East Wells Street • Milwaukee, Wisconsin 53202-3551 • Telephone: 414 286 2601 • TDD: 414 286 2025 • Fax: 414 286 2550

Assistant District Attorney requested Detective Bushmann's participation at the meeting in question.

Please feel free to contact me with any additional questions. If you can provide me with any further information on the additional meeting the charging parties alluded to in their charges, let me know. I note that our information to date is that there was no meeting on February 24, 2006. If the charging parties can identify where that meeting took place, and who may have been involved, I can check further.

Very truly yours,

Miriam R. Horwitz
Assistant City Attorney
Enc.
MRH/mrh
1032-2006-1070

**CONFIDENTIAL**           **OTT 003106**

# MILWAUKEE POLICE DEPARTMENT

Professional Performance Division

**REPORT**                                           May 30, 2006

In the Matter Of: EEOC NO.: 443-2006-00865 and 443-2006-00861
              COMPLAINANT: RICKY BUREMS and DIEDRA COLE


To:    Mary K. HOERIG
       Captain of Police

**Ma'am:**

This report is written by P.O. Dena KLEMSTEIN, assigned to the Professional Performance Division, day shift. The following is intended to provide a basic timeline of the investigation and is only based upon reports found in the Milwaukee Police Department file. This does not reflect any follow up that may have been conducted that did not result in a report filed.

Homicide Occurred: November 20, 1994

    -Detectives that were first sent to this investigation:
      Detective Michael Wesolowski
      Detective Gordan Bradley
      (These detectives have retired and were retired at the time of the March 6, 2006 meeting).

    -Detective Carl Buschmann and Detective Michael Valuch also responded to this homicide on November 20, 1994 and assisted with the investigation.

    -Based on supplemental reports found in the file, the following detectives conducted follow up on this case:
      07-13-97   Detective William Jessup
      08-11-97   Detective Cameo Barbian Gayan
      01-14-98   Detective James Devalkenaere
                 Detective Kenneth Morrow
      01-14-98   Detective Steven Fyfe
                 Detective Larry Devalkenaere

**CONFIDENTIAL**          **OTT 003107**

-On 04-27-01 Dirk Janssen, head Serologist at the Wisconsin Crime Lab located in Milwaukee notified the Department of a DNA match. Detective Weslowski and Detective Buschmann handled the follow up regarding this information.

-The file reflects that on 11-14-01, a Clearance Report was filed by Detective Wesolowski and Detective Buschmann.

-Based on supplemental reports found in the file, Detective Burems and Detective Cole conducted follow up on 02-05-05, 02-07-05, 05-18-05 and 7-29-05.

Respectfully submitted,

P.O. Dena Klemstein

Dena KLEMSTEIN, #008843
Police Officer
Professional Performance Division

**CONFIDENTIAL**          **OTT 003108**

# MILWAUKEE POLICE DEPARTMENT

### Professional Performance Division

R E P O R T                                                      April 13, 2006

In the Matter Of: INTERVIEW OF:
ASSISTANT DISTRICT ATTORNY MARK WILLIAMS
EEOC NO.: 443-2006-00865 and 443-2006-00861
COMPLAINANT: RICKY BUREMS and DIEDRA COLE

To:   Mary K. HOERIG
Captain of Police

Ma'am:

This report is written by Police Officer Dena KLEMSTEIN, assigned to the
Professional Performance Division, day shift. On April 12, 2006, at 1:45 p.m., Police
Officer Jesse BENITEZ, and I interviewed Assistant District Attorney Mark Williams
relevant to this complaint. This interview was conducted on the sixth floor of the
Safety Building.

ADA Mark WILLIAMS stated that he was very familiar with the homicide case as
referenced in Detective Ricky BUREMS and Detective Dedria COLE's complaint. He
stated that he has been working with these detectives on this case and that they had
assisted with the John Doe investigation. ADA WILLIAMS stated that he does not have
any complaints regarding their work performance and in fact believes to have an
excellent working relationship with Detective BUREMS as they have worked on several
cases together over the past several years.

ADA WILLIAMS does not recall a meeting on February 24, 2006. He is aware of the
meeting on March 6, 2006 as referenced in this complaint. This meeting was held at the
request of the victim's family, who wished to address concerns regarding the District
Attorney's decision not to charge a particular suspect in the case. ADA WILLIAMS
stated that he had contacted Lieutenant of Detectives JESSUP of the Criminal
Investigation Bureau to request that Detective Carl BUSCHMANN attend this meeting.
ADA WILLIAMS stated that due to the fact Detective BUSCHMANN was the original
investigator, he specifically requested that he attend this meeting.

In addition, ADA WILLIAMS requested the attendance of Detective William STAWICKI
to this meeting. ADA WILLIAMS explained that he requested his presence due to his
extensive knowledge of the suspect's background.

He stated that he at no time was Detective BUREMS and Detective COLE intentionally
excluded from this meeting. ADA WILLIAMS related that Detective COLE arrived at the
meeting and that she advised him that Detective BUREMS would also be attending,
however, he never arrived. ADA WILLIAMS is unaware of how Detective COLE was
advised of the meeting.

**CONFIDENTIAL**           **OTT 003109**

ADA WILLIAMS stated that he was never aware that Detective BUREMS and Detective COLE were upset about the request for Detective BUSCHMANN to attend this meeting. ADA WILLIAMS stated that Detective BUREMS and Detective COLE had different opinions than that of the District Attorney's Office in regards to whether charges should be issued. However, their different opinions never rose to any level of concern as it relates to their working relationship.

ADA WILLIAMS stated that he recently met with Detective BUREMS and Detective COLE regarding follow up work that they are in the progress of conducting and anticipates that they will be meeting again soon.

Respectfully submitted,

*P.O. Dena Klemstein*

Dena M. KLEMSTEIN
Police Officer
Professional Performance Division

# MILWAUKEE POLICE DEPARTMENT

### Professional Performance Division

**R E P O R T**                                      April 12, 2006

In the Matter Of: INTERVIEW OF:
LIEUTENANT OF DETECTIVES WILLIAM JESSUP
EEOC NO.: 443-2006-00865 and 443-2006-00861
COMPLAINANT: RICKY BUREMS and DIEDRA COLE

To:    Mary K. HOERIG
       Captain of Police

Ma'am:

This report is written by Police Officer Dena KLEMSTEIN, assigned to the
Professional Performance Division, day shift. On April 11, 2006, at 1:15 p.m., Police
Officer Jesse BENITEZ, and I interviewed Lieutenant of Detectives William JESSUP
relevant to this complaint. This interview was conducted on the fourth floor of the
Police Administration Building. Lieutenant JESSUP was briefed as to the content of
the complaint filed by Detective Ricky BUREMS and Detective Diedra COLE.

Lieutenant JESSUP related that he was in fact familiar with the investigation
referenced the complaint filed. He stated that this was a homicide investigation
involving a sexual assault. This homicide occurred approximately around the year of
1990 and Detective Carl BUSCHMANN was the original lead investigator assigned to
the case. Over time, this investigation ultimately resulted in a cold case.

Lieutenant JESSUP further stated that in 2003 or 2004, DNA recovered from the
victim resulted in a match to a subject that was incarcerated. Lieutenant JESSUP
stated that Captain Eric MOORE made the decision to assign the follow up regarding
this new information to Detective Ricky BUREMS and Detective Diedra COLE.
Detective COLE was a newly promoted detective and Captain MOORE felt that the
assignment of this follow up would assist in providing experience for Detective
COLE. Detective COLE and Detective BUREMS were partners at this time,
assigned to the Violent Crimes Unit, early shift. Lieutenant JESSUP stated that
Detective BUREMS and Detective COLE have been working on this case for the last
two years.

As Lieutenant JESSUP explained, the Milwaukee Police Department's Criminal
Investigation Bureau does not exclusively assign cases to detectives. Rather, there
may be a lead detective assigned to the case, however, if the Department would
receive additional information or require follow up on a case, that assignment could
be given to any detective on any shift. Lieutenant JESSUP further explained that
when a detective is exclusively assigned to a case, as in some other police agencies,
it does not allow for the case to be investigated when that particular detective is on
vacation or on his or her regular off days. Therefore, by assigning detectives, who

may not necessarily be the lead detective on the case, follow up or assignments regarding a particular case, it allows the Department, if need be, to investigate a case 24 hours a day.

This follow up is usually assigned according to the needs of the Department, it may be determined by the shift most appropriate for the follow up to be conducted or simply based upon who may be available at the time the assignment is received by the Department.

Lieutenant JESSUP stated that on March 3, 2006, he received a call from ADA Mark WILLIAMS requesting Detective Carl BUSCHMANN to attend a meeting on Monday, March 6, 2006. Lieutenant JESSUP stated that since Detective BUSCHMANN was the original investigator, worked day shift and was specifically requested by the District Attorney's Office, he approached Detective BUSCHMANN and requested that he attend this meeting. Detective BUSCHMANN advised Lieutenant JESSUP that he was unsure if he would be available to attend this meeting. Lieutenant JESSUP then requested that Detective Louis JOHNSON, who also worked day shift, attend this meeting. Due to Detective JOHNSON involvement in another trial, he was also unable to attend. Detective BUSCHMANN then advised Lieutenant JESSUP that he would indeed be available on that day and would attend the meeting.

Lieutenant JESSUP stated that he made no attempt to intentionally exclude Detective BUREMS or Detective COLE from this meeting. Lieutenant JESSUP further stated that race was not a factor in his decision to assign the attendance of this meeting to Detective BUSCHMANN. In fact, Detective Louis JOHNSON, who he requested attend the meeting when advised that BUSCHMANN could not attend, is a black male. Lieutenant JESSUP stated that he did not have any complaints in regards to Detective BUREMS or Detective COLE's work performance.

Lieutenant JESSUP also stated that he was never aware that Detective BUREMS or Detective COLE were upset that they were not requested to attend the meeting. It was only because of this interview that he was made aware of any concerns regarding the attendance to the meeting.

Lieutenant JESSUP also related that he was advised Detective COLE did in fact attend the meeting on March 6, 2006. He was not aware of how Detective COLE was advised of the meeting, or exactly how her involvement in the meeting came about. Detective BUREMS or Detective COLE never approached him regarding this matter. To his knowledge, Detective BUREMS and Detective COLE never made a complaint to any supervisor regarding this situation.

It was explained to Lieutenant JESSUP that Detective BUREMS and Detective COLE reported that there was an additional meeting on February 24, 2006, and that they were not advised of this meeting. Lieutenant JESSUP does not recall any other meetings that Detective BUREMS and Detective COLE were not advised of.

Lieutenant JESSUP stated that Detective BUREMS is no longer partners with Detective Cole, as he has now been assigned to the day shift. He further stated that, to his knowledge, neither detective has ever been advised that they are not allowed to work on this case and believes that one or both detectives are still actively conducting follow up regarding the case.

Respectfully submitted,

P.O. Dena Klemstein

Dena M. KLEMSTEIN
Police Officer
Professional Performance Division

**CONFIDENTIAL**        **OTT 003113**

# MILWAUKEE POLICE DEPARTMENT

Professional Performance Division

REPORT

April 17, 2006

In the Matter Of: INTERVIEW OF: DETECTIVE CARL BUSCHMANN
EEOC NO.: 443-2006-00865 and 443-2006-00861
COMPLAINANT: RICKY BUREMS and DIEDRA COLE

To: Mary K. HOERIG
Captain of Police

Ma'am:

This report is written by P.O. Jesse BENITEZ, assigned to the Professional Performance Division, day shift. On April 11, 2006, I, P.O. BENITEZ, interviewed Detective Carl BUSCHMANN relative to this complaint. The interview was held on the first floor of the Police Training Academy.

Detective BUSCHMANN stated that he was informed by Lieutenant of Detectives William JESSUP to attend a meeting with Assistant District Attorney Mark WILLIAMS. This meeting was held at the Career Youth Development Center, 2601 N. M.L.K. Drive. This meeting was with the family of a homicide victim in which the crime occurred in 1990. Detective BUSCHMANN was the lead detective at the time of the crime. Detective BUSCHMANN related that at no time did Detective BUREMS or Detective COLE complain to him about not being advised of this meeting. Detective BUSCHMANN attended the meeting as he was instructed and stated that Detective COLE also attended this meeting. Detective BUSCHMANN is unaware of a February 24, 2006 meeting.

Respectfully submitted,

*P.O. Jesse B...*

Jesse BENITEZ
Police Officer
Professional Performance Division

**CONFIDENTIAL        OTT 003114**